## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KEITH ALLEN, M21830,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **ROB JEFFREYS,** | ) |
| **WEXFORD HEALTH SOURCES, INC.,** | ) |
| **ANTHONY WILLS,** | ) |
| **DeANNA KINK,** | ) |
| **ANGELA CRAIN,** | ) |
| **J. CRANE,** | )   **Case No. 23-cv-3775-DWD** |
| **ALISA DEARMOND,** | ) |
| **NICOLE BRAND,** | ) |
| **M. MOLDENHAUER,** | ) |
| **N. FLORENCE,** | ) |
| **N. YOUSUF,** | ) |
| **CLARA RICHMOND,** | ) |
| **KELLY PIERCE,** | ) |
| **NURSE REVA,** | ) |
| **NURSE SUZIE,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Keith Allen, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Menard Correctional Center (Menard), brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. (Doc. 1). Plaintiff's 158-page complaint focuses entirely on a hand injury he sustained on August 16, 2021, and his subsequent efforts to seek care to treat his injury and to alleviate

his pain.  He seeks compensatory and injunctive relief and has also moved to certify a class action on behalf of all inmate's currently incarcerated in IDOC (Doc. 2).

Plaintiff's Complaint (Doc. 1) is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A.  Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims.  *See* 28 U.S.C. § 1915A(a)-(b). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed.  28 U.S.C. § 1915A(b).  At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed.  *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

## The Complaint

Plaintiff's complaint is verbose and redundant.  It is 158-pages, accompanied by more than 400 pages of exhibits.  At many points throughout the complaint, Plaintiff quotes administrative directives and internal prison guidance at great length, directives that he also attached in full form as exhibits.  The Court will not recount the complaint in exhaustive detail here, but it did review the pleading in great detail, and it reviewed the exhibits with particular attention to grievances and medical documents.[1]  What follows is a brief recitation of key facts and actions sufficient for purposes of initial review.

---

[1] The Court notes that some of the exhibits appear to contradict allegations that Plaintiff makes in his complaint, and some of these contradictions are rather troublesome for purposes of the integrity of Plaintiff's pleading.  For example, in the opening paragraphs of his complaint, Plaintiff alleges that he sought medical care during cellhouse medication rounds on August 16, 2021, from Nurse Reva.  In the complaint he describes his hand as broken during a fight on August 16 while he was trying to defend himself.  However, when Plaintiff was seen in the medical unit on August 17, 2021, the nurse's notes indicate that he self-reported the cause of his injury as falling off his bunk bed at night.  (Doc. 1-1 at 23). Plaintiff also included a Disciplinary Report from September 15, 2021, at which point he was found guilty

Plaintiff alleges that on August 16, 2021, he severely injured his right hand while defending himself during an altercation with another inmate.  (Doc. 1 at 16).  That evening during medication rounds in segregation, Plaintiff caught the attention of Nurse Reva, he showed her his swollen hand, described his symptoms, and asked for care.  Nurse Reva refused all care and simply told him to file a sick call slip.  (*Id.* at 16-17).

On August 17, 2021, Plaintiff saw J. Crane, a nurse practitioner, at sick call for his hand injury.  His hand was swollen, painful and discolored, but Crane did not accurately record all of his symptoms, gave him an ice pack and ibuprofen and dismissed him.  Plaintiff saw Crane again on August 20, 2021, at which time she noted discoloration and put him in for an immediate x-ray.  Crane and Dearmond conducted the x-ray together and concluded that it showed no fracture or break.  An outside radiologist—Dr. Florence—concurred that there was no fracture or break.  Plaintiff was given Motrin, which Crane knew to be ineffective, and he was denied other care.

Plaintiff saw Crane again in August and had a second x-ray on August 31, 2021.  An "M.D. Review" of the second x-ray by Dr. N. Yousef produced a recommendation that he see an outside specialist.[2]  Crane ignored this recommendation.  (*Id.* at 26).  After

---

of assaulting another offender on August 16, 2021.  (Doc. 1-1 at 37).  In Plaintiff's first emergency grievance on his injury on October 15, 2021, he states that the "next day" after his injury he asked the nurse for pain pills.  (Doc. 1-1 at 39).  The Court also notes that in the October 15, 2021, grievance, Plaintiff spoke in a neutral tone about interactions with Defendants J. Crane and Dearmond during his x-rays, but later when he learned from the orthopedic specialist that he may have an old fracture, he then recharacterized Crane and Dearmond's behavior as "laughing" and joking about his condition (Doc. 1 at 20-21), and he accuses them of falsifying records.  Despite contradictions like these, the Court still read Plaintiff's complaint with broad deference and construed it in his favor.

[2] The actual x-ray report from N. Yusuf says, "if symptoms persist or progress, a follow-up study may be considered."  (Doc. 1-1 at 32).

the second x-ray, Dearmond prescribed Ibuprofen despite knowing it would be ineffective.  (*Id.* at 27).

Plaintiff saw Dearmond and Crane for a third x-ray September 14, 2021.  (Doc. 1 at 28).  Dr. Yousef noted mild soft swelling and other conditions and recommended a physician's appointment,[3] but Crane and Dearmond denied or delayed this and continued ineffective pain medicine.

Plaintiff also alleges that N. Yousuf misdiagnosed his x-ray on or around September 2, 2021, and then inconsistent with the misdiagnosis, on September 14 or 16, 2021, he noted mild degenerative changes and swelling.  Plaintiff further alleges N. Yousuf should have or did refer him to a specialist, but then never followed-up to ensure he was seen for further care.  (Doc. 1 at 33-41).

