## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEITH ALLEN, M21830, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| ANTHONY WILLS, | ) |
| ANGELA CRAIN, | ) |
| ALISA DEARMOND, | )     Case No. 23-cv-3775-DWD |
| N. FLORENCE, | ) |
| N. YOUSUF, | ) |
| KELLY PIERCE, | ) |
| JILLIAN CRANE, | ) |
| MICHAEL MOLDENHAUER, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Keith Allen, an inmate of the Illinois Department of Corrections (IDOC) currently incarcerated at Menard Correctional Center ("Menard"), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. Specifically, he alleges that the defendants failed to treat or delayed treatment for a hand injury he sustained during a fight in August of 2021. Defendant Moldenhauer has moved for judgment on the pleadings on the premise that he saw Plaintiff just once and immediately directed an appropriate course of care, or alternatively for summary judgment on the premise Plaintiff failed to exhaust his administrative remedies against

him (Doc. 67). Plaintiff has responded (Doc. 89)[1], and replies have followed (Docs. 77, 80).

<h1 align="center">B<small>ACKGROUND</small></h1>

Here, the Court will limit the factual overview to the assertions relevant to Defendant Moldenhauer. Plaintiff injured his hand on August 16, 2021, while defending himself during a fight. He immediately began to seek medical care from the prison's medical staff, which included multiple x-rays. As a continuation of his quest for care, Plaintiff alleges in the Complaint that he saw Defendant Moldenhauer on November 6, 2021, at which time *she* continued medication and treatment that was ineffective. (Doc. 1 at 74). He explains that he saw Moldenhauer at sick call, informed her of pain rated at an 8 out of 10, and despite the treatment protocol stating that an inmate should be referred to a doctor if severe pain was present, she failed to refer him to see a doctor. (Doc. 1 at 75-76). He argued that as a nurse, Moldenhauer had a professional obligation and independent duty to ensure he received adequate care, which may have entailed discussing concerns about his situation with a doctor or medical administrator. (Doc. 1 at 76-77).

He alleges he saw Moldenhauer a second time on December 1, 2021, at which time his medications were changed, his issue was deemed an emergency, and he was referred

---

[1] Upon review of Plaintiff's response, the Court determined that when the document was processed as a scan from the prison's law library to the Court's Clerk's Office, Plaintiff's response as produced at docket entry 76 inadvertently contained pages from another inmate's summary judgment response, that the response was out of order, and that it omitted Plaintiff's brief about judgment on the pleadings. As such, the Clerk's Office struck the pleading with errors, reviewed the original scan files, and created a new document—document 89—on the docket sheet to accurately reflect Plaintiff's full pleading and to best organize the documents.

to an orthopedic specialist. (Doc. 1 at 79-80). Despite this change in the course of treatment, he faulted Moldenhauer for scheduling the orthopedic consultation for two months out. (Doc. 1 at 80). He claims this was inappropriate because *she* should have ensured Plaintiff be seen within 24-72 hours given the emergency nature of his condition. (Doc. 1 at 80-81). He was not seen by the specialist until February 8, 2022. He alleges the delays constituted deliberate indifference and caused unnecessarily prolonged pain and suffering as well as permanent damage. Based on the allegations in the Complaint, which are more fully recounted in the Order of Initial Review (Doc. 11), the Court allowed two claims against Moldenhauer:

Claim 1:    Eighth Amendment deliberate indifference claim against Defendants J. Crane, Alisa Dearmond, M. Moldenhauer, N. Florence, and N. Yusuf concerning their handling of his right hand injury as medical professionals;

Claim 5:    State law intentional infliction of emotional distress claim against all Defendants.

(Doc. 11 at 12). Plaintiff was allowed to proceed on multiple additional claims that are not relevant to the exhaustion analysis for Defendant Moldenhauer. (Doc. 11 at 30).

FINDINGS OF FACT

A. Judgment on the pleadings

Plaintiff's medical records submitted with the Complaint (and again in response to the recent motions) reflect that he had x-rays in August and September of 2021. On August 26, 2021, Dr. Florence reported no evidence of an acute fracture or malalignment, and no other remarkable characteristics. (Doc. 1-1 at 29). On September 2, 2021, Dr. Yousuf again reported no sign of fracture or abnormality, but suggested, "[i]f symptoms

persist or progress, a follow-up study may be considered." (Doc. 1-1 at 32). On September 16, 2021, Dr. Yousuf noted mild degenerative changes, but no acute fracture or dislocation. He noted mild swelling, but again stated a follow-up could be considered if symptoms persisted or progressed. (Doc. 1-1 at 38).

