United States District Court For
The Southern District OF Illinois

Keith Allen - # M21830
      Plaintiff,

V.

Wexford Health Sources, Inc., et al.
      Defendants.

Case Number: 23-cv-3775-DWD

Honorable Judge: David W. Dugan

---

"Plaintiff's Motion To Compel Discovery"

---

    The plaintiff, Keith Allen-M21830, pro se, moves pursuant to Rule 34(b) and 37(a), Fed. R. Civ. P., for an order Compelling the defendants to produce for inspection and copying the documents requested on 10/16/25.

Date: 5/3/26

Name And Address: Keith Allen-M21830
                Menard Correctional Center
                P.O. Box 1000
                Menard, IL. 62259

/S/ Keith Allen -# M21830
Plaintiff's Signature - Pro Se

United States District Court For
The Southern District OF Illinois

Keith Allen - #M21830,

     Plaintiff,

v.

Wexford Health Sources, Inc., et al.
     Defendants.

Case Number: 23-cv-3775-DWD

Honorable Judge: David W. Dugan

" Plaintiff's Declaration In Support OF Motion To Compel "

Keith Allen - M21830 declares under penalty of perjury:

1.) I am the plaintiff in this case. I make this affidavit in support of my motion to compel discovery.

2.) On 10/16/25, I served on the defendants' counsel a request for production of documents, which is attached to this affidavit as Exhibit #"1K".

3.) On 12/18/25, defendant responded to plaintiff's document request by filing objections to the production of any of the materials sought. A copy of their objections is attached as Exhibit #"2K".

4.) Plaintiff wrote to defendant's counsel, Keith B. Hill, representing Wexford Health Sources, Inc., on 3/3/26, in an attempt to resolve the dispute informally as required by Local Rule. A copy of my letter is attached as Exhibit #"3K". One month have passed since ~~he mailed~~ he mailed Exhibit #"3K" and defendant's counsel has not yet responded to it.

5.) Defendants' Objections on the ground that the discovery sought is irrelevant, burdensome, overly broad, and privileged have no merit, as set forth in the brief accompanying this motion.

Date: 5/3/26

/s/ Keith Allen - M21830
    Plaintiff's Signature, Pro se

Name And Address: Keith Allen - M21830, Menard Correctional Center, P.O. Box 1000, Menard, IL. 62259.

page (1.) of (1.)

United States District Court For
The Southern District OF Illinois

Keith Allen - #M21830,

     Plaintiff,

v.

Wexford Health Sources, Inc., et al.

     Defendants.

Case Number: 23-cv-3775-DWD

Honorable Judge: David W. Dugan

"Memorandum OF Law In Support OF Plaintiff's Motion To Compel"

   Now Comes Plaintiff, Keith Allen-M21830, Pro Se, and moves this Court for an order compelling the production of plaintiff's discovery requests and more complete answers to Plaintiff's discovery requests, and in support therefore states as follows:

("Statement Of The Case")

  This is a civil rights case filed under 42 U.S.C. §1983 by a State prisoner at Menard Correctional Center and asserting claims for the unconstitutional denial of adequate medical care for a broken hand, denial and delays of access to adequate medical care for a broken hand, denial and delays of access to adequate medical treatment, examination by Orthopaedic Hand Specialist, misdiagnosis, falsified medical reports, medical malpractice claims, deliberate indifference to serious medical needs claims on multiple defendants, and intentional infliction of emotional distress claims against 8 different state tort claims consisting of 4 Medical Malpractice claims, and 8 Intentional Infliction of Emotional Distress Claims. Plaintiff seeks damages as to all claims, a declaration, and an injunction to ensure proper medical care in the future and to correct unlawful Wexford Health Sources, Inc., medical policies that are causing inmates serious injuries, irreparable damage, unnecessary pain and suffering, permanent damage and deformity, and even deaths of inmates under their care.

page ① of ⑭.

("Statement Of Facts")

On 10/16/25, the plaintiff, Keith Allen - #MA1830, served a request for production of documents pursuant to Rule 34, Fed. R. Civ. P. (See Ex. #"1K"). As set forth in plaintiff's declaration, on 12/18/25, defendants served a response in which they objected to the plaintiff's efforts to resolve this dispute, despite plaintiff sending a letter to defendants counsel on 3/3/26, in an attempt to resolve this dispute informally as required by local rule. (See Ex. #"3K").

("Standard Of Review")

The scope of discovery is defined by Federal Rule of Civil Procedures as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. Proc. 26 (b)(1).

The key phrase in this definition — "relevant to the subject matter involved in the pending action" — has been contrued broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. Oppenheimer Fund, Inc v. Sanders, 437 U.S. 340, 351 (1978) (citing Hickman v. Taylor, 329 U.S. 495 (1947). Discovery is not limited to Issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. Id.

("Argument")

"Point 1"

("THE DISCOVERY SOUGHT IS RELEVANT TO THE CLAIMS AND DEFENSES IN THIS CASE")

Defendants' objections state that the documents requested by the plaintiff are irrelevant to the action, the requests are overly broad and unduly burdensome because it's not reasonably limited in time, seeks documents that are equally available to plaintiff, etc. Their arguments are frivolous.

Plaintiff submits that each of his requests is well within the scope of discovery as defined by Rule 26 (b)(1) and the cases interpreting it. Plaintiff notes additionally that Defendant has failed to provide any evidence to establish how any of these requests would be unduly burdensome. (see Ex. #1K).

Rule 26 (b)(1), Fed. R. Civ. P., permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense.

... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

Each item mentioned in this motion and sought by the plaintiff is relevant to the claims and defenses in the case, as explained below.

(A.) "Documents relevant to Wexford Health Sources, Inc.'s Unconstitutional Expressed Policies that was the moving force behind Plaintiff's injury".

The primary issues requiring resolution are as follows:

(1.) "Timeline" — (applicable to multiple requests: Plaintiff requested documents from 2011 to 2025. (See Ex. # "1K"). Defendants assert that via their objections to plaintiff's request as overly broad and unduly burdensome because it is not reasonably limited in time and subject matter. (See Ex. "1K"). Plaintiff submits that, his document requests are reasonably limit in time and subject matter from 2011 to 2025 as it pertains

Page (3.) of (14.)

-the Wexford's Unconstitutional policies surrounding their providing health care for the Illinois Department Of Corrections inmates between Wexford Health Sources, Inc., and the Illinois Department of Corrections agreed upon in 2011. Then the creation of the Wexford Health Sources, Inc.'s "Provider Handbook" with the date of effectiveness 6/8/12, consisting of their medical policies governing the administration of medical care instructed and provided by the employed medical staff that was the motivating force behind the delays, denials, misdiagnosis, and inadequate medical treatment plaintiff received upon sustaining his severe hand injury on 8/16/21, which led him to the unnecessarily experiencing prolonged pain and the worsening of his injury that resulted in an approximately 19 month delay from the date he sustained his injury until receiving any form of meaningful treatment in Carpal Tunnel Syndrome surgery on 3/3/23, which lessened the effectiveness of the treatment he received in being denied bone corrective surgery for an improperly healed misdiagnosed fractured hand on 2/8/22. Reed v. Wexford Health Sources, Inc., 20-cv-01139-SPM (S.D. Ill. Sep 28, 2023) ("Finally, IDOC had not provided any information to support its contentions that the requests were overly broad and producing the subpoenaed documents would be burdensome. The court therefore could not make a determination on whether the burden imposed by the subpoena was undue).

(2.) Request No. 1: "Provider Handbook from June 8, 2012": Plaintiff requested the Wexford Health Sources, Inc., "Provider Handbook" (Approved by the Wexford Medical Advisory Committee on June 8, 2012). (see Ex. "1K").

• "Defendant's Response": Defendant objects to this request because it seeks a document that is not relevant to any party's claim or defense and proportional to the needs of the case. (see Ex. # "2K").

• "Plaintiff's Response To Defendant's Objection": Plaintiff contends that defendants response is insufficient, because plaintiff's request for the Wexford Health Sources, Inc.'s, Provider Handbook from June 8, 2012, is directly relevant since it contains their expressed —

-medical policies which are inadequate instructing their employed medical staff to misdiagnose inmates injuries to prevent having to provide treatment, how cost is one of the main factors in deciding to provide effective treatment, and various policies aimed at providing known ineffective courses of treatment that prolongs inmates pain, worsens their injuries, lessens the effective of the treatment provided, all due to delays and denials of access to adequate medical treatment for chronic illnesses, and more expensive forms of treatment to cut costs. (See Ex. "5K"). All of which forms the basis of plaintiff's policy claims against Wexford Health Sources, Inc., and other defendants adherance to it that shows how they were the moving force behind his deliberate indifference to his serious medical needs claims and injuries resulting thereof; And proof of Wexford's intentional, malicious conduct since their policies Contradict the level of care they agreed to provide IDOC inmates inorder to secure the Bid for the IDOC Health Care Service Provider Contract, exhibiting deliberate deception that is highly relevant to plaintiff's claims of Wexford's unconstitutional policies being the motivating force behind his inadequate Medical care and injuries. (See Plaintiff's Complaint; Ex. # "5K"). Wiley v. Young, 21-cv-599-JPG-RJD (S.D. Ill. Feb 13, 2023) ("Nonetheless, because Plaintiff has articulated a relevant purpose to her discovery, the court opts to compel defendant to produce certain documents responsive to that purpose, rather than just deny plaintiff's motion to compel outright).

(3.) Request No. 2: "IDOC & Wexford Negotiated Health Service Contract": Plaintiff request any copy of the Negotiated Health Services Contract between Wexford Health Sources, Inc., and the Illinois Department of Corrections agreed upon in 2011, and any other/later negotiated Health Service Contracts thereafter to the current date. (See Ex. # "1K"). '

"Defendant's Response": Defendant objects to this requests as overly broad and unduly burdensome because it is not reasonably limited in time and subject matter. Defendant further objects to this request because it seeks documents that are not relevant to any party's

Page (5.) of (14.)

- claim or defense and proportional to the needs of the case. (See Ex. #"2K").

• "Plaintiff's Response To Defendant's Objection": Plaintiff argues that the defendant's response is insufficient for the following reasons. First, the IDOC and Wexford Health Sources, Inc.'s Negotiated Healthcare Service Provider Contract agreement agreed upon in 2011 is relevant to plaintiff's inadequate Wexford Medical Policy Claims inside their June 8, 2012 Provider Handbook, which contradicts the IDOC Medical Service Contract Agreement terms that shows they intentionally created inadequate medical policies that goes against the medical terms and agreements that complied with the medical standards of care and the Eighth Amendment's adequate medical care require -ments - less than a year after agreeing to provide adequate medical treatment to IDOC inmates. (See Ex.º "5K", Ex. #"4K"). Then medical care, the adequate medic -al care standard that IDOC required Wexford to provide its inmates in custody under their care in order to become the Healthcare Medical Service Provider of IDOC, was entered with Wexford under false pretenses. Which review of the IDOC Contract between Wexford, and the Wexford Health Sources, Inc., Provider Handbook effective June 8, 2012 demonstrates, proving that Wexford provided false promises to provide Illinois prisoners adequate medical treatment in agreemen -t in agreement with the terms, and level of care required by IDOC to procure the bid; and position as the Medical Service Provider for IDOC inmates in excha -nge for an approximately 1 Billion dollar, ten year contract agreement. Only to draft the medical policies governing their standards of care that they're instruct -ing their employees to adhere to that doesn't meet the terms agreed upon to satisfy their ~~employee~~ contract agreement with IDOC, aimed at providing inadequate, cheap, and known ineffective courses of treatment designed to cut costs and increase their profit margin -s by delaying and denying access to adequate medical care leading to various inmates injur -ies; despite them knowing they could lose their IDOC Medical Service Provider Contract-

Page (6) of (14)

-for causing inmates injuries. And the initial IDOC and Wexford contract agreement for an approximately 10 year period commencing between 2011 to 2012 would lead up to 2021 around the time plaintiff sustained his severe right hand injury under Wexford's care, with the events and inadequate practices of the care Wexford's medical staff provided plaintiff being reflective as resulting from Wexford's expressed medical policies in their Provider Handbook from June 8, 2012, and customs being responsible and the motivating force behind plaintiff's injuries, pain and worsening of his injury, etc. Nor would providing plaintiff a copy of this Negotiated Contract between IDOC and Wexford be burdensome, or providing any other updated or amended versions, all of which is directly related to proving plaintiff's policy claims against Wexford, and support his claims against his other defendants. Reed v. Wexford Health Sources, Inc.; 2022 WL 4483949, at *6 (S.D. Ill. Sept 27, 2023)("Often Monell claims that involve an alleged "widespread and persistent' practice" necessarily involve broad discovery.").

