In The United States District Court
For The Southern District Of Illinois

Keith Allen-Williams,

  Plaintiff,

v.

            Case No. 23-cv-3775-DWD

Wexford Health Sources, Inc.,   Humrable David W. Dugan

  Defendants.

"Plaintiff's First Request For Admissions To Nicholas Florence"

  Pursuant to Rule 36, Fed. R. Civ. P. plaintiff, Keith Allen-Williams, requests the defendants to make the following admissions within 30 days after the service of this request.

(1.) Nicholas Florence, admit that you are a Medical Doctor, Radiologist, licensed to practice Medicine in the State of Illinois.

(2.) Admit that you were a medical Doctor, Radiologist, reviewing x-ray films of inmates at Menard Correctional Center between the dates 8/16/21 to 2/8/22.

(3.) Nicholas Florence, admit that you took the following Oath of Office: "I do solemnly swear (affirm) that I will support the Constitution of the United States, and the Constitution of the State of Illinois, and that I will faithfully discharge the duties of ▓... to the best of my ability."

(4.) Nicholas Florence, Admit that the following is true: "each prospective holder of a state office or other state positions created by the Illinois Constitution, before taking office shall take and subscribe to the following oath or affirmation: "I do solemnly swear (affirm) that I will support the Constitution of the United States, and the Constitution of the State Of Illinois, and that I will faithfully discharge the duties of the office of ... to the best of my ability."

(5.) Nicholas Florence, Admit that the "Illinois Oath of Office" you took required you to follow all

Page ① of ⑮

Exhibit A

- state laws of Illinois.

(6.) Nicholas Florence, Admit that you were made aware of plaintiff, Keith Allen's (M23183) right hand injury, when Jilian Crane, Nurse Practitioner, sent you a copy of his 8/30/21 x-ray film reviews of his right hand.

(7.) Nicholas Florence, Admit the following to be true: "That your "M.D. Review" Radiology Report Findings of Plaintiff, Keith Allen's (M23183), 8/30/21 x-ray film review Findings Stated: "Findings: Dependent edema; Findings: No evidence of acute fracture or malalignment; Normal joint spaces and mineralization is preserved; the soft tissues are unremarkable; Impression: Unremarkable radiographs of the right hand."

(8.) Nicholas Florence, Admit that you made your "M.D. Review" on date - 9/7/21 of plaintiff, Keith Allen's (M23183), 8/30/21 x-ray film review of his right hand injury.

(9.) Nicholas Florence, Admit that you signed your signature on your "M.D. Review" Radiology Report, dated 9/7/21, of Keith Allen's (M23183), 8/30/21 x-ray film review of his right hand injury.

(10.) Nicholas Florence, Admit that you were employed as a Medical Doctor - Radiologist by Wexford Health Sources Inc., when you received Keith Allen's (M23183), 8/30/21 x-ray film review of his right hand injury.

(11.) Nicholas Florence, Admit that you were hired by the Illinois Department of Corrections to provide medical care to inmates at Menard Correctional Center between dates 8/16/21 to 9/16/21.

(12.) Nicholas Florence, Admit that you were an Illinois State Employee between the dates of 8/16/21 to 9/16/21.

(13.) Nicholas Florence, Admit that you were hired by Illinois Department of Corrections as a Medical Doctor, Radiologist, to review plaintiff, Keith Allen's (M23183), 8/30/21 x-ray film reviews of his right hand injury between dates 8/16/21 to 9/16/21.

(14.) Nicholas Florence, Admit that you were privately employed Medical Doctor - Radiologist

page (2.) of (5.)

-t for a company named "One Radiology" in Normal, Illinois, zip code 61761 between dates 8/10/21 to 9/16/21.

15.) Nicholas Florence, Admit that you took an Illinois Oath of Office.

16.) Nicholas Florence, Admit that you are required by Illinois State law to adhere to all Illinois Department of Corrections Administrative Directive Medical Policies.

17.) Nicholas Florence, Admit that you misdiagnosed plaintiff's (Keith Allen - M2830) right hand injury on the 8/20/21 x-ray film review findings you conducted on your "M.D. Review" dated 9/7/21.

18.) Nicholas Florence, Admit that as a Medical Doctor, Radiologist, you are required to adhere to the National Commission of Correctional Health Care (NCCHC) standards of care.

19.) Nicholas Florence, Admit that you received plaintiff, Keith Allen's (M2830), 8/20/21 x-ray film reviews of his right hand injury ordered by Nurse Practitioner, Jillian Crane, by fax.

20.) Nicholas Florence, Admit that you received plaintiff, Keith Allen's (M2833), 8/20/21 x-ray film reviews of his right hand injury ordered by Nurse Practitioner, Jillian Crane, by email.

21.) Nicholas Florence, Admit that you were a Medical Doctor - Radiologist, who was considered a "community physician" employed by Wexford Health Sources, Inc., as a sub-contracted Radiologist used to review Keith Allen's (M2830), 8/20/21 x-ray films.

22.) Nicholas Florence, Admit that the exhibit #14 attached to plaintiff, Keith Allen's (M2830), Verified Complaint and this request is an authentic copy of your Radiology Report dated 9/7/21, of Keith Allen's (M2830) 8/20/21 x-ray film review findings.

23.) Nicholas Florence, Admit that your 8/20/21 x-ray film review findings of plaintiff, Keith Allen's (M2830) right hand injury, ordered by Jillian Crane and forwarded to

page 3 of 15

you, resulted in an x-ray film review finding of no fractures seen.

24.) Nicholas Florence, Admit that Jillian Crane faxed you a copy of plaintiff (Keith Allen ~s ~M218309) 8/20/21 x-ray film reviews of his right hand injury.

25. Nicholas Florence, Admit that after you reviewed plaintiff, Keith Allen's (~M218309), 8/20/21 x-ray film reviews of his right hand injury, you did not recommend that Keith Allen (M218309) be seen by a Medical Doctor at an Outside Clinic for Evaluation.

26. Nicholas Florence, Admit that your x-ray film review findings of plaintiff, Keith Allen's (M218309) right hand injury consist of the following results: "Findings: Dependent edema; Findings: No evidence of acute fracture or malalignment; Normal joint spaces and mineralization is preserved; The soft tissues are unremarkable; Impression: Unremarkable the radiographs of the right hand."

27. Nicholas Florence, Admit that the following is true: "Under Medical Malpractice, to sustain an action for medical negligence, the plaintiff must establish: 2 the standard of care in the medical community by which the medical professional to comply with the Standard of care; (3) the resulting injury was proximately caused by the deviation from the Standard of Care."

28.) Nicholas Florence, Admit that your x-ray film review findings, of plaintiff, Keith Allen's ~M218309, 8/20/21 x-ray film review order by Nurse Practitioner, Jillian Crane, "concurred that there was no fracture or break."

29. Nicholas Florence, Admit that the following Deliberate Indifference to serious medical needs Standard is true: "A deliberate Indifference claim premised upon inadequate medical treatment requires, to satisfy, the objective element, a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention; within the subjective component of a deliberate indifference to a serious medical need claim requires that the prison official know of "a substantial risk of harm to the –

page (4) of (15)

~inmate and disregarded the risk."

30. Nicholas Florence, Admit that you were made aware of a substantial risk of harm to plaintiff's health for his seven cyst hand injury, yet disregarded that risk.

31. Nicholas Florence, Admit that you as a licensed Medical Doctor - Radiologist in the State of Illinois, it's your duty to follow all National Commission of Correctional Health Care (NCCHC) Standards.

32. Nicholas Florence, Admit that you as a licensed Medical Doctor - Radiologist in the State of Illinois, it's your duty to follow all National Commission of Correctional Health Care (NCCHC) Standards.

33. Nicholas Florence, Admit that the following is true: "When physicians fail to follow their own policy, or rules and regulations, there is a clear indication of deliberate and intentional indifference.

34. Nicholas Florence, Admit that physicians will be liable under the Eighth Amendment if they intentionally disregard a known, objectively serious medical condition that posed an excessive risk to an inmate's health.

35. Nicholas Florence, Admit that a prison doctor is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards.

36. Nicholas Florence, Admit that, a delay in treatment may show deliberate indifference if it exacerbated the inmate's or unnecessarily prolonged his pain.

37. Nicholas Florence, Admit that the treatment you provided plaintiff, Keith Allen (M21530) was not based on a legitimate medical judgment.

38. Nicholas Florence, Admit that Deliberate Indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers

page 5 of 5

—or a "blatantly inappropriate" medical treatment.

39. Nicholas Florence, Admit that when you were made aware of a significant risk to plaintiff, Keith Allen's health, you administered blatantly inappropriate medical treatments.

40. Nicholas Florence, Admit that a plaintiff's receipt of some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was, "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" a medical condition.

41. Nicholas Florence, Admit that prison physicians must provide inmate with medical care that is adequate in light of the severity of the condition or professional norms.

42. Nicholas Florence, Admit that you failed to provide plaintiff, Keith Allen's (m12:830), 8/20/21 x-ray film review of his right hand injury resulted from your failure to exercise ordinary knowledge, skill, and constituted medical malpractice.

43. Nicholas Florence, Admit that as a Medical Doctor-Radiologist, Illinois State law requires that when you're confronted with an "inappropriate or questionable" practice" you should not simply defer to that practice, but rather has a professional obligation to the patient to "take appropriate action", whether by discussing your concerns with the treating physician or by contacting a responsible administrator or higher authority.

44. Nicholas Florence, Admit that you were subcontracted as a Medical Doctor-Radiologist, by Wexford Health Sources, Inc., between the dates of 8/16/21 to 9/7/21.

45. Nicholas Florence, Admit that the Illinois Department of Corrections paid you for your services in reviewing plaintiff, Keith Allen's (m12:830), 8/20/21 X-ray film reviews of his right hand injury on your "M.D. Review" Radiology Report dated 9/7/21.

page 6. of 15.

46.) Nicholas Florence, Admit that Wexford Health Sources, Inc., paid you for your services in reviewing plaintiff, Keith Allen's (m23832), 8/24/21 x-ray film reviews of his right hand injury on your "M.D Review" Radiology Report, dated - 9/7/21.

47.) Nicholas Florence, Admit that you were aware that Wexford Health Sources, Inc., was the Contracted Health Care Medical Service Provider for the Illinois Department Of Corrections between the dates of 8/16/21 to 9/16/21 when you conducted your "M.D. Review" of Keith Allen's (m231834), 8/24/21 x-ray film.

48.) Nicholas Florence, Admit that you were aware that between the dates of 8/16/21 to 9/16/21, that Wexford Health Sources, Inc., were the State of Illinois Medical Contractor for prison healthcare.

49.) Nicholas Florence, Admit that you read the 2021 Illinois Department of Corrections and Wexford Health Sources, Inc's Negotiated Healthcare Service Provider Contract Agreement.

50.) Nicholas Florence, Admit that you read the Wexford Health Sources, Inc's Provider Handbook from June 2012 - "Doc. 1-2 at 61-86".

51.) Nicholas Florence, Admit that you did read the Wexford Health Sources, Inc's Provider Handbook from effective date of June 8, 2012 (Doc. 1-2 at 61-86).

52.) Nicholas Florence, Admit that between the dates of 8/16/21 to 9/16/21 you were not an employee of the State Of Illinois.

53.) Nicholas Florence, Admit that between the dates of 8/16/21 to 9/16/21 you were not an employee of the Illinois Department of Corrections.

54.) Nicholas Florence, Admit that between the dates of 8/16/21 to 9/16/21 you were not an employee of Wexford Health Sources, Inc.

55.) Nicholas Florence, Admit that you did not recommend that plaintiff, Keith Allen, (m23832), be seen by an outside Clinic Doctor for an evaluation of his right hand injury.

page 7 of 15.

(56.) Nicholas Florence, Admit that you had to sign the "Attestation" on page 23 of the Wexford Health Sources, Inc.'s "Provider Handbook" Approved by the Wexford Medical Advisory Committee on June 8, 2012, which states: "I _____ do attest that the Wexford Health Sources, Inc handbook has been read by me; I understand and agree to abide by the procedures and policies set forward in this handbook; Further, I have been allowed to ask questions and I have been given appropriate answers to those questions."

(57.) Nicholas Florence, Admit that you had to sign the "Attestation" on page 23 of the Wexford Health Sources, Inc.'s "Provider Handbook" from June 2012 (Doc. 1-2 at 61-68), in order to be employed by Wexford Health Sources, Inc.

(58.) Nicholas Florence, Admit that ~~the following is~~ the following is true: "On 8/26/21, you were made aware of Keith Allen's (M31830) severe right hand injury by the 8/20/21 x-ray files report sent to you by Jilian Crane where you knowingly disregarded obvious risks to Keith Allen's (M31830) health.

(59.) Nicholas Florence, Admit that the following is true: "You had knowledge of Keith Allen's (M31830) severe right hand injury within the pain he experienced, yet failed to provide adequate medical treatment to him yourself by referring him to see a physician for evaluation or to ensure others did.

(60.) Nicholas Florence, Admit that by you failing to refer Keith Allen-M31830 to see a physician for evaluation or ensure others did when confronted with an inappropriate or questionable practice, it denied or delayed him access to adequate medical treatment that unnecessarily prolonged his pain.

(61.) Nicholas Florence, Admit that your decision to not refer plaintiff, Keith Allen-M31830, to be seen by an Orthopaedic Hand Specialist for evaluation after you were made aware of his complaints of pain for his severe right hand injury, were not based on legitimate medical judgment.

page (Four) (15.)

63. Nicholas Florence, Admit that inside the Wexford Health Sources, Inc.'s "Provide r Handbook" there's a policy on page 10 that states: "No diagnosis = No treat -ment."

62. Nicholas Florence, Admit that inside the Wexford Health Sources, Inc's "Provider Handbook" there's a policy on page 10 that states: "Since they are seeing a doctor, many think they should "have something"

64. Nicholas Florence, Admit that inside the Wexford Health Sources, Inc's "Provider Handbook" there's a policy on page 10 that states: "Observation may be the best course of action."

65. Nicholas Florence, Admit that you as a Wexford Health Sources, Inc Employe -yee you were required to adhere to all the policies contained inside the Wexfo -rd Health Sources, Inc's "Provider Handbook" from June 2012.

66. Nicholas Florence, Admit that you signed the Wexford Health Sources, Inc.'s "Provider Handbook" from June 2012, contract agreeing to adhere to the terms or policies contained inside.

67. Nicholas Florence, Admit that Wexford Health Sources, Inc's "Provider Handbook" from June 2012, has a policy therein that requires it's employee nurses to forward their x-ray film review findings to Wexford Health Sources Inc's hired community Physician Radiologists to reinforce their nurses diagnosis.

68. Nicholas Florence, Admit that as a Medical Doctor, Radiologist, providing medical care to inmates locked up in the Illinois Department of Corrections, you must adhere to all applicable Illinois Department of Corrections Administr -ative Directives.

69. Nicholas Florence, Admit that the following is true "that the Illinois Department of Correction Administrative Directive, number: 03.02.108, Titled "Standard of Conduct," section (F)(a)(b) states: Employees shall obey all federal, state, and local laws, and shall obey

- all applicable court decisions and orders related to the performance of their job duties."