Plaintiff filed an emergency grievance on October 15, 2021, about his hand injury, and Warden Wills deemed it an emergency on October 21 and sent it to the grievance office for further expedited processing.  (Doc. 1-1 at 39-42).  Despite the grievance being deemed an emergency, and despite it being received, Defendant Kelly Pierce (a correctional counselor) never responded to it.  (Doc. 1 at 44).  On November 3, 2021, Plaintiff filed a 'supplemental grievance' because he had yet to receive a response to the emergency or to get follow-up care.  (Doc. 1-1 at 45-47).  The second grievance was rejected by Kelly Pierce as a duplicate of the earlier grievance.  (Doc. 1-1 at 50-51).  Plaintiff

---

[3] Dr. Yusuf's radiology report notes mild degenerative changes and swelling, but no acute fracture or dislocation. (Doc. 1-1 at 38).  He again suggests a follow-up study be "considered" if symptoms persist.  (Doc. 1-1 at 38).  The radiology report is also stamped as reviewed by an "M.D." on October 13, 2021.  This stamping has a notation to "see patient."

alleges that Pierce was made aware of his predicament by the grievances but failed to investigate or to render assistance.  (Doc. 1 at 54-59).  Plaintiff faulted both Wills and Pierce for turning a blind eye to the second grievance without verifying anything had been done in response to the first grievance.  (*Id.* at 54-66)

Plaintiff goes on at length about the failures of Allison Hargis and Sheila Ramsey to properly process or respond to his emergency grievances.  (Doc. 1 at 44-52).  Among other things, he alleges Ramsey and Hargis discriminated against him and acted to deprive black prisoners of adequate healthcare, in violation of multiple IDOC Directives, and without consideration for Wexford's own policies that support the provision of 24/7 emergency care.

On the topic of grievances, Plaintiff alleges that Deanna Kink and Rob Jeffreys further violated his rights when they received his emergency grievances in their roles with the Administrative Review Board and failed to act or turned a blind eye to his situation.  (Doc. 1 at 68-71).  He adds that these two, along with Wills and Pierce, discriminated against him in the handling of the grievance because the grievance form calls for an inmate's race, and he is black.  He further alleges black inmates receive worse grievance responses and worse medical care.  (Doc. 1 at 71-73).

On two occasions, Plaintiff saw Nurse Practitioner Moldenhauer concerning his hand injury.  (Doc. 1 at 74-83).  At the first visit on November 6, 2021, he alleges she simply continued medication and treatment that was ineffective despite three prior x-rays and multiple visits in 30 days, which he believed warranted escalating the issue to a

doctor or specialist.[4]   At the second visit on December 1, 2021, she changed his medication, deemed his issue an emergency, and referred him to an orthopedic specialist, but the specialist visit did not occur until February 8, 2022.  Plaintiff alleges the delay constituted deliberate indifference and caused unnecessary pain and suffering as well as permanent damage.

Plaintiff provides nearly 30-pages of allegations against healthcare unit administrator Angela Crain.  (Doc. 1 at 84).  Of importance for his Eighth Amendment claims, he alleges that Crain turned a blind-eye to his need for care in her handling of his emergency grievances in October and November of 2021.  He further alleges that when he was finally referred to an orthopedic specialist, Crain delayed the appointment up to two-and-a-half months by her delay in approving the referral for care.  Plaintiff raises many additional theories about Crain's responsibilities to oversee medical personnel, to implement procedures in the healthcare unit and the prison, and to comply with professional obligations, among other things, but the Court will not recite 30 pages of detailed allegations at length here.

Plaintiff then explains that after the specialist visit on February 8, 2022, he saw Dr. Glen Babich.  Dr. Babich diagnosed him with an old fracture, internal damage from improper handling, and carpal tunnel nerve damage syndrome.  (Doc. 1 at 113).  Dr. Babich offered carpal tunnel release nerve surgery, but Plaintiff declined because he believed it would make him vulnerable in a maximum-security violent prison.  Dr. Babich

---

[4] The visit note from November 6, 2021, is signed by a nurse with an illegible signature.  (Doc. 1-1 at 48).  However, the December 1, 2021, notes are clearly signed by M. Moldenhauer.  (Doc. 1-1 at 52).

also informed Plaintiff that not much could be done for the improperly healed fracture because it has not limited his range of motion, so surgery would not be an optimal option. (Doc. 1 at 113-14). These recommendations and findings are consistent with the notes from the orthopedic visit on February 8, 2022. (Doc. 1-1 at 61-64).

A week later, on February 15, 2022, Plaintiff filed an emergency grievance wherein he sought a second opinion as well as a standing prescription for 500mg of ibuprofen to manage his pain. (Doc. 1 at 114). Although Warden Wills deemed it an emergency, the grievance was ultimately denied after Crain reviewed his records and concluded that surgery was not recommended by the orthopedic specialist. (Doc. 1-1 at 69-72; 75). The grievance denial was affirmed by Defendants DeAnna Kink and Rob Jeffreys. (Doc. 1 at 114-115; Doc. 1-1 at 76). Ultimately, Plaintiff faults Defendants Pierce, Crain, Wills, Kink, and Jeffreys for turning a blind eye to this grievance. (Doc. 1 at 119).

In May of 2022, Plaintiff initiated another round of attempts to secure further care and pain medication for his injured hand. (Doc. 1 at 115-118). He began with sick call slips for medical and mental health attention on May 10, 2022, and also verbally informed a non-party counselor of his ongoing pain on May 13, 2022. (Doc. 1 at 115). On May 14, 2022, he saw Jane Doe Nurse Suzie at sick call. Suzie indicated she would contact Angela Crain about pain medication. Plaintiff alleges that Suzie exhibited deliberate indifference because she knew he had an order from the orthopedic specialist for pain medication that was not being followed, and she did not even offer an alternative medication while she waited for Angela Crain's response. (Doc. 1 at 120).

On May 18, 2022, Plaintiff wrote Angela Crain about his ongoing issues.  Plaintiff saw a telepsychiatrist on May 24, 2022, and he began antidepressants for his ongoing mental anguish over his injury and treatment.  (Doc. 1 at 117).  On May 31, 2022, Plaintiff sent requests to Crain and Wills describing his ongoing problems.  Finally, on June 2, 2022, Plaintiff saw a non-party nurse who gave him some ibuprofen and said she would refer him to a doctor of his ongoing nerve pain.  (Doc. 1 at 118).