The records further reflect that on November 6, 2021, Plaintiff was seen for his right-hand injury. (Doc. 1-1 at 48). He reported pain of 8 out of 10, although there was no visible swelling or discoloration. (*Id.*). The author of the "offender outpatient progress notes" utilized the form for "fracture, dislocation, sprains" and circled the option for "refer to MD." A sticker for ibuprofen was also affixed to the record. The signature is not legible.

On December 1, 2021, Plaintiff was seen again. The offender progress notes were charted as an "NP Note" and were legibly signed by M. Moldenhauer. (Doc. 1-1 at 52). The notes indicated that Plaintiff was seen to review right hand x-ray results. Plaintiff self-reported severe pain, trouble making a fist, and disfigurement, though Moldenhauer recorded no swelling or disfigurement and indicated Plaintiff made a fist while complaining he could not do so. (*Id.*). In the notes, Moldenhauer recorded "no results in chart," but also noted an August 2021 x-ray, and included an additional note that per a September 2021 finding "if symptoms continue may need f/u." (Doc. 1-1 at 52). Moldenhauer prescribed Plaintiff two months of naproxen, he referred him for an orthopedic evaluation, he ordered an "EMG", and he indicated there should be a follow-up in two months with the "MDNP CL." (Doc. 1-1 at 52).

The EMG was authorized the next day by Wexford. (Doc. 1-1 at 53). On December 2, 2021, a medical furlough clerk charted an urgent referral for an orthopedic evaluation, and on December 3, 2021, the medical furlough clerk charted authorization had been received and the appointment was to be scheduled. (Doc. 1-1 at 55-56). On December 6, 2021, a medical furlough clerk charted that the orthopedic evaluation was scheduled. (Doc. 1-1 at 57). Additionally, on December 10, 2021, the medical furlough clerk charted that an EMG was scheduled. (Doc. 1-1 at 58).

The orthopedic appointment ultimately took place on February 8, 2022. (Doc. 1-1 at 61-64). The provider noted an "old fracture…it did appear was impacted, but it was healed." (Doc. 1-1 at 63). In the plan portion of the report, the provider wrote:

> At this time, we did discuss nerve studies and carpal tunnel release. However, the patient states he is not interested at this point in carpal tunnel surgery. He was told that if the symptoms become worse or he would like to have this addressed that he can have a follow-up made here at the clinic. It was explained to the patient that the fracture itself is healed. There is not much that can be done. An osteotomy more than likely would not provide any benefit due to the nature of the fracture and it did appear that the fracture had encroached on the distal row of carpal bones, but again the fracture is healed. He had very little pain on palpation of the fracture site and was able to make a complete fist. At this time it was explained to the patient this does not appear to be a surgical issue. Surgery would be less than optimal. He does have full function and range of motion, so we would not suggest surgery at this point. The patient agreed. He was instructed to take anti-inflammatories for his intermittent pain and to use the hand with no restrictions. We will go ahead and release him p.r.n..

(Doc. 1-1 at 63).

### B. Exhaustion of administrative remedies—grievance records

On October 15, 2021, Plaintiff submitted a grievance about his right hand injury that he designated as an emergency. (Doc. 68-1 at 14). The Warden approved emergency

handling of the grievance, which was assigned number 232-10-21.  (*Id.*).  In the grievance Plaintiff explained that he injured his hand and immediately experienced severe visible swelling.  He made requests to nurses during cellhouse rounds for assistance, and he was ultimately seen a few days after his injury by a nurse practitioner (Defendant Crane).  Crane ordered an x-ray, and gave pain medication, and in subsequent weeks, Plaintiff ultimately had three x-rays that all revealed no damage.  His severe pain persisted.  (Doc. 68-1 at 14-15).  At the time of writing the grievance, he indicated he was still in serious pain, and he sought an x-ray and MRI from an outside provider, as well as additional medication for the pain.  He claimed that without intervention, he was suffering ongoing pain in violation of the Eighth Amendment, inflicted by "Menard staff, correctional officers, health care personnel, nurses, LPNs, doctors, Wexford Health Care providers Inc., the assistant warden, director of operations, chief administrative officer (warden), John Doe staff, etc."  (Doc. 68-1 at 15).