(4.) Request No. 3: "Any and all other updated Wexford Health Sources, Inc., "Provider Handbooks" issued between dates 2012 to the present year of 2025." (see Ex. # "2k").

• "Defendant's Response": Defendant objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time. Defendant further objects to this request because it seek documents that are not relevant to any party's claims or defense and proportional to the needs of the case. (see Ex. # "2k").

• "Plaintiff's Response To Defendant's Objections": Plaintiff states in response to the defendant's objection to his request for copies of any and all other updated Wexford Health Sources, Inc., Provider Handbooks' issued between date 2012 to the present year of 2025 is not overly broad and unduly burdensome, nor is it not reasonably limited in time. Since even if Wexford issued a new handbook once a year that would only be 14 handbooks since plaintiff is only requesting the updated Wexford Provider Handbooks issued —

between the dates of 2012-2025, and these time frames aren't overly broad and unduly burdensome, and they are reasonably limited in time, because IDOC and Wexford entered their negotiated healthcare service provider contract in May of 2011, which then ed to the issuance of the 2012 Wexford Provider's Handbook that demonstrates the policies therein were the moving force behind the injuries plaintiff suffered, and supports his claims. Claims of which occurred in 2021 through 2023 and the updated versions of the Wexford Provider's Handbook from 2012 produced between the years of 2012-2025 are relevant to his claims against defendants and time frames surround the issuance of the 2012 Wexford Provider's Handbook. (See Ex. # "5K"). These requested documents are relative to the period between when plaintiff injured his right hand, the inadequate medical treatment he received over that 19 month period until he finally received surgery on 3/3/23.

Hence, any Wexford Provider Handbook whose policies governing their medical practices, treatment, and employees, including subcontracted community physi-cians Radiologists conduct that dictates the medical care they provide Illinois inmates. Wexford's employed and subcontracted medical staff personnel who admi-nistered blatently inadequate medical care to plaintiff as a result of their adherance to those unlawful Wexford medical policies contained in their Provider Handbooks being the motivating force instructing their employees conduct that is relevant to plaintiff's claims of the inadequate medical treatment he received by medical personnel employed and overseen by Wexford whether directly employed or subcontrac-ted by Wexford to fulfill their Illinois Healthcare Medical Service Provider obligati-on and responsibility to inmates housed in the Illinois Department of Corrections to provide adequate medical care for their serious medical needs. Thus plaintiff has shown that the information requested in this request is relevant for the purpose of discovery, and Wexford Health Sources, Inc., hasn't provided any information to support its

Page 8. of 14.

— contentions that this request was overly broad and producing the request document -s in this request would be burdensome, and Wexford has already released these similiar requested Provider Handbooks to plaintiff's in other cases. (See Ex. #"5k", Ex.# "4k", Ex. #"1k", Ex. #"2k", Ex. #"3k"). Wiley v. Young, 21-cv-599-JPG-RJD (S.D. Ill. Feb 13, 2023) ("Wexford produced its Guidelines and Provider Handbook to plaintiff's in response to a request for "all documents, including but not limited to manuals, proto -cols, procedural guides, rules, policies, practices, guidelines, and training materials, from the period of January 2014 - present. .... regarding the following subjects." Accordin -gly, Defendant shall produce any documents that refer to Wexford's unwritten customs and practices since 1/1/2014, but before July 1, 2019, within the IDOC regarding ① diagnosis, evaluation, treatment for colon cancer, and ② diagnosis, evaluation, and treatment for sudden or dramatic weight loss).

⑤ Request No. 8 : "A copy of any and all documents of Wexford Health Source -s, Inc., Subcontracting or employing Radiologists - Medical Doctors, N. Florence and N. Yousuf, or a company named "One Radiology", address: Normal, IL. 61761 to conduct reviews of inmates at Menard Correctional Center X-ray films." (See Ex. 1k)

• "Defendant's Response": Defendant objects to this request because it is uninte -llible so as to make an answer impossible without speculation as to the ~~meaning~~ meaning of the request. Defendant further objects because this request is based on an assumption, which is improper. If Plaintiff wants information from defendant, he must ask simple questions that are clear to the reader and can be answered with simple responses. Shelley v. Hoenish, No. 08-cv-107 bbc, 2008 WL 2489927, at *2 (W.D. Wis. June 19, 2008). Def -endant further object to this request as overly broad and unduly burdensome because it is not reasonably limited in time or subject matter. Defendant further objects to this request because it seeks documents that are not relevant to any party's claim or defense and proportio -nal to the needs of the case." (See Ex. #"2k").

page ⑨ of ⑭

• "Plaintiff's Response To Defendant's Objection": Plaintiff disagrees with all defendant's objections in response to his production of documents request number 8. First, defendants object stating this request is unintellible so as to make an answer impossible without speculation as to the meaning of the request, but there's nothing difficult to understand about plaintiff's request asking for a copy of any and all documents Wexford has in regards to them subcontracting or employing the two Medical Doctor-Radiologists, Nicholas Florence and Naveed Yousuf, or the company they were employed by named "One Radiology" located in "Normal, IL. 61761" at the relevant times they were used by Wexford employees Nurse Practitioners - Jilian Crane and Alisa Dearmond as a consultant to review plaintiff's x-ray films tooken at Menard Correctional Center on dates 8/20/21, 8/31/21, and 9/14/21, who they corresponded back and forth with on multiple occasions, and provided "M.D. Review" x-ray film Radiology Report Finding Diagnosis of plaintiff's right hand injury.

Contrary to defendant's objection stating, plaintiff's request is based on an assumption which is improper. Plaintiff's request for any and all documents Wexford has pertaining to them subcontracting or employing Radiologists N. Florence and N. Yousuf to review his x-ray films of his right hand injury conducted on three seperate occasions is not improper, nor based on an assumption because they're Independent, private medical Radiologists whom at least N. Florence worked for "One Radiology" at the time Wexford's employees Jilian Crane and Alisa Dearmond, employed the services of on a consultant basis to review and diagnosis plaintiff's x-ray films of his right hand injury; on behalf of Wexford Health Sources, Inc., who were the Healthcare Medical Service Providers for IDOC responsible for providing adequate medical care to plaintiff, who were allowed to use subcontractors to fulfill their medical service provider obligations pursuant to the IDOC and Wexford's Negotiated Health Service Contract.

The information plaintiff requested from defendant, Wexford Health Sources, Inc. in his—

production of documents request number 8 were simple and straight forward quest-ions that were clear to the reader that could be answered with simple responses. Plaintiff's request wasn't overly broad or unduly, burdensome because it was reasonably limited in time and subject matter as it pertained to the inadequate conduct of two Radiologist- N. Florence and N. Yousuf whom Wexford and it's employees employed the services of as a consultant to review and diagnose plaintiff's severe right hand injury that they misdiagnosed and were deliberate indifferent to his serious medical needs; that led to unnecessary delays or denials of access to adequate medical treatment, which are relevant to plaintiff's claims and proportional to the needs of the case, because the Radiologists conduct caused him unnecessary prolonged pain, the worsening of his injury, and the lessening of the effectiveness of the treatment provided as a result of their inappropriate conduct, whom Wexford employed and subcontracted the services of to assist in fulfilling their medical contract obligations to IDOC and the Illinois inmates under their care. Wiley v. Young, 21-cv-599-JPG-RJD(s.D. Ill. Feb 13, 2023)("Nonetheless, because Plaintiff has articulated a relevant purpose to her discovery, the court opts to compel defendant to produce certain documents respon-sive to that purpose, rather than just deny plaintiff's motion to compel outright).

(6.) Request No. 5: "Request For NCCHC Standards" - "A copy of the Nationa-l Commission of Correctional Health Care (NCCHC) Standards, which Wexford Health Sources, Inc., claims that whenever it assumes responsibility for medical care manage-ment, a concerted effort is made to meet and exceed the standards for medical care in Prisons and Jails as established by the National Commission of Correctional Health Care, that Wexford claims to have met and operates under." (See Ex. "1k").

• "Defendant's Response": Defendant objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time and subject matter. Defenda-nt further objects to this request because it seek documents that are not relevant to

Page (11.) of (14.)

any party's claim or defense and proportional to the needs of the case. Defendant further objects to this request because it seeks documents that are equally available to plaintiff." (See Ex. 2K).

• "Plaintiff's Response To Defendant's Objection": Plaintiff contends that this request for the National Commission of Correctional Health Care (NCCHC) standards are not overly broad and unduly burdensome because it is reasonably limited in time and subject matter; and it's relevant to plaintiff's Medical Malpractice claims against medical personnel defendants, whose conduct deviated from the NCCHC standard of care that resulted in plaintiff sustaining an injury prolonged pain, and the worsening of his injury, and lessening the effectiveness of the treatment he received. The NCCHC standards are also relevant to his deliberate indifferent claims against the medical staff and Radiologists whose medical judgment went against the NCCHC medical standards that caused delays or denials of access to adequate medical treatment, an Orthopaedic Hand Specialist for eval to property assess, diagnose, and treat plaintiff's severe right hand injury. These NCCHC standards are also relevant to plaintiff's claims of Wexford's inadequate policies that were the motivating factor in dictating Wexford's employees and subcontract consultants Radiologists N. Florence and N. Yousuf's treatment provided in misdiagnosing his right hand injury, omitting key information and symptoms from their medical records X-ray review findings inside Radiology Reports, defering their sound professional judgment to adhere to Wexford's unlawful policies aimed at providing known ineffective courses of treatment to cut cost and save money, which is designed to delay or deny adequate medical care and access to outside physicians qualified to properly treat plaintiff's serious medical needs. It's also relevant because Wexford Health Sources, Inc., Claims that their medical policies within their Wexford Provider's Handbook from 2012 and their employed and subcontracted medical staff all meet

Page (12) of (14)

and exceed the standards for medical care in prisons and jails as established by the National Commission of correctional Health Care that Wexford claims to met and operate under. Thus, are relevant to plaintiff's claims and experiences of inadequate medical treatment he received by Wexford and their employed and subcontracted medical staff that contradicts their contentions, and the production of the NCCHC standards when compared to the Wexford's provider Handbook and care plaintiff received will prove that didn't adhere to the NCCHC Standards of care. For these reasons, the material sought is relevant and should be produced. **Reed** v. Wexford Health Sources, Inc., 20-cv-01139-SPM (S.D.Ill. Sep 28, 2023) ( Finally, IDOC had not provided any information to support its contentions that the requests were overly broad and producing the subpoenaed documents would be burdensome. The court therefore could not make a determination on whether the burden imposed by the subpoena was undue.).

## "Conclusion"

For the foregoing reasons, Plaintiff, Keith Allen-M21830, respectfully requests that this Court enter an order compelling Defendants to comply fully and completely with Plaintiff's Production Request contained with this Motion to Compel and supporting Memorandum by a reasonable date.

Keith Allen-M21830
Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259

Date: 5/3/26    Respectfully Submitted,
/S/ Keith Allen-M21830

## "Certificate Of Service"

I, plaintiff, Keith Allen-M21830, certify that on ___5/3/26___ I placed the Motion titled Plaintiff's Motion To Compel Discovery" consisting of a combined 16 page and 36 pages of attached exhibits in Menard Correctional Center's institutional mail to be mailed via USPS certified

Page 13. of 14.

-mail to be filed with the Clerk of the court of the United States District Court, for the Southern District Of Illinois, 750 Missouri Avenue, of this motion to all defendant's attorneys of the record!

Date: 5/3/26                 Respectfully Submitted, Thank You & God Bless!

Keith Allen - M21830

/S/ Keith Allen

Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259

In The United States District Court
For The Southern District OF ILLINOIS

Keith Allen - #M21830,

    Plaintiff.

v.