(70.) Nicholas Florence, Admit that the following statements are true: "Medical Doctor - Radiology, Nicholas Florence's negligent failure by a medical professional to comply with the Standard of Care resulting in plaintiff's - Keith Allen-B121830 injury of pain being proximately caused by the deviation from the Standard of care set by the National Commission of Corrections (NCCHC) standard guidelines which required Radiolog -ist - Nicholas Florence to report accurate information to treating physicians, to fulfill his professional Obligation and Independent duty to ensure that inmates receive constituti -onally adequate care, misdiagnosing plaintiff resulting from failure to exercise ordinary knowledge, skill, constituting medical malpractice state tort claims violatings and/ for not referring patient to see a medical Doctor/Physician for examination constitut -ing Deliberate and Intentional Infliction of Indifference to plaintiff's serious medical needs causing unnecessary pain and exacerbating his injury for a fractured hand.

(71.) Nicholas Florence, Admit the following statement to be true: "that the Illinois Department of Corrections Administrative Directive, number: 04.03.103, Title: Offender Health Care services, section (F.)(3.)(b.)(C.)(1.) states: "All offenders shall have daily access to health care personnel and be referred to a facility physician, physician assistant or nurse practitioner as needed, and offenders shall be referred for special services if determined medically necessary."

(72.) Nicholas Florence, Admit the following to be true: that you failed to adhere to the Illinois Department of Corrections Administrative Directive, number: 04.03.103, section (F)(3)(b)(C) ~~[struck through text]~~ by not referring Plaintiff, Keith Allen-B121830, to see a medical Doctor, Orthopedic Hand Specialist when he was confronted with plaintiff's complaints of pain for his right hand injury and made aware of symptoms that required he be referred to see a physician, along with Radiologist - Nicholas Florence being confronted when a

-treating physician, nor did he fulfill his state law professional obligation or independ-ent duty to ensure plaintiff received constitutionally adequate medical care, and avoid mis-gnosed plaintiff's 8/24/21 x-ray film review of his right hand injury by reporting his findings came back negative for any fractures when plaintiff's hand was fractured, which lead to delaying or denying plaintiff access to qualified medical personnel for eval and proper medical treatment that caused him unnecessary prolonged pain that led to the worsening of his injury.

(73) Nicholas Florence, admit that your failure to adhere to Illinois Department of Corrections Administrative Directive, number: 04.03.102, Title: Offender Health Care Service, section (F)(3)(b)(C)(1) which led Keith Allen-M12830 to suffer unnecessary pain.

(74.) Nicholas Florence, Admit that you denied Keith Allen-M12830 access to an Orthopedic Hand Specialist physician as needed when you misdiagnosed his 8/24/21 X-ray film review when your x-ray film M.D. Review dated 9/3/21 came back negative for any fractures.

(75.) Nicholas Florence Admit that as a Medical Doctor in Illinois Under State law, you have an independent duty to ensure that plaintiff, Keith Allen-M12830 receives constitutionally adequate medical care.

(76.) Nicholas Florence, Admit that you must take an Oath of office to work at a Medical Doctor - Radiologist in the State of Illinois.

(77.) Nicholas Florence, Admit that you were subcontracted by Wexford Health Source, Inc. to review X-ray films of inmates at Pinckneyville Correctional Center in August of 2021.

(78.) Nicholas Florence, Admit that you were made aware of a risk of harm to Keith Allen's (maistri) health.

(79.) Nicholas Florence, Admit that you were made aware of Keith Allen-M12 to severe right hand injury.

Page (11) of (15.)

80.) Nicholas Florene, Admit that you prevented Keith Allen (M121832) to be seen by an Orthopaedic Hand Specialist for eva' of his right hand injury.

81. Nicholas Florene, Admit that Jillian Crane - Nurse Practitioner - ordered you to review Keith Allen's (M121832) 8/26/21 x-ray films taken of his right hand injury.

82.) Nicholas Florene, Admit that upon review of Keith Allen's (M121832) x-ray film of his right hand, you didn't find any fracture.

83.) Admit that you contributed to delaying Keith Allen (M121832) adequate medical treatment.

84. Admit that plaintiff, Keith Allen (M121832) was seen for the same complaint 3 times in 30 days.

85.) Admit that Medical Doctor, Glen Babich, diagnosed Keith Allen (M121832) with an old fracture at the base of the 5th metacarpal.

86.) Admit that Medical Doctor, Glen Babich, diagnosed Keith Allen (M121832) with a close and nondisplaced fracture of the base of fifth metacarpal bone of right hand.

87. Admit that plaintiff, Keith Allen (M121832), was sent to the Orthopaedic Institute of Southern Illinois for an evaluation.

88.) Admit that the Orthopaedic Institute Of Southern Illinois evaluation of Keith Allen (M121832) was conducted on 2/8/22.

89. Admit that Medical Doctor, Glen Babich, diagnosed Keith Allen (M121832) with right 5th metacarpal fracture malunion.

90.) Admit that Medical Doctor, Glen Babich, diagnosed Keith Allen (M121832) with Bilateral Carpal Tunnel Syndrome.

91. Admit that Medical Doctor, Steven Young, x-ray film diagnostic interpretation of Keith Allen's right hand stated," He did have an old fracture at the base of the 5th metacarpal.

92.) Admit that the Medical Doctor, Glen Babich, x-ray film diagnostic interpretation

-of Keith Allen's right hand stated, "He didn't have an old fracture at the base of the 5th metacarpal."

93. Admit that Medical Doctor, Steven Young, took an x-say of Keith Allen (N12183?) right hand 3/8/22.

94. Admit that Medical Doctor, Glen Babich, diagnosed Keith Allen (N121835) with Arthritis.

95. Admit the Exhibit #41 attached to this request is a true and accurate copy of Medical Doctor, Glen Babich's, Evaluation of Keith Allen's right hand injury.

96. Admit that Keith Allen (N121834) was placed in segregation under investigation status on 8/16/21.

97. Admit that Exhibit #1 attached to this request is a true and accurate copy of the Investigative Status Report.

98. Admit that Keith Allen (N121834) was issued a disciplinary report for "102 C: Assault of An Offender for an altercation that occurred on 8/16/21.

99. Admit that Exhibit #20 attached to this request is a true and accurate copy of the Disciplinary Report for 102 C: Assault of an Offender.

100. Admit that Keith Allen - N121834 injured his right hand on 8/16/21.

101. Admit that Keith Allen's ~~emergency grievance dated 8/15/21~~ (N121834) injured his hand in a physical altercation in self-defense.

102. Admit that Keith Allen's emergency grievance dated 10/15/21 regarded his medical treatment.

103. Admit that Exhibit #22 attached to this request is a true and accurate copy of his emergency grievance dated 10/15/21.

104. Admit that Keith Allen's emergency grievance dated 10/15/21 was about the inadequate medical treatment he experienced.

105. Admit that Keith Allen - N121834 was seen on nurses sick call on 8/17/21.

page 13 of 15.

106. Admit that Keith Allen's (M121830) 8/17/21 nurses sick call visit, recorded symptoms of swelling.

107. Admit that Keith Allen's (M121830) nurses sick call visit, recorded symptoms of restricted range of motion (unable to make fist).

108. Admit that Keith Allen's 8/17/21 nurses sick call visit was for his severe right hand injury.

109. Admit that Keith Allen's 8/17/21 nurses sick call visit, recorded symptoms of pain at an 8 on a scale of 1 through 10.

110. Admit that Exhibit #11 attached to this request is a true and accurate copy of his 8/17/21 sick call visit eval report.

111. Admit that Keith Allen's (M121830) was seen on nurses sick call visit on 8/24/21.

112. Admit that Keith Allen's (M121830) nurses 8/24/21 sick call visit, recorded symptoms of right hand pain.

113. Admit that Keith Allen's (M121830) nurses 8/24/21 sick call visit, recorded symptoms of moderate swelling.

114. Admit that Keith Allen's (M121830) nurses 8/24/21 sick call visit, recorded symptoms of purple discoloration.

Date: 5/24/26

Keith Allen - M121830

Menard Correctional Center

P.O. Box 1000

Menard, IL. 62259

Submitted By: J

/S/ Keith Allen - M121830
Plaintiff's Pro se Signature

page 14 of 15.

"Certificate of Service"

I, plaintiff Keith Allen -M21830, certify that I placed the following motion titled "Plaintiff's First Request For Admissions To Nicholas Florence" consisting of 15 pages and 10 pgs of attached exhibits in Menard Correctional Center's Institutional mail on May 25, 2026 to be sent via USPS certified mail postage to defendant's Attorney Zachary G. Stillman, of Litchfield Cavo LLP, 303 West Madison Street, Suite 300, Chicago, IL. 60606.

Under the penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as aforesaid that he verily believes the same to be true.

Keith Allen -M21830
Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259

Submitted By: /S/ Keith Allen
Plaintiff's - Pro Se Signature

Date: 5/25/26

page 15. of 15.

08/27/2021  11:55   3098631302   BLOOMINGTONRADIOLOGY   PAGE  04/05

Exhibit# 10

OneRadiology
Normal, IL 61761
Date : 8/26/2021

ALLEN, KEITH
ID# M21830
D.O.B.: 6-4-88
Ordered by: Crane
Menard Correctional Center

THREE VIEWS OF THE RIGHT HAND 8-20-2021:

HISTORY: Status post fall.

FINDINGS: Dependent edema.

FINDINGS: No evidence of acute fracture or malalignment. Normal joint spaces and mineralization is preserved. The soft tissues are unremarkable.

IMPRESSION: Unremarkable radiographs of the right hand.

Signed _____
N. Florence, M.D.

Dic.: 08/26/2021

Films from Menard Correctional Center

OneRadiology
Normal, IL 61761
Date : 8/26/2021

ALLEN, KEITH
ID#: M21830
D.O.B.: 6-4-88
Ordered by: Crane
Menard Correctional Center

THREE VIEWS OF THE RIGHT HAND 8-20-2021

HISTORY: Status post fall.

FINDINGS: Dependent edema.

FINDINGS: No evidence of acute fracture or malalignment. Normal joint spaces and mineralization is preserved. The soft tissues are unremarkable.

IMPRESSION: Unremarkable radiographs of the right hand.

Signed _____
N. Florence, M.D.

Dic : 08/26/2021

Films from Menard Correctional Center

M.D. REVIEW
DATE _____
DOCTOR _____
PULL CHART _____
SEE PATIENT _____ CC/PE/HIV
FILE _____

8/31/21



Patient:            Keith Allen
Date of Birth:      06/04/1988 Age: 33
Date:               02/08/2022 9:20 AM
Visit Type:         Office Visit

## CHIEF COMPLAINT:

Right hand pain.

## HISTORY OF PRESENT ILLNESS:

1.. rt hand

Patient is a 33-year-old right-hand dominant male who states that in September 2021 he got into a fight. He states that since then he has had pain in the hand. States his pain level varies between a 1 and 9 and describes it as a sharp, burning, stabbing pain. States he occasionally has numbness in the thumb, index finger and long finger as well. He has been taking ibuprofen. He is an inmate and he did state he was very apprehensive about surgical procedures due to the conditions he lives in.

Today we reviewed his past medical history, medications, allergies, surgical history, social history, family history, and review of systems. They are all part of his electronic medical record.

## PAST MEDICAL HISTORY (Detailed)

| Disease | Onset Date | Comments |
|---|---|---|
| Arthritis | | |

## PAST SURGICAL HISTORY

| Management | Laterality | Date | Comments |
|---|---|---|---|
| no known surgical history | | | |

## SOCIAL HISTORY (Detailed)

Tobacco use reviewed.
Preferred language is English.
Tobacco use status: Cigarette smoker.
Smoking status: Current every day smoker.

KEITH ALLEN 000591

## FAMILY HISTORY (Detailed)

Condition
Family history of Cardiovascular disease
Family history of Cancer, unknown
Family history of Diabetes mellitus

## MEDICATIONS:

Patient Status
Completed with information received for patient transitioning into care.
Medication Reconciliation
Medications reconciled today.
Medication Reviewed

| Medication Name | Prescribed Elsewhere | Status |
|---|---|---|
| naproxen 500 mg tablet | Y | Verified |

## ALLERGIES:

| Ingredient | Reaction (Severity) | Medication Name | Comment |
|---|---|---|---|

NO KNOWN ALLERGIES

## REVIEW OF SYSTEMS:

| System | Neu/Pos | Details |
|---|---|---|
| Constitutional | Negative | Chills, Fever and Night sweats. |
| Eyes | Negative | Blurred vision. |
| Respiratory | Negative | Asthma, Cough and Dyspnea. |
| Cardio | Negative | Chest pain and irregular heartbeat/palpitations. |
| GI | Positive | Abdominal pain. |
| GI | Negative | Black tarry stools, Nausea and Vomiting. |
| GU | Negative | Dysuria and Urinary incontinence. |
| Endocrine | Negative | Cold intolerance and Heat intolerance. |
| Neuro | Positive | Paresthesia, Numbness in extremities. |
| Neuro | Negative | Dizziness and Headache. |
| Psych | Negative | Anxiety. |
| Integumentary | Negative | Rash and Skin lesion. |
| MS | Negative | Except as noted in HPI and Chief complaint and Muscle weakness. |
| Hema/Lymph | Negative | Bruising and Easy bleeding. |
| Allergic/Immuno | Negative | Contact dermatitis. |

Vital Signs

## VITAL SIGNS

| BP mm/Hg | Ht ft | Ht in | Ht cm | Wt lb | BMI kg/m2 | Pulse /min | Resp /min | Temp F | Time | Measured_by |
|---|---|---|---|---|---|---|---|---|---|---|
| | 5.0 | 9.00 | 175.26 | 185.00 | 27.32 | | | | 9:43 AM | April Hines |

## PHYSICAL EXAM:

GENERAL: Patient is a well-developed, well-nourished 33-year-old male who looks to be stated age. He is in no

Allen, Keith    000000372220 05/04/1988 02/08/2022 09:20 AM Page: 2/4

KEITH ALLEN 000532

acute distress at this time. Mood and affect were appropriate. He was alert and oriented x3. He is 5 feet 8 inches and weighed 185 pounds.

MUSCULOSKELETAL: On inspection of the upper extremities, he was able to make a complete fist with both hands and extend the fingers past neutral. Light touch sensation was intact at the tips of the fingers in both hands. Capillary refill was brisk at 2+ to the tips of the fingers of both hands. On examination of the wrist themselves, they have full range of motion of both wrists to include flexion, extension, pronation, supination, radial and ulnar deviation. He had a mildly positive Tinel's and median nerve compression test bilaterally.

## DIAGNOSTICS:

| Ordered Date | Completed Date | Dx/Indication | Study | Result | OrderedBy |
|---|---|---|---|---|---|
| 02/09/2022 | | Pain in right hand | Hand Xray Min 3 Views | | Young MD, Steven D MD |

Diagnostic Interpretation: X-rays were obtained today. Three views of the right hand were taken. He did have an old fracture at the base of the 5th metacarpal. It did appear was impacted, but it was healed.

## CLINICAL ASSESSMENT/PLAN:

| # | Detail Type | Description |
|---|---|---|
| 1. | Assessment | Pain in left hand (M79.642). |
| 2. | Assessment | Pain in right hand (M79.641). |
| 3. | Assessment | Closed nondisplaced fracture of base of fifth metacarpal bone of right hand, initial encounter (S62.346A). |

Assessment:
1. Right 5th metacarpal fracture malunion.
2. Bilateral carpal tunnel syndrome.