On June 17, 2022, Plaintiff was sent on a medical furlough to UIC/UIH Hospital for evaluation of his nerve pain.  The provider offered interim forms of relief such as a wrist/hand splint, physical therapy, and stronger pain medication, but she also referred him back to the orthopedic specialist for further consultation.  She suggested that the only viable form of relief would be carpal tunnel surgery.  (Doc. 1 at 121).  Plaintiff faults Wills and Crain for allowing a 15-day delay between his June 2 visit to sick call and his June 17 specialist visit.  He alleges this violates internal policies that dictate emergency care be rendered within 72 hours.  (*Id.* at 121-22).

Plaintiff went on a medical writ to the orthopedic specialist for a second time on September 27, 2022.  (Doc. 1 at 127).  He attributes the 3-month delay from the June 2022 hospital visit until the September specialist visit to Crain and Wills.  The specialist suggested a wrist brace, stronger prescription pain medication and physical therapy as options to try prior to surgery.  (Doc. 1 at 127).

Plaintiff got the prescribed pain medication on October 2, 2022, he started physical therapy on October 3, and on October 13 he got a soft wrist brace.  (Doc. 1 at 127).  Plaintiff alleges that the soft brace did not satisfy the orthopedic specialist's order, so he faults

Wills and Crain for deliberate indifference by not carrying out the specialist's orders.  (*Id.* at 128).   In late October, Plaintiff fell while trying to access his top bunk and further injured his wrist.  He alleges this was in-part due to having the wrong kind of brace.  He was seen on sick call and got additional pain medication, but he also lodged an emergency grievance on November 3, 2022, to seek carpal tunnel surgery because he did not feel the alternative treatments were working.  He alleges Crain and Wills were deliberately indifferent to this grievance.  (Doc. 1 at 128-29).

On November 15, 2022, Plaintiff was seen again by the orthopedic specialist who confirmed that the soft brace Plaintiff had was not the type he intended.  (Doc. 1 at 129-30).  The specialist re-ordered the brace and referred Plaintiff for surgery.

Plaintiff alleges that on November 18, 2022, Defendant Nurse Nicole Brand came to his cell and gave him a medical permit form to sign for a new wrist brace.  (Doc. 1 at 130).  When she returned to collect the signed form she informed him it could still take up to two months for the brace to arrive, which he protested.  He alleges the nurse then "gave it to him," which constituted deliberate indifference.  (*Id.*).  Plaintiff further alleges that Defendant M. Moldenhauer signed his medical permit when in fact the medical director should have signed, and he alleges this somehow resulted in him not receiving the brace.  (Doc. 1 at 130).  Plaintiff ultimately got the brace on December 9, 2022, a delay which he attributes to Moldenhauer.  He alleges this was deliberate indifference because it delayed the specialist's recommendations.

Meanwhile, Plaintiff alleges he submitted two grievances to Defendant Clara Richmond on November 21, 2022, about the missing wrist brace, and for a status of his

surgery. (Doc. 1 at 131; Doc. 1-2 at 46-51). Plaintiff alleges he did not get responses to these grievances until June 27, 2023, from Angela Crain. (Doc. 1-2 at 57-58). He alleges this delay amounted to deliberate indifference. (Doc. 1 at 131-32).

Plaintiff alleges that he was approved for surgery at Menard on December 1, 2022, but that surgery was delayed multiple times for non-medical reasons and errors. (Doc. 1 at 132-33). He ultimately did not get surgery until March 3, 2023. He attributes the four-month delay from the specialist's recommendation in mid-November 2022, until surgery in March of 2023 to Wills and Crain. (Doc. 1 at 133). After surgery, Plaintiff was returned to the prison, and then sent back out on March 20, 2023, to have his stitches removed. (Doc. 1 at 135). He was supposed to return for a second follow-up six weeks after surgery, but that appointment was cancelled for non-medical reasons, and he was not returned until August 3, 2023. (Doc. 1 at 135-36). Plaintiff faults Crain and Wills for the delay.

At the end of his factual narrative, Plaintiff attributes his problems securing care for his right wrist to a host of policies, customs or practices maintained by Wexford Health Sources, Inc. (Doc. 1 at 137-143). Specifically, he alleges that Wexford's policies, customs, or practices include:

- Directing staff when conditions are pre-existing or chronic to simply monitor and observe them instead of providing treatment;
- Directing staff to maintain doubt or suspicion of inmate's complaints and to misdiagnose their injuries to avoid having to offer treatment;
- Failing to maintain a full-time doctor at Menard to offer adequate medical care;
- Giving staff full discretion to disregard inmate's needs if it is convenient for medical and correctional staff;
- Encouraging staff to falsify information on medical documentation to support a misdiagnosis and to avoid offering treatment;

- Allowing Angela Crain to undermine recommendations of a provider by having final authority to decide on recommended procedures or services;
- Directing nurses or nurse practitioners to review x-ray films and to evaluate the need for treatment;
- Encouraging staff to prescribe ineffective courses of treatment for long periods of time to save costs;
- Instructing medical staff to give less attention to proposed corrective treatment that may only give some relief, and to give more weight to a proposal only if it will make a significant difference;
- Telling staff they do not have an obligation to provide treatment simply because an inmate requests it;
- Prescribing non-formulary or generic drugs instead of brand medications;
- Prolonging and delaying access to care to save money.
- 

(Doc. 1 at 137-43).  As a result of all of these alleged policies, customs, or practices, Plaintiff alleges that Wexford contributed to delays in his care which caused unnecessary pain, and which allowed permanent damage.

Plaintiff presents an Eighth Amendment claim against Defendants Jeffreys, Wexford, Wills, Kink, Crain, Crane, Dearmond, Brand, Moldenhauer, Florence, Yousuf, Richmond, Pierce, Reva, and Suzie related to his injury and delayed care.  (Doc. 1 at 143-144).  He alleges state law negligence or medical malpractice against Defendants Crane, Dearmond, Yousuf, and Florence, for their early involvement in misdiagnosing him and failing to line up specialist care.  (Doc. 1 at 144-149).  And he alleges state law intentional infliction of emotional distress against all Defendants.  (Doc. 1 at 149-154).

Plaintiff seeks compensatory and punitive damages, as well as many forms of injunctive relief.  (Doc. 1 at 154-155).