In response, the healthcare unit administrator indicated that Plaintiff had undergone x-rays on August 20, 2021, and August 31, 2021, and he was scheduled to review the results of the latter x-ray and possible future treatment.  (Doc. 68-1 at 13).  Based on this report, the grievance officer recommended denying the grievance as moot, and the Chief Administrative Officer (CAO) concurred on November 10, 2021.  (Doc. 68-1 at 12-13).  Plaintiff timely appealed to the Administrative Review Board (ARB).  The ARB deemed the grievance "mixed" given that an appointment was pending.  (Doc. 68-1 at 11).

Plaintiff submitted a second emergency grievance about his hand on November 3, 2021. (Doc. 68-1 at 9-10). The Warden expedited it for emergency processing, and it was assigned number 95-11-21. (Doc. 68-1 at 9). In the grievance Plaintiff indicated he was still awaiting a response for his first emergency grievance, and that his pain had intensified without treatment. He blamed the "nurses, LPNs, staff members, COs, John Doe staff, Wexford Health care medical provider personnel, Warden (Chief administrative officer), assistant warden, director of operations, doctors, [and] physicians" for violating his rights with the lack of treatment. (Doc. 68-1 at 10). On November 8, 2021, the grievance officer labeled the grievance a duplicate of the first emergency grievance, and on November 10, 2021, the Warden concurred with this finding. (Doc. 68-1 at 8). The ARB rejected the grievance as a duplicate and because the events alleged were "not submitted within the timeframe outlined in Department Rule 504." (Doc. 68-1 at 7). The ARB further noted, "date of incident is outside of 60 days." (*Id.*).

On February 15, 2022, Plaintiff submitted a third grievance that was approved for emergency processing and was assigned number 121-2-22. (Doc. 68-1 at 5). Plaintiff alleged that on February 8, 2022, he was seen for his hand injury at an outside hospital and was told his hand was broken. (Doc. 68-1 at 5). He alleged his hand had healed improperly, and that he was also diagnosed with arthritis and carpal tunnel. Plaintiff indicated he desired surgery and medication. He stated, "Wexford Health Care Services, Inc., staff nurses, LPNs, in Menard C.C. who gave me 3 different x-rays within a 30 day period right after I broke my hand all lied to me maliciously and misdiagnosed me when

they told me the x-rays they had conducted results came back negative with no broken bones where they joked about it and I knew it was lie which the second opinion from the outside doctor and LPN I seen on 2/8/22 confirmed." (Doc. 68-1 at 15). He further alleged that the lack of diagnosis or misdiagnosis caused him prolonged suffering and permanent disfigurement or damage, which he attributed to "Menard's staff and Wexford's health care services provider, inc. staff, medical staff, nurses, LPNs, doctors inadequate policies." (Doc. 68-1 at 15).

In response, the healthcare unit administrator relayed notes from the orthopedic specialist consistent with the notes quoted above in the facts about judgment on the pleadings. (Doc. 68-1 at 4). Based on this report, the grievance officer recommended the grievance be denied as moot, and the CAO concurred. (Doc. 68-1 at 3). The ARB denied the grievance on March 30, 2022, as appropriately addressed by the prison, and because treatment is at the discretion of the licensed medical providers. (Doc. 68-1 at 2).

## CONCLUSIONS OF LAW

### A. Legal Standards

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 357-58 (7th Cir. 2016). A reviewing court must draw all reasonable inferences and facts in favor of the non-movant but need not accept as true any legal assertions. *Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014). "As in a Rule 12(b)(6) analysis, [the court's] review is limited to the pleadings; however, the court 'may take into consideration documents incorporated by reference to the pleadings,' and 'may also take judicial notice of matters of public record.'" *Milwaukee Police Ass'n v. Flynn*, 863. F.3d 636, 640 (7th Cir. 2017) (quoting *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)).

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, when the motion for summary judgment pertains to a prisoner's failure to exhaust administrative remedies, the Seventh Circuit has instructed courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a prisoner's efforts to exhaust. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). After hearing evidence, finding

facts, and determining credibility, the court must decide whether to allow the claim to proceed or to dismiss it for failure to exhaust. *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018). The court is not required to conduct an evidentiary hearing if there is no genuine dispute of material fact, and the determination is purely legal. *See e.g.*, *Walker v. Harris*, 2021 WL 3287832 * 1 (S.D. Ill 2021); *Miller v. Wexford Health Source, Inc.*, 2017 WL 951399 *2 (S.D. Ill. 2017).