Wexford Health Sources, Inc., et al.
        Defendants.

Case No. 23-cv-3775-DWD

Plaintiff Keith Allen - #M21830's Request For Production OF Documents To Defendant Wexford Health Sources, Inc.

Plaintiff, Keith Allen - #M21830, Pro Se, pursuant to the Fed. R. Civ. P. 34, requests that defendant, Wexford Health Sources, Inc., to respond to the following Requests For Production within 30 days following service:

"Requests For Production"

1.) The Wexford Health Sources, Inc., "Provider Handbook" (Approved by the Wexford Medical Advisory Committee On June 8, 2012).

2.) Any and all other updated Wexford Health Sources, Inc., "Provider Handbooks" issued between dates 2012 to the present year of 2025.

3.) A copy of the Negotiated Health Service Contract between Wexford Health Sources, Inc., and the Illinois Department Of Corrections agreed upon in 2011, and any other later negotiated health service Contracts thereafter to the current date.

4.) A copy of the American Correctional Association (ACA) Standards, which Wexford claims to have met and operates under.

5.) A Copy of the "National Commission of Correctional Health Care (NCCHC) Standards, which Wexford Health Sources, Inc., claims that whenever it assumes responsibility for medical care management, a concerte effort is made to meet and exceed the Standards for Medical Care in Prisons and jails as established by the National Commission of Correctional Health Care, that Wexford claims to have met and operates under.

6.) A Copy of Wexford Health Sources, Inc., Medical Protocols, "SOAPE" Charts.

(1)

7.) Any and all electronically stored correspondences such as logs, fax, email messages between Wexford Health Sources, Inc., and Menard Correctional Center Medical Personnel, Medical Doctors V. Florence and N. Yousef Radiologists, and any other outside medical providers pertaining to the medical care and treatment of Keith Allen - # M21830 between dates March 1, 2021 to October 1, 2024.

8.) A Copy of any and all documents of Wexford Health Sources, Inc., sub-contracting or employing Radiologists - Medical Doctors, N. Florence and N. Yousef, or a company named "OneRadiology", address: Normal, IL. 61761 to conduct reviews of inmates at Menard Correctional X-ray films.

9.) All medical records, reports, or correspondence from IDOC or outside medical providers concerning evaluation, treatment, or diagnosis of your right hand from August 16, 2021 to present.

10.) All radiology images (including X-rays, MRIs, CT scans) or radiology reports for plaintiff's right hand from August 2021 to present received for Menard Correctional Center's Medical personnel, The Orthopaedic Institute OF Southern Illinois medical staff, (SIH) Southern Illinois Healthcare - Brian and Spine Institute, and from Radiologists - N. Florence and N. Yousef.

11.) All medical records or notes from any outside provider who diagnosed or treated plaintiff right hand or pertaining to plaintiff - Keith Allen - # M21830 healthcare related to his right hand injury that Wexford Health Sources, Inc. received from 3/16/21 to the present.

12.) A list of all the names and civil cases filed and settled against Wexford Health Sources, Inc., from 2011 to 2025 in the whole United States pertaining to inadequate medical care and deliberate indifference to inmates serious medical needs.

13.) All written communications or filings you have made to any government agency, lawyer, or court concerning this lawsuit or plaintiff's right hand injury.

14.) All photographs, videos, recordings, of plaintiff's - Keith Allen - # M21830 right hand taken from August 16, 2021 to present received from Menard C.C. and any outside medical providers.

(2)

905-189

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KEITH ALLEN. #M21830.            )
                                 )
        Plaintiff,               )
                                 )
v.                               )        No. 23-cv-3775-DWD
                                 )
WEXFORD HEALTH SOURCES, INC.,    )
et al.                           )
                                 )
        Defendants.              )

### WEXFORD HEALTH SOURCES, INC.'S OBJECTIONS AND RESPONSES TO PLAINITFF'S "REQUESTS FOR PRODUCTION"

NOW COMES Defendant, WEXFORD HEALTH SOURCES, INC., by and through its

attorney, Keith B. Hill of HEYL, ROYSTER. VOELKER & ALLEN, P.C., and for its

Objections and Responses to Plaintiff's "Requests for Production," states:

1.) The Wexford Health Sources, Inc., "Provider Handbook" (Approved by the Wexford Medical Advisory Committee on June 8, 2012).

**RESPONSE:** Defendant objects to this request because it seeks a document that is not relevant to any party's claim or defense and proportional to the needs of the case.

2.) Any copy of the Negotiated Health Service Contract between Wexford Health Sources, Inc., and the Illinois Department of Corrections agreed upon in 2011, and any other later negotiated Health Service Contracts thereafter to the current date.

**RESPONSE:** Defendant objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time and subject matter. Defendant further objects to this request because it seek documents that are not relevant to any party's claim or defense and proportional to the needs of the case.

3.) Any and all other updated Wexford Health Sources, Inc., "Provider Handbooks" issued from an dates paid to the present year of 2022.

**RESPONSE:** Defendant objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time. Defendant further objects to this request because it seek

documents that are not relevant to any party's claim or defense and proportional to the needs of the case.

4.) [handwritten text, illegible] ... Correctional Association (ACA) Standards, which Wexford claims to have met and operates under.

**RESPONSE:** Defendant objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time and subject matter. Defendant further objects to this request because it seek documents that are not relevant to any party's claim or defense and proportional to the needs of the case. Defendant further objects to this request because it seeks documents that are equally available to Plaintiff.

5.) A copy of the "National Commission of Correctional Health Care (NCCHC) standards, which Wexford Health Sources, Inc., claims that whenever it assumes responsibility for medical care management, a concerted effort is made to meet and exceed the standards for Medical Care in Prisons and jails as established by the National Commission of Correctional Health Care, that Wexford claims to have met and operates under.

**RESPONSE:** Defendant objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time and subject matter. Defendant further objects to this request because it seek documents that are not relevant to any party's claim or defense and proportional to the needs of the case. Defendant further objects to this request because it seeks documents that are equally available to Plaintiff.

6.) A copy of Wexford Health Sources, Inc., Medical Records, "SHU" Charts.

**RESPONSE:** Defendant object to this request because it is unintelligible so as to make an answer impossible without speculation as to the meaning of the request. Defendant further objects because this request is based on an assumption, which is improper. If Plaintiff wants information from Defendant, he must ask simple questions that are clear to the reader and can be answered with simple responses. *Shelley v. Hoenisch*, No. 08–cv–107–bbc, 2008 WL 2489927, at *2 (W.D.Wis. June 19, 2008). Defendant further objects to this request as overly broad and unduly burdensome because it is not reasonably limited in time or subject matter. Defendant further object to this request because it seek documents that are not relevant to any party's claim or defense and proportional to the needs of the case. Without waiving its objection, Defendant refers Plaintiff to previously produced medical records, including documents bates stamped Keith Allen 000191 to Keith Allen 000496.

905-189

*7.) Any and all electronically stored correspondences such as logs, fax, email messages between Wexford Health Sources, Inc., and Menard Correctional Center, Medical Personnel, Medical Doctors ... ... and any other outside medical providers pertaining to the medical care and treatment of Keith Allen #M21850 between dates March 1, 2021 to October 1, 2024.*

. **RESPONSE:** None.

*8.) A Copy of any and all documents of Wexford Health Sources, Inc., sub-contracting or employing Radiologists - Medical Doctors, N. Florence and M. Yousef, or a company named "One Radiology", address: Normal, IL. 61761 to conduct reviews of inmates at Menard Correctional ... on X-ray films.*

**RESPONSE:** Defendant objects to this request because it is unintelligible so as to make an answer impossible without speculation as to the meaning of the request. Defendant further objects because this request is based on an assumption, which is improper. If Plaintiff wants information from Defendant, he must ask simple questions that are clear to the reader and can be answered with simple responses. *Shelley v. Hoenisch*, No. 08–cv–107–bbc, 2008 WL 2489927, at *2 (W.D.Wis. June 19, 2008). Defendant further object to this request as overly broad and unduly burdensome because it is not reasonably limited in time or subject matter. Defendant further objects to this request because it seek documents that are not relevant to any party's claim or defense and proportional to the needs of the case.

*9.) All medical records, reports, or correspondence from Wexford or outside medical provider concerning evaluation, treatment, or diagnosis of your right hand from August 1, 2021 to present.*

, **RESPONSE:** Defendant objects to this request because Plaintiff's medical records are not in the custody or control of Defendant. Without waiving its objection, Defendant refers Plaintiff to previously produced medical records, including documents bates stamped Keith Allen 000191 to Keith Allen 000496.

*10.) All radiology images (including X-rays, MRIs, CT scans) or radiology reports for plaintiff's right hand from August 2021 to present received for Menard Correctional Center's Medical personnel, The Orthopedic Institute of Southern Illinois medical staff, (SI4) Southern Illinois Healthcare - Brain and Spine Institute, and from Radiologists - N. Florence and M. Yousef.*

. **RESPONSE:** Defendant objects to this request because Plaintiff's medical records are not in the custody or control of Defendant. Without waiving its objection, Defendant refers Plaintiff to

Page 3 of 6

905-189

previously produced medical records, including documents bates stamped Keith Allen 000191 to Keith Allen 000496.

11.) All medical records or the like for *[handwritten, partially illegible]* right hand or pertaining to plaintiff - Keith Allen *[illegible]* healthcare related to his right hand injury that Wexford Health Sources, Inc. received from 3/16/21 to the present.

**RESPONSE:** Defendant objects to this request because Plaintiff's medical records are not in the custody or control of Defendant. Without waiving its objection, Defendant refers Plaintiff to previously produced medical records, including documents bates stamped Keith Allen 000191 to Keith Allen 000496.

12.) A list of all the names and civil cases filed and settled against Wexford Health Sources, Inc., from 2011 to 2025 in the whole United States pertaining to inadequate medical care and deliberate indifference to inmates serious medical needs.

**RESPONSE:** Defendant object to this request because it is not required to create new documents to respond to a request for production. Defendant further objects to this request as overbroad and unduly burdensome because it is not reasonably limited in time or subject matter or geographic scope. Defendant further objects to this request because it seeks discovery that is not relevant to any party's claim or defense and proportional to the needs of the case. *See Jordan v. Welborn,* 2017 U.S. Dist. LEXIS 90690, *2-3 (S.D. Ill. June 13, 2017) (denying the plaintiff's motions to compel the defendants to answer discovery about "prior lawsuits" in an Eighth Amendment case, finding that the defendants involvement in prior lawsuits and actions by other inmates are irrelevant to whether they were deliberately indifferent to Plaintiff's medical needs); *Beard v. Obaisi,* 2012 WL 5305357, *3 (C.D. Ill. October 25, 2012) (denying the plaintiff's motions to compel defendant-doctor to answer questions about "prior settlements" in an Eighth Amendment case, finding: "Prior settlements … are not relevant to whether Dr. Obaisi was deliberately indifferent to Plaintiff's medical needs. Settlements typically involve no admission of liability and are motivated by a desire to reduce financial costs and exposure"); *McCabe v. Phillips,* 2012 WL 1571149, *2 (C.D. Ill. May 3, 2012) (denying the plaintiff-detainee's motion to compel the defendants to answer discovery about "prior lawsuits and complaints" in a punitive environment case). To the extent this request could be interpreted to seek confidential settlement agreements, the public policy favoring settlements weighs against compelling production of confidential settlement agreements, particularly, where the agreements have little to no relevance to this litigation. *See Homeland Ins. Co. v. Health Care Serv. Corp.,* 2019 U.S. Dist. LEXIS 56877 (N.D. Ill. April 3, 2019). Defendant further objects to this request insofar as it seeks discovery protected and prohibited from discovery by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Pub. L. No. 104-191, 110 Stat. 1936), 21 C.F.R. § 20.63, 215 ILCS 97/1 et seq., and/or 735 ILCS 5/8-802.

905-189

13.) All written communications or filings you have made to any government agency, lawyer or court concerning this lawsuit or plaintiff's - Keith Miller - #121830 right hand taken from the past his, that he present received from Wexford P.C. and an outside medical provider

**RESPONSE:** Defendant objects to this request to the extent it invades the attorney-client privilege. Defendant further objects to producing all documents it has filed in this case because they have been previously served on Plaintiff. Defendant has not made any "written communications" or made any "filings" with "any government agency" concerning this lawsuit or Plaintiff's right hand.