Plan:
At this time, we did discuss nerve studies and carpal tunnel release. However, the patient states he is not interested at this point in carpal tunnel surgery. He was told that if the symptoms become worse or he would like to have this addressed that he can have a follow-up made here at the clinic. It was explained to the patient that the fracture itself is healed. There is not much that can be done. An osteotomy more than likely would not provide any benefit due to the nature of the fracture and it did appear that the fracture had encroached on the distal row of carpal bones, but again the fracture is healed. He had very little pain on palpation of the fracture site and was able to make a complete fist. At this time it was explained to the patient this does not appear to be a surgical issue. Surgery would be less than optimal. He does have full function and range of motion, so we would not suggest surgery at this point. The patient agreed. He was instructed to take anti-inflammatories for his intermittent pain and to use the hand with no restrictions. We will go ahead and release him p.r.n.

KEITH ALLEN 000593

Electronically signed by : *Phillip R. Erthall PA 02/08/2022 09:20 AM*

*Document generated by: N. Admin 02/08/2022 02:46 PM      v 8.4/8/9*
*v.8.4/8.9*

CC Providers:
Glen Babich MD
10940 Lawrence Rd
Lawrence Correctional Center
Sumner, IL, 624661205
6189362859

Phillip R Erthall, PA-C/60023

510 Lincoln Drive Herrin, IL 62948 - Phone: 618.997.6800 - Fax: 618.998.9385 - www.orthopaedicinstitute.com

Electronically signed by Steven D. Young MD on 02/23/2022 04:06 PM

Allen, Keith    000000272220 06/04/1988 02/08/2022 09:20 AM Page: 4/4

KEITH ALLEN 000534

Allan v. Hunter (23-3775) Bates Document No.   000033

Name of ~~~~ in Custody   Keith ALLEN ~~~~    ID~~

Observation Date: 8/16/2021    Approximate Time: 2:12    ☐ a.m. ☑ p.m.    Location    Internal Area

Offense(s): DR 504:    Investigative Status

Observation (NOTE: Each offense itemized above must be substantiated.):
On the above date and approximate time, Individual in Custody Keith ALLEN M21830 is being placed on Investigative Status for the safety and security of the Institution. Individual in Custody Keith ALLEN M21830 was identified by State I.D. and Offender 360. End of Report.

Witness(es): _____
☐ Check if Disciplinary Report Continuation Page, DOC 0316, is attached to describe additional facts, observations, or witnesses.

| C/O J. Huffman | 13822 | | 8/16/2021 | 2:12 | ☐ a.m. ☑ p.m. |
| Reporting Employee (Print Name) | Badge # | Signature | Date | Time | |

---

## Disciplinary Action:

**Shift Review:** ☐ Temporary Confinement    ☐ Investigative Status    Reasons: _____

_____
Printed Name and Badge #

Shift Supervisor's Signature
(For Transition Centers, Chief Administrative Officer)    Date

**Reviewing Officer's Decision:** ☐ Confinement reviewed by Reviewing Officer    Comment: _____

☐ Major Infraction, submitted for Hearing Investigator, if necessary and to Adjustment Committee
☐ Minor Infraction, submitted to Program Unit

_____    Reviewing Officer's Signature    Date
Print Reviewing Officer's Name and Badge #

☐ Hearing Investigator's Review Required (Adult Correctional Facility Major Reports Only)

_____    Hearing Investigator's Signature    Date
Print Hearing Investigator's Name and Badge #

Procedures Applicable to all Hearings on Investigative and Disciplinary Reports
You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material in the form of records or documents.

Procedures Applicable to Hearings Conducted by the Adjustment Committee on Disciplinary Reports
You may ask that witnesses be interviewed and, if necessary and relevant, they may be called to testify during your hearing. You may ask that the witnesses questioned along lines you suggest. You must notice in advance of the hearing the witnesses you wish to have interviewed and specify what they will testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing.

☐ Check if individual in custody refused to sign.    _____    ID#
                                                      Individual in Custody's Signature

_____    Badge #    _____
Serving Employee (Print Name)                        Signature    ☐ a.m. ☐ p.m.

_____    _____
Date Served                Time Served

☐ I hereby agree to waive 24 hour notice of charges prior to the disciplinary hearing.

_____    ID#
Individual in Custody's Signature

---

(Detach and Return to the Adjustment Committee or Program Unit Prior to the H~~~~)

_____    _____
Date of Disciplinary Report    Print individual in custody's name

I am requesting that the Adjustment Committee or Program Unit consider calling the following witness of the above date.

_____    _____    _____
Print Name of Witness    Witness badge or ID#    Assigned Cell (if applicable)

Witness can testify to: _____

_____    _____    _____
Print Name of Witness    Witness Badge or ID#    Assigned Cell (if applicable)

Witness can testify to: _____

Page 1 of 1

Distribution:    Master File
                 Individual in Custody

Exhibit # 20

THE DEPARTMENT OF CORRECTIONS

## Disciplinary Report

Type of Report:
☑ Disciplinary    ☐ Investigative    Facility: Menard Correctional Center    Date: 9/15/2021

Name of Individual in Custody: KEITH ALLEN    ID #: M21830    SMI ☐    Race: Black

Observation Date: 9/15/2021    Approximate Time: 1:30    ☐ am ☑ pm    Location: WCH First

Offense(s): DR 504    102c Assault to an Offender

Observation: (NOTE: Each individual shall have his/her interview)

Upon the conclusion of an investigation which concluded on today's date it was determined that Keith ALLEN M21830 assaulted another individual in custody (identified but not named due to the Safety and Security of the Institution) on 8/16/2021 on the front of 8 gallery in the West cell house. Based on statements given by two confidential sources, as well as other information discovered during the investigation, Keith ALLEN M21830 is being issued a disciplinary report for 102c Assault of An Offender. Keith ALLEN M21830 was identified by State Identification unit (SID).

Witness(es):

☐ Check if Disciplinary Report Continuation Page (DOC 0317) is attached to document additional facts, observations or witnesses

| O. Lumer | 15846 | | 9/15/2021 | 1:30 | ☐ am ☑ pm |
|---|---|---|---|---|---|
| Reporting Employee (Print Name) | Badge # | Signature | Date | Time | |

## Disciplinary Action:

Shift Review: ☐ Temporary Confinement    ☐ Investigative Status    Reason:

Printed Name and Badge #    Shift Supervisor's Signature (For Transition Centers, Chief Administrative Officer)    Date

Reviewing Officer's Decision: ☐ Confinement reviewed by reviewing Officer    Comment:

☐ Major Infraction, submitted for Hearing Investigation, if necessary, and to Adjustment Committee
☐ Minor Infraction, submitted to Program Unit

Print Reviewing Officer's Name and Badge #    Reviewing Officer's Signature    Date

☐ Hearing Investigator's Review Required (Minor infractions - Facility Merit Reports Only)

Print Hearing Investigator's Name and Badge #    Hearing Investigator's Signature    Date

### Procedures Applicable to all Hearings on Investigative and Disciplinary Reports

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

### Procedures Applicable to Hearings Conducted by the Adjustment Committee on Disciplinary Reports

You may ask that witnesses be interviewed and, if necessary and relevant, they may be called. If they cannot appear in person, you may submit questions for them in advance. To request witnesses, you must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could verify, by filling out the appropriate space on this form. Inability to complete all details will not prohibit a request. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing.

☐ Check if individual in custody refused to sign

Individual in Custody's Signature    Date

Serving Employee (Print Name)    Badge #    Signature    ☐ am ☐ pm

Date Served    Time Served

☐ I hereby agree to waive 24-hour notice of charges prior to the Adjustment Hearing

Individual in Custody's Signature    Date

### (Detach and Return to the Adjustment Committee or Program Unit Prior to the Hearing)

Date of Disciplinary Report    Printed Individual in Custody's Name    ID#

I am requesting that the Adjustment Committee or Program Unit consider calling the following witnesses regarding the Disciplinary Report of the above date:

Witness Name or Address    Witness Badge # or ID#    Assignment Cell (if contacted)    Tier (if applicable)

Witness can testify to:

Witness Name or Address    Witness Badge # or ID#    Assignment Cell (if contacted)    Tier (if applicable)

Witness can testify to:

Page ___ of ___

Distribution: Master File, Individual in Custody    DOC 0317 (Rev. 04/2020)

"Certificate of Service"

I, plaintiff, Keith Allen -M21830, certify that I placed the following motion titled, "Plaintiff's Interrogatories First Request To Nicholas Florence", consisting of 4 pages and "___" attached exhibits in Menard Correctional Center's Institutional mail on May __25__, 2026 to be sent via USPS certified mail postage to defend -ant's attorney Zachary G. Stillman, of Litchfield Cavo, LLP, 303 West Madison Street, Suite 300, Chicago, IL. 60606.

Under penalties as provided by law pursuant to section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and ~~belief~~ belief and as aforesaid that he verily believes the same to be true.

Keith Allen -M21830
Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259

Submitted By: /S/ Keith allen
Plaintiff's Pro Se Signature

Dated: 5/25/26

Page (4.) of (4.)

~ of the subject of their testimony, their opinions, and the grounds for those opinions.

(17.) List any possible defenses you have or plan to raise in response to Keith Allen's claims against you in his complaint.

(18.) What's your connection to Naveed Yousuf.

(19.) For each expert whom you expect to call as a witness at trial, please state: (a.) the name and address of the expert; (b.) the subject matter on which each such expert is expected to testify; (d.) A summary of the grounds for each such opinion.

(20.) List the identity of the people from whom you've obtained statements, and provide their statements.

(21.) What's your connection with Wexford Health Sources, Inc.,?

(22.) Have you ever had any communications with Wexford Health Sources, Inc.? And if so, please state: (a.) the time, dates, and manner of the specific representatives you communicated with on behalf of Wexford, (b.) the purpose of such communication, (c.) the name and address of each person you communicated with; (d.) list any documentations, emails, faxes, letters or correspondences of any and all communications between Wexford Health Sources, Inc., or their representatives.

(23.) Have you ever been contacted by Wexford Health Sources, Inc., pertaining to working as a subcontractor for them to fulfill their obligations to provide medical care to Illinois Department of Correction's inmates?

(24.) List all the codes or regulations, or medical policies or NCCHC standards pertaining to the reviewing of x-ray films of inmates.

Date:
Keith Allen - M21830
Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259

Submitted By: Keith Allen
Plaintiff's Pro Se Signature

page (3) of (4.)

— Keith Allen's — M21830  8/31/21  x-ray film of his right hand injury ?

7.) List the Medical Standards that governs the policies you are to adhere as a Medical doctor — Radiologist in the State of Illinois.

8.) List the National Commission of Correctional Health Care (NCCHC) standards of care applicable to your duties and responsibilities as a medical doctor — Radiologist.

9.) List your state law professional obligation as a Medical Doctor — Radiologist governing your duties and responsibilities pertaining to providing adequate medical care.

10.) Did the Illinois Department of Corrections or Wexford Health Sources, Inc., pay you for reviewing Keith Allen's (M21830) 8/31/21 and 9/14/21 X-ray film reviews of his right hand injury ?

11.) List all the medical records you received from Menard Correctional Center's Nurse Practitioners, Jilian Crane and Alisa Dearmond pertaining to Keith Allen's (M21830) review of any and all of the X-ray film reviews you diagnosed and reviewed of any and all of the X-ray film reviews you diagnosed and reviewed of his right hand injury.

12.) List all the applicable Illinois Department of Corrections Administrative Directi -ves governing your medical duties and responsibilities as it pertains to providing adequate medical care to inmates in IDOC.

13.) What is your connection to "One Radiology" between the dates of 8/16/21 to 10/13/21 ?

14.) List the Identity of Expert Witnesses you will call at trial, with a listing of the subject of their testimony, their opinions, and the grounds for those opinion -s.

15.) List all the codes or regulations or medical policies that you think are relevant to this case.

16.) List the Identity of Expert witnesses you will call at trial, with a listing

page (2) of (4).

In The United States District Court
For The Southern District OF Illinois

Keith Allen - M21830,

        Plaintiff,

V.                                                          Case No. 23-cv-3775-DWD

Wexford Health Sources, Inc.,                    Honorable David W. Dugan

        Defendants.

---

"Plaintiff's Interrogatories First Request To Nicholas Florence"

Pursuant to Rules 33, Fed.R. Civ. P., the plaintiff submits the following inter-ogatories to defendant - Nicholas Florence. You are directed to answer each of the interrogatories in writing under Oath, and provide them within 30 days after servic-e of this request.

(1.) Nicholas Florence, what is you connection between Nurse Practitioner, Jilian Crane who is a Wexford Health Sources, Inc., employee, who worked at Menard Correction-al Center Between the dates of 8/16/21 to 9/16/21.

(2.) Were you subcontracted by Wexford Health Sources, Inc., when you reviewed Keith Allen's (M21830) 8/20/21 x-ray film of his right hand injury.

(3.) Were you Subcontracted by Illinois Department of Corrections when you reviewe-d Keith Allen's (M21830) 8/20/21 x-ray film of his right hand injury.

(4.) Nicholas Florence, who hired you as a Medical Doctor - Radiologist to review Illinois Department of Corrections inmate's x-ray films at Menard Correct-ional Center between date 8/16/21 to 10/13/21.

(5.) Who hired you as a medical doctor - Radiologist to review Illinois Departme-nt of Correction's inmates' x-ray films at Menard Correctional Center between dates 8/16/21 to 10/13/21?

(6.) Were you subcontracted by Illinois Department of Corrections when you reviewed

page (1.) of (4.)

Exhibit L

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

_____ **Menard Correctional** _____ Center

**Fracture, Dislocation, Sprains**

Offender Information:

Aller _____ Heith _____ _____ ID#: M21830
Last Name        First Name        MI

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/17/21 750A | **RN NOTE   LPN/CMT NOTE**<br><br>S) – When did the injury occur? Stx teat-night<br>- How did it happen? stx fell off Bed"<br>- Location of injury? Rt hand<br>- Any restriction in range of motion? yes<br><br>- Pain scale 1 -10? 8<br><br>O) 953 96 R 12 BP 130/76 WT /<br>- Inspection for anatomical alignment wnl<br><br>- Presence of swelling yes<br><br>- Presence of discoloration no<br>- Skin integrity Intact<br>- Check for circulatory integrity Radial pulse present & strong<br>- Capillary refill wnl<br>- Distil pulses present & strong<br>- Assess for active ROM Restricted-unable to make fist<br><br><br>A)  R/O Skeletal Injury | **P)  Refer to MD if:**<br><br>- Any deformity, severe pain or swelling, discoloration, limited motion, lack of warmth to touch, pulses diminished or absent (symptoms of impaired circulation)<br><br>**No MD Referral:**<br>Cold pack PRN for 24 hrs<br><br>- **Splint and elevate extremity**<br>- Discuss management of injury with MD on-call if necessary<br>- FIRST GIVE – Ibuprofen 200mg 1-2 tabs t.i.d. PRN X 3 days (18 tabs)<br><br>- Acetaminophen 325 mg, 1 – 2 tablets t.i.d. PRN X 3 days (18 tablets)   OR<br><br><br>**Patient Teaching:**<br>Medication use<br>Application of cold<br>No weight bearing, elevation<br>- Crutch walking if applicable<br>Safety measures<br>- Importance of follow up<br>**Follow-Up:**<br>Return to sick call for increased pain, numbness or skin color changes.<br>Nurse Signature ____<br><br>Payment voucher        YES        NO |

DOC 0084 (Eff. 9/2002)<br>(Replaces DC 7147)

Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

__Menard Correctional__ Center

| Offender Information: |
|---|
| Allen           Keith              MI           ID# M21830 |
| Last Name       First Name |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8 Oct 04 1135 18? 98.4 98 70 20 74 | NP Note S) "It's my right hand. It was more swollen than it is now. O) A & O x 4, resp E/u NAD noted. ® hand c̄ moderate swelling and discoloration purple/ to hand/palm. Pulse ⊕ radial. cap refill < 3 seconds. ROM moderate/severe restricted. A) Right Hand Pain | P) X-ray ® hand F/u pending X-ray results Matrix 600mg TID PRN # 17 given from stock |
| | | [signature] |

In The United States District Court
For The Southern District Of Illinos

Keith Allen-M21830,
        Plaintiff,

V.                                              Case No. 23-cv-3775-DWD

Wexford Health Sources, Inc.                    Honorable David W. Dugan
        Defendants.