Based on the allegations in the Complaint, the Court will designate the following claims:

**Count 1:** **Eighth Amendment deliberate indifference claim against Defendants J. Crane, Alisa Dearmond, Nicole Brand, M. Moldenhauer, N. Florence, N. Yousuf, Nurse Reva, and Nurse Susie concerning their handling of his right-hand injury as medical professionals;**

**Count 2:** **Eighth Amendment deliberate indifference claim against Defendants Rob Jeffreys, Anthony Wills, DeAnna Kink, Angela Crain, Clara Richmond, and Kelly Pierce for their handling of Plaintiff's grievances and other correspondence about his need for care;**

**Count 3:** ***Monell* claim against Wexford for maintaining multiple allegedly harmful customs, policies, or practices that prevented Plaintiff from getting timely and appropriate care;**

**Count 4:** **State law medical negligence claim against Defendants J. Crane, Alisa Dearmond, N. Yousuf, and N. Florence for their early handling and diagnosis of Plaintiff's injury;**

**Count 5:** **State law intentional infliction of emotional distress claim against all Defendants.**

The parties and the Court will use these designations in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order is considered dismissed without prejudice as inadequately pled under *Twombly*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face").

## Preliminary Dismissals

Throughout the complaint, there are times when Plaintiff refers to individuals by name who were not listed in the master caption of the case, or in the list of defendants. Examples include Sheila Ramsey and Allison Hargis, whom he discusses in relation to

the processing of his grievances.  The title of the complaint must name all the parties. FED. R. CIV. P. 10.  Because Plaintiff has not properly named these individuals in the case caption, any claims against them are dismissed without prejudice.

Throughout the vast majority of Plaintiff's complaint, he repeatedly quotes at length or cites state and local guidance that he believes was not followed by medical staff and prison administrators in the handling of his injury.  For example, he frequently complains that per the Administrative Directives and Wexford's guidance, emergency care should have been available 24/7, and he should have been seen within 24 to 72 hours after it was determined that his hand injury necessitated emergency care.  While contentions of this nature might point to evidence that could be used to argue that a defendant acted with deliberate indifference, all of this state and local guidance (the Administrative Directives, Menard's handbook, Wexford's handbook and treatment protocols, etc.) does not give rise to a freestanding constitutional claim under the Eighth Amendment because a violation of state law or local policy does not rise to the level of a § 1983 claim.  *See e.g.*, *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws, or in this case, departmental regulations and police practices.").  As such, any of Plaintiff's allegations premised on the failure to follow state or local directives are dismissed with prejudice as insufficient to state a § 1983 claim against any defendant.

On a more granular level, Plaintiff alleged multiple times throughout his complaint that he was subject to differential or discriminatory treatment based upon his race.  He hinged this assertion on the notion that he is required to report his race on a

grievance form, and the disclosure of his race as black then allowed anyone processing his grievance to target him for worse treatment.[5]  (Doc. 1 at 71-72, 110-11).  "The Equal Protection Clause of the Fourteenth Amendment prohibits intentional racial discrimination." *Williams v. Dart*, 967 F.3d 625, 637 (7th Cir. 2020).  To assert an equal protection claim, a prisoner must allege that he is a member of a protected class and that the prison treated him less favorably than other prisoners not in the class but who are similarly situated.  *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005).  The Court is mindful that the pleading standard for an Equal Protection claim is lenient[6], but the Court must still ask under Federal Rule of Civil Procedure 8(a)(2) "whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case."  *Williams v. Dart*, 967 F.3d 625, 637-38 (7th Cir. 2020) (reversing the dismissal of an Equal Protection claim at the pleading stage where a group of detainees alleged the Sheriff targeted them for detention in defiance of the court's bail orders because of their race, and where they alleged that the statistics on those detained showed that blacks were disproportionately being detained by the Sheriff).  And the Court must also ask if the allegations are plausible, or if they are conclusory.

---

[5] Plaintiff's October 15, 2021, grievance had a box that made race an "optional" characteristic to disclose. (Doc. 1-1 at 39).  His November 3, 2021, grievance did not have a box for that characteristic on the template form.  (Doc. 1-1 at 45).  A November 21, 2022, grievance also had an option box to report race.  (Doc. 1-1 at 46).  Neither the grievance officer response form nor the ARB response form appear to record race.  *See e.g.* (Doc. 1-1 at 50-51).

[6] At the pleading stage an inmate need not identify a similarly situated individual as long as the complaint plausibly alleges differential treatment motivated by plaintiff's membership in a group that is distinct for equal protection purposes.  *See, Hess v. Garcia*, 72 F.4th 753, 760 (7th Cir. 2023) (a district court should not have dismissed an equal protection claim at the pleading stage for lack of an identified similarly situated individual).

Here, Plaintiff's allegations are overly conclusory.  He alleges that his grievances were handled differently because he disclosed his race on the grievance form, but the box allowing an inmate to record his race is clearly marked as "optional."  *See e.g.*, Doc. 1-1 at 39.  Plaintiff also does not explain beyond bald assertion how his elective decision to tender this optional information actually impacted the processing of his grievance by the personal actions of the defendants.  Nor does he point to any information that even remotely suggests that others experienced a different outcome by either omitting this information or indicating a different race than his.  While an inmate is not required to affirmatively identify and present a similarly situated comparator at the pleading stage, Plaintiff's silence on this issue undermines the plausibility of his theory.  Unlike the plaintiffs in *Williams* that included some generic information about disparate impact in their complaint that could support a plausible finding of discrimination, Plaintiff's allegations are based purely on speculation.  As such, the Court finds that Plaintiff's allegations related to equal protection or discrimination are insufficient as pled.  Any equal protection claim is dismissed without prejudice.