The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey*, 544 F.3d at 740. "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Id.* at 1024.

As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, et seq. (2017). The regulations first require an inmate to file his grievance with his counselor within 60 days of the discovery of an incident, occurrence, or problem that gave rise to the grievance. 20 ILL. ADMIN. CODE § 504.810(a). Administrative regulations require the grievance "contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject

of or who is otherwise involved in the complaint." 20 ILL. ADMIN. CODE § 504.810(c). If the names of the individuals are unknown to the offender, he can still file the grievance but "must include as much descriptive information about the individual as possible." *Id.* Further, the Seventh Circuit has held that an inmate is required to provide enough information to serve a grievance's function of giving "prison officials a fair opportunity to address [an inmate's] complaints." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011).

If the complaint is not resolved through the counselor, the grievance may be submitted to a grievance officer, who reports his or her findings and recommendations in writing to the Chief Administrative Officer (CAO). 20 ILL. ADMIN. CODE § 504.830(e). The CAO then provides the inmate with a written decision on the grievance. *Id.*

If the inmate is not satisfied with the CAO's response, he can file an appeal with the IDOC Director through the Administrative Review Board (ARB). 20 ILL. ADMIN. CODE § 504.850(a). The ARB must receive the appeal within 30 days of the date of the CAO's decision. *Id.* The inmate must attach copies of the responses from the grievance officer and CAO to his appeal. *Id.* The ARB submits a written report of its findings and recommendations to the Director, who them makes a final determination. 20 ILL. ADMIN. CODE § 504.850(d), (e).

**B. Analysis**

**1. Judgment on the pleadings**

First, the Court considers Defendant Moldenhauer's contention that he is entitled to judgment on the pleadings because contrary to Plaintiff's assertions in the Complaint, he saw Plaintiff on just one occasion and immediately altered the course of treatment at

that single visit.  (Doc. 67).  Moldenhauer supports his argument by citing to the medical records that Plaintiff attached to the complaint.  Specifically, he argues that the note from the November 6, 2021, visit was recorded by a CMT at the nurse sick call line, as is demonstrated by the use of a specific form for triaging fractures and sprains.  By contrast, the December 1, 2021, which clearly bears Moldenhauer's signature, is explicitly noted as an "NP" (nurse practitioner) encounter.  Moldenhauer also points out that in the complaint Plaintiff described the November 6, 2021, encounter as being with a female, whereas he is a male.  Moldenhauer further contends that because he altered the course of treatment at his first visit with Plaintiff and directed that he be sent to an outside specialist, his actions cannot be characterized as deliberate indifference.

Plaintiff dedicated an entire response brief to Moldenhauer's Motion for Judgment on the Pleadings.  (Doc. 89 at 1-21).  In the brief, he states without support that he saw Moldenhauer on November 6 and December 1, 2021.  (Doc. 89 at 4).  In his statement of additional material facts contained within his separate response brief on summary judgment, he asserts that it is possible he saw Moldenhauer on both occasions, but that Moldenhauer simply followed a custom of Wexford providers to sign the visit notes under someone else's name.  (Doc. 89 at p. 30, ¶ 16).  He further asserts this was a tactic to prevent care, or to intentionally incorporate false information in the records.  (*Id.*).  He maintains he would need further discovery to substantiate this theory.  (*Id.*).  In the alternative, in response to judgment on the pleadings, he argues that even if he saw Moldenhauer just once, Moldenhauer's care still amounted to deliberate indifference.  (Doc. 89 at 7).  He set forth the standards for a deliberate indifference claim at length,

arguing he had an objectively serious injury and that Moldenhauer's conduct was subjectively inadequate.