WEXFORD HEALTH SOURCES, INC., Defendant,

/s/ *Keith B. Hill*

BY _____

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Keith B. Hill, ARDC #6277660

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Suite 100, Mark Twain Plaza III
105 West Vandalia
Edwardsville, Illinois 62025 0467
Telephone 618.656.4646
Facsimile 309.420.0402
edwecf@heylroyster.com
khill@heylroyster.com

Page **5** of 6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this **18th** day of **November, 2025**, the foregoing was electronically served via email to the following participants:

Todd Nelson
Illinois Attorney General's Office
todd.nelson@ilag.gov

Peter W. Brandt
Margaret Rhoades
Livingston, Barger, Brandt & Schroeder, LLP
pbrandt@lbbs.com
mrhoades@lbbs.com

James D. Sloan
Donohue, Brown, et al.
131 South Dearborn Street
Suite 1600
Chicago, IL 60603
sloanj@litchfieldcavo.com

Zachary G Stillman
Litchfield Cavo LLP
303 West Madison Street
Suite 300
Chicago, IL 60606
stillman@litchfieldcavo.com

I further certify that on this **18th** day of **November, 2025**, I mailed by United States Postal Service, the foregoing document to the following non-registered participant:

Keith Allen, #M21830
Menard Correctional Center
711 Kaskaskia Street
Menard, IL 62259
Plaintiff - PRO SE

/s/ *Keith B. Hill*

Copy

3/8/26

Greetings Keith B. Hill,

In regards to Keith Allen's (m21830) "Request For Production of Documents to Defendant Wexford Health Sources, Inc.", sent to you on 10/16/25, that you responded to in November of 2025 where you failed to provide any of the documents requested; one of which plaintiff has attached as a copy to his verified complaint which is the copy of the "Wexford Health Sources, Inc - Provider Handbook From June 2012 (Doc. 1-2 at 61-86). So you know exactly what document I'm seeking and it is relevant to plaintiff's claims about Wexford's Policies, governing the medical care of it's employees who are two nurses in their current lawsuit. Also the Wexford and IDOC's Negotiated Health Services Contract is also relevant, along with the other requests. So I'm asking you to fulfill my Discovery requests for Production of documents so we can resolve this matter, or I'll be forced to file a motion to compel with the Judge. Thank You, Respectfully Requested!

Sincerely, Keith—

905-189

Exhibit # "4K" 5 pgs.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KEITH ALLEN, #M21830,                     )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )        No. 23-cv-3775-DWD
                                          )
WEXFORD HEALTH SOURCES,                   )
INC, et al.                               )
                                          )
                                          )
        Defendants.                       )

## MOTION TO STRIKE

NOW COMES Defendant, WEXFORD HEALTH SOURCES, INC., by and through its

attorney, Keith B. Hill of HEYL, ROYSTER, VOELKER & ALLEN, P.C., and for its Motion to

Strike, states:

1.      On November 22, 2023, Plaintiff filed his Complaint. (Doc. 1).

2.      Plaintiff's Complaint is 158-pages, and is accompanied by more than 400 pages

of exhibits.

3.      Among the exhibits is a copy of Wexford Health Sources, Inc.'s "Provider

Handbook" from June 2012. (Doc. 1-2 at 61-86).

4.      Wexford's "Provider Handbook" should be stricken from Plaintiff's Complaint

because it is superfluous; it is irrelevant; and it contains proprietary and confidential information,

and was produced subject to a protective order in another case.

5.      The handbook is superfluous to Plaintiff's Complaint. Plaintiff was not required

to attach any alleged supporting documentation to his Complaint. *See* Fed. R. Civ. P. 8 (requiring

only "a short and plain statement of the claim showing that the pleader is entitled to relief.").

Case 3:23-cv-03775-DWD   Document 143   Filed 05/07/26   Page 27 of 57   Page ID
#2806
Case 3:23-cv-03775-DWD   Document 49   Filed 03/29/24   Page 2 of 5   Page ID #843

905-189

6.     The handbook is not relevant to this case because it is not the handbook that was in effect at the time of the incidents complained of in the Complaint. The handbook bears a date of effectiveness of June 8, 2012. (Doc. 1-2 at 62). Plaintiff's claims against the Wexford defendants arise from incidents that occurred after August 16, 2021 - nine years later. A handbook with a different date of effectiveness applied then.

7.     The handbook contains proprietary and confidential information, and was produced subject to a protective order in another case.

8.     The handbook states that its contents are "proprietary and confidential." And, it also states that the provider must return the handbook upon the provider's termination or end of contract. (Doc.1-2 at 62).

9.     Although it is unknown how Plaintiff came to possess this copy of the handbook, this copy of the handbook was produced during the course of discovery and subject to an Agreed General Confidentiality/Protective Order in the case of *Raymond Nesbitt v. Tarry Williams, et al.*, Northern District of Illinois case number 13-cv-9241.

10.     The handbook is marked "CONFIDENTIAL  SUBJECT TO GENERAL PROTECTIVE ORDER" at the top of each page, and is marked with the *Nesbitt v. Williams* case number[1], and document production bates numbering at the bottom of each page.

11.     Attached hereto as Exhibit 1 is the Agreed General Confidentiality/Protective Order that was entered on September 13, 2017 in the *Nesbitt* case.

12.     Per the *Nesbitt* protective order, any party to that litigation could designate a document as confidential, and the designation of a document as confidential was a certification

---

[1] Someone has blacked out with a marker the case number on all but one of the pages of the handbook. The case number can be seen on page 1 of the handbook. (Doc. 1-2 at 64).

Case 3:23-cv-03775-DWD    Document 143    Filed 05/07/26    Page 28 of 57    Page ID
Case 3:23-cv-03775-DWD   Document 49  Filed 03/29/24   Page 3 of 5   Page ID #844
#2867

905-189

by an attorney or a party that the document contained confidential information as defined by the *Nesbitt* protective order.

13.  Per the *Nesbitt* protective order, confidential information was not to be used or disclosed by the parties, counsel for the parties, or designated third parties for any purpose whatsoever other than in the *Nesbitt* litigation.

14.  Per the *Nesbitt* protective order, under no circumstances was confidential information to be disseminated by any person to any current or former inmate of the Illinois Department of Corrections, except that confidential information could be provided to Raymond Nesbitt consistent with the terms of the order.

15.  Per the *Nesbitt* protective order, within sixty-three days after dismissal or entry of a final judgment not subject to further appeal, all confidential information, including copies, had to be destroyed to the extent practicable.

16.  The *Nesbitt* case terminated on September 22, 2022 — over a year before Plaintiff filed this case. *See Nesbitt v. Williams*, case no. 13-cv-9241 (Doc. 257). And so, all copies of the handbook from the *Nesbitt* case should have been destroyed long before Plaintiff filed this suit.

17.  Although the *Nesbitt* case is over, by its own terms, the *Nesbitt* protective order remains in force.

18.  Plaintiff has not filed a motion in the *Nesbitt* case or in this case challenging the handbook's designation as confidential information

19.  Putting aside the issue of whether the handbook is confidential, this Court should strike the handbook from Plaintiff's Complaint for the reasons stated above, and because doing

Case 3:23-cv-03775-DWD   Document 49   Filed 03/29/24   Page 4 of 5   Page ID #845

905-189

so imparts on Plaintiff[2] and others who - intentionally or unintentionally - run afoul of Court orders, that Court orders must be obeyed unless set aside or varied through proper procedure.

20.     By moving this Court to strike the handbook from Plaintiff's Complaint, Defendant is not asking this Court to rule on the admissibility of the handbook as evidence at summary judgment or trial.

WHEREFORE, Defendant, WEXFORD HEALTH SOURCES, INC., respectfully requests that this Court strike its "Provider Handbook" from Plaintiff's Complaint (Doc. 1-2 at 61-86), and to admonish Plaintiff to obey court orders, including those of other courts.


WEXFORD HEALTH SOURCES, INC., Defendant,


BY:          /s/ Keith B. Hill
        HEYL, ROYSTER, VOELKER & ALLEN, P.C.
        Keith B. Hill, ARDC #6277660


HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Suite 100, Mark Twain Plaza III
105 West Vandalia
Edwardsville, Illinois 62025 0467
Telephone 618.656.4646
Facsimile 309.420.0402
edwecf@heylroyster.com
khill@heylroyster.com

---

[2] Defendant does not claim that Plaintiff intentionally disobeyed any court order.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



# Wexford Health
## SOURCES INCORPORATED

# Provider Handbook

## Physicians, Psychiatrists, Dentists, Nurse Practitioners, and Physician Assistants

Wexford Health Sources, Inc.
Foster Plaza 2
425 Holiday Drive
Pittsburgh, PA 15220



WEX166

CONFIDENTIAL - SUBJECT #2870 GENERAL PROTECTIVE ORDER

Exhibit

 **Wexford Health**
SOURCES INCORPORATED

## Corporate Authorization – Annual Review

This Provider Handbook has been reviewed and approved by the Corporate Medical Advisory Committee:

On behalf of the Wexford Health Sources, Inc. Medical Advisory Committee:

_____

Dr. Thomas Lehman
Corporate Medical Director, Clinical Services & Utilization Management

---

Date of Effectiveness: June 8, 2012

The contents of this manual are proprietary and confidential. This manual must be returned to the Wexford Health corporate office upon employee termination or end of contract.

---

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health** SOURCES INCORPORATED

Provider Handbook

## Table of Contents

INTRODUCTION .................................................................................................................. 1

HISTORY OF WEXFORD HEALTH SOURCES................................................................. 2

LEVELS OF SERVICE ......................................................................................................... 3

STANDARDS AND GUIDELINES ...................................................................................... 5

HEALTH CARE ROLES ...................................................................................................... 7

MEDICAL ADMINISTRATIVE PROTOCOLS................................................................. 10

HEALTH CARE UNIT SERVICES .................................................................................... 13

ADMINISTRATIVE SERVICES........................................................................................ 18

PRE-EXISTING MEDICAL CONDITIONS ...................................................................... 19

QUALITY ASSURANCE..................................................................................................... 21

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## INTRODUCTION

This handbook is designed to acquaint you with Wexford Health Sources, Inc. and provide you with general information regarding your role as a physician within the correctional health care setting. This guide will help to serve as a road map by offering optimal paths to inmate health care. It is also an emphatic reminder that the role of the physician is key to the overall success of correctional health care operations. Because the audience for this handbook is the entire network of Wexford's physicians (jails and prisons), all readers are encouraged to consult their site-specific operational policies and procedures with regard to facility protocols. Please note that this document is intended for state correctional facilities and jail facilities and staffing may vary among facilities.

For many physicians coming from private practice, the transition to institutional practice may be difficult. Correctional medicine is primarily public health practice. Providing care for *individuals in a community* is substantially different from providing care for a *community of individuals*. Your decision-making must consider the mass of patients living in relatively confined space, and the necessary regulations intended to assure: 1) reasonable care for the inmates, and 2) reasonable security for the staff. Included, where helpful, are examples and hints to ease the transition into this special society.

Case No. 13 CV 9241                                                                      WEX169

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



Provider Handbook

## HISTORY OF WEXFORD HEALTH SOURCES

A division of the Bantry Group (located in Pittsburgh, Pennsylvania), Wexford Health Sources, Inc. provides medical management services in the correctional industry. The firm has over thirty-five (35) years experience in health services management, including long-term care, psychiatric, and substance abuse programs. In 1992, Wexford Health seized the opportunity to use this expertise in the corrections industry.

### I.   Philosophy of Medical Practice

Wexford Health is an innovative medical management organization specializing in providing quality medical service to incarcerated patients. Incarcerated patients are wards of their respective state or county with no alternatives for care other than services the institution provides.

The circumstances that brought the patient to incarceration are irrelevant. The medical unit should provide an area where inmates are treated with respect and concern, even if "extra effort" is necessary to make that happen. Any attitude that demeans the status of an inmate-patient is unacceptable. Medical service is NOT the mission of corrections (though the institution is required to provide such). Medical care is a support service. The mission of the Department of Corrections is security and discipline.