"Plaintiff's Second Request For Admissions To Nicholas Florence"

Pursuant to Rule 36, Fed. R. Civ. P., plaintiff, Keith Allen-M21830, requests the defendants to make the following admissions within 30 days after the service of this request.

1. Admit that Keith Allen (M21830) nurses 8/20/21 sick call visist, recorded symptoms of moderate/severe restricted range of motion in his right hand.

2. Admit that Keith Allen (M21830) had a x-ray of his right hand injury on 8/20/21.

3. Admit that Keith Allen (M21830) 8/20/21 x-ray film findings stated no fractures.

4. Admit that Exhibit #14 attached to this request is a true and accurate copy of Nicholas Florence's Radiology Report Review findings of Keith Allen (M21830) of his 8/20/21 x-ray film reviews of his right hand injury.

5. Admit that Keith Allen (M21830) was given an ice pack by the nurse on his 8/17/21 sick call visit.

6. Admit that Keith Allen (M21830) was prescribed Ibuprofen 200 mg pain medication by nurse on his 8/17/21 sick call visit.

7. Admit that Keith Allen (M21830) was prescribed Motrin 600 mg pain medication on 8/20/21 by nurse practitioner, Jilian Crane.

page 1 of 9.

(8.) Admit that Exhibit #12 attached to Keith Allen's (m21830) current request is a true and accurate copy of the Administration Record of the Motrin 600 mg pain medication Jilian Crane prescribed on 8/20/21.

(9.) Admit that Nurse Practitioner, Jilian Crane, conducted the x-ray film review of Keith Allen's (m21830) right hand injury on 8/20/21.

(10.) Admit that Nurse Practitioner, Alisa Dearmond, assisted Jilian Crane when conducting the 8/20/21 x-ray film review of Keith Allen's (m21830) right hand injury.

(11.) Admit that Keith Allen (m21830) had another x-ray conducted of his right hand injury on 8/31/21.

(12.) Admit that Nurse Practitioner, Jilian Crane, conducted Keith Allen's (m21830) x-ray of his right hand injury on 8/31/21.

(13.) Admit that Nurse Practitioner, Alisa Dearmond, assisted Jilian Crane when conducting Keith Allen's (m21830) x-ray of his right hand on 8/31/21.

(14.) Admit that Medical Doctor-Radiologist, Nicholas Florence's 8/20/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "no fractures."

(15.) Admit that Medical Doctor-Radiologist, Nicholas Florence's, 8/20/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "no evidence of malalignment."

(16.) Admit that Medical Doctor-Radiologist, Nicholas Florence's, 8/20/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "the soft tissues are remarkable."

(17.) Admit that Exhibit #18 attached to Keith Allen's (m21830) current request is a true and accurate copy of the "Laboratory and Radiology Summary" of the x-ray completed on 8/20/21.

(18.) Admit that Keith Allen's (m21830) 8/31/21 x-ray film review findings stated: "no fractures."

page (2) of (9.)

19. Admit that Keith Allen's (m21830) 8/31/21 x-ray film review findings stated, "no destructive or erosive abnormality."

20. Admit that Keith Allen's (m21830) 8/31/21 x-ray film review findings stated, "the soft tissues are unremarkable."

21. Admit that Exhibit #16 attached to this request is a true and accurate copy of Naveed Yousuf's Radiology Report Review Findings of Keith Allen's (m2183) 8/31/21 x-ray film reviews of his right hand injury.

22. Admit that Medical Doctor-Radiologist, Naveed Yousuf's, 8/31/21 x-ray film review findings of Keith Allen's (m21830) right hand injury, stated, "no fractures".

23. Admit that Medical Doctor-Radiologist, Naveed Yousuf's, 8/31/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "no destructive or erosive abnormality."

24. Admit that Medical Doctor-Radiologist, Naveed Yousuf's, 8/31/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "the soft tissues are unremarkable.

25. Admit that Keith Allen (m21830) was prescribed Ibuprofen 600 mg pain medication on 9/3/21 by Nurse Practitioner, Alisa Dearmond.

26. Admit that Exhibit #17 attached to this request is a true and accurate copy of the Medication Administration Record, of Ibuprofen 600 mg pain medication prescribed by Alisa Dearmond on 9/3/21.

27. Admit that Keith Allen (m21830) was prescribed Ibuprofen 600 mg pain medication on 9/1/21 by Nurse Practitioner, Alisa Dearmond.

28. Admit that Keith Allen (m21830) had three x-ray film reviews of his right hand injury within a 30 day period.

29. Admit that Keith Allen (m21830) had another x-ray conducted of his right hand injury on 9/14/21.

Page (3.) of (8.) (9.)

30.) Admit that Nurse Practitioner, Alisa Dearmond, conducted Keith Allen's (m21830) x-ray of his right hand injury on 9/14/21.

31.) Admit that Medical Doctor -Radiologist, Naveed Yousuf's, 9/14/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "mild degenerative changes are seen."

32.) Admit that Medical Doctor - Radiology, Naveed Yousuf's, 9/14/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "No acute bony fracture is noted on this initial study."

33.) Admit that Medical Doctor -Radiologist, Naveed Yousuf's, 9/14/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "no dislocation is noted on this initial study."

34.) Admit that Medical Doctor- Radiologist, Naveed Yousuf's; 9/14/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "there is mild soft tissue swelling of the thenar."

35.) Admit that Medical Doctor -Radiologist, Naveed Yousuf's, 9/14/21 x-ray film review findings of Keith Allen's (m21830) right hand injury, stated, "there is mild soft tissue swelling of the hypothenar eminences."

36.) Admit that Medical Doctor -Radiologist, Naveed Yousuf's, 9/14/21 x-ray film review findings of Keith Allen's (m21830) right hand injury stated, "If symptoms persist or progress a follow up, study may be considered."

37.) Admit that Medical Doctor-Radiologist, Naveed Yousuf, conducted two different x-ray film reviews of Keith Allen's (m21830) right hand injury.

38.) Admit that Medical Doctor -Radiologist, Naveed Yousuf's, 10/13/21 medical doctor Review recommended Keith Allen (m21830) be seen by a Specialist.

39.) Admit that Medical Doctor -Radiologist, Naveed Yousuf's, 9/14/21 medical doctor review recommended Keith Allen (m21830) be seen by a Specialist.

page 4. of 9.

40.) Admit that Medical Doctor - Radiologist, Naveed Yousuf's, 8/31/21 x-ray film review finding contradicted his 9/14/21 x-ray film review findings.

41.) Admit that Keith Allen (m21830) being seen for the same complaint of his right hand injury three times within 30 days, required you to ensure he was referred to see a physician for evaluation.

42.) Admit that you failed to ensure Keith Allen (m21830) was referred to see a physician for evaluation after being seen for the same complaint of his right hand injury three times within 30 days.

43.) Admit that Exhibit #21 attached to this request is a true and accurate copy of Naveed Yousuf's, Radiology Report Review Findings of Keith Allen's (m21830) 9/14/21 x-ray film reviews of his right hand injury.

44.) Admit that plaintiff, Keith Allen (m21830) was evaluated by medical Doctor - Tiffany Ward, at the "SIH brain and Spine Institute on 6/17/22.

45.) Admit that Medical Doctor - Tiffany Ward's patient history of Keith Allen noted: "Pain in the ular portion of the hand."

46.) Admit that Medical Doctor - Tiffany Ward's diagnosis conclusion of Keith Allen's (m21830) right hand injury stated: "this is evidence of a mild median neuropathy at the right wrist."

47.) Admit that Medical Doctor - Tiffany Ward's patient history of history of Keith Allen (m21830) noted: "Pain in the ular portion of the hand."

48.) Admit that Medical Doctor- Tiffany Ward's diagnosis conclusion of Keith Allen's (m21830) right hand injury stated: "the dorsal ulnar cutaneous nerve is normal."

49.) Admit that Medical Doctor - Tiffany Ward's diagnosis conclusion of Keith Allen's (m21830) right hand injury stated: "Results outside the specified normal range were found in 1 nerve(s), as follows: "In the right median, ulnar - Transcarpal comparison study."

50.) Admit that Exhibit that Exhibit # "1-I" attached to this request is a true and accurate copy of Medical Doctor -Tiffany Ward's diagnosis conclusion of Keith Allen's (m21830) right hand conducted on 6/17/22.

51.) Admit that Keith Allen (m21830) went on a Med Furlough to the "SIH Brain and Spine Institute on 6/17/22 for an evaluation by medical Doctor -Tiffany Ward.

52.) Admit that Medical Doctor- Glen Babich's diagnostic clinical assessment determined Keith Allen (m21830) had "pain in his left hand."

53.) Admit that Medical Doctor -Glen Babich's diagnostic clinical assessment determined Keith Allen (m21830) had "pain in his right hand."

54.) Admit that the Orthopaedic Hand Specialist - Glen Babich instructed Keith Allen (m21830) to take anti-inflammatories for his intermittent pain."

55.) Admit that the following statement by Orthopaedic Hand Specialist -Glen Babich is true: "An Osteotomy more than likely would not provide any benefit due to the nature of the fracture."

56.) Admit that the following statement by Orthopaedic Hand Specialist -Glen Babich is true: "And it did appear that the fracture had encroached on the distal row of Carpal bones, but again the fracture itself is healed."

57.) Admit the following statement by Orthopaedic Hand Specialist -Glen Babich is true: "It was explained to the patient that the fracture itself is healed."

58.) Admit that Exhibit # "1-H" attached to this request is a true and accurate copy of the Med Furlough Notification to the Brain and Spine Institute on 6/17/22.

59.) Admit that you reviewed the 8/20/21 x-ray film review conducted of Keith Allen's (m21830) right hand injury.

60.) Admit that your review of Keith Allen's (m21830) 8/20/21 x-ray film review findings —

page (6.) of (9.)

— didn't notice any swelling shown.

61.) Admit that your review of Keith Allen's (m21830) 8/20/21 x-ray film review findings didn't notice any fractures shown.

62.) Admit that your review of Keith Allen's (m21830) 8/20/21 x-ray film review findings didn't notice any malalignments shown.

63.) Admit that Exhibit # "3-A" attached to this request is a true and accurate copy of one of the three right hand views of Keith Allen's (m21830) x-ray films conducted on 8/20/21.

64.) Admit that Exhibit # "3-B" attached to this request is a true and accurate copy of two of the three right hand views of Keith Allen's (m21830) x-ray films conducted on 8/20/21.

65.) Admit that Exhibit # "3-C" attached to this request is a true and accurate copy of one of the three right hand views of Keith Allen's (m21830) x-ray films conduct-ed on 8/31/21.

66.) Admit that Exhibit # "3-D" attached to this request is a true and accurate copy of two of the three right hand views of Keith Allen's (m21830) x-ray films conduc-ted on 8/31/21.

67.) Admit that Exhibit # "3-E" attached to this request is a true and accurate copy of two of the three right hand views of Keith Allen's (m21830) x-ray films conducted on 8/14/21.

68.) Admit that Exhibit # "3-F" attached to this request is a true and accurate copy of one of the three right hand views of Keith Allen's (m21830) x-ray films conduc-ted on 9/14/21.

69.) Admit that you reviewed the ~~8/31/21~~ 8/31/21 x-ray film review conducted of Keith Allen's (m21830) right hand injury.

70.) Admit that you reviewed the 9/14/21 x-ray film review conducted of Keith —

Page 7. of ● ● 9.

—Allen's (m21830) right hand injury.

(71.) Admit that your review of Keith Allen's (m21830) 8/20/21 x-ray film review findings didn't notice any nerve damage.

(72.) Admit that Exhibit #94 is a True and accurate copy of the Wexford Health Sources, Inc., Provider Handbook from June 8, 2012, which is attached to this request.

Date: 5/25/26                    Submitted By: /S/ Keith Allen —M21830
                                                Plaintiff's Pro Se Signature

Keith Allen—M21830

Menard Correctional Center

P.O. Box 1000

Menard, IL. 62259

Page (8.) of (8) (8) (9.)

"Certificate Of Service"

I, plaintiff, Keith Allen-M21830, certify that I placed the following motion titled "Plaintiff's Second Request For Admissions To Nicholas Florence" consisting of 9 pages and "4 pages" attached exhibits in Menard Correctional Center's Institutional mail on May 25, 2026 to be sent via USPS certified mail postage to defendant's Attorney Zachary G. Stillman, of Litchfield Cavo LLP, 303 West Madison Street, suite 300, Chicago, IL. 60606.

Under penalties as provided by law pursuant to section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as aforesaid that he verily believes the same to be true.

Keith Allen-M21830

Menard Correctional Center

P.O. Box 1000

Menard, IL. 62259

Submitted By: /S/ Keith allen
Plaintiff - pro se  Signature

Dated: 5/25/26

page 9 of 9 9

Exhibit #18

ILLINOIS DEPARTMENT OF CORRECTIONS
**Laboratory and Radiology Summary**

Menard Correctional Center
Facility

Date: 9/7/21

Offender/Patient Name: M12830

Offender ID Number: ALLEN, KEITH

Housing Unit: N2 8-47

The following checked results were found to be normal or stable by ___Crane___ , M̶Ð. N.P

Laboratory completed: _____

Radiology completed: X-RAY COMPLETED ON 8/20/21

Distribution:    Offender Medical Record
                 Offender

*Printed on Recycled Paper*

DOC 0510 (Eff 9/2016)

Exhibit #12

# MEDICATION ADMINISTRATION RECORD  BOSWELL PHARMACY SERVICES
### 814-629-1397 · Fax: 814-629-7644



Case 3:23-cv-03375-DWD   Document 153-1   Filed 06/09/26   Page 41 of 83   Page ID #2984

| EFFECTIVE DATES | MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Order 6/20/21 | Motrin 600mg PO TID PRN x 1 week  Crane | | | | | | | | | | | | | | | | | | | | | | | | | | AC 21 | | | | | | | |
| Discontinue  Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Discontinue  Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Discontinue  Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Discontinue  Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Discontinue  Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | aq | |

| Date of Birth or Soc. Sec. No. | Allergies | | Diagnosis |
|---|---|---|---|
| | NKDA | | |
| | Facility  MCC | Charting for | Through |

# MEDICATION NOTES

## INSTRUCTIONS:
- Initial appropriate box when medication or treatment is given.
- Circle initials when medication or treatment is refused.
- State reason for refusal under Medication Notes.
- State reason and result for PRN Medication or Treatment.
- Indicate injection site with appropriate code.