## Analysis

## Claim 1

An Eighth Amendment claim arising from the denial of medical care consists of an objective and a subjective component. *Berry v. Peterman*, 604 F.3d 435, 439–40 (7th Cir. 2010).  A plaintiff must show that he suffered from a serious medical condition (i.e., an objective standard) and also show that each defendant responded with deliberate indifference (i.e., a subjective standard).  *Id.*  To satisfy the subjective component, a

prisoner must demonstrate that an official knew of and disregarded an excessive risk to inmate health. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Neither medical malpractice, nor mere disagreement with a doctor's medical judgment will amount to deliberate indifference. *Id.* Additionally, an inmate is not entitled to demand specific care, and a medical professional may choose from a range of acceptable courses of care. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019). If an inmate alleges a delay in treatment, he must present verifying medical evidence that the delay, and not the medical condition itself, cause some harm. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). He must also show it was the defendant's actions or inaction that caused the delay in treatment. *Walker*, 940 F.3d at 964.

Here, Plaintiff alleges that he fractured his hand defending himself during a fight on August 16, 2021, but he was not seen by a specialist to confirm his injury until February 8, 2022, and he did not undergo surgery that provided any relief for his pain until March of 2023. At first glance, these allegations are plainly enough to proceed on a claim of deliberate indifference because Plaintiff insists that he repeatedly contacted medical providers about his ongoing extreme pain and suffering, and he showed them a severely swollen and deformed hand on multiple occasions. However, it is also important to note that Plaintiff did receive at least *some* care during the months from his injury until surgery, and when carpal tunnel surgery was initially suggested in February of 2022 by a specialist, he declined to undergo that surgery at the time for fear it would make him vulnerable in a maximum-security prison environment. When he saw a specialist a second time in October or November of 2022 the specialist offered alternative methods to

try to mitigate his problems to try before surgery, and it was after trying those alternatives for only a month that Plaintiff then opted to demand immediate surgery. Given the sheer length of Plaintiff's complaint, the Court did not recite every obscure detail of his complaint in the factual summary above, but it is important to note that the Court did carefully read everything and that it took stock of the things Plaintiff said and demonstrated in exhibits. Having thoroughly read the complaint, and having reviewed supporting exhibits, the Court finds that this case is likely more nuanced than is suggested by a high-level initial review.

The Court will not discuss every medical provider in great detail here, however, a few warrant specific discussion. First, Plaintiff alleges that during medication rounds on the day of his injury, he flagged down Defendant Nurse Reva and showed her his swollen right hand. He asked for pain medication and a doctor's visit to address his injury, but Reva offered nothing. Instead of helping him, Reva simply told him there was nothing that she could do, and she told Plaintiff to file a sick call slip. Plaintiff contests this response for many reasons related to administrative directives and Reva's obligation as a medical professional. He also alleges this was deliberate indifference. Plaintiff also states that the next day he attended sick call. Against this backdrop, the Court is not convinced that a single interaction with a nurse, who was doing rounds in the cellhouse for a different purpose, is sufficient to sustain a claim for deliberate indifference. Plaintiff does not suggest he made any other efforts to inform other prison staff of his injury on that day, and it is not apparent that the staff who reported to the altercation when he injured his hand believed that he was severely injured. As such, the Court finds that

Plaintiff does not have sufficient factual allegations to sustain an Eighth Amendment claim against Nurse Reva for this single brief encounter, and it will dismiss Claim 1 against her without prejudice.

Likewise, Plaintiff alleges that he saw Defendant Nurse Suzie on a single occasion on May 14, 2022, at nurse sick call.  (Doc. 1 at 116).  He informed Suzie of his hand injury, and he told her that Angela Crain was denying his requests for a follow-up specialist appointment to consider surgery and she was depriving him of pain for his carpal tunnel nerve damage.  Plaintiff alleges Suzie said she would contact Crain, but she did not provide any other assistance.  Like the brief interaction with Reva, the Court also finds that this brief single interaction with Suzie is insufficient to form a basis for an Eighth Amendment deliberate indifference claim.  Plaintiff explained that all of his problems stemmed from Crain either denying or ignoring his grievances, and Suzie promised to contact Crain.  It's not clear what else Plaintiff expected Suzie to do on his behalf since he seemed to believe Crain's authorization was needed to get what he sought.  As such, Claim 1 against Nurse Suzie is dismissed without prejudice.

Additionally, Plaintiff alleges that Nurse Nicole Brand violated his rights on November 18, 2022, when she came to his cell and asked him to sign a medical permit form for his right wrist brace.  (Doc. 1 at 130).  Plaintiff alleges when Brand came back to collect her copy of the form, that she did not have a brace to give him and instead informed him it could take up to two months to arrive.  Plaintiff admits later that he got the brace on December 9, 2022, just weeks after Brand asked him to sign the permit form. (Doc. 1 at 131-32; Doc. 1-2 at 57 (Memorandum indicating the permit for the second brace

was delivered on December 9, 2022)).  Based on this series of interactions, Plaintiff has not stated a valid deliberate indifference claim against Defendant Brand and Claim 1 is dismissed as to Brand without prejudice.

This leaves Defendants J. Crane, Alisa Dearmond, M. Moldenhauer, N. Florence, and N. Yousuf, as medical professionals whom Plaintiff alleges were deliberately indifferent to his serious medical condition.  Other than N. Florence, these providers all saw Plaintiff in person or participated in reviewing images and diagnosing his condition on multiple occasions.  N. Florence is notable because, despite only appearing to review x-ray films once, the films he reviewed were the first ones taken after Plaintiff's injury. As medical professionals who were directly involved in the decision-making process to assess, diagnose and treat Plaintiff's injury, the Court finds that Plaintiff's allegations against these providers are sufficient to proceed beyond initial review.