In making his argument against Moldenhauer, Plaintiff contends that the specialist found on February 8, 2022, that his "broken" hand had healed incorrectly, with bones "infused together, overlapping each other with them touching and rubbing against each other over a nerve," which required surgery and "a metal rod between the bones after rebreaking them[.]" (Doc. 89 at 9). He argues that radiology doctors "recommended on two occasions [he] be seen by a physician at an outside clinic[.]" (Doc. 89 at 9). He further argues Moldenhauer had these reports, but still ordered a two-month delay in his orthopedic consultation, which he alleges was a delay that caused a worsening of his condition and permanent damage. (Doc. 89 at 11). He characterizes Moldenhauer's decisions as intentionally ignoring a recommendation by a specialist. (Doc. 89 at 14). He also faults Moldenhauer for failing to follow Wexford directives, which he maintains should have allowed for emergency access to care within 24 hours, or within 72 hours at most. (Doc. 89 at 15). Finally, he contends that Moldenhauer had an independent professional and legal duty to intervene and to offer better care upon realizing that Plaintiff had a serious injury and had received grossly inadequate or inappropriate care. (Doc. 89 at 17).

In essence, the parties disagree about the contents of the same few pages of medical records. Plaintiff's assertion that medical staff follow a policy to falsify or omit information from records to cut costs is irrelevant to the issue of who he saw on November 6, 2021, because he does not argue the November 6 record contains false

information or information that prevented him from care.  At most, Plaintiff might rely on his second contention—that staff and nurses had a custom of signing records as other providers.  Although the Court must construe the record broadly and make all reasonable inferences in Plaintiff's favor, the Court finds this particular assertion and the associated inferences to be plainly unreasonable.  The Court views the record as undisputably demonstrating that Plaintiff saw different providers on November 6 and December 1, 2021.

The visit notes from the November 6, 2021, visit and the December 1, 2021, visit are clearly prepared in distinct formats.  The form containing the November 6 notes provides a triage protocol for an injury with a designated line for a "nurse signature." (Doc. 1-1 at 48). The individual using the form records a variety of information about physical symptoms and then has different outcomes to select based on the symptoms recorded.  The author of the November 6 notes recorded self-reported pain of an 8 out of 10, and based on this notation, the author then circled the "plan" to refer Plaintiff to an MD, which the form called for if severe pain was reported.  (*Id.*).  By contrast, the December 1 notes are recorded on a plain "progress notes" form that calls for the author to provide an open-ended narrative of the symptoms and plan.  (Doc. 1-1 at 52). Moldenhauer noted that Plaintiff was being seen to review right hand x-ray results. Plaintiff reported severe pain, and Moldenhauer then recorded a plan to prescribe Naproxen for 2 months for the pain, to schedule an EMG, to schedule an orthopedic consultation, and to see Plaintiff in two months on "MDNPCL."  Moldenhauer's signature is clearly legible at the end of the note.  (*Id.*).

Given the obvious distinctions between the two documents, the Court is not convinced Moldenhauer signed the November 6 visit notes using someone else's name, or that he had another provider sign on his behalf. Reading the records plainly, it makes sense that Plaintiff was first seen by a nurse or CMT on November 6, 2021, and was then seen by Moldenhauer on December 1, 2021, as a follow-up referral ordered by the November 6 provider. Accepting then that Plaintiff only saw Moldenhauer on a single occasion, the Court must consider if the allegations limited to this visit are sufficient to sustain a deliberate indifference claim.

Plaintiff faults Moldenhauer for delaying his access to treatment by directing that the orthopedic consultation be held two months from the December 1, 2021, visit, but this contention has no support in the record other than Plaintiff's own bare assertion that Moldenhauer intentionally delayed the specialist consult. (Doc. 89 at p. 30, ¶ 16). By contrast, the medical records with the complaint indicate that on December 2, 2021, the medical furlough clerk was already in the process of securing authorization for the "urgent referral for ortho eval" that Moldenhauer had made the previous day. (Doc. 1-1 at 55). Within a week of the December 1, 2021, visit, the medical furlough clerk's notes show that both the orthopedic evaluation and the EMG had been approved and scheduled. (Doc. 1-1 at 55-58). It appears that Plaintiff believes Moldenhauer intentionally delayed the appointment because his notes called for a two-month follow-up, but this was an in-house follow-up at Menard, not the orthopedic specialist visit. There are also no indications in the record that Moldenhauer had any control over the timeframe for scheduling the visit, or that he knew the date it was ultimately scheduled.

Given that Moldenhauer prescribed different pain medications, and made referrals for an EMG and orthopedic evaluation, the Court finds that at most his actions could be characterized as negligence, but certainly not deliberate indifference.