### II.   Our "Practice" Population

Our patients are inmates in correctional centers, having been convicted of various crimes against society - some of which were quite heinous. Our concern and responsibility is with their medical care. We are not the judges of their guilt or innocence.

Most inmates are cooperative. They want to complete their sentence and get on with their lives. They cooperate with medical instruction and are usually compliant. About 15% of any given population are marginally (or completely) uncooperative and create 90% of the health service demand. They are the challenge of medical management.

Often inmates have had little or no access to medical care prior to incarceration, and are not certain when or how to use the services. Some are embarrassed, and some just don't know what to say or ask. Their response to your service may appear unusual, or even bizarre. They often (more often than in private practice) will say what they think you want to hear, rather than what relates to their problems.

Inmates can be very manipulative. People in general manipulate their environment to their own end. Inmates tend to engage their environment with skilled adeptness. Every institution provides an "Inmate Handbook" listing the rules and conduct expected of the inmates. You should read and understand this document. Never take anything from or bring anything to an inmate. Do not authorize special privileges. Anything that raises a question about inmate relationships should be discussed with your health care unit administrator, or the responsible assistant warden.

In spite of their situation, inmates deserve to be treated with respect and concern. They were not raised in prison. How much respect you receive will be directly related to how fair, just and professional you are with your inmate patients. The inmate/physician relationship demands "fair and firm" – this garners respect. They are your practice - treat them as such!

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## LEVELS OF SERVICE

Medical and health care should be delivered by a team of medical professionals. The services are organized into levels of care as follows:

- **Self Care.** Individuals are personally responsible for seeking medical advice regarding their health care concerns. Inmates do not lose this responsibility. They are the managers of their general health and lifestyle. Every effort must be made to teach and reinforce personal responsibility.

- **Nursing Sick Call.** This service is provided daily by staff nurses. Inmates desiring to be seen usually sign up for Sick Call the day before. Often, protocols are used to guide the nurses triaging Sick Call. Such protocols should first be read and approved by the medical director. Once in use, they should be reviewed by the medical director to assure compliance.

- **Emergency Care.** Emergency care is available twenty-four (24) hours a day, seven days a week. Any inmate must have access to health care unit personnel for immediate medical service any time an emergency arises. Medical personnel (or teams) are also available to respond to a cell or other areas in the prison to meet medical needs. Another option for Emergency Care is referral to a local emergency department if a physician is not on site AND the medical personnel deems this appropriate, or if the needed medical service is beyond the capability of the unit personnel. Medical personnel must contact the medical director/designee first unless the emergency is life/limb threatening.

- **Doctor's Sick Call.** An inmate has the right to request to see a physician. This request should be honored within seventy-two (72) hours. Inmates seen in Sick Call by the nurses are frequently "referred" to Doctor's Call for evaluation, diagnosis, and/or treatment.

- **Specialty Care.** This is provided in various ways. This includes onsite clinics, offsite referral to their office, and emergency department or a hospital. Referral may be made to hospitals or ambulatory centers for surgery, specialized testing, or other services as indicated.

*Note: All referrals that are not an emergency must be discussed in Wexford Health's collegial review.*

### 1. "Level of Community Care"

Both by contract and by decree of the federal courts, corrections departments must provide inmates' medical care that is "equal to that available in the local community." Generally this means "usual and customary" medical service. Although a program of comprehensive medical care is required, not every diagnosis mandates treatment, nor is repair done on every existing condition. The medical staff should identify medical conditions on entry, or as early as possible, and design a program of individual care that seeks to maintain inmate health during          illness             during, or aggra- incarceration should be    promptly and a              tended.

These objectives can be met in many ways, including proper classification, inmate education, alteration of work and recreational assignments, frequent observation and examination, adjustments of medication and/or diet, and adjustments of a multitude of other variables. Consideration should be given to any alternative therapy that protects the patient and is allowable in the correctional setting. *Please discuss with the regional medical director and/or corporate medical director any unusual alternative therapy being considered before it is started.*

Inmate health problems are considered somewhat like "worker's compensation" cases. If a condition occurs in conjunction with, or is aggravated by incarceration, it is the responsibility of the Department of Corrections (thus the medical contractor) to treat or correct it. Many inmates, however, enter with pre-

Case No.

WEX171

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER


**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

existing problems that require significant care. Random examples include diabetes mellitus, hypertension, cancer, chronic renal problems, cardiac disease, asthma, seizures, paralytic conditions, and many other significant debilitating conditions. Conditions that are pre-existing, chronic, and stable require monitoring only.

Longstanding problems, e.g., arthritis, old knee and ankle injuries, recurrent low back ache, flat feet, childhood eye problems resulting in amblyopia, presbycusis, hammer toes, "trigger fingers," persistent acne, tinea versicolor, inguinal hernias of long duration without complication, uncomplicated ventral hernias, uncomplicated umbilical hernias, and a multitude of other such conditions may receive minimal, but reasonable support or observation.

A.    Many variables must be considered when deciding a course of treatment. These include, but are not limited to the following:

B.    When (how long ago) did the problem begin?

C.    The chronicity of the problem

D.    Whether the problem initiated in the Department of Corrections, or prior to incarceration

E.    What is the problem?

F.    How long is the inmate's sentence?  When will he (she) be released?

G.    Will the treatment "make a difference?"

H.    Will it improve the inmate's function?

I.    Will the treatment make the care of the inmate easier for the medical or correctional staff?

J.    What is the simplest, most basic, and safest means of managing this problem?

As physicians of leadership representing both Wexford Health and the Department of Corrections where you work, you are responsible for providing a level of care that at least meets these requirements.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health** SOURCES INCORPORATED

Provider Handbook

## STANDARDS AND GUIDELINES

I.    **National Commission of Correctional Health Care (NCCHC) Standards**

Wherever Wexford Health Sources, Inc. assumes responsibility for medical care management, a concerted effort is made to meet and exceed the *Standards for Medical Care in Prisons and Jails* as established by the National Commission of Correctional Health Care. A copy of these standards is available in the office of your health care unit administrator.

II.   **American Correctional Association (ACA) Standards**

Another important set of standards applied to health services are those of the ACA. The administration of the correctional department will be particularly interested that the medical staff comply with these standards.

III.  **Wexford Standards**

Wexford supports the highest level of standards desired by the state/county where those services have been contracted. ACA standards are the minimal level acceptable to Wexford; however, the preferred level of care at least should meet NCCHC Standards. In many units, Wexford has met and operates under ACA and NCCHC.

IV.   **Contract Definitions**

In any given correctional care facility; the services required, the standards of care and the quality assurance expected are defined in the negotiated health service contract. The health care unit administrator will have a copy of that specific contract. These definitions must be met to assure continuation of Wexford as manager of the services.

V.    **Chain of Command**

It is imperative for all providers to understand the various organizational charts and reporting chain of command that exists at each facility. Please be sure to review the following chain of command structures in operations at your facility with your Regional Medical Director or site Medical Director:

A.    Security leadership (state or county)

B.    Medical leadership (state of county

C.    Wexford medical _____ ____ _____ ____
       ____ ____ ___ ____ ____ ____

D.    Wexford administrative and nursing leadership

VI.   **Using Protocols**

Protocols may be developed and used to guide the care given by nurses. They are also used to guide nurses and the appropriate routines in the chronic clinics. All protocols must be approved by the unit medical director. As part of the unit Quality Assurance Program, both acute care and chronic clinic protocols (or a defined sample) will be reviewed each month by the unit medical director. Wexford has pre-prepared protocols that may be used or revised for use at the discretion of the unit medical director.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



Wexford Health
SOURCES INCORPORATED

Provider Handbook

## VII.  Professional Dress Code

How you dress has a direct relationship to how the inmates treat you. Patients, including inmates, expect and prefer the physician to dress in a professional manner. Discretion is given to the units regarding personal dress; however, as a general guideline, ties are appropriate, and blue jeans should never be worn. Whatever the dress, be professional.

## VIII.  Continuing Medical Education (CME)

Physicians, by the choice of their profession, should be lifetime students. Ongoing study is mandatory to remain current in medicine. The use of journals, libraries, approved textbooks, and other educational programs are encouraged. Arrangements may be available for you to attend medical education programs; please check with your Regional Medical Director for details. You are also encouraged to attend educational programs offered by local hospitals and state medical societies.

A unit in-service training program should be led by participation of the physician staff. The more the support medical staff understands what you expect and learns your practice patterns, the more efficiently they can assist you.

## IX.  Relationships

Developing positive professional relationships with your medical staff, correctional staff and supporting specialists greatly helps to ease your work. Discussions about your patients' problems, treatment plans, new developments, security, and other issues will help you and your staff better understand what must be done and when it should be done. Again, it is important to consider the public health and institutional aspects of correctional medicine. The administrative directives of the Department of Corrections are important documents that must be applied to your decision-making. Developing relationships with the corrections staff is as important as the medical staff.

## X.  Early Release from Custody for Terminally Ill Inmates

Wexford Health makes every effort to facilitate the early release of those inmates who are classified as terminally ill. A terminally ill inmate is defined as one who has been given a prognosis of less than a year to live. Physicians are requested to discuss individual cases with the facility medical director who, in accordance with state regulations, will submit recommendations to the correctional authority.

## XI.  Providing Medical Care to Staff

Wexford Health Sources carries general and professional liability insurance that "covers" employed physicians, physician assistants and other health care staff for work performed on behalf of the Company. The Company, of course, is contracted to provide care to the inmate population. Therefore, it is not appropriate for a site physician to deliver care to a fellow employee or to a corrections officer; nor would such care be "covered" under the existing insurance policy. Persons other than inmates seeking medical care should be directed to their personal physicians. Exceptions would include: 1) in the event of an emergency where immediate care is needed, and 2) routine services that may be included in the specific contract, i.e., routine immunization of corrections officers.

Case No

WEX174

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## HEALTH CARE ROLES

### I. Corporate Medical Director

The corporate medical director is primarily responsible for medical policy development, professional development, and quality assurance. A further role is support and oversight of the utilization management process. You are welcome (and encouraged) to contact the corporate medical director for any assistance or questions you may have regarding medical policy or decision-making.

### II. Regional Medical Director

The regional medical director is the immediate supervisor for the unit medical director. He conducts peer review on the unit medical director and assists in some utilization management issues, at the discretion of the corporate medical director.

Note that the unit medical director conducts the peer review on unit staff providers and is responsible for their peer review (excluding psychiatrists). Generally, peer review should be performed at least annually by the regional medical director (or his designee) and the unit medical director or as designated by the DOC/county. All peer reviews should give feedback to those healthcare providers being reviewed and must be kept confidential. A copy of the peer review should be forwarded to Wexford's credentialing department for use as a reference during the reappointment process.

### III. Agency Medical Director

In states where the Department of Corrections has an agency medical director, that position has the prime responsibility for establishing medical policy. The corporate medical director will assure that all corporate medical policies comply with the state medical directives. All unit medical directors will keep both the regional and the agency medical directors informed of critical problems. The regional medical director should be contacted first to allow for internal resolution of as many problems as possible. Discretion is given, however, to unit medical directors to directly contact the agency medical director when it seems appropriate.

### IV. Correctional Staff

Cooperation with the correctional staff is expected and necessary. The medical program in a prison system has a role similar to the military - it is a support element, not the primary force. Every institution has a set of DOC/county policies, usually called administrative directives as well as Wexford's own set of operational policies. In both case, some of the policies apply to the medical and mental health services. You must be familiar with all of these policies.

The warden of a prison unit is responsible for everything that happens in the unit. Though at times a medical decision may be in conflict with his (her) express wishes, most decisions should respect his (her) management responsibility. Usually an assistant warden is responsible for the medical service area, and you will work most directly with that position.

Security is the prime objective of all prison operations, and you are expected to understand and respect that responsibility. Security is the first issue of concern to most correctional staff. On occasion, security and health service are in conflict. These issues must be addressed on an individual basis. Decisions of this nature require your use of reasonable judgment. We depend on you to understand both the medical and security roles.

Case No.