## INJECTION SITE CODES:
1. Abdomen Left
2. Abdomen Right
3. Arm (Deltoid) Left
4. Arm (Deltoid) Right
5. Buttocks (Gluteus) Left
6. Buttocks (Gluteus) Right
7. Thigh (Quadriceps) Left
8. Thigh (Quadriceps) Right
9. Upper Back Left
10. Upper Back Right
11. Upper Chest Left
12. Upper Chest Right

## RESULT CODES:
A. Effective
B. Slightly Effective
C. Ineffective
D. No Effect Observed

## NON ADMINISTERED MEDICATION REASON CODES:
1. Refused by Inmate
2. Inmate did not show
3. Inmate not in cell
4. Security lockdown
5. Medication held (state reason)
6. Medication out of stock

| DATE | TIME | INIT. | MEDICATION - DOSE | ROUTE | REASON | RESULT | DATE | TIME | INIT. | MEDICATION - DOSE | ROUTE | REASON | RESULT |
|------|------|-------|-------------------|-------|--------|--------|------|------|-------|-------------------|-------|--------|--------|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |

| Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature |
|---------|-----------|---------|-----------|---------|-----------|---------|-----------|---------|-----------|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

Form # 6182LMR

Reorder From **MED·PASS** 800-438-8884

INH031901B

Case 3:23-cv-03775-DWD Document 153-1 Filed 06/09/26 Page 43 of 83 Page ID #2986

Exhibit # 17

Exhibit # 17

# MEDICATION ADMINISTRATION RECORD · BOSWELL PHARMACY SERVICES

814-629-1397 · Fax: 814-629-7644

| EFFECTIVE DATES | MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Order PRN 9/3/2021 Discontinue 10/2/2021 Rx # 5078671 | IBUPROFEN 600MG TAB SUB FOR: MOTRIN    DEARMOND, ALISA TAKE 1 TABLET(S) BY MOUTH THREE TIMES A DAY AS NEEDED | 0700 1300 1900 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order Discontinue Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order Discontinue Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order Discontinue Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order Discontinue Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Original Order Discontinue Rx # | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

E 813

| Location | Date of Birth or Soc. Sec. No. | Allergies | | Diagnosis |
|---|---|---|---|---|
| M2-847    w TO12 | 06/04/1988 | NO KNOWN DRUG ALLERGY | | |
| Name and Number | | Facility | Charting for | Through |
| M31232 | | MENARD CORR CTR | 10/01/2021 | 10/31/2021 |

# MEDICATION NOTES

Case 3:23-cv-03775-DWD    Document 153-1    Filed 06/09/26    Page 44 of 83    Page ID #2987

**INSTRUCTIONS:**
- Initial appropriate box when medication or treatment is given.
- Circle initials when medication or treatment is refused.
- State reason for refusal under Medication Notes.
- State reason and result for PRN Medication or Treatment.
- Indicate injection site with appropriate code.

**INJECTION SITE CODES:**
1. Abdomen Left
2. Abdomen Right
3. Arm (Deltoid) Left
4. Arm (Deltoid) Right
5. Buttocks (Gluteus) Left
6. Buttocks (Gluteus) Right
7. Thigh (Quadriceps) Left
8. Thigh (Quadriceps) Right
9. Upper Back Left
10. Upper Back Right
11. Upper Chest Left
12. Upper Chest Right

**RESULT CODES:**
A. Effective
B. Slightly Effective
C. Ineffective
D. No Effect Observed

**NON ADMINISTERED MEDICATION REASON CODES:**
1. Refused by Inmate
2. Inmate did not show
3. Inmate not in cell
4. Security lockdown
5. Medication held (state reason)
6. Medication out of stock

| DATE | TIME | INIT. | MEDICATION - DOSE | ROUTE | REASON | RESULT | DATE | TIME | INIT. | MEDICATION - DOSE | ROUTE | REASON | RESULT |
|------|------|-------|-------------------|-------|--------|--------|------|------|-------|-------------------|-------|--------|--------|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature | Initial | Signature |
|---------|-----------|---------|-----------|---------|-----------|---------|-----------|---------|-----------|
| | | | | | | | | | |
| | | | | | | | | | |

Form # 6182LMR

Reorder **MED·PASS** The Fine Art of Document Design 800-438-8884

INH031501E

Exhibit # 21

OneRadiology
Normal, IL 61761
Date: 09/16/2021

ALLEN, KEITH
ID#: M21830
D.O.B.: 6-4-88
Ordered by: Dearmond
Menard Correctional Center

RIGHT HAND, THREE VIEWS 9-14-2021:

HISTORY: Injury and pain.

Mild degenerative changes are seen, but no acute bony fracture or dislocation is noted on this initial
study. There is mild soft tissue swelling of the thenar and hypothenar eminences. If symptoms persist or
progress a follow up study may be considered.

Signed _____

N. Yousuf, M.D.

Dic.: 09/16/2021

Films from Menard Correctional Center

OneRadiology
Normal, Illinois
September 2, 2021

ALLEN, KEITH
ID #: M21830
DOB: 06-04-88
Ordered by: Crane NP
Menard Correctional Center

RIGHT HAND THREE VIEWS 08-31-2021

HISTORY: Pain.

FINDINGS:
Three views of the right hand are submitted. The joint spaces are intact. No fracture, destructive or erosive abnormality. The soft tissues are unremarkable. If symptoms persist or progress, a follow-up study may be considered.

Signed_____
N. Yousuf, M.D.

Dic: 09-02-2021

Films from Menard Correctional Center

Exhibit #1-I, p. (1) of (3)

M21830

Keith Allen                              1537618                          6/17/2022 16:45

## SIH Brain & Spine Institute

305 W. Jackson Street, Suite 103
Carbondale, IL 62901
Phone (618) 351-4972 Fax (618) 351-6522

**Full Name:** Keith Allen      **Gender:** Male
**Patient ID:** 1537618       **Date of Birth:** 6/4/1988

**Visit Date:**            6/17/2022 16:45
**Age:**                34 Years
**Examining Physician:**  Tiffany Ward, MD
**Referring Physician:**  Michael Moldenhauer, NP
**Patient History:**      This is a 34 year-old right haned man with numbness in the right hand and pain in the
ular portion of the hand.

### Motor NCS

| Nerve / Sites | Muscle | Lat ms | Amp mV | Segments | Dist mm | Lat Diff ms | Vel m/s |
|---|---|---|---|---|---|---|---|
| R Median - APB | | | | | | | |
| Wrist | APB | 3.7 | 5.4 | Wrist - APB | 70 | | |
| Elbow | APB | 8.4 | 5.2 | Elbow - Wrist | 272 | 4.7 | 58 |
| R Ulnar - ADM | | | | | | | |
| Wrist | ADM | 2.6 | 11.3 | Wrist - ADM | 70 | | |
| B.Elbow | ADM | 6.6 | 11.2 | B.Elbow - Wrist | 232 | 3.9 | 59 |
| A.Elbow | ADM | 8.4 | 10.7 | A.Elbow - B.Elbow | 100 | 1.8 | 56 |

### Sensory NCS

| Nerve / Sites | Rec. Site | Lat ms | Amp µV | Segments | Dist mm | Peak Diff ms | Vel m/s |
|---|---|---|---|---|---|---|---|
| R Median, Ulnar - Transcarpal comparison | | | | | | | |
| Median Palm | Wrist | 1.6 | 202.0 | Median Palm - Wrist | 70 | | 45 |
| Ulnar Palm | Wrist | 1.3 | 20.3 | Ulnar Palm - Wrist | 70 | | 55 |
| | | | | Median Palm - Ulnar Palm | | 0.3 | |
| R Radial - Superficial (Antidromic) | | | | | | | |
| Forearm | Wrist | 1.8 | 42.6 | Forearm - Wrist | 100 | | 55 |

### Summary

The motor conduction test was normal in all 2 of the tested nerves: R Median - APB, R Ulnar - ADM.

The sensory conduction test was performed on 2 nerve(s). The results were normal in 1 nerve(s): R Radial -
Superficial (Antidromic). Results outside the specified normal range were found in 1 nerve(s), as follows:
- In the R Median, Ulnar - Transcarpal comparison study
  - the take off velocity result was reduced for Median Palm - Wrist segment

Exhibit H 7:(1) of (2)



JB Pritzker
Governor

Rob Jeffreys
Director

## The Illinois Department of Corrections

Menard Correctional Center
711 Kaskaskia Street • Menard, IL  62259 • (618) 826-5071 TDD: (800) 526-0844

# M E M O R A N D U M

DATE:    April 29, 2022

TO:    Record Office
    Med Furlough Notification

FROM:    Angela Crain.
    Health Care Unit Administrator

SUBJECT: M21830 Allen, Keith

---

**PLACE:**
**Brain and Spine Institute**
**305 W. Jackson St.**
**Carbondale, IL**
**618-351-4972**

---

**DATE: June 17, 2022**                    **TIME: 2:40 pm**

**ADA attention: N/A**

**REASON: RUE EMG**

*Angela Crain, RN, BSN-HCUA*
Angela Crain, RN, BSN, HCUA
**MS: LM**

cc:    **Shift Commander's Office**
    **Medical Records**
    **Office File**

---

*Mission: To serve justice in Illinois and increase public safety by promoting positive change in offender behavior, operating successful reentry programs, and reducing victimization.*

**www.illinois.gov/idoc**

Keith Allen 000261

Exhibit #2992 I-I⁴/p.(3.) of (3.)

M2183C

Keith Allen                          1537618                          6/17/2022 16:45



Exhibit #1-B (3) of (3.)

M21830

| Keith Allen | 1537618 | 6/17/2022 16:45 |

**Conclusion:**

1. There is evidence of a mild median neuropathy at the right wrist.
2. The dorsal ulnar cutaneous nerve is normal.

*DRAFT*

Tiffany Ward, MD

6/17/2022 16:45

Keith Allen 000263



KEITH

5141439643

1988 M

Illinois Department Of Correction

9-December-2025 14:16:0





Exhibit B





CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



# Wexford Health

### SOURCES INCORPORATED

# Provider Handbook

## Physicians, Psychiatrists, Dentists, Nurse Practitioners, and Physician Assistants

Wexford Health Sources, Inc.
Foster Plaza 2
425 Holiday Drive
Pittsburgh, PA 15220

WEX166

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

# Corporate Authorization – Annual Review

This Provider Handbook has been reviewed and approved by the Corporate Medical Advisory Committee:

On behalf of the Wexford Health Sources, Inc. Medical Advisory Committee:


_____

Dr. Thomas Lehman
Corporate Medical Director, Clinical Services & Utilization Management

---

Date of Effectiveness: June 8, 2012

The contents of this manual are proprietary and confidential. This manual must be returned to the Wexford Health corporate office upon employee termination or end of contract.

Approved by the Wexford Medical Advisory Committee on June 8, 2012

Case No. ~~████████~~

Page 1

WEX167

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## Table of Contents

INTRODUCTION ........................................................................................................................... 1

HISTORY OF WEXFORD HEALTH SOURCES.................................................................... 2

LEVELS OF SERVICE ............................................................................................................... 3

STANDARDS AND GUIDELINES ........................................................................................... 5

HEALTH CARE ROLES ............................................................................................................. 7

MEDICAL ADMINISTRATIVE PROTOCOLS..................................................................... 10

HEALTH CARE UNIT SERVICES ......................................................................................... 13

ADMINISTRATIVE SERVICES............................................................................................... 18

PRE-EXISTING MEDICAL CONDITIONS ........................................................................... 19

QUALITY ASSURANCE............................................................................................................. 21

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## INTRODUCTION

This handbook is designed to acquaint you with Wexford Health Sources, Inc. and provide you with general information regarding your role as a physician within the correctional health care setting. This guide will help to serve as a road map by offering optimal paths to inmate health care. It is also an emphatic reminder that the role of the physician is key to the overall success of correctional health care operations. Because the audience for this handbook is the entire network of Wexford's physicians (jails and prisons), all readers are encouraged to consult their site-specific operational policies and procedures with regard to facility protocols. Please note that this document is intended for state correctional facilities and jail facilities and staffing may vary among facilities.

For many physicians coming from private practice, the transition to institutional practice may be difficult. Correctional medicine is primarily public health practice. Providing care for *individuals in a community* is substantially different from providing care for a *community of individuals*. Your decision-making must consider the mass of patients living in relatively confined space, and the necessary regulations intended to assure: 1) reasonable care for the inmates, and 2) reasonable security for the staff. Included, where helpful, are examples and hints to ease the transition into this special society.

Case No. 13 CV 9241                                                                         WEX169

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## HISTORY OF WEXFORD HEALTH SOURCES

A division of the Bantry Group (located in Pittsburgh, Pennsylvania), Wexford Health Sources, Inc. provides medical management services in the correctional industry. The firm has over thirty-five (35) years experience in health services management, including long-term care, psychiatric, and substance abuse programs. In 1992, Wexford Health seized the opportunity to use this expertise in the corrections industry.

### I.    Philosophy of Medical Practice

Wexford Health is an innovative medical management organization specializing in providing quality medical service to incarcerated patients. Incarcerated patients are wards of their respective state or county with no alternatives for care other than services the institution provides.

The circumstances that brought the patient to incarceration are irrelevant. The medical unit should provide an area where inmates are treated with respect and concern, even if "extra effort" is necessary to make that happen. Any attitude that demeans the status of an inmate-patient is unacceptable. Medical service is NOT the mission of corrections (though the institution is required to provide such). Medical care is a support service. The mission of the Department of Corrections is security and discipline.

### II.    Our "Practice" Population

Our patients are inmates in correctional centers, having been convicted of various crimes against society - some of which were quite heinous. Our concern and responsibility is with their medical care. We are not the judges of their guilt or innocence.

Most inmates are cooperative. They want to complete their sentence and get on with their lives. They cooperate with medical instruction and are usually compliant. About 15% of any given population are marginally (or completely) uncooperative and create 90% of the health service demand. They are the challenge of medical management.

Often inmates have had little or no access to medical care prior to incarceration, and are not certain when or how to use the services. Some are embarrassed, and some just don't know what to say or ask. Their response to your service may appear unusual, or even bizarre. They often (more often than in private practice) will say what they think you want to hear, rather than what relates to their problems.

Inmates can be very manipulative. People in general manipulate their environment to their own end. Inmates tend to engage their environment with skilled adeptness. Every institution provides an "Inmate Handbook" listing the rules and conduct expected of the inmates. You should read and understand this document. Never take anything from or bring anything to an inmate. Do not authorize special privileges. Anything that raises a question about inmate relationships should be discussed with your health care unit administrator, or the responsible assistant warden.

In spite of their situation, inmates deserve to be treated with respect and concern. They were not raised in prison. How much respect you receive will be directly related to how fair, just and professional you are with your inmate patients. The inmate/physician relationship demands "fair and firm" – this garners respect. They are your practice - treat them as such!

Case No.

WEX170

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER


**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## LEVELS OF SERVICE

Medical and health care should be delivered by a team of medical professionals. The services are organized into levels of care as follows:

- **Self Care.** Individuals are personally responsible for seeking medical advice regarding their health care concerns. Inmates do not lose this responsibility. They are the managers of their general health and lifestyle. Every effort must be made to teach and reinforce personal responsibility.

- **Nursing Sick Call.** This service is provided daily by staff nurses. Inmates desiring to be seen usually sign up for Sick Call the day before. Often, protocols are used to guide the nurses triaging Sick Call. Such protocols should first be read and approved by the medical director. Once in use, they should be reviewed by the medical director to assure compliance.