It is important to note that it is not entirely clear if Defendants N. Florence and N. Yousuf are employees of the state or of Wexford (the state's medical contractor for prison healthcare).  Plaintiff refers to these individuals as radiologists and employees of OneRadiology in Normal, Illinois.  This place of employment tracks with the exhibits to his complaint.  *See e.g.,* Doc. 1-1 at 29 (Dr. Florence's radiology report); Doc. 1-1 at 32 (Dr. Yousuf's radiology report).   Nevertheless, the viability of this claim will turn on inquiries that the Court cannot complete at the stage of initial review.  First, the Court will need to determine, through a "functional inquiry" what the relationship is between the state and Drs. Florence and Yousuf.  *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 797-98 (7th Cir. 2014) ("whether a medical provider is a state actor is a functional inquiry, focusing

on the relationship between the state, the medical provider, and the prisoner.")  This is true because § 1983 liability is only proper against those who are "state actors," and not all private doctors that provide care to inmates are considered "state actors."  *See e.g.* *Manzanales v. Krishna*, 113 F.Supp.3d 972, 980-81 (N.D. Ill. June 30, 2015) (finding that the factual allegations in the complaint were not sufficient to determine if the private doctors were state actors for purposes of § 1983 at the motion to dismiss stage); *Rackemann v. Robinson*, 2019 WL 4737194 at *2-3 (S.D. Ind. Sept. 27, 2019) (granting summary judgment in favor of a doctor because he was not a 'state actor' for purposes of § 1983 where he only occasionally saw patients from the prison at a local hospital, and where he was privately employed).  The Complaint provides insufficient information to determine if Drs. Florence or Yusuf are or are not state actors, so construing the complaint broadly in Plaintiff's favor, he will be allowed to proceed against Drs. Florence and Yusuf at this stage.

In sum, Plaintiff may proceed against Defendants J. Crane, Alissa Dearmond, M. Moldenhauer, N. Florence, and N. Yusuf related to their treatment and handling of his injury from August 2021 onward.

## Claim 2

Aside from the medical personnel, Plaintiff devoted a substantial portion of his complaint to the involvement of administrative or non-medical prison personnel for their role in responding to his injury.  Defendant Clara Richmond was a counselor who received grievances from him, Defendant Kelly Pierce was a grievance officer who was involved in some of his grievances, Defendants Angela Crain (healthcare administrator)

and Anthony Wills (warden) participated in processing his grievances at the last level of review, and Defendants Rob Jeffreys and DeAnna Kink participated in the final stage of review at the Administrative Review Board.

Generally, the mere role of processing a grievance is not enough to give rise to constitutional liability. *See e.g.,* *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (the alleged mishandling of a grievance by an official who did not cause the underlying conduct states no claim).  To be liable, an individual must have either caused or participated the underlying harm, or they must have blatantly turned a blind eye to a serious issue for fear of what they might learn.  *Id.*, *see also* *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015) (a prison official may not turn a blind eye to an inmate's plight). Prison administrators are allowed to defer to the expertise of medical professionals in the review of grievances, but they cannot shirk all knowledge of or responsibility for a serious situation if they fail to ensure an adequate investigation into a grieved issue. *Hayes v. Snyder,* 546 F.3d 516, 527-28 (7th Cir. 2008) ("the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one.")

Plaintiff's allegations closely straddle the divide between what is enough and what is not enough to make out an Eighth Amendment claim.  As to Defendant Clara Richmond, a counselor, Plaintiff alleges that on November 21, 2022, he submitted two grievances to her complaining that he did not get the appropriate wrist brace from Nicole Brand, and demanding carpal tunnel surgery because the alternative forms of treatment were not working.  (Doc. 1 at 131).  Remember, Plaintiff got his wrist brace on December

9, 2022, and records show that Plaintiff was referred for carpal tunnel surgery on December 1, 2022.  In light of this information, it is not clear what Richmond would have done, but that is beside the point.  The records also show that Richmond noted his grievances as received on November 23, 2022, and that when she got responsive memorandums back from the healthcare unit in late May of 2023, she transmitted those to Plaintiff.  (Doc. 1-2 at 46-51; 56-57).  By the time Richmond got responses from Crain, Plaintiff had already received the wrist brace and had the requested surgery.  (*Id.* at 56-57). Against this backdrop, it does not appear that Richmond did anything more than process the grievances as a counselor and transmit them through the needed channels for input from the medical unit.  The simple processing of grievances, even if erroneous, is not sufficient to state a claim.  Accordingly, Claim 2 against Defendant Richmond is dismissed without prejudice.

As to Defendants Rob Jeffreys (the former head of IDOC) and DeAnna Kink (a member of the Administrative Review Board), Plaintiff also has little by way of allegations that suggest they knowingly turned a blind-eye to his plight.  Plaintiff would have the reader believe that Kink and Jeffreys first gained knowledge of his problems by his appeal of his second emergency grievance, that he claims he submitted because he had not gotten a response to the first, and which they ultimately denied as duplicative. Plaintiff's presentation of the facts does not completely square with the exhibits he presented.  Although he alleges in his factual allegations that he never got a response at the prison to his first emergency grievance, the exhibits to his complaint suggest a different story.   The grievance officer's response to Plaintiff's second emergency

grievance indicated that it was a duplicate of the first, so it would not be addressed further. (Doc. 1-1 at 50). When Plaintiff appealed this outcome to the ARB, the ARB indicated that it had "previously addressed this issue on 11.29.21" and that it was a duplicate with his first emergency grievance. These notations both strongly suggest that the ARB received and reviewed an appeal of Plaintiff's first emergency grievance either at the same time or shortly after his appeal of his second emergency grievance.

On these facts, the Court does not find that Plaintiff has a plausible claim against Jeffreys and Kink for turning a blind eye to his situation. The Court acknowledges that Plaintiff made additional allegations about Jeffreys and Kink's participation in reviewing more grievances, but it is not persuaded on the facts available that these two officials did anything more than review grievances in the ordinary course of business, with deference given to medical professionals. For example, in response to a February 15, 2022, grievance in which Plaintiff asked for surgery shortly after his first visit to the orthopedic specialist, Kink reported that "per HCUA—medical reports from Orthopedic specialist indicate surgery is not suggested at this point." (Doc. 1 at 76). This finding by Kink is supported by the records from the orthopedic visit, which indicated "[i]t was explained to the patient this does not appear to be a surgical issue. Surgery would be less than optimal." (Doc. 1-1 at 63). The same visit notes also indicate that the provider discussed carpal tunnel surgery with Plaintiff, but he was "not interested at [that] point in carpal tunnel surgery." (Doc. 1-1 at 63). With this information from a medical specialist immediately prior to Plaintiff's February grievance, it is not plausible that Kink or Jeffreys would have had any reason to doubt that Plaintiff was receiving ongoing care deemed

adequate by professionals, or that they needed to investigate further.  As such, the Court will dismiss Claim 2 against Defendants Kink and Jeffreys because their involvement seems to be nothing more than the administrative review of grievances with deference to treating professionals.