Plaintiff includes additional arguments about how urgently Moldenhauer should have addressed his situation, but these arguments are unavailing. To the extent that he argues Moldenhauer *knew* two earlier specialists (the radiologists who made x-ray findings in August and September of 2021) had recommended an outside follow-up, this is simply not true. The radiology x-ray findings show unequivocally that on September 2, 2021, and September 16, 2021, Dr. Yousuf detected no fractures or notable abnormalities and stated if Plaintiff's condition persisted or worsened then an outside visit *may* be considered. (Doc. 1-1 at 29, 32). Moldenhauer directly quoted this language in his notes from December 1, 2021, and though it was just suggestive, he followed it by making an urgent referral for an orthopedic consultation. Against this backdrop, it cannot be said he refused to follow another specialist's explicit recommendation or finding.

Plaintiff also argues that Moldenhauer had a duty to follow Wexford protocol for emergency services within 24 or 72 hours. Whatever Wexford's policies may be, they do not create a constitutionally protected interest. Additionally, Moldenhauer's notes do not suggest an emergency. Moldenhauer noted no swelling or deformity and recorded that although Plaintiff complained about not being able to make a fist, he was actually able to do so. Against this backdrop, it cannot plausibly be said Moldenhauer thought he was faced with an emergency necessitating immediate care. Finally, Plaintiff argues

Moldenhauer had an independent duty to intervene in inappropriate or inadequate care, but again, there is no evidence that care was so severely deficient, or that Plaintiff faced a dire medical risk. Thus, the Court is not persuaded that Plaintiff has plausibly alleged enough for a deliberate indifference claim against Moldenhauer.

Based on the foregoing analysis, the Court finds that the exhibits to the complaint support the finding that Moldenhauer is entitled to judgment on the pleadings on the deliberate indifference claim. All defendants were also included in an intentional infliction of emotional distress claim under state law but given that the Court finds it appropriate to grant judgment on the pleadings on claim 1 against Moldenhauer, it will now relinquish supplemental jurisdiction over any potential state law claim against Moldenhauer. Even if the Court did not relinquish supplemental jurisdiction, given that Plaintiff only saw Moldenhauer once and Moldenhauer completely altered the course of care at that visit, the Court does not find it plausible that Moldenhauer's treatment decisions could amount to the intentional infliction of emotional distress.

**B. Exhaustion of administrative remedies**

Despite concluding that judgment on the pleadings is appropriate, the Court will also briefly address the exhaustion issue. Moldenhauer argues that the October and November 2021 grievances are not sufficient to exhaust a claim against him because he had not yet seen Plaintiff at that point. As for the February 2022 grievance, he argues that it does not clearly identify his involvement in Plaintiff's care. Plaintiff counters that the primary purpose of a grievance is to put the prison on notice of a situation, and that because he generically named large groups of medical staff in each of the three

grievances, they are all sufficient to exhaust his claim against Moldenhauer.  (Doc. 89 at

21-38, Doc. 89 at 123-134 (Plaintiff's declaration)).

First, as to Plaintiff's contention that he did not have to specifically name

Moldenhauer, the Court is unpersuaded by this line of reasoning.  Though Plaintiff is

correct that the IDOC grievance policy allows for a grievance without knowing the name

of an individual, the grievance policy still calls for as much identifying information as

possible.  Plaintiff did not meet the spirit of this requirement for any potential allegations

against Moldenhauer.  Prior to seeing Moldenhauer on either November 6 or December

1, 2021, he could not have described Moldenhauer's characteristics in the October or

November grievances.  As for the February 2022 grievance, he could have provided

physical identifiers about Moldenhauer, or he could have clearly discussed the December

1, 2021, visit, but he did not do so.  Nothing in the February 2022 grievance distinguishes

Moldenhauer from any other potential healthcare employee at the prison.  This does not

comply with IDOC's grievance policy, which at least requires "as much descriptive

information about the individual as possible." 20 Ill. Admin Code § 504.810(c).

This leaves Plaintiff's alternative contention that precise identification of a party

by name or physical description is not essential to exhaustion where the grievance alerts

the prison to the issue with a chance to address it short of litigation.  Again, Plaintiff has

correctly identified legal precedent about exhaustion, but the precedent does not

necessarily fit his situation.  The present grievance dispute between the parties' centers

on a determination of if Plaintiff's grievances were sufficient under a theory of a

continuing violation to constitute exhaustion against Moldenhauer.  *See e.g., Turley v.*

*Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) ("primary purpose is to 'alert the state' to the problem and 'invite corrective action'").