WEX175

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER


**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

### V.    Pittsburgh and Regional Staff

The Pittsburgh and regional staff are meant to provide support and resources to the unit operation and are not available to make the decisions that should be made at the unit level. The best clinical and medical decisions are made by the staff closest to the patient.

### VI.    Health Care Unit Administrator (HCUA)/Health Services Administrator (HSA)/Site Manager

For optimal unit efficiency, the key leadership personnel need to become a tightly knit team with the prime objective of providing high quality medical service at the best possible price. The administrative leader of the unit is the health care unit administrator (HCUA)/health services administrator (HSA). This position manages all the administrative aspects of the medical operation. He (she) deals most frequently with the corrections staff, regional staff and the local health service administrators.

Since the administrator is expected to manage all the unit administrative details and orchestrate the staff functions, it is easy to understand the necessity of developing a close and interdependent relationship with this person. The HCUA/HSA deals extensively with the correctional staff and solves most of those inter-staff problems. He (she) is the one most likely to represent your interests and/or concerns to the corrections staff.

For the most effective, efficient and rewarding operation, you, the HCUA/HSA and the DON should be a supportive interdependent team.

### VII.    Director of Nursing (DON)

The Nursing Director provides the leadership, training and nursing direction to the staff nurses. She is responsible for assuring the nursing staff is capable and attentive in their efforts to provide the necessary inmate nursing care. She is responsible for the staff schedules and the in-service training. She also assists the medical director with the quality assurance responsibilities.

A close working relationship with the DON would greatly ease the medical director's job. She (he) has constant access to the inmate needs from her staff. The "daily reports" from her staff gives an excellent communications flow. This position can be a great help to your work. Respect this position and support it.

### VIII.    Support Medical Staff

If you are the medical director, you may have the responsibility of managing staff physicians. They will expect to be considered as colleagues. They will have variable abilities. Learn to understand each of their strengths and support that skill. If they need skill training, arrange it. There may be other staff physicians or physicians at another unit who can teach; or you can send the physician to a seminar or training program. Encourage them, have faith in their decisions, tell them what is expected and expect that - reward them with your confidence in them.

Occasions will occur when you must correct or discipline them. Explain what caused the problem, why it is a problem, and how it must be corrected. Many physician problems in the correctional medical service pose problems for the medical service, the DOC, and the individual physician. Therefore, prompt correction is important.

Physicians, by nature and training, are independent, strongly self-motivated persons who are conditioned to analyze events and make decisions. These abilities are positive and desirable. They also generate strong EGO feelings. Although, as medical director, you will spend considerable time managing those egos, you must also respect them and learn how to direct them in a positive direction.

Case No. ▓▓▓▓▓▓▓

WEX176

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## IX.    Community Physicians

Since it is not feasible to provide all the necessary medical services within the institution, Wexford depends on the skills of community physicians. These physicians are usually sub-specialists, emergency physicians or obstetricians. They supply specialty services and hospitalizations; offer procedures and evaluations; and direct consultations. They not only fill important service needs, but they also bring a private practice perspective into the institution that adds validity (or reinforcement) to the decisions of the correctional medical staff. If you practice appropriate medical care, they will reinforce your medical decisions.

**Note:** Every effort must be made to use Wexford Health's contracted providers. The use of community physicians must be discussed in the collegial review process.

Even though we depend on the services of the private community physicians, this is a referral relationship. You are not "giving up" the patient. The referred inmate is still your (and the DOC's/county's) responsibility. The specialist has a responsibility, as in private practice, to inform you of the treatment plans, proposed surgeries and the medical strategy being considered for the patient. They must send you prompt reports of their care.

As in private practice, it is important for you to inform your consultant of the patient's history, physical and laboratory findings, and your reasons for referral. You also have a legitimate right to disagree with a specialist's position. Do not abdicate your medical judgment simply because you are referring a patient. Most of the time, you will agree with the consultant, but do not hesitate to disagree if you have a reason. Discuss the difference of opinion with the consultant. Often, circumstances of the confinement or security are not understood by the consultants. You are expected to understand these issues and work around or through them. DO NOT BLAME THE PROBLEM ON THE DEPARTMENT/COUNTY - simply explain that you have policy responsibilities that must be addressed.

If you do not understand a policy, either an institutional or a Wexford policy, ask for an explanation. Often, the policies are in place to protect the staff and finances of the community providers. We place a high priority on protecting the community providers.

When an inmate has been admitted to a local hospital, call the attending physician daily and check on your patient. You need to understand what is happening, and they need to know you are interested. You must initiate discharge planning immediately and explain your infirmary capabilities. No one will fault you for being interested in your patient.

Case No. ▓▓▓▓▓▓▓

WEX177

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## MEDICAL ADMINISTRATIVE PROTOCOLS

I.  **Inmate Interview Tips and Techniques**

    A.  Basic Points Directly Affecting the Interview Process

        1.  Inmates are patients and deserve to be treated as patients.

        2.  Some inmates do not know how to relate to health professionals, thus their efforts to communicate may appear bizarre.

        3.  As a group, inmates are extremely manipulative.

        4.  Generally, the "tighter" the assigned security housing, the greater the inmates' demand for health services. Death row inmates are usually an exception to this. They usually demonstrate medical usage directly proportional to their identified medical problems.

        5.  To some inmates, medical service is the only area where they feel they have any personal control. Thus, answers and actions may reflect control efforts rather than medical concerns.

        6.  Corrections officers (CO) sometimes intervene with the interview process. They may feel

            a.  They must be present - to protect

            b.  They can't remove the restraints

            c.  They must assure security

        7.  Medical staff too often assume a CO's role by becoming very directive, or attempting to enforce security. CO's too often assume medical roles by judging inmate medical status, or prejudging the presence or absence of illness.

        8.  Each level of medical team support tends to feel they know the inmates better than the trained professional who is their supervisor (also, jumping two supervisory levels mysteriously anoints an assistant as an absolute expert). Positive support for your staff is very important.

    B.  Interview Techniques

        1.  As much and as often as possible, an inmate deserves privacy during interviews and examinations. Such expressions of personal dignity and respect are limited in prison.

        2.  Have as much knowledge as possible at hand when you start the interview. Review the inmate chart (if one is available). A few minutes of chart review will save you considerable duplication of work and evaluation.

        3.  Listen CAREFULLY to inmate complaints and descriptions of their problems. Be willing to accept their claims and descriptions, but maintain a healthy amount of doubtful suspicion. *Remember, the most difficult diagnosis is the separation of the presence from the absence of pathology.* "Does this patient truly have a medical condition?" is a tough question to answer. Not all inmates are being manipulative. Many are correct in their descriptions. Many are incorrect, but truly believe some condition exists (seizures? asthma?). Some don't know how to tell you, nor how to describe their problems. Since they are seeing a doctor, many think they *should* "have something." No diagnoses = no treatment. Observation may be the best course of action.

        4.  Require the inmates to relate detailed descriptions of evaluations and treatments they received when pre-existing conditions are claimed. Document those descriptions as close to verbatim as possible. Document all medical devices, prosthetics, and medical equipment

Case No.

WEX178

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

brought to the facility by the inmate. **Have the unit staff obtain outside records on all problems claimed by the inmate.**

5.  Be careful of promising treatment, surgery, or relief. You may not be in a position to deliver what is promised. There are many contingencies over which you have little or no control. Be fair - be just - but be honest.

6.  Do not generate interpersonal "games" with inmates. Taunting, teasing, and use of oblique innuendo are poorly understood and usually misinterpreted by inmates. They have a high level of negative suspicion as a protective tool.

7.  Inmates may exaggerate their conditions. On the other hand, understating significant aspects of their health conditions is equally common, e.g., denial of serious diabetic problems or past high-risk activities, IV drug use or homosexual activity, etc. Often the presence, or absence, of signs found at physical exam or by chart review helps to sort out inconsistencies. The best tool you have is a sensitive, professional and analytical review of each inmate's status.

8.  DO NOT EVER explain symptoms you would expect to see to confirm a diagnosis to an inmate. If you should, those symptoms will likely be present with the next visit. Do not prompt, lead, suggest, or describe symptom sets. Prison life is a special social society with its own special sets of rules. The inmates discuss their treatments and symptoms and compare the care they get. Interview technique should be non-directive with personal descriptions being encouraged and RECORDED. What happened? How did that bother you? Did you have pain? Where? Was that the only place it hurt? What did your doctor say? What did they do? How did you respond? Did the treatment work? How long? This method is more time consuming, but overall it requires less total effort and follow-up.

9.  Be straightforward with inmate patients. If their "problem" doesn't require treatment, tell them that, and stick to your decision. Treat or recommend on the basis of identified medical need. Any inmate can demand all sorts of treatment or situations, but their demands - in the absence of a medical need - do not justify supplying the service. Again, be sensitive and analytical. Never withhold a service whether demanded or not, as a punishment, nor to manipulate the inmate. Since the inmates are incarcerated as wards of the state, they have no medical alternative, and therefore require more patience and latitude from the health care professional. Do not promise what you may not have the authority to deliver. Frequently, inmate non-compliance or over utilization is due to poor understanding of their problem; weak or superficial explanation, or simply neglect on the part of the medical staff to deal with the inmate or his problem in a direct manner.

10. Look for specific symptom sets and discipline yourself to require the inmate to identify and validate those symptoms as he describes his medical history. Then back up the history with corroborative physical findings and/or laboratory testing to assure yourself that a condition actually exists. We are all aware that disease states vary from patient to patient; the basic uniformity of major disease presentation and expression is incredibly standard. Remember the old medical school ada--- *"When you hear hoof beats in the street, do ..."* ... deliver service ... as ... iden ed med... need, and you ... be o..... care.



**II   Charting Technique**

A.   You have spent years with medical charts. Nevertheless, you will find this presentation of Wexford's charting expectations a helpful guide. A chart is an extremely important permanent document. It is a journal of social history. It is a linear set of snap-shots into the deepest shadows of personality. It is, above all, a legal document. Please respect its power.

B.   The chart is the medical service memory of what the patient told you, what you found on physical examination, what diagnostic strategies were used, and what treatment programs were applied.

Case No.▓▓▓▓▓▓                                                                      WEX179

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

Other practitioners will review your data and add theirs. In this institutional setting, nurses, CMT's, administrators, mental health personnel and other officials may make entries in the chart. Those entries provide you, as the medical authority, with multifaceted information you have no other means of obtaining. It is often important information. If you are not familiar with paramedical entries in the medical record, you will quickly learn the value of their contributions.

C.   Other than prepared forms for specific medical information, all routine entries should be made in the "SOAPE" format. The Subjective (S), Objective (O) Assessment (A), and (E) Education components are placed on the left side of the progress sheet, with the Plan (P) component placed on the right.

D.   Chart ALL inmate encounters!  Inmates will frequently stop you outside of the health care unit seeking your opinion and advice. If those "curb-side consults" have any significance, require the inmate to come to the health care unit and formally address the problem. Do NOT give what you think is informal information without documentation. It will show up in some future litigation when you least expect it.

E.   Record adverse events promptly and accurately. For example, refusals of treatment and your efforts to alter that decision; reasons for "no-show" at chronic clinics or medication runs; threats to you, other inmates or staff; seemingly bizarre statements or actions and activities that contradict inmate claimed medical problems. These are but a few of the possibilities. Remember - if it isn't recorded, it didn't happen!

F.   Keep your entries objective, descriptive, and concise. Personal conflicts have no place in medical charts. Resolve conflicts before making a note. Leave your personal feelings for direct discussion. Do not criticize either medical or correctional staff in an individual's medical chart.

G.   **Write so others can read what you wrote.** An illegible medical entry is worthless. If you can't write legibly, print. If you can't print legibly - learn to print. Your entry is meant to communicate - there is no communication if an entry cannot be read.

H.   Charts are CONFIDENTIAL information. Physician-patient visits are privileged information. Such data are not for community discussion. Please help to keep the integrity of the medical records.

Case No. [redacted]

WEX180

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES, INCORPORATED

Provider Handbook

## HEALTH CARE UNIT SERVICES

### I.    Intake Reception and Classification (R&C)

Each inmate, when first incarcerated and at the start of the Reception and Classification process, is initially screened by qualified health care staff to identify the presence of any condition needing immediate attention; for example: pediculosis, insulin dependent diabetes mellitus, active seizures, acute asthma or an existing injury. If an inmate enters on a given medication, it should be continued until the condition is documented or validated through securing outside records. Other necessary treatment should be started as indicated or as indicated by the DOC/county.

Within fourteen (14) days following the intake screening, a complete history and physical examination should be completed, including whatever routine and other indicated laboratory and biometric testing is indicated to establish claimed problems. These data should be consolidated, a health status determined, and a care plan established to maintain the inmate's health during his prison stay. This is an excellent opportunity to address advance directives, if appropriate.

### II.    Preventive Care

Emphasis is placed on preventive medicine during the inmate's incarceration. Prison is institutional medicine with institutional exposures. The individual inmate must be protected, as must the inmate population. Immunizations(flu, pneumonia), educational directives, adjusted activities, alternate housing or work assignments are all part of the preventive options.

Inmates with pre-existing problems should have a plan designed to correct or keep the condition from becoming worse (see our explanation of pre-existing conditions presented later). The third preventive strategy is a system for frequent observation and early diagnosis. This is embodied in the following procedures for simple and frequent access to multiple levels of medical service. For specific unit operations, you should consult the policy and procedure manuals and the institutional directives in your institution.

### III.    Routine Ambulatory Care

There are three (3) basic service routes for Routine Care, 1) Sick Call, 2) Physician Call, and 3) Pill Call. A fourth, Chronic Clinics, could also be included here.

Sick Call is usually held by nurses or PA's. Inmates are usually required to sign up for the service indicating the reason for the request. Scheduled inmates are seen and screened by nurses or CMT's using authorized protocols. Only OTC medications may be used by these personnel, unless the specific protocol authorizes a legend medication.

If a screened problem is not covered by protocol and is beyond the skill of the triage, the patients are referred to the Physician Call Line. They must be seen within 72 hours of referral. If they are seriously ill, they may be seen immediately (see Emergency Service below) by the physician, or in his (her) absence, sent to the local hospital emergency room.

Physician Call is scheduled daily for the general population, and is held at least weekly in "lock down" areas such as administrative segregation or protective custody. This time is used by the physician for medical evaluations, follow-up treatments, clarification of symptom complaints, diagnostic study, etc. Physician Call in "Lock Down" should be limited to screening and the discovery of problems needing further attention. Identified problems should be brought to the health care unit later for proper evaluation and treatment.

---

Case No                     WEX181

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

Pill Call is scheduled delivery of prescribed medication, and may occur either inside the health care unit, or at the assigned cell blocks. This is managed differently at different units. Medication is usually given by nurses or corrections medical technicians (CMT's).

## IV.  Emergency Service

Inmates have access to emergency service any time there is no scheduled service available. Emergency service can be provided onsite by whatever level of provider able to meet the level of care necessary. If the unit has sufficient equipment and personnel skill to meet the patient's problem, it should be managed there. If the facility, equipment, or skill level of the onsite personnel is inadequate, the patient may be transferred to the nearest hospital emergency department.

If no staff physician is on site and the situation is life-threatening, the attending nurse may make the decision to transfer the patient. In such an event, the unit medical director must be notified at the earliest possible time. Wexford must authorize payment for this service, so an Emergency Referral Sheet should be faxed to the Wexford Pittsburgh office as soon as reasonably possible.

## V.  Infirmary Care

The inpatient unit is available to provide limited medical and nursing services for patients with health care problems in an inpatient setting. Inpatient services may include medical care, isolation, observation, first aid, nursing care and post-operative care. Patients may also be assigned to the inpatient unit for sheltered housing. In-patient care is not used as a substitute to hospital level care (ICU, medical/surgical acute care), or a licensed nursing care facility. It is generally recommended that all patients discharged from acute inpatient facilities be placed in the infirmary for observation, unless such a patient is deemed stable for the general population. Clinical issues are the responsibility of the Site Medical Director or designee and operational issues are the responsibility of the Health Services Administrator and the Director of Nursing.

## VI.  Chronic Care

Services are provided on site to monitor the status of inmates with identified chronic illness conditions. Chronic Clinics for patients with the following are normally required: cardiac-hypertension, diabetes, asthma and seizures. Any other such clinic could be established at your discretion. These clinics are generally defined by a mandated protocol. Any additional clinic should have a similar protocol written and approved prior to initiation of the clinic.

Chronic Disease Clinics are normally conducted every three to four months, and provide the basis for preventive and prospective care of the patient's problem. Refer to Wexford Health's Chronic Care Guidelines manual for further guidance on Chronic Care.

## VII.  Specialty Care

It is impractical to have specialists in every unit, so arrangements are made to support the staff physician services with specialty consultation. Actually, you may seek consultation for an inmate in any area you feel is medically indicated for an inmate. The key issue is medical necessity. Many inmates demand to see a specialist for minor events, or just to get a second opinion. If you, as responsible physician, believe specialty services are indicated and identify a medical need, the case must be discussed in collegial review. Please review the utilization management policies and procedures for all offsite care.

### A.   Onsite Specialty Care

At some units, specialty physicians come on site and hold scheduled clinics. This is frequently the case with orthopedics, general surgery and optometry. This allows more inmates to be seen in a secure setting, and decreases the transportation demands on the department. The specialty physician also becomes more familiar with the inmates and the requirement of the correctional setting. These

Approved by the Wexford Medical Advisory Committee on June 8, 2012

Page 14

Case No.

WEX182

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

physicians are "consultants" and require supervision by the facility medical director for appropriateness of recommendations.

B.    Offsite Specialty Care

When specialists are not available for "onsite" clinics, inmates may be scheduled to be seen in the specialist's office, in the local hospital emergency department or other ambulatory care facility. All such referrals must be arranged through the corrections department, and pre-approved through Wexford's utilization management/collegial review process. Every effort must be made to use contracted providers.

## VIII.  Hospital

At times, specialty care requires hospitalization. This may be requested on either a routine or emergency basis. When an emergency admission occurs, Wexford must be notified as soon as practical. Scheduled admissions should be requested through routine utilization management/collegial review. Such requests should clearly identify the medical necessity for the admission - beyond "the inmate agrees to (or wants) the surgery."

The recommendation for a procedure (or service) by a specialist should be given significant weight when deciding to provide that service; however, the unit physician must agree that such a procedure is indicated and necessary. All inmates are the patients of the medical director, NOT the specialist. Using a specialist does not remove the unit physician from the primary responsibility for care. The specialist does not (or may not) understand the special requirements of the correctional setting, and you must make treatment decisions within that context. In addition, the treatment or repair may not be the responsibility of the Department of Corrections. That is an interpretation you must make.

## IX.  Hospital Care

As reflected above, hospital care is a necessary part of our responsibility. This is done in many ways; however, most of the time, this is done by referral. Again, referral for hospitalization does not remove you from responsibility for the patient. Speak to the consulting physician to whom you are referring the patient. Learn of his (her) treatment plans and jointly create the discharge plans. Follow up on the status of the patient, and inform the physician of the capabilities of the unit to provide convalescence or other care.

Make arrangements to get an immediate discharge summary when the patient is released.

## X.   Dialysis

Some units have dialysis units where inmates may be dialyzed when the management and control of their end stage renal disease has exceeded the ability of the unit staff. Acute dialysis for toxic overdose or acute renal failure is usually accomplished through hospital referral.

## XI.   AIDS

Testing to identify HIV positive inmates, with further testing to validate the presence of AIDS, varies depending on the statutes and regulations of the state where you are assigned. All services that are needed to diagnose and treat AIDS are made available. Efforts are made to share and keep current on the status of AIDS trial and treatment. Some departments are still very sensitive about AIDS data, and keep all information as confidential as possible. As with other illnesses, confidentiality must be maintained.

## XII.  TBC (Routine, MAI, Multiresistant)

All inmates receive screening TB skin testing upon admission to their institutions. Follow-up testing is usually done annually. Each institution has a TB program to identify, follow up, and treat inmates. This is

Approved by the Wexford Medical Advisory Committee on June 8, 2012                                              Page 15

Case No.

WEX183

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

an important surveillance program. In the face of AIDS immune incompetence plus a tendency to fail completion of INH therapy, the incidence of resistant TB is rapidly rising. Every diligent effort must be made to protect our population from TB. Remember, inmates leave the prison and carry their problems to their communities.

## XIII. Pharmaceutical Service

Medications are provided through the pharmaceutical service. Medication may be ordered by: 1) a physician, ARNP, physician assistant (with the approval of the medical director, 2) a nurse/CMT using an approved protocol when the medication is included in the protocol, or 3) using the approved protocol for an over-the-counter (OTC) request.

The authorized medications are included in an approved formulary. Although some non-formulary medication may be used, all efforts must be made to adhere to the official formulary. Most meds are provided in a blister-pack format.

Please be judicious in the prescribing of PAIN MEDICATIONS due to potential of abuse. This is a dependent population, and the majority are incarcerated for drug-related crimes. The use of hard narcotic analgesics is not forbidden, but should be stringently controlled. These meds become a valuable trade item in the units. More are traded than are ever taken by the intended patient.

Stop dates should be written on all orders. Our patients may know more than all of us about the benefits and disadvantages of these medications.

Medication should be prescribed based on indications and using objective findings as a guide, and not solely on a patient's subjective complaints.

A Pharmacy and Therapeutics Committee is part of the ongoing QA of a unit. Medication schedules and changes can appropriately be made in that meeting.

## XIV. Laboratory Service

Routine laboratory services are available on site. A reference lab is contracted to provide timely pick-ups. Any appropriate test may be done. Please share the results of your testing with your inmate patients. Stat lab services are available through the local hospital and should be utilized only if medically necessary.

Specimen collection should be done under closely controlled conditions. Any urine sample desired for complaints of "hematuria" must be collected under direct observation of the MEDICAL STAFF.

## XV. Radiology Service

Routine radiology may be done on site or at the local hospital. Do not initiate any contrast media procedures unless you are able to manage the adverse impact of allergic reaction. This does not occur often; however, any such occurrence can be devastating.

Not many conditions require immediate radiographic procedures. As you know, with certain routine x-ray situations (e.g., sprained ankles, routine chest films, head injuries in young people, knee injuries) a very high percentage are "normal" or non-contributing to the evaluation. When these events occur at inconvenient times, e.g., evenings or weekends, it is rarely necessary to get immediate radiographic studies. The patients may be placed at bed rest, the area immobilized, iced and elevated and x-ray studies done soon, but at a more convenient time. Of course, circumstances occur when the degree of findings is sufficient to require immediate review. Such decisions are left for you to discern and justify.

You may not be a radiologist, and Wexford does not expect you to be the definitive interpreter of x-ray films; however, if you feel a condition clinically requires an x-ray evaluation, that signals enough importance that

Case No.                                                                                  WEX184



you should personally review the films. The radiologist's reading will be the definitive interpretation, but your personal evaluation is equally important to your onsite (and more immediate) decisions.

Complicated radiographic procedures may be ordered from the local hospital or contracted vendor. Acute findings will be immediately called back to the unit physician. Routine x-rays and readings that are needed immediately should be ordered directly from your local contracted hospital.

## XVI. Physical Therapy

This area of service is easily and often abused. The patients tend to use the sub maximal effort, and will continue to use the service for extended periods of time with poor outcomes. Except for the early phases of post-operative healing, and in paralytic cases, passive exercise has little role. The exercise programs should be designed to be vigorous (depending on the diagnosis) and demanding. The initial exercise periods should be monitored with encouragement by medical staff to complete the scheduled sets of activity until designing a specified home exercise program (HEP).

Physical therapy modalities are also helpful adjuncts, but have a limited scope of effectiveness. Their application, for example, in longstanding chronic back cases may soothe the mind, but does nothing to soothe the back. Back braces, corsets and similar adjuncts for use in chronic back cases are often requested, but their use is not supported in the literature.

## XVII. Prosthetics - Orthotics

Many inmates come into the institution needing prosthetics and/or orthotic devices. Arrangements can be made to supply these services if medically necessary. The decision to repair versus replace prosthetics is one of individual review. Such decisions require the considerations discussed during the collegial review process.

Splints and wraps are frequent adjuncts to treatment in the system, and are acceptable for use. Two considerations are offered when directing their use. First, always check with the corrections staff before ordering splints that contain metal parts. Unrestricted use of metal parts is frequently converted by the inmate population into weapons and/or tools. Usually the same or similar splint can be found with plastic components that are more acceptable. Just remember, our patients are often very skilled, and can make serious weapons from innocuous materials.

Second, wraps (elastic bandages, etc.) are often used as a constricting device to cause swelling. For example, to prolong a "sprained" ankle or "edema" of the distal leg or arm. If you are presented with a confusing symptom set that isn't supported by history, testing or general physical findings, suspect an iatrogenic etiology.

One of the constant demands in almost any correctional unit is for "soft" shoes. Shoes are rarely a medical issue. Once inmates know you will authorize soft shoes, their demands quickly become unmanageable. On occasion, there is a clear medical indication or a situation with a medical basis for using soft shoes. If you are convinced that is the case, prescribe accordingly. Just use the judgment.

Case No.

WEX185

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## ADMINISTRATIVE SERVICES

### I.   Policies and Procedures

The basic policies guiding the correctional operations are found in the department's administrative directives where you are working. It is vital that you read, know and develop the medical operation within the guidelines of these directives. There will be a section that addresses the general operational policies of the medical unit. Specific medical operations in your assigned unit are described in the institutional directives of each individual unit.

Wexford provides a set of medical policies and procedures as well as operational policies from which the medical staff can develop their own. These are prepared with cross-references between the various standards to facilitate compliance.

### II.   Referrals

As part of your medical support system, you will be requesting referrals to specialists, sub-specialists, emergency departments, hospitals, ambulatory facilities and other providers. Each referral requires a collegial review along with a utilization management form to be completed and submitted for an authorization number. That number authorizes Wexford to reimburse for the service.

If you decide a referral is indicated, complete the referral form with brief but pertinent information about the case and what is being requested. The following discussions will give you a sense of the considerations for making decisions about referrals. The initial portion deals with a most difficult decision area - appropriate care for pre-existing conditions.

Case No.

WEX186

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health** SOURCES INCORPORATED

## PRE-EXISTING MEDICAL CONDITIONS

I.    **The Basis for Care**

A.    Upon incarceration, the inmate becomes a ward of the state. The DOC becomes the *"guardian"* of each inmate, and has *"parental"* responsibility.

B.    Incarceration limits the "medical alternatives" of the inmate, thus incurring a higher demand level from the medical service.

C.    The DOC/county (and medical contractor) is prohibited from practicing **"deliberate indifference to serious medical needs"** in the course of medical service. We are obligated to provide medically necessary care consistent with community standards.

D.    By means of contract definition (and the support of federal court decisions) medical care usually is interpreted as "comprehensive medical services equal to those available in the local community." It is understood that *"local community"* may be more liberally interpreted as the current state of the art as generally practiced across the country.

E.    Contracting for medical service does not relieve the state of their responsibility as *"guardian"* of the inmate. The medical service contractor has a direct responsibility to represent the state with the proper provision of medical services to the inmate. Also, each medical staff member has a direct responsibility to respect the inmate's civil right for reasonable medical service.

F.    The *"deliberate indifference"* term is not a mandate *"to cure;"* it is a mandate requiring problems be addressed in an appropriate and professional manner. Further, the dictum relates that attention is to be directed to *"serious medical need."* Conditions of lesser significance, of course, should not be neglected. (By association, such neglect could and should be suggestive that serious needs might also be neglected.) But the major concern was for serious medical needs - those basically threatening a patient's life and/or limb.

II.   **The State Department of Corrections Responsibility**

A.    As generally noted above, the state becomes the *"guardian"* of the inmate. Therefore, the state is to provide a comprehensive medical service equal to *"that found in the local community."* When a private contractor is utilized, that contractor must meet the same responsibility required of the state. Thus, decisions made by the medical contractor reflect the state's role.

B.    Wexford Health's practice philosophy is to provide the required comprehensive medical service *"equal to (or better than) the level available in the local community."* The program designed to address ... preventative care those inmates who enter with pre-existing conditions.

C.    Inmate problems in the institution are treated with a *"worker's compensation"* philosophy, e.g., conditions which occur in the DOC, or which are directly aggravated by incarceration are the responsibility of the DOC.

D.    However, inmates present with many conditions that are totally unrelated to their incarceration. Many of these conditions have never been addressed prior to incarceration. Many have been diagnosed and treated prior to incarceration. Many inmates claim to have been diagnosed and treated, but no evidence can be found to validate the problems. For some conditions, e.g., cosmetic problems, it is rarely appropriate for the DOC to accept a treatment responsibility.

Case No. ▓▓▓▓▓▓▓                                                    WEX187

CONFIDENTIAL – SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

E.  The state does NOT have a responsibility to provide a service simply because an inmate demands it be done. Nor does the state have a responsibility to CURE, only to appropriately diagnose and treat.

## III.  Individual Responsibility

A.  Understanding that the state has a *"guardian"* role to care for the inmate, and the inmate has limited alternative choices for medical service, there is still a major personal responsibility on the inmate to seek to preserve his/her health. This means an inmate is responsible for complying with medical plans and treatment prescribed.

B.  The inmate is responsible for personal hygiene and other normal activities of daily living that promote his/her own health.

C.  Inmates have the responsibility to bring to medical staff attention the fact that they believe a personal medical problem exists.

D.  Inmates may refuse medical service, but their refusal does not speak to a *"deliberate indifference"* in that case. Documentation of all refused care is necessary and psychiatric evaluation of competency should be obtained when in question.

E.  All inmates have a *"public health"* responsibility to aide in the protection of the health of the other inmates. Just like citizens in *"free-world"* communities, they must submit to individual practices, which help assure the health of the institution, e.g., TB testing and treatment.

## IV.  Summary

No inmate who has a problem will be denied treatment simply because the condition existed prior to incarceration. Treatment will be offered on the basis of medical need, appropriate diagnosis and the degree of objective limitation of function. Further consideration will be applied to the treatment plan if incarceration activities might aggravate or hasten deterioration of the condition. Pain will be given serious consideration as an aggravating factor, but must be evaluated in the light of the patient's dependency history.

An additional factor with significant weight is the anticipated prognosis of the proposed treatment. Only if there is a reasonable expectation that the outcome of the treatment will make a significant difference for a reasonable duration will a procedure be given serious consideration. Recommended approaches that *"might give some relief"* are reviewed and considered, but are not given substantial support.

Case No.

WEX188

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## QUALITY ASSURANCE

It is difficult to maintain a quality practice in correctional medicine. Staffing, equipment, security constraints, cumbersome policies, conflicting operational objectives, unrelenting and often unrealistic inmate demands and an ever-present shadow of litigation combine to promote fragmentation and frustration. These variables can be controlled by consistent leadership which identifies quality medical service, persistently pursues the identified goals and maintains the levels achieved. Part of that process is the candid review of error, mistake and disappointing outcomes. If we do not face our failures, we will continue to fail through ignorance. Continual review through quality assurance serves to identify deficiencies and improves patient outcomes.

It is expected that all clinical providers (MD/Dentist/PA/NP) will actively participate in their site's Quality Management Program or meetings. The site Medical Director (or designee) will co-chair the Quality Management Program meetings.

### I. Peer Reviews

One responsibility of both the unit and the corporate medical director is the review of provider medical care. Although this is usually physician - physician review, in our units, physician - nurse or CMT review is also included. Generally, peer review should be performed at least annually by the regional medical director (or his designee) and the unit medical director or as designated by the DOC/county. All peer reviews should give feedback to those healthcare providers being reviewed and must be kept confidential. A copy of the peer review should be forwarded to Wexford's credentialing department for use as a reference during the reappointment process.

### ii. Death Reviews

The occurrence of an inmate death in the institution is always accompanied by suspicion. The family, other inmates, and sometimes even DOC and medical staff are suspect that unusual events have occurred. Realistically, death is inevitable. Most deaths are for obvious or expected reasons. However, every inmate death must be reported as soon as reasonable to the regional office and the corporate medical director. If the death is unexpected, or you perceive unusual events, immediate notification is indicated. The unit medical director must file a complete chart summary within a week of the day of death. This summary should include: 1) patient identification, 2) all listed problems, 3) cause of death, 4) a history of the patient's incarceration and medical care with an emphasis on the care preceding the death, 5) any special circumstances you believe accompanied the event, and any information from "outside" providers or facilities that are important, and 6) all pertinent laboratory, radiographic, pathologic, or other studies.

This report is both an informational and a legal document that becomes a part of the permanent record, and part of our medical review. Please treat it as such ... ... high degree of ... in the treatment of the ... ment. There is no place in "... ounded in ... ... ... ... ular as This ... a factual ... ... with your best effort at reasonable analysis and detail, ... degree of detail is left to your judgment; be thorough, but concise. Above all, include ONLY what is supported by existing, documented and preserved evidence, and validated information sources.

### III. High-Risk Population

The population of any Correctional Unit has "more" of almost any pathologic condition you wish to consider. The lifestyles, personalities, socio-economic pathology and circumstances of illegal trafficking extracts a huge physiologic price tag. As responsible professionals, we are here to maintain the best level of health possible for as long as is reasonable. Personal judgments regarding the basis for the problem have little place in the treatment of these problems.

Approved by the Wexford Medical Advisory Committee on June 8, 2012

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

Patients with AIDS, end-stage renal disease, failing cardio-vascular support, uncontrolled diabetes mellitus, and many other terminal problems that may generate from poor lifestyles should find support and reasonable comfort in the health care staff. These patients often pose the greatest challenges to the healthcare staff. Nevertheless, we must extend our care and attention FAR beyond the usual limits of private practice. These patients have no place to go — YOU may be their final provider. Regardless of what they have done, they deserve your best care. Judgment of their prior acts should be left to those capable of overall judgment.

## IV.    Experimental Care Services

Inmates may not participate in an experimental study without the specific written approval of the corporate medical director. Further approval will be required by the agency medical director or the state Department of Corrections.

## V.    Transportation

Transport of inmates for outside medical service is usually the task of the Department of Corrections. As contractor, we are usually responsible for emergency transportation. However, these issues are specifically addressed in the contract.

## VI.    Cost Considerations

A criticism frequently directed toward private managed care programs like Wexford Health is that services are withheld to improve profits. Similar criticism has been directed at the medical industry in general, implying that cost - money - should never be a consideration in regards to providing medical care. Cost has always been a consideration in treatment, and with progressive government "Health Care Reform" will become a far greater factor than it has ever been under the "control of the health profession."

Consideration in deciding treatment is given to whether or not the Department of Corrections has the responsibility to provide a treatment: The mere existence of a condition DOES NOT CONSTITUTE A RESPONSIBILITY for repair!

When considering alternative treatment approaches, cost becomes a consideration. Even then, it is not THE determinant, but only ONE of several possible variables considered. Cost, per se, usually becomes the last variable considered, belying its importance.

Meanwhile, the role of the medical staff is to: 1) provide medical care to individual patients, and 2) seek the best quality we can afford and spread our health care budget to effectively cover as many services as possible. Cost has been and must continue to be a consideration. The "cost of service" remains an important factor to be shouldered by each health care professional. Being fiscally responsible builds a broader range of treatment alternatives.

Case No

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

# ATTESTATION

I, _____do attest that the Wexford Health Sources, Inc. handbook has been read by me. I understand and agree to abide by the procedures and policies set forward in this handbook. Furthermore, I have been allowed to ask questions and I have been given appropriate answers to those questions.


_____          _____
Provider                                    Date



_____          _____
Facility Medical Director                   Date



_____          _____
Regional-Level Operator                     Date



_____          _____
Regional Medical Director                   Date

Case No.

Keith Allen – M21830
Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259

Correspondence from
Individual In Custody
LEGAL

FIRST-CLASS

US POSTAGE IM PITNEY BOWES

ZIP 62259 $ 003.84⁰
02 7W
0008037385 MAY 04 2026

Legal Mail

MAIL CLEARED
US MARSHALS

Clerk OF The Court
United States District Court
For The Southern District OF Illinois
750 Missouri Avenue
East St. Louis, IL. 62201

RECEIVED

MAY 0 7 202

CLERK, U.S. DISTRICT C
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

Legal Mail