- **Emergency Care.** Emergency care is available twenty-four (24) hours a day, seven days a week. Any inmate must have access to health care unit personnel for immediate medical service any time an emergency arises. Medical personnel (or teams) are also available to respond to a cell or other areas in the prison to meet medical needs. Another option for Emergency Care is referral to a local emergency department if a physician is not on site AND the medical personnel deems this appropriate, or if the needed medical service is beyond the capability of the unit personnel. Medical personnel must contact the medical director/designee first unless the emergency is life/limb threatening.

- **Doctor's Sick Call.** An inmate has the right to request to see a physician. This request should be honored within seventy-two (72) hours. Inmates seen in Sick Call by the nurses are frequently "referred" to Doctor's Call for evaluation, diagnosis, and/or treatment.

- **Specialty Care.** This is provided in various ways. This includes onsite clinics, offsite referral to their office, and emergency department or a hospital. Referral may be made to hospitals or ambulatory centers for surgery, specialized testing, or other services as indicated.

*Note: All referrals that are not an emergency must be discussed in Wexford Health's collegial review.*

1. **"Level of Community Care"**

Both by contract and by decree of the federal courts, corrections departments must provide inmates' medical care that is "equal to that available in the local community." Generally this means "usual and customary" medical service. Although a program of comprehensive medical care is required, not every diagnosis mandates treatment, nor is repair done on every existing condition. The medical staff should identify medical conditions on entry, or as early as possible, and design a program of individual care that seeks to maintain inmate health during ... illness ... during, or after incarceration should be promptly and ... tended.

These objectives can be met in many ways, including proper classification, inmate education, alteration of work and recreational assignments, frequent observation and examination, adjustments of medication and/or diet, and adjustments of a multitude of other variables. Consideration should be given to any alternative therapy that protects the patient and is allowable in the correctional setting. *Please discuss with the regional medical director and/or corporate medical director any unusual alternative therapy being considered before it is started.*

Inmate health problems are considered somewhat like "worker's compensation" cases. If a condition occurs in conjunction with, or is aggravated by incarceration, it is the responsibility of the Department of Corrections (thus the medical contractor) to treat or correct it. Many inmates, however, enter with pre-

Case No. ▓▓▓▓▓▓▓
WEX171

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

existing problems that require significant care. Random examples include diabetes mellitus, hypertension, cancer, chronic renal problems, cardiac disease, asthma, seizures, paralytic conditions, and many other significant debilitating conditions. Conditions that are pre-existing, chronic, and stable require monitoring only.

Longstanding problems, e.g., arthritis, old knee and ankle injuries, recurrent low back ache, flat feet, childhood eye problems resulting in amblyopia, presbycusis, hammer toes, "trigger fingers," persistent acne, tinea versicolor, inguinal hernias of long duration without complication, uncomplicated ventral hernias, uncomplicated umbilical hernias, and a multitude of other such conditions may receive minimal, but reasonable support or observation.

A.  Many variables must be considered when deciding a course of treatment. These include, but are not limited to the following:

B.  When (how long ago) did the problem begin?

C.  The chronicity of the problem

D.  Whether the problem initiated in the Department of Corrections, or prior to incarceration

E.  What is the problem?

F.  How long is the inmate's sentence? When will he (she) be released?

G.  Will the treatment "make a difference?"

H.  Will it improve the inmate's function?

I.  Will the treatment make the care of the inmate easier for the medical or correctional staff?

J.  What is the simplest, most basic, and safest means of managing this problem?

As physicians of leadership representing both Wexford Health and the Department of Corrections where you work, you are responsible for providing a level of care that at least meets these requirements.

 

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## STANDARDS AND GUIDELINES

**I.    National Commission of Correctional Health Care (NCCHC) Standards**

Wherever Wexford Health Sources, Inc. assumes responsibility for medical care management, a concerted effort is made to meet and exceed the *Standards for Medical Care in Prisons and Jails* as established by the National Commission of Correctional Health Care. A copy of these standards is available in the office of your health care unit administrator.

**II.    American Correctional Association (ACA) Standards**

Another important set of standards applied to health services are those of the ACA. The administration of the correctional department will be particularly interested that the medical staff comply with these standards.

**III.    Wexford Standards**

Wexford supports the highest level of standards desired by the state/county where those services have been contracted. ACA standards are the minimal level acceptable to Wexford; however, the preferred level of care at least should meet NCCHC Standards. In many units, Wexford has met and operates under ACA and NCCHC.

**IV.    Contract Definitions**

In any given correctional care facility; the services required, the standards of care and the quality assurance expected are defined in the negotiated health service contract. The health care unit administrator will have a copy of that specific contract. These definitions must be met to assure continuation of Wexford as manager of the services.

**V.    Chain of Command**

It is imperative for all providers to understand the various organizational charts and reporting chain of command that exists at each facility. Please be sure to review the following chain of command structures in operations at your facility with your Regional Medical Director or site Medical Director:

A.    Security leadership (state or county)

B.    Medical leadership (state of county

C.    Wexford medical leadership

D.    Wexford administrative and nursing leadership

**VI.    Using Protocols**

Protocols may be developed and used to guide the care given by nurses. They are also used to guide nurses and the appropriate routines in the chronic clinics. All protocols must be approved by the unit medical director. As part of the unit Quality Assurance Program, both acute care and chronic clinic protocols (or a defined sample) will be reviewed each month by the unit medical director. Wexford has pre-prepared protocols that may be used or revised for use at the discretion of the unit medical director.

Approved by the Wexford Medical Advisory Committee on June 8, 2012

Case No

WEX173

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## VII.  Professional Dress Code

How you dress has a direct relationship to how the inmates treat you. Patients, including inmates, expect and prefer the physician to dress in a professional manner. Discretion is given to the units regarding personal dress; however, as a general guideline, ties are appropriate, and blue jeans should never be worn. Whatever the dress, be professional.

## VIII.  Continuing Medical Education (CME)

Physicians, by the choice of their profession, should be lifetime students. Ongoing study is mandatory to remain current in medicine. The use of journals, libraries, approved textbooks, and other educational programs are encouraged. Arrangements may be available for you to attend medical education programs; please check with your Regional Medical Director for details. You are also encouraged to attend educational programs offered by local hospitals and state medical societies.

A unit in-service training program should be led by participation of the physician staff. The more the support medical staff understands what you expect and learns your practice patterns, the more efficiently they can assist you.

## IX.  Relationships

Developing positive professional relationships with your medical staff, correctional staff and supporting specialists greatly helps to ease your work. Discussions about your patients' problems, treatment plans, new developments, security, and other issues will help you and your staff better understand what must be done and when it should be done. Again, it is important to consider the public health and institutional aspects of correctional medicine. The administrative directives of the Department of Corrections are important documents that must be applied to your decision-making. Developing relationships with the corrections staff is as important as the medical staff.

## X.  Early Release from Custody for Terminally Ill Inmates

Wexford Health makes every effort to facilitate the early release of those inmates who are classified as terminally ill. A terminally ill inmate is defined as one who has been given a prognosis of less than a year to live. Physicians are requested to discuss individual cases with the facility medical director who, in accordance with state regulations, will submit recommendations to the correctional authority.

## XI.  Providing Medical Care to Staff

Wexford Health Sources carries general and professional liability insurance that "covers" employed physicians, physician assistants and other health care staff for work performed on behalf of the Company. The Company, of course, is contracted to provide care to the inmate population. Therefore, it is not appropriate for a site physician to deliver care to a fellow employee or to a corrections officer; nor would such care be "covered" under the existing insurance policy. Persons other than inmates seeking medical care should be directed to their personal physicians. Exceptions would include:  1) in the event of an emergency where immediate care is needed, and  2) routine services that may be included in the specific contract, i.e., routine immunization of corrections officers.

Case No

WEX174

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## HEALTH CARE ROLES

### I.   Corporate Medical Director

The corporate medical director is primarily responsible for medical policy development, professional development, and quality assurance. A further role is support and oversight of the utilization management process. You are welcome (and encouraged) to contact the corporate medical director for any assistance or questions you may have regarding medical policy or decision-making.

### II.   Regional Medical Director

The regional medical director is the immediate supervisor for the unit medical director. He conducts peer review on the unit medical director and assists in some utilization management issues, at the discretion of the corporate medical director.

Note that the unit medical director conducts the peer review on unit staff providers and is responsible for their peer review (excluding psychiatrists). Generally, peer review should be performed at least annually by the regional medical director (or his designee) and the unit medical director or as designated by the DOC/county. All peer reviews should give feedback to those healthcare providers being reviewed and must be kept confidential. A copy of the peer review should be forwarded to Wexford's credentialing department for use as a reference during the reappointment process.

### III.   Agency Medical Director

In states where the Department of Corrections has an agency medical director, that position has the prime responsibility for establishing medical policy. The corporate medical director will assure that all corporate medical policies comply with the state medical directives. All unit medical directors will keep both the regional and the agency medical directors informed of critical problems. The regional medical director should be contacted first to allow for internal resolution of as many problems as possible. Discretion is given, however, to unit medical directors to directly contact the agency medical director when it seems appropriate.

### IV.   Correctional Staff

Cooperation with the correctional staff is expected and necessary. The medical program in a prison system has a role similar to the military - it is a support element, not the primary force. Every institution has a set of DOC/county policies, usually called administrative directives as well as Wexford's own set of operational policies. In both case, some of the policies apply to the medical and mental health services. You must be familiar with all of these policies.

The warden of a prison, it is ... or ... that happens in the ... though ... on a medical decision may be in conflict with his (her) express wishes, most decisions should respect his (her) management responsibility. Usually an assistant warden is responsible for the medical service area, and you will work most directly with that position.

Security is the prime objective of all prison operations, and you are expected to understand and respect that responsibility. Security is the first issue of concern to most correctional staff. On occasion, security and health service are in conflict. These issues must be addressed on an individual basis. Decisions of this nature require your use of reasonable judgment. We depend on you to understand both the medical and security roles.

Case No.

WEX175

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

### V. Pittsburgh and Regional Staff

The Pittsburgh and regional staff are meant to provide support and resources to the unit operation and are not available to make the decisions that should be made at the unit level. The best clinical and medical decisions are made by the staff closest to the patient.

### VI. Health Care Unit Administrator (HCUA)/Health Services Administrator (HSA)/Site Manager

For optimal unit efficiency, the key leadership personnel need to become a tightly knit team with the prime objective of providing high quality medical service at the best possible price. The administrative leader of the unit is the health care unit administrator (HCUA)/health services administrator (HSA). This position manages all the administrative aspects of the medical operation. He (she) deals most frequently with the corrections staff, regional staff and the local health service administrators.

Since the administrator is expected to manage all the unit administrative details and orchestrate the staff functions, it is easy to understand the necessity of developing a close and interdependent relationship with this person. The HCUA/HSA deals extensively with the correctional staff and solves most of those inter-staff problems. He (she) is the one most likely to represent your interests and/or concerns to the corrections staff.

For the most effective, efficient and rewarding operation, you, the HCUA/HSA and the DON should be a supportive interdependent team.

### VII. Director of Nursing (DON)

The Nursing Director provides the leadership, training and nursing direction to the staff nurses. She is responsible for assuring the nursing staff is capable and attentive in their efforts to provide the necessary inmate nursing care. She is responsible for the staff schedules and the in-service training. She also assists the medical director with the quality assurance responsibilities.

A close working relationship with the DON would greatly ease the medical director's job. She (he) has constant access to the inmate needs from her staff. The "daily reports" from her staff gives an excellent communications flow. This position can be a great help to your work. Respect this position and support it.

### VIII. Support Medical Staff

If you are the medical director, you may have the responsibility of managing staff physicians. They will expect to be considered as colleagues. They will have variable abilities. Learn to understand each of their strengths and support that skill. If they need skill training, arrange it. There may be other staff physicians or physicians at another unit who can teach; or you can send the physician to a seminar or training program. Encourage them, have faith in their decisions, tell them what is expected and expect that - reward them with your confidence in them.

Occasions will occur when you must correct or discipline them. Explain what caused the problem, why it is a problem, and how it must be corrected. Many physician problems in the correctional medical service pose problems for the medical service, the DOC, and the individual physician. Therefore, prompt correction is important.

Physicians, by nature and training, are independent, strongly self-motivated persons who are conditioned to analyze events and make decisions. These abilities are positive and desirable. They also generate strong EGO feelings. Although, as medical director, you will spend considerable time managing those egos, you must also respect them and learn how to direct them in a positive direction.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health** SOURCES INCORPORATED

Provider Handbook

## IX. Community Physicians

Since it is not feasible to provide all the necessary medical services within the institution, Wexford depends on the skills of community physicians. These physicians are usually sub-specialists, emergency physicians or obstetricians. They supply specialty services and hospitalizations; offer procedures and evaluations; and direct consultations. They not only fill important service needs, but they also bring a private practice perspective into the institution that adds validity (or reinforcement) to the decisions of the correctional medical staff. If you practice appropriate medical care, they will reinforce your medical decisions.

**Note:** Every effort must be made to use Wexford Health's contracted providers. The use of community physicians must be discussed in the collegial review process.

Even though we depend on the services of the private community physicians, this is a referral relationship. You are not "giving up" the patient. The referred inmate is still your (and the DOC's/county's) responsibility. The specialist has a responsibility, as in private practice, to inform you of the treatment plans, proposed surgeries and the medical strategy being considered for the patient. They must send you prompt reports of their care.

As in private practice, it is important for you to inform your consultant of the patient's history, physical and laboratory findings, and your reasons for referral. You also have a legitimate right to disagree with a specialist's position. Do not abdicate your medical judgment simply because you are referring a patient. Most of the time, you will agree with the consultant, but do not hesitate to disagree if you have a reason. Discuss the difference of opinion with the consultant. Often, circumstances of the confinement or security are not understood by the consultants. You are expected to understand these issues and work around or through them. DO NOT BLAME THE PROBLEM ON THE DEPARTMENT/COUNTY - simply explain that you have policy responsibilities that must be addressed.

If you do not understand a policy, either an institutional or a Wexford policy, ask for an explanation. Often, the policies are in place to protect the staff and finances of the community providers. We place a high priority on protecting the community providers.

When an inmate has been admitted to a local hospital, call the attending physician daily and check on your patient. You need to understand what is happening, and they need to know you are interested. You must initiate discharge planning immediately and explain your infirmary capabilities. No one will fault you for being interested in your patient.

Case No.

WEX177

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## MEDICAL ADMINISTRATIVE PROTOCOLS

I.    Inmate Interview Tips and Techniques

A.    Basic Points Directly Affecting the Interview Process

1.    Inmates are patients and deserve to be treated as patients.

2.    Some inmates do not know how to relate to health professionals, thus their efforts to communicate may appear bizarre.

3.    As a group, inmates are extremely manipulative.

4.    Generally, the "tighter" the assigned security housing, the greater the inmates' demand for health services. Death row inmates are usually an exception to this. They usually demonstrate medical usage directly proportional to their identified medical problems.

5.    To some inmates, medical service is the only area where they feel they have any personal control. Thus, answers and actions may reflect control efforts rather than medical concerns.

6.    Corrections officers (CO) sometimes intervene with the interview process. They may feel

a.    They must be present - to protect

b.    They can't remove the restraints

c.    They must assure security

7.    Medical staff too often assume a CO's role by becoming very directive; or attempting to enforce security. CO's too often assume medical roles by judging inmate medical status, or prejudging the presence or absence of illness.

8.    Each level of medical team support tends to feel they know the inmates better than the trained professional who is their supervisor (also, jumping two supervisory levels mysteriously anoints an assistant as an absolute expert). Positive support for your staff is very important.

B.    Interview Techniques

1.    As much and as often as possible, an inmate deserves privacy during interviews and examinations. Such expressions of personal dignity and respect are limited in prison.

2.    Have as much knowledge as possible at hand when you start the interview. Review the inmate chart (if one is available). A few minutes of chart review will save you considerable duplication of work and evaluation.

3.    Listen CAREFULLY to inmate complaints and descriptions of their problems. Be willing to accept their claims and descriptions, but maintain a healthy amount of doubtful suspicion. *Remember, the most difficult diagnosis is the separation of the presence from the absence of pathology.* "Does this patient truly have a medical condition?" is a tough question to answer. Not all inmates are being manipulative. Many are correct in their descriptions. Many are incorrect, but truly believe some condition exists (seizures? asthma?). Some don't know how to tell you, nor how to describe their problems. Since they are seeing a doctor, many think they *should* "have something." No diagnoses = no treatment. Observation may be the best course of action.

4.    Require the inmates to relate detailed descriptions of evaluations and treatments they received when pre-existing conditions are claimed. Document those descriptions as close to verbatim as possible. Document all medical devices, prosthetics, and medical equipment

Case No.

WEX178

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED                                             Provider Handbook

brought to the facility by the inmate. **Have the unit staff obtain outside records on all problems claimed by the inmate.**

5. Be careful of promising treatment, surgery, or relief. You may not be in a position to deliver what is promised. There are many contingencies over which you have little or no control. Be fair - be just - but be honest.

6. Do not generate interpersonal "games" with inmates. Taunting, teasing, and use of oblique innuendo are poorly understood and usually misinterpreted by inmates. They have a high level of negative suspicion as a protective tool.

7. Inmates may exaggerate their conditions. On the other hand, understating significant aspects of their health conditions is equally common, e.g., denial of serious diabetic problems or past high-risk activities, IV drug use or homosexual activity, etc. Often the presence, or absence, of signs found at physical exam or by chart review helps to sort out inconsistencies. The best tool you have is a sensitive, professional and analytical review of each inmate's status.

8. DO NOT EVER explain symptoms you would expect to see to confirm a diagnosis to an inmate. If you should, those symptoms will likely be present with the next visit. Do not prompt, lead, suggest, or describe symptom sets. Prison life is a special social society with its own special sets of rules. The inmates discuss their treatments and symptoms and compare the care they get. Interview technique should be non-directive with personal descriptions being encouraged and RECORDED. What happened? How did that bother you? Did you have pain? Where? Was that the only place it hurt? What did your doctor say? What did they do? How did you respond? Did the treatment work? How long? This method is more time consuming, but overall it requires less total effort and follow-up.

9. Be straightforward with inmate patients. If their "problem" doesn't require treatment, tell them that, and stick to your decision. Treat or recommend on the basis of identified medical need. Any inmate can demand all sorts of treatment or situations, but their demands - in the absence of a medical need - do not justify supplying the service. Again, be sensitive and analytical. Never withhold a service whether demanded or not, as a punishment, nor to manipulate the inmate. Since the inmates are incarcerated as wards of the state, they have no medical alternative, and therefore require more patience and latitude from the health care professional. Do not promise what you may not have the authority to deliver. Frequently, inmate non-compliance or over utilization is due to poor understanding of their problem; weak or superficial explanation, or simply neglect on the part of the medical staff to deal with the inmate or his problem in a direct manner.

10. Look for specific symptom sets and discipline yourself to require the inmate to identify and validate those symptoms as he describes his medical history. Then back up the history with corroborative physical findings and/or laboratory testing to assure yourself that a condition actually exists. We are all aware that disease states vary from patient to patient; the basic uniformity of major disease presentation and expression is incredibly standard. Remember the old medical school adage "When you hear hoof beats in the street, do not expect zebras." Deliver service to an identified medical need, and you will be on target in care.

## II. Charting Technique

A. You have spent years with medical charts. Nevertheless, you will find this presentation of Wexford's charting expectations a helpful guide. A chart is an extremely important permanent document. It is a journal of social history. It is a linear set of snap-shots into the deepest shadows of personality. It is, above all, a legal document. Please respect its power.

B. The chart is the medical service memory of what the patient told you, what you found on physical examination, what diagnostic strategies were used, and what treatment programs were applied.

Case No                                                                    WEX179

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER



Provider Handbook

Other practitioners will review your data and add theirs. In this institutional setting, nurses, CMT's, administrators, mental health personnel and other officials may make entries in the chart. Those entries provide you, as the medical authority, with multifaceted information you have no other means of obtaining. It is often important information. If you are not familiar with paramedical entries in the medical record, you will quickly learn the value of their contributions.

C.  Other than prepared forms for specific medical information, all routine entries should be made in the "SOAPE" format. The Subjective (S), Objective (O) Assessment (A), and (E) Education components are placed on the left side of the progress sheet, with the Plan (P) component placed on the right.

D.  Chart ALL inmate encounters! Inmates will frequently stop you outside of the health care unit seeking your opinion and advice. If those "curb-side consults" have any significance, require the inmate to come to the health care unit and formally address the problem. Do NOT give what you think is informal information without documentation. It will show up in some future litigation when you least expect it.

E.  Record adverse events promptly and accurately. For example, refusals of treatment and your efforts to alter that decision; reasons for "no-show" at chronic clinics or medication runs; threats to you, other inmates or staff; seemingly bizarre statements or actions and activities that contradict inmate claimed medical problems. These are but a few of the possibilities. Remember if it isn't recorded, it didn't happen!

F.  Keep your entries objective, descriptive, and concise. Personal conflicts have no place in medical charts. Resolve conflicts before making a note. Leave your personal feelings for direct discussion. Do not criticize either medical or correctional staff in an individual's medical chart.

G.  **Write so others can read what you wrote.** An illegible medical entry is worthless. If you can't write legibly, print. If you can't print legibly - learn to print. Your entry is meant to communicate - there is no communication if an entry cannot be read.

H.  Charts are CONFIDENTIAL information. Physician-patient visits are privileged information. Such data are not for community discussion. Please help to keep the integrity of the medical records.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health** SOURCES, INCORPORATED

Provider Handbook

## HEALTH CARE UNIT SERVICES

### I.    Intake Reception and Classification (R&C)

Each inmate, when first incarcerated and at the start of the Reception and Classification process, is initially screened by qualified health care staff to identify the presence of any condition needing immediate attention; for example: pediculosis, insulin dependent diabetes mellitus, active seizures, acute asthma or an existing injury. If an inmate enters on a given medication, it should be continued until the condition is documented or validated through securing outside records. Other necessary treatment should be started as indicated or as indicated by the DOC/county.

Within fourteen (14) days following the intake screening, a complete history and physical examination should be completed, including whatever routine and other indicated laboratory and biometric testing is indicated to establish claimed problems. These data should be consolidated, a health status determined, and a care plan established to maintain the inmate's health during his prison stay. This is an excellent opportunity to address advance directives, if appropriate.

### II.    Preventive Care

Emphasis is placed on preventive medicine during the inmate's incarceration. Prison is institutional medicine with institutional exposures. The individual inmate must be protected, as must the inmate population. Immunizations (flu, pneumonia), educational directives, adjusted activities, alternate housing or work assignments are all part of the preventive options.

Inmates with pre-existing problems should have a plan designed to correct or keep the condition from becoming worse (see our explanation of pre-existing conditions presented later). The third preventive strategy is a system for frequent observation and early diagnosis. This is embodied in the following procedures for simple and frequent access to multiple levels of medical service. For specific unit operations, you should consult the policy and procedure manuals and the institutional directives in your institution.

### III.    Routine Ambulatory Care

There are three (3) basic service routes for Routine Care, 1) Sick Call, 2) Physician Call, and 3) Pill Call. A fourth, Chronic Clinics, could also be included here.

Sick Call is usually held by nurses or PA's. Inmates are usually required to sign up for the service indicating the reason for the request. Scheduled inmates are seen and screened by nurses or CMT's using authorized protocols. Only OTC medications may be used by these personnel, unless the specific protocol authorizes a legend medication.

If a screened problem is not covered by protocol and is beyond the skill of the triage, the patients are referred to the Physician Call Line. They must be seen within 72 hours of referral. If they are seriously ill, they may be seen immediately (see Emergency Service below) by the physician, or in his (her) absence, sent to the local hospital emergency room.

Physician Call is scheduled daily for the general population, and is held at least weekly in "lock down" areas such as administrative segregation or protective custody. This time is used by the physician for medical evaluations, follow-up treatments, clarification of symptom complaints, diagnostic study, etc. Physician Call in "Lock Down" should be limited to screening and the discovery of problems needing further attention. Identified problems should be brought to the health care unit later for proper evaluation and treatment.

Case No.                                                                                       WEX181

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

Pill Call is scheduled delivery of prescribed medication, and may occur either inside the health care unit, or at the assigned cell blocks. This is managed differently at different units. Medication is usually given by nurses or corrections medical technicians (CMT's).

## IV.    Emergency Service

Inmates have access to emergency service any time there is no scheduled service available. Emergency service can be provided onsite by whatever level of provider able to meet the level of care necessary. If the unit has sufficient equipment and personnel skill to meet the patient's problem, it should be managed there. If the facility, equipment, or skill level of the onsite personnel is inadequate, the patient may be transferred to the nearest hospital emergency department.

If no staff physician is on site and the situation is life-threatening, the attending nurse may make the decision to transfer the patient. In such an event, the unit medical director must be notified at the earliest possible time. Wexford must authorize payment for this service, so an Emergency Referral Sheet should be faxed to the Wexford Pittsburgh office as soon as reasonably possible.

## V.    Infirmary Care

The inpatient unit is available to provide limited medical and nursing services for patients with health care problems in an inpatient setting. Inpatient services may include medical care, isolation, observation, first aid, nursing care and post-operative care. Patients may also be assigned to the inpatient unit for sheltered housing. In-patient care is not used as a substitute to hospital level care (ICU, medical/surgical acute care), or a licensed nursing care facility. It is generally recommended that all patients discharged from acute inpatient facilities be placed in the infirmary for observation, unless such a patient is deemed stable for the general population. Clinical issues are the responsibility of the Site Medical Director or designee and operational issues are the responsibility of the Health Services Administrator and the Director of Nursing.

## VI.    Chronic Care

Services are provided on site to monitor the status of inmates with identified chronic illness conditions. Chronic Clinics for patients with the following are normally required: cardiac-hypertension, diabetes, asthma and seizures. Any other such clinic could be established at your discretion. These clinics are generally defined by a mandated protocol. Any additional clinic should have a similar protocol written and approved prior to initiation of the clinic.

Chronic Disease Clinics are normally conducted every three to four months, and provide the basis for preventive and prospective care of the patient's problem. Refer to Wexford Health's Chronic Care Guidelines manual for further guidance on Chronic Care.

## VII.    Specialty Care

It is impractical to have specialists in every unit, so arrangements are made to support the staff physician services with specialty consultation. Actually, you may seek consultation for an inmate in any area you feel is medically indicated for an inmate. The key issue is medical necessity. Many inmates demand to see a specialist for minor events, or just to get a second opinion. If you, as responsible physician, believe specialty services are indicated and identify a medical need, the case must be discussed in collegial review. Please review the utilization management policies and procedures for all offsite care.

### A.    Onsite Specialty Care

At some units, specialty physicians come on site and hold scheduled clinics. This is frequently the case with orthopedics, general surgery and optometry. This allows more inmates to be seen in a secure setting, and decreases the transportation demands on the department. The specialty physician also becomes more familiar with the inmates and the requirement of the correctional setting. These

Case No.

WEX182

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health** SOURCES INCORPORATED

Provider Handbook

physicians are "consultants" and require supervision by the facility medical director for appropriateness of recommendations.

B.    Offsite Specialty Care

When specialists are not available for "onsite" clinics, inmates may be scheduled to be seen in the specialist's office, in the local hospital emergency department or other ambulatory care facility. All such referrals must be arranged through the corrections department, and pre-approved through Wexford's utilization management/collegial review process. Every effort must be made to use contracted providers.

## VIII.  Hospital

At times, specialty care requires hospitalization. This may be requested on either a routine or emergency basis. When an emergency admission occurs, Wexford must be notified as soon as practical. Scheduled admissions should be requested through routine utilization management/collegial review. Such requests should clearly identify the medical necessity for the admission - beyond "the inmate agrees to (or wants) the surgery."

The recommendation for a procedure (or service) by a specialist should be given significant weight when deciding to provide that service; however, the unit physician must agree that such a procedure is indicated and necessary. All inmates are the patients of the medical director, NOT the specialist. Using a specialist does not remove the unit physician from the primary responsibility for care. The specialist does not (or may not) understand the special requirements of the correctional setting, and you must make treatment decisions within that context. In addition, the treatment or repair may not be the responsibility of the Department of Corrections. That is an interpretation you must make.

## IX.  Hospital Care

As reflected above, hospital care is a necessary part of our responsibility. This is done in many ways; however, most of the time, this is done by referral. Again, referral for hospitalization does not remove you from responsibility for the patient. Speak to the consulting physician to whom you are referring the patient. Learn of his (her) treatment plans and jointly create the discharge plans. Follow up on the status of the patient, and inform the physician of the capabilities of the unit to provide convalescence or other care.

Make arrangements to get an immediate discharge summary when the patient is released.

## X.   Dialysis

Some units have dialysis units where inmates may be dialyzed when the management and control of their end stage renal disease has exceeded the ability of the unit staff. Acute dialysis for toxic overdose or acute renal failure is usually accomplished through hospital referral.

## XI.  AIDS

Testing to identify HIV positive inmates, with further testing to validate the presence of AIDS, varies depending on the statutes and regulations of the state where you are assigned. All services that are needed to diagnose and treat AIDS are made available. Efforts are made to share and keep current on the status of AIDS trial and treatment. Some departments are still very sensitive about AIDS data, and keep all information as confidential as possible. As with other illnesses, confidentiality must be maintained.

## XII. TBC (Routine, MAI, Multiresistant)

All inmates receive screening TB skin testing upon admission to their institutions. Follow-up testing is usually done annually. Each institution has a TB program to identify, follow up, and treat inmates. This is

Case No.                                                                               WEX183

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

an important surveillance program. In the face of AIDS immune incompetence plus a tendency to fail completion of INH therapy, the incidence of resistant TB is rapidly rising. Every diligent effort must be made to protect our population from TB. Remember, inmates leave the prison and carry their problems to their communities.

### XIII. Pharmaceutical Service

Medications are provided through the pharmaceutical service. Medication may be ordered by: 1) a physician, ARNP, physician assistant (with the approval of the medical director, 2) a nurse/CMT using an approved protocol when the medication is included in the protocol, or 3) using the approved protocol for an over-the-counter (OTC) request.

The authorized medications are included in an approved formulary. Although some non-formulary medication may be used, all efforts must be made to adhere to the official formulary. Most meds are provided in a blister-pack format.

Please be judicious in the prescribing of PAIN MEDICATIONS due to potential of abuse. This is a dependent population, and the majority are incarcerated for drug-related crimes. The use of hard narcotic analgesics is not forbidden, but should be stringently controlled. These meds become a valuable trade item in the units. More are traded than are ever taken by the intended patient.

Stop dates should be written on all orders. Our patients may know more than all of us about the benefits and disadvantages of these medications.

Medication should be prescribed based on indications and using objective findings as a guide, and not solely on a patient's subjective complaints.

A Pharmacy and Therapeutics Committee is part of the ongoing QA of a unit. Medication schedules and changes can appropriately be made in that meeting.

### XIV. Laboratory Service

Routine laboratory services are available on site. A reference lab is contracted to provide timely pick-ups. Any appropriate test may be done. Please share the results of your testing with your inmate patients. Stat lab services are available through the local hospital and should be utilized only if medically necessary.

Specimen collection should be done under closely controlled conditions. Any urine sample desired for complaints of "hematuria" must be collected under direct observation of the MEDICAL STAFF.

### XV. Radiology Service

Routine radiology may be done on site or at the local hospital. Do not initiate any contrast media procedures unless you are able to manage the adverse impact of allergic reaction. This does not occur often; however, any such occurrence can be devastating.

Not many conditions require immediate radiographic procedures. As you know, with certain routine x-ray situations (e.g., sprained ankles, routine chest films, head injuries in young people, knee injuries) a very high percentage are "normal" or non-contributing to the evaluation. When these events occur at inconvenient times, e.g., evenings or weekends, it is rarely necessary to get immediate radiographic studies. The patients may be placed at bed rest; the area immobilized, iced and elevated and x-ray studies done soon, but at a more convenient time. Of course, circumstances occur when the degree of findings is sufficient to require immediate review. Such decisions are left for you to discern and justify.

You may not be a radiologist, and Wexford does not expect you to be the definitive interpreter of x-ray films; however, if you feel a condition clinically requires an x-ray evaluation, that signals enough importance that

Case No.

WEX184

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

you should personally review the films. The radiologist's reading will be the definitive interpretation, but your personal evaluation is equally important to your onsite (and more immediate) decisions.

Complicated radiographic procedures may be ordered from the local hospital or contracted vendor. Acute findings will be immediately called back to the unit physician. Routine x-rays and readings that are needed immediately should be ordered directly from your local contracted hospital.

## XVI. Physical Therapy

This area of service is easily and often abused. The patients tend to use the sub maximal effort, and will continue to use the service for extended periods of time with poor outcomes. Except for the early phases of post-operative healing, and in paralytic cases, passive exercise has little role. The exercise programs should be designed to be vigorous (depending on the diagnosis) and demanding. The initial exercise periods should be monitored with encouragement by medical staff to complete the scheduled sets of activity until designing a specified home exercise program (HEP).

Physical therapy modalities are also helpful adjuncts, but have a limited scope of effectiveness. Their application, for example, in longstanding chronic back cases may soothe the mind, but does nothing to soothe the back. Back braces, corsets and similar adjuncts for use in chronic back cases are often requested, but their use is not supported in the literature.

## XVII. Prosthetics - Orthotics

Many inmates come into the institution needing prosthetics and/or orthotic devices. Arrangements can be made to supply these services if medically necessary. The decision to repair versus replace prosthetics is one of individual review. Such decisions require the considerations discussed during the collegial review process.

Splints and wraps are frequent adjuncts to treatment in the system, and are acceptable for use. Two considerations are offered when directing their use. First, always check with the corrections staff before ordering splints that contain metal parts. Unrestricted use of metal parts is frequently converted by the inmate population into weapons and/or tools. Usually the same or similar splint can be found with plastic components that are more acceptable. Just remember, our patients are often very skilled, and can make serious weapons from innocuous materials.

Second, wraps (elastic bandages, etc.) are often used as a constricting device to cause swelling. For example, to prolong a "sprained" ankle or "edema" of the distal leg or arm. If you are presented with a confusing symptom set that isn't supported by history, testing or general physical findings, suspect an iatrogenic etiology.

One of the constant demands in almost any correctional unit is for "soft" shoes. Shoes are rarely a medical issue. Once inmates know you will authorize soft shoes, their demands quickly become unmanageable. On occasion, there is a clear medical indication or a situation with a medical basis for using soft shoes. If you are convinced that is the case, present a simple request to the security...

Case No. ▓▓▓▓▓                    WEX185

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## ADMINISTRATIVE SERVICES

### I.    Policies and Procedures

The basic policies guiding the correctional operations are found in the department's administrative directives where you are working. It is vital that you read, know and develop the medical operation within the guidelines of these directives. There will be a section that addresses the general operational policies of the medical unit. Specific medical operations in your assigned unit are described in the institutional directives of each individual unit.

Wexford provides a set of medical policies and procedures as well as operational policies from which the medical staff can develop their own. These are prepared with cross-references between the various standards to facilitate compliance.

### II.    Referrals

As part of your medical support system, you will be requesting referrals to specialists, sub-specialists, emergency departments, hospitals, ambulatory facilities and other providers. Each referral requires a collegial review along with a utilization management form to be completed and submitted for an authorization number. That number authorizes Wexford to reimburse for the service.

If you decide a referral is indicated, complete the referral form with brief but pertinent information about the case and what is being requested. The following discussions will give you a sense of the considerations for making decisions about referrals. The initial portion deals with a most difficult decision area - appropriate care for pre-existing conditions.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## PRE-EXISTING MEDICAL CONDITIONS

I.  **The Basis for Care**

  A.  Upon incarceration, the inmate becomes a ward of the state. The DOC becomes the *"guardian"* of each inmate, and has *"parental"* responsibility.

  B.  Incarceration limits the "medical alternatives" of the inmate, thus incurring a higher demand level from the medical service.

  C.  The DOC/county (and medical contractor) is prohibited from practicing **"deliberate indifference to serious medical needs"** in the course of medical service. We are obligated to provide medically necessary care consistent with community standards.

  D.  By means of contract definition (and the support of federal court decisions) medical care usually is interpreted as "comprehensive medical services equal to those available in the local community." It is understood that *"local community"* may be more liberally interpreted as the current state of the art as generally practiced across the country.

  E.  Contracting for medical service does not relieve the state of their responsibility as *"guardian"* of the inmate. The medical service contractor has a direct responsibility to represent the state with the proper provision of medical services to the inmate. Also, each medical staff member has a direct responsibility to respect the inmate's civil right for reasonable medical service.

  F.  The *"deliberate indifference"* term is not a mandate *"to cure;"* it is a mandate requiring problems be addressed in an appropriate and professional manner. Further, the dictum relates that attention is to be directed to *"serious medical need."* Conditions of lesser significance, of course, should not be neglected. (By association, such neglect could and should be suggestive that serious needs might also be neglected.) But the major concern was for serious medical needs - those basically threatening a patient's life and/or limb.

II.  **The State Department of Corrections Responsibility**

  A.  As generally noted above, the state becomes the *"guardian"* of the inmate. Therefore, the state is to provide a comprehensive medical service equal to *"that found in the local community."* When a private contractor is utilized, that contractor must meet the same responsibility required of the state. Thus, decisions made by the medical contractor reflect the state's role.

  B.  Wexford Health's practice philosophy is to provide the required comprehensive medical service *"equal to (or better than) the level available in the local community."* The program is designed to accompany with preventative care those inmates who enter with pre-existing conditions.

  C.  Inmate problems in the institution are treated with a *"worker's compensation"* philosophy, e.g., conditions which occur in the DOC, or which are directly aggravated by incarceration are the responsibility of the DOC.

  D.  However, inmates present with many conditions that are totally unrelated to their incarceration. Many of these conditions have never been addressed prior to incarceration. Many have been diagnosed and treated prior to incarceration. Many inmates claim to have been diagnosed and treated, but no evidence can be found to validate the problems. For some conditions, e.g., cosmetic problems, it is rarely appropriate for the DOC to accept a treatment responsibility.

Case No.                                                                          WEX187

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
RESOURCES INCORPORATED

Provider Handbook

---

E.    The state does NOT have a responsibility to provide a service simply because an inmate demands it be done. Nor does the state have a responsibility to CURE, only to appropriately diagnose and treat.

## III.    Individual Responsibility

A.    Understanding that the state has a *"guardian"* role to care for the inmate, and the inmate has limited alternative choices for medical service, there is still a major personal responsibility on the inmate to seek to preserve his/her health. This means an inmate is responsible for complying with medical plans and treatment prescribed.

B.    The inmate is responsible for personal hygiene and other normal activities of daily living that promote his/her own health.

C.    Inmates have the responsibility to bring to medical staff attention the fact that they believe a personal medical problem exists.

D.    Inmates may refuse medical service, but their refusal does not speak to a *"deliberate indifference"* in that case. Documentation of all refused care is necessary and psychiatric evaluation of competency should be obtained when in question.

E.    All inmates have a *"public health"* responsibility to aide in the protection of the health of the other inmates. Just like citizens in *"free-world"* communities, they must submit to individual practices, which help assure the health of the institution, e.g., TB testing and treatment.

## IV.    Summary

No inmate who has a problem will be denied treatment simply because the condition existed prior to incarceration. Treatment will be offered on the basis of medical need, appropriate diagnosis and the degree of objective limitation of function. Further consideration will be applied to the treatment plan if incarceration activities might aggravate or hasten deterioration of the condition. Pain will be given serious consideration as an aggravating factor, but must be evaluated in the light of the patient's dependency history.

An additional factor with significant weight is the anticipated prognosis of the proposed treatment. Only if there is a reasonable expectation that the outcome of the treatment will make a significant difference for a reasonable duration will a procedure be given serious consideration. Recommended approaches that *"might give some relief"* are reviewed and considered, but are not given substantial support.

---

Case No. ▓▓▓▓▓▓▓                                                                    WEX188

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## QUALITY ASSURANCE

It is difficult to maintain a quality practice in correctional medicine. Staffing, equipment, security constraints, cumbersome policies, conflicting operational objectives, unrelenting and often unrealistic inmate demands and an ever-present shadow of litigation combine to promote fragmentation and frustration. These variables can be controlled by consistent leadership which identifies quality medical service, persistently pursues the identified goals and maintains the levels achieved. Part of that process is the candid review of error, mistake and disappointing outcomes. If we do not face our failures, we will continue to fail through ignorance. Continual review through quality assurance serves to identify deficiencies and improves patient outcomes.

It is expected that all clinical providers (MD/Dentist/PA/NP) will actively participate in their site's Quality Management Program or meetings. The site Medical Director (or designee) will co-chair the Quality Management Program meetings.

### I.    Peer Reviews

One responsibility of both the unit and the corporate medical director is the review of provider medical care. Although this is usually physician - physician review, in our units, physician - nurse or CMT review is also included. Generally, peer review should be performed at least annually by the regional medical director (or his designee) and the unit medical director or as designated by the DOC/county. All peer reviews should give feedback to those healthcare providers being reviewed and must be kept confidential. A copy of the peer review should be forwarded to Wexford's credentialing department for use as a reference during the reappointment process.

### II.    Death Reviews

The occurrence of an inmate death in the institution is always accompanied by suspicion. The family, other inmates, and sometimes even DOC and medical staff are suspect that unusual events have occurred. Realistically, death is inevitable. Most deaths are for obvious or expected reasons. However, every inmate death must be reported as soon as reasonable to the regional office and the corporate medical director. If the death is unexpected, or you perceive unusual events, immediate notification is indicated. The unit medical director must file a complete chart summary within a week of the day of death. This summary should include: 1) patient identification, 2) all listed problems, 3) cause of death, 4) a history of the patient's incarceration and medical care with an emphasis on the care preceding the death, 5) any special circumstances you believe accompanied the event, and any information from "outside" providers or facilities that are important, and 6) all pertinent laboratory, radiographic, pathologic, or other studies.

This report is both an informational and a legal document that becomes a part of the permanent record, and part of our medical review. Please treat it as such. ... degree of ... in the treatment of the document. There is no place for ... bounded in ... This ... be a factual document, with your best effort at reasonable analysis and detail. The degree of detail is left to your judgment; be thorough, but concise. Above all, include ONLY what is supported by existing, documented and preserved evidence, and validated information sources.

### III.    High-Risk Population

The population of any Correctional Unit has "more" of almost any pathologic condition you wish to consider. The lifestyles, personalities, socio-economic pathology and circumstances of illegal trafficking extracts a huge physiologic price tag. As responsible professionals, we are here to maintain the best level of health possible for as long as is reasonable. Personal judgments regarding the basis for the problem have little place in the treatment of these problems.

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

 **Wexford Health**
SOURCES INCORPORATED

Provider Handbook

Patients with AIDS, end-stage renal disease, failing cardio-vascular support, uncontrolled diabetes mellitus, and many other terminal problems that may generate from poor lifestyles should find support and reasonable comfort in the health care staff. These patients often pose the greatest challenges to the healthcare staff. Nevertheless, we must extend our care and attention FAR beyond the usual limits of private practice. These patients have no place to go -- YOU may be their final provider. Regardless of what they have done, they deserve your best care. Judgment of their prior acts should be left to those capable of overall judgment.

## IV.    Experimental Care Services

Inmates may not participate in an experimental study without the specific written approval of the corporate medical director. Further approval will be required by the agency medical director or the state Department of Corrections.

## V.    Transportation

Transport of inmates for outside medical service is usually the task of the Department of Corrections. As contractor, we are usually responsible for emergency transportation. However, these issues are specifically addressed in the contract.

## VI.    Cost Considerations

A criticism frequently directed toward private managed care programs like Wexford Health is that services are withheld to improve profits. Similar criticism has been directed at the medical industry in general, implying that cost - money - should never be a consideration in regards to providing medical care. Cost has always been a consideration in treatment, and with progressive government "Health Care Reform" will become a far greater factor than it has ever been under the "control of the health profession."

Consideration in deciding treatment is given to whether or not the Department of Corrections has the responsibility to provide a treatment: The mere existence of a condition DOES NOT CONSTITUTE A RESPONSIBILITY for repair!

When considering alternative treatment approaches, cost becomes a consideration. Even then, it is not THE determinant, but only ONE of several possible variables considered. Cost, per se, usually becomes the last variable considered, belying its importance.

Meanwhile, the role of the medical staff is to: 1) provide medical care to individual patients, and 2) seek the best quality we can afford and spread our health care budget to effectively cover as many services as possible. Cost has been and must continue to be a consideration. The "cost of service" remains an important factor to be shouldered by each health care professional. Being fiscally responsible builds a broader range of treatment alternatives.

Case No

CONFIDENTIAL - SUBJECT TO GENERAL PROTECTIVE ORDER

**Wexford Health**
SOURCES INCORPORATED

Provider Handbook

## ATTESTATION

I, _____do attest that the Wexford Health Sources, Inc. handbook has been read by me. I understand and agree to abide by the procedures and policies set forward in this handbook. Furthermore, I have been allowed to ask questions and I have been given appropriate answers to those questions.

_____        _____
Provider                                Date


_____        _____
Facility Medical Director               Date


_____        _____
Regional-Level Operator                 Date


_____        _____
Regional Medical Director               Date

Approved by the Wexford Medical Advisory Committee on June 8, 2012                    Page 23

Case No. ~~[illegible]~~

Keith Allen - M21830
Menard Correctional Center
P.O. Box 1000
Menard, IL. 62259



Correspondence from
Individual in Custody

US POSTAGE PITNEY BOWES

CORRECTION
ZIP 62259  $ 009.74⁰
02.7W
0008037385 MAY. 26. 2026



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

9589 0710 5270 2262 4031 90

Legal Mail

Litchfield Cavo, LLP
Zachary G. Stillman
303 West Madison Street, Suite 300,
Chicago, IL. 60606

ZGS