On the local level, Plaintiff alleges that grievance officer Kelly Pierce was involved in the processing of his emergency grievances, and thus was deliberately indifferent to the emergency care he needed.  (Doc. 1 at 44, 52-59).  Plaintiff makes a variety of allegations against Pierce.  For example, he alleges that if she had begun to investigate his emergency grievance when she received it, she would have discovered that Dr. Yusuf had twice suggested that he see an outside doctor.[7]  Plaintiff also suggests that Pierce left him to suffer for many months without pain medication, but the medical records that he submitted show that he had Ibuprofen 600mg for a week from August 20, 2021, and again from September 1, 2021 to October 3.  (Doc. 1-1 at 27, 33). He also was prescribed Naproxen 500mg on December 1, 2021, until February 1, 2022. (Doc. 1-1 at 53).  His next sick call slip complaining of pain that he included with his complaint was not tendered until October 28, 2021.  (Doc. 1-1 at 43).

At the stage of initial review, the Court reads the complaint broadly in Plaintiff's favor and construes any plausible inferences on his behalf to support a claim.  In doing so on the facts presented, the Court will allow Plaintiff to proceed against Defendant Pierce on the theory that she may have turned a blind eye to issues presented in the

---

[7] This assertion appears to be an exaggeration of Dr. Yusuf's notes.  The radiology reports from Dr. Yusuf stated on two occasions, "if symptoms persist or progress, a follow-up study may be considered." (Doc. 1-1 at 32, 38).  This language does not clearly indicate a referral to an outside provider, as Plaintiff contends.

grievances or may have acted more slowly in response to an emergency grievance than was appropriate. However, the Court set forth the factual details in the previous paragraph about Plaintiff's underlying care to signal that, although it is reading the complaint broadly in Plaintiff's favor, there is significant doubt about the ultimate viability of a claim for turning a blind-eye against Pierce. If records ultimately show that she was timely in contacting the healthcare unit about Plaintiff's grievance, and if she was awaiting a response or had information that a course of care was ongoing, then Plaintiff will not be able to prevail on a deliberate indifference claim against her for her role in processing his grievances.

Finally, Plaintiff has alleged at great length that Defendants Wills and Crain did not do enough in response to his multiple grievances about his hand injury, as well as in response to his correspondence that he sent on multiple occasions in addition to the grievances. Plaintiff's allegations against Wills and Crain, and the details he gives about their involvement in his medical situation are much more comprehensive than the information provided about the other defendants associated with Claim 2. For example, Plaintiff alleges that Crain was aware of his medical situation at the latest by October of 2021 when his first grievance was deemed an emergency, but when he was referred for a specialist visit in early December of 2021, he claims Crain delayed in approving the visit despite knowing of his situation and/or she allowed it to be scheduled for more than two months from the date it was originally recommended. Allegations of this nature suggest sufficient personal involvement by Crain both through the receipt, investigation and responses to grievances, as well as through her role as the healthcare unit administrator.

The Court will also allow Plaintiff to proceed against Defendant Wills for his handling of Plaintiff's grievances, which he deemed emergencies on multiple occasions. While the Court is not convinced that Plaintiff's first emergency grievance went entirely unanswered at the prison, the records do suggest that it may not have been processed in a very expedient fashion, and that possibly to get a response to it, Plaintiff did have to submit the second emergency grievance before it shook things free.  Against this backdrop, it is plausible to infer that Wills was notified of a medical condition that he viewed as urgent based on Plaintiff's allegations, and that perhaps he was not diligent in ensuring the emergency grievance was handled in an expeditious fashion.  While Wills is certainly entitled to defer to the medical professionals, his deference cannot be blind and unthinking, and he cannot simply deem a grievance an emergency and forget about it.  Reading the complaint broadly in Plaintiff's favor, he has provided sufficient allegations about Wills' involvement in his question for care to proceed on Claim 2 against Wills.

One additional thing is worth mention in relation to Wills and Crain.  Plaintiff alleges at great length in his complaint that Wills and Crain were liable for harm he suffered because in their roles as high-level administrators they had various responsibilities and duties to ensure the adequate provision of care and emergency services at the prison.  These allegations are almost entirely rooted in Plaintiff's extensive citations to state law and local directives, which the Court already explained to be deficient in the preliminary dismissal section.  However, it is also worth noting that there is no general theory of *respondeat superior* liability under § 1983.  *Burks v. Raemisch*, 555

F.3d 592, 593-94 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility.  Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of the persons they supervise.").  So, to the extent that Plaintiff attempted to present additional theories for relief against Wills or Crain premised solely on their leadership roles, he cannot succeed, and any such claims are dismissed without prejudice.

**Claim 4**

In Claim 4, Plaintiff alleges that Defendants J. Crane, Alissa Dearmond, and Drs. Florence and Yusuf should be held liable for negligence or medical malpractice under state law.  Because the Court has allowed Claim 1 to proceed against these Defendants, it will also allow Plaintiff to proceed on Claim 4 for the time-being.  However, if these parties are later dismissed from this suit (like if Florence and Yusuf are not state actors), then the Court will also decline to exercise further supplemental jurisdiction over this claim as to any dismissed party.

**Claim 5**

In Claim 5 Plaintiff alleges in broad terms that all defendants' actions amounted to the intentional infliction of emotional distress.  To state a claim for intentional infliction of emotional distress ("IIED") under Illinois common law, a plaintiff must show that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew there was a high probability that his conduct would cause severe emotional distress; and (3) the defendants' conduct did cause severe emotional distress.  *Lifton v. Bd. of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005).

Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency...." *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976); *Cook v. Winfrey*, 141 F.3d 322, 331 (7th Cir. 1998).

Based on Plaintiff's detailed allegations about his injury, his attempts to secure care, and his allegations that he was so distraught he sought mental health care to cope, the Court will allow him to proceed on Claim 5 at this juncture against Defendants J. Crane, Alissa Dearmond, N. Florence, N. Yousuf, M. Moldenhauer, Kelly Pierce, Angela Crain, Anthony Wills, and Wexford Health Sources, Inc.. By contrast, the Court declines to exercise supplemental jurisdiction over any potential IIED claim against any defendant for whom all other claims are being dismissed in this order (Nurse Reva, Nurse Suzie, Nicole Brand, Clara Richmond, Rob Jeffreys, and DeAnna Kink).

## Motion for Class Certification

Plaintiff seeks to certify this matter as a class action on the notion that the relief he seeks and the problems he describes are common to all people currently incarcerated in the IDOC. (Doc. 2 at 1). He describes common questions such as: the adequacy of healthcare in IDOC, the constitutionality of Wexford's policies, and the prison's ability to follow its own healthcare directives. (Doc. 2 at 1-2). To be certified as a class, Plaintiff must first satisfy the four elements in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012). Then, the case must fall under one of the conditions specified in Rule 23(b). *See* FED. R. CIV. P. 23(a), (b); *Lacy v. Cook Cnty.*, 897 F.3d 847, 864 (7th Cir. 2018).

Here, Plaintiff cannot satisfy the element of adequacy of representation because as a nonlawyer, he cannot represent the other potential members of the class.  *See Howard v. Pollard*, 814 F.3d 476, 478 (7th Cir. 2015) ("[I]t is generally not an abuse of discretion for a district court to deny a motion for class certification on the ground that a pro se litigant is not an adequate class representative.") (emphasis omitted).  Therefore, this motion (Doc. 2) will be denied.

## Motion for Recruitment of Counsel

Plaintiff has moved for recruited counsel (Doc. 4).  He indicated that he is a high-school graduate with some college education.  (Doc. 4 at 2).  Plaintiff's Motion (and exhibits to his complaint) show that he has corresponded with a variety of attorneys from whom he sought representation.  (Doc. 4 at 1, Doc. 1-3 at 35-57).  Plaintiff also included a memorandum in support of his request for counsel wherein he explained his concerns about the complexity of his case, including his belief that he will need expert testimony, that he wishes to pursue a class action, that his ability to investigate his claims is hindered by his incarceration, and that there may be conflicted testimony, among other things. (Doc. 4 at 5-6).

There is  no right to the appointment of counsel in civil matters.  *Romanelli v. Suliene*, 615 F.3d 847, 851 (7th Cir. 2010).  When presented with a request to appoint counsel, the Court must consider: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself [.]" *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007).  Plaintiff has clearly attempted to retain

his own counsel, but this is not the end of the inquiry.  At this very early juncture, Plaintiff has done a sufficient job presenting his claims, and the next stages will involve the exchange of basic information and will not yet include any of the complex tasks for which Plaintiff expressed concern in his supporting memorandum.  Based on the early status of this litigation, the Court will deny Plaintiff's motion without prejudice.

### Disposition

**IT IS HEREBY ORDERED THAT Claim 1** of the Complaint (Doc. 1) survives against Defendants J. Crane, Alissa Dearmond, N. Florence, N. Yusuf, and M. Moldenhauer, **Claim 2** survives against Kelly Pierce, Anthony Wills and Angela Crain, **Claim 3** survives against Wexford, and **Claim 4** survives against J. Crane, Alissa Dearmond, N. Yusuf, and N. Florence, and **Claim 5** survives against Defendants J. Crane, Alissa Dearmond, N. Florence, N. Yusuf, M. Moldenhauer, Anthony Wills, Angela Crain, and Wexford.  By contrast, **Claim 1** is dismissed as insufficient against Nurse Reva, Nurse Suzie and Nicole Brand, **Claim 2** is dismissed as insufficient against Clara Richmond, DeAnna Kink, and Rob Jeffreys, and **Claim 5** is dismissed as insufficient against Nurse Reva, Nurse Suzie, Nicole Brand, Clara Richmond, DeAnna Kink, and Rob Jeffreys.  The Clerk of Court is **DIRECTED** to **TERMINATE** Defendants Nurse Reva, Nurse Suzie, Nicole Brand, Clara Richmond, DeAnna Kink, and Rob Jeffreys, for failure to state a claim.

The Clerk of Court is **DIRECTED** to prepare for Defendants: J. Crane, Alissa Dearmond, N. Florence, N. Yusuf, M. Moldenhauer, Kelly Pierce, Angela Crain, Anthony Wills and Wexford Health Sources, Inc.: (1) Form 5 (Notice of a Lawsuit and Request to

Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), and this Memorandum and Order to Defendants' place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendant, and the Court will require Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merits Review Order.

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, regardless of whether his application to proceed in forma pauperis was granted. See 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that he is under a continuing obligation to inform the Clerk of Court and each opposing party of any address changes; the Court will not independently investigate his whereabouts.  This shall be done in writing and not later than 14 days after a change of address occurs.  Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for failure to prosecute.  FED. R. CIV. P. 41(b).

The Clerk of Court is **DIRECTED** to enter the standard HIPAA Order in this case because it will involve the exchange of medical records.

Plaintiff's Motion for Counsel (Doc. 4) is **DENIED** without prejudice.  Plaintiff's Motion for Class Certification (Doc. 2) is also **DENIED**.

**IT IS SO ORDERED.**

Dated: January 26, 2024

_____
DAVID W. DUGAN
United States District Judge

**NOTICE TO PLAINTIFF**

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.

The Court wishes to remind the Plaintiff that litigation is often viewed a series of hurdles that the Plaintiff must clear to get to another hurdle. Initial screening is such a hurdle, but it is a very low one for the Plaintiff to clear.  As noted above, surviving initial screening only requires the bare statement of a claim that, if proven, could entitle Plaintiff to some relief. At trial, he will need to prove by a preponderance of evidence that the facts alleged actually occurred and that those facts satisfy the legal requirements for recovery. Trial is the highest and most difficult of hurdles for any Plaintiff to clear.