The continuing violation theory does not always allow a single grievance about a medical condition to cover claims in perpetuity about a condition. For example, there have been instances when a medical grievance has been found insufficient if a provider had never seen or treated the inmate when a grievance was filed, or if the issues with care provided differed from one point in time to another. *See e.g., Barrow v. Wexford Health Sources, Inc.*, 2019 WL 5681378 (7th Cir. Nov. 1, 2019) (finding that an inmate's grievances about extended treatment for an eye condition believed to require surgery were not sufficient to exhaust claims against a new medical director that took over at the facility 8 months after a grievance was filed); *Reed v. Larson*, 2019 WL 6769319 at * 3 (S.D. Ill. Dec. 12, 2019) (finding that one grievance about a doctor's treatment might have sufficed to grieve a course of that doctor's treatment, but a grievance about a medical condition could not be sufficient to exhaust a claim "against a doctor whose conduct had not yet had any effect on [plaintiff]."); *Burt v. Harrington*, 2017 WL 468211 at *4-5 (S.D. Ill. Feb. 3, 2017) (finding that an inmate's grievance that a "medical doctor" did not refill his Motrin prescription did not exhaust claims against three named doctors where there was no evidence any of them treated him or had interactions with him prior to the grievance, and where he got two Motrin prescriptions within days of filing the grievance); *Garcia v. David, et al.*, Case No. 23-cv-3561 (S.D. Ill. Oct. 18, 2024, Doc. 41) (collecting cases on the continuing violation theory as it pertains to PLRA exhaustion).

At the time Plaintiff filed the October and November grievances, Moldenhauer was not yet involved in his treatment.  When Moldenhauer became involved, he immediately changed course from the prior providers by changing medications and ordering an EMG scan and an orthopedic consultation.  By changing the course of care, Moldenhauer parted ways with the contents of the October and November grievances.  Plaintiff's February 2022 grievance substantively circles back to the treatment that occurred *prior* to Moldenhauer's involvement.  Plaintiff clearly and unequivocally speaks again of his three prior x-rays in a 30-day period, and also complains of repeatedly being given ibuprofen.  Moldenhauer did not participate in any of this conduct and gave Naproxen instead of ibuprofen.  Against this backdrop, Plaintiff's situation is more similar to cases finding a grievance insufficient to exhaust against a new provider, than to cases finding that a single early grievance was sufficient to exhaust additional claims about future care.  Thus, the Court concludes that Plaintiff's grievances are insufficient to exhaust a claim against Moldenhauer, so Claim 1 is also subject to dismissal against Moldenhauer for failure to exhaust administrative remedies.  If the case was resolved on this alternative ground, the Court would still relinquish supplemental jurisdiction over Claim 5 against Moldenhauer.

### DISPOSITION

Plaintiff's Motion for Judge to Accept Late Filing to Respond to Reply Brief (Doc. 81), and the Motion for Status of the same (Doc. 82) are **DENIED**.  Sur-reply briefs are prohibited by Local Rule 7.1(a)(4), so the Court will not accept the contents of Plaintiff's

sur-reply at document 80.  Plaintiff's Motion for a Status Update (Doc. 82) on recently filed pleadings is **GRANTED** by the issuance of this Order, and the Clerk of Court is DIRECTED to send Plaintiff a copy of the docket sheet.

Defendant Moldenhauer's Motion for Judgment on the Pleadings (Doc. 68) is **GRANTED**, and in the alternative, the Court concludes that Defendant Moldenhauer is also entitled to summary judgment on Plaintiff's failure to exhaust the claims against him. The Court declines to exercise supplemental jurisdiction over Claim 5 against Defendant Moldenhauer.  Thus, this Order resolves all claims against Moldenhauer.  The Clerk of Court is **DIRECTED** to **TERMINATE** Moldenhauer and to enter judgment in his favor at the close of this case.

Defendants Crain, Pierce, and Wills' Motion to Withdraw the affirmative defense of failure to exhaust administrative remedies (Doc. 66) is **GRANTED**.  However, merits discovery will remain stayed until Defendant Florence's pending Motion for Summary Judgment is resolved.

IT IS SO ORDERED.

Dated: December 27, 2024

/s *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge