Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KEITH ALLEN, #M21830 )
                                          )
          Plainatiff,          )
                                          )
              V                )23-CV-3775-DWD
                                          )
WEXFORD HEALTH SOURCES,       )
INC., et al.                      )
                                          )
          Defendants.           )

DEPOSITION OF KEITH ALLEN
March 5, 2026
11:00 a.m.

Called as a witness by the Defendants herein, pursuant to the Federal Rules of Civil Procedure, before PAMELA C. TAYLOR, CSR/RPR, License No. 084-001184, a Notary Public qualified and commissioned for the State of Illinois, taken via Zoom conference.

Exhibit E

Page 2

APPEARANCES:

MR. KEITH ALLEN- M21830
   PRO SE,

LITCHFIELD CAVO, LLP.,
BY: MR. ZACHARY G. STILLMAN
303 W. Madison Street - #300
Chicago, Illinois 60606
(312)781-6650
stillman@litchfieldcavo.com
Appeared on behalf of Defendant,
Dr. Florence,

HEYL, ROYSTER,
BY: MR. KEITH HILL,
105 W. Vandalia Street
Edwardsville, Illinois 62025
(618)656-4646
khill@heylroyster.com
Appeared on behalf of the Defendants,
Wexford and their employees,

LIVINGSTON BARGER,
BY: MS. MARGARET RHOADES
115 W. Jefferson Street - #400
Bloomington, Illinois 61701
(309)828-5281
mrhoades@lbbscom
Appeared on behalf of the Defendant,
Dr. Yousuf,

KWAME RAOUL
Attorney General of Illinois
BY: AAG TODD NELSON
628 Main Street
Quincy, Illinois 62301
(617)223-2221
Appeared on behalf of the Defendants,
IDOC employees.

Page 3

I N D E X

WITNESS:
KEITH HILL

Mr. Hill            4
Ms. Rhoades         96
Mr. Stillman        101
Mr. Nelson          138

EXHIBITS

Exhibit 1           124

Page 4

KEITH ALLEN
having been first duly sworn, deposed and testified
as follows:

EXAMINATION
BY
MR. HILL:

Q.  Good morning Mr. Allen, my name is Keith Hill and I'll be asking you some questions this morning.

Would you please state your name for the record?

A.  Keith Allen.

Q.  What's your date of birth?

A.  6/4/88.

Q.  And for identification purposes, what are the last four digits of your social security number?

A.  6127.

Q.  Have you ever given a deposition before or otherwise testified in a court proceeding?

A.  Yes.

Q.  Which one or both?

A.  Been to a deposition before.

Q.  Okay.  Was that in your own case?

A.  Huh?

Page 5

Q.  Was that in your own case or someone else's case?

A.  It was within my own case.

Q.  When was that?

A.  I'm not sure of the exact date but it was within the last five years.

Q.  Can you generally give me a sense, the nature of that case, what do you allege in that case?

A.  It was a condition of confinement case, Pontiac, another lawsuit, condition of confinement.

Q.  What court did you file that, was that like in the Central District or Southern District of Illinois or someplace else?

A.  Central District.

Q.  What's the status of that case?

A.  It's resolved.

Q.  Were the defendants, were they all state employees, Department of Correction employees or did you have other people who were employed by other folks?

A.  Department of Corrections employees.

Q.  All right, well you've done this before, given a deposition, but let me briefly go over the

2 (Pages 2 - 5)

Page 6

ground rules just to remind you of what, what's going to transpire today and give you some helpful tips to move things along.

I'll be asking you questions, some of the other attorneys will also be asking you questions. Please allow us to get our entire question out before you start your answer, and we will allow you to get your entire answer out before we start our next question.

We want to avoid talking over each other because that makes it difficult for our court reporter, who is taking down everything that you and I say, to get all that down after talking over each other.

Keep all your responses verbal, you can nod or shake your head, but if you just nod or shake your head, I'll ask you if that's a yes or no. I'm not trying to be rude, I just want to make sure that your response is properly reflected in our transcript.

Keep your voice up as well, that way the court reporter can hear you and understand you.

If you don't hear my question or don't understand my question, please ask me to

Page 7

repeat it or rephrase it, I want you to both hear and understand my question.

If you don't ask me to repeat or rephrase my question, I'm going to assume that you heard it and that you understood it.

Is that fair?

A. Yes.

Q. Try to avoid saying un-huh or un-un, or um-um or un-un.

I might, from your inflection, I might be able to understand what you meant, but on the transcript it might be less clear so if you say those words, I'll again ask you, is that a yes or no so the transcript is clear.

If you need to take a break, we can take a break just let us know, the only requirement we'll have is, if there's a question pending, we want you to go ahead and answer that question before you answer.

Are you looking at like a laptop or an iPad?

A. Laptop.

Q. We may show you some things on the screen, hopefully you'll be able to see it from your laptop,

Page 8

but we'll see how all that works out.

So let's go ahead and get started.

Where did you grow up?

A. Milwaukee, Wisconsin.

Q. Did you graduate high school?

A. Yes.

Q. When did you graduate high school?

A. 2006.

Q. Was that in Milwaukee area?

A. Yes.

Q. Any education after high school?

A. Yes.

Q. What do you have?

A. One year community college, eight-month program.

Q. What community college?

A. Computer Systems Institute in Chicago, Illinois.

Q. And that was, you say an eight-month program?

A. Say it again?

Q. That was an eight-month program?

A. Yes.

Q. What did you -- did you obtain a degree or

Page 9

certificate through that program?

A. Yes.

Q. Certificate or degree, what would you call it?

A. Certificate, was IT professional certification.

Q. When did you earn that?

A. Around somewhere around 2009.

Q. Did you after that, did you work in IT?

A. No.

Q. Prior to your current incarceration, did you work?

A. Yes.

Q. What did you do for a living?

A. I worked several jobs, several different jobs.

Q. Can you let me know what type of jobs these were?

A. Factory jobs, McDonald's, Journal Sentinel, J.C. Penny warehouse.

Q. Can you spell that for us?

A. Newspaper company, Journal Sentinel.

Q. Any other, aside from your high school diploma and your IT professional certification that

3 (Pages 6 - 9)

Page 10

you got from the Computer Systems Institute in Chicago.

Q. Do you have any other education or training?

A. No.

Q. Do you have any medical training?

A. No.

Q. Have you ever been convicted of a felony?

A. Yes.

Q. How many?

A. I'm not sure.

Q. Can you give me a range?

A. Say, one.

Q. One. What felony is that for?

A. First degree murder and I believe home invasion as well.

Q. Did those two felonies occur at the same time?

A. Yes.

Q. What year was that?

A. What year was what, I get convicted?

Q. Good clarification.

What year were you convicted of those felonies?

Page 11

A. 2011.

Q. What county was that?

A. DuPage County.

Q. And that's Illinois?

A. Yes.

Q. Where -- before you were convicted and you were merely charged, were you held in jail?

A. Yes.

Q. Were you held in DuPage County jail?

A. Yes.

Q. When were you first detained at DuPage County Jail?

A. I don't know the exact pod --

Q. Not where, but when, like what year, more specifically, what month and year you --

A. 2009.

Q. Had you been continuously detained or incarcerated since 2009?

A. Yes.

Q. When did you first enter IDOC?

A. 2011.

Q. Do you know what month?

A. Not sure.

Q. Did you first go to Stateville?

Page 12

A. Yes.

Q. To the Northern Reception Center there?

A. Yes.

Q. How long were you at Stateville?

A. Not sure of the exact amount of time.

Q. Where did you go after Stateville?

A. You say what?

Q. What's the next facility you went to after you were at Stateville?

A. Menard Correctional Center.

Q. And that's where you're at today?

A. Yes.

Q. Is Stateville NRC and Menard the only two prisons you've been incarcerated at in Illinois?

A. Pontiac and Stateville Correctional Center.

Q. When did you go to Pontiac?

A. 2013.

Q. How long were you at Pontiac?

A. For about somewhere around a year.

Q. And in your mind, do you distinguish between Stateville, the Northern Reception Center where individuals in custody go and getting classified, do you distinguish that as being

Page 13

incarcerated at Stateville prison?

A. Yes, Stateville prison is separate from NRC somewhat.

Q. Okay. Have you been in both the NRC side and the sort of the Stateville prison side as well or just the NRC?

A. Yes, yes.

Q. So just to make sure that I captured this all, you have been to Stateville NRC Pontiac, Stateville, and Menard?

A. Yes.

Q. How long have you been -- how long have you been at Menard?

A. What you mean?

Q. Sure, had you been at Menard continuously or have you been at Menard for a period of time, left, went someplace else and then came back to Menard or have you always been, once you got to Menard, you've been there?

A. Nah, eight-month program, got to Menard in 2011, left and went to Pontiac in 2013, left Pontiac 2014 and went to Stateville in 2014. Left Stateville in 2016, went back to Pontiac for a year in 2016 and left Pontiac in 2017 and came back to

4 (Pages 10 - 13)

Page 14

Menard in 2017, and I've been in Menard since 2017 to the current day.

Q. Thank you, that's helpful.

At Menard have you ever had a job?

A. Yeah.

Q. What jobs have you held at Menard, since, let's say since 2017, have you had a job at Menard since 2017?

A. Yes.

Q. What jobs have you had?

A. Just a gallery worker.

Q. What does a gallery worker do?

A. Pass out trays, stuff like that.

Q. Is that also called a quarter?

A. Yes.

Q. When did you first start working as a gallery worker at Menard?

A. Probably, anywhere between 2023 and 2025 is somewhere between there.

Q. Since you first started working as a gallery worker, have you continuously worked as a gallery worker?

A. Nah, I didn't really work that long, I wasn't really out there long, I don't know if they

Page 15

even had me officially down at the time.

Q. How long did you officially work as a gallery worker?

A. Not that long, probably like six months.

Q. Less than six months, is that fair?

A. Possibly.

Q. When you were working as a gallery worker sometime between 2023 and 2025 for that less than six months time period, how many hours a day were you working?

A. Eight hours, first shift.

Q. And how many days a week were you working?

A. Seven days a week.

Q. Were you able to perform your job duties during those less than six months that you held that job?

A. Yes.

Q. Do you know why you stopped working as a gallery worker?

A. I don't think I was officially even hired, so, it probably wasn't even, you know, on the books, but it was kind of like a trial period, I guess.

Q. Was there anything that happened that, you know, you failed after the tryout period or they

Page 16

just stopped calling on you to do the job, can you explain a little more detail what happened?

A. I'm not sure.

Q. So you have been to a number of different facilities in IDOC, when it comes to an individual in custody wanting to request medical care, is the procedure basically the same at each of the facilities that you have been at?

A. Somewhat.

Q. Well, let's talk about then, let's talk about specifically Menard since 2017, for an individual in custody at Menard since 2017, what is the procedure for an individual in custody to request medical care?

A. As far as what?

Q. Yes, so you're in your cell, you start having something happening with you where you want to see a nurse, what do you have to do to see a nurse at Menard?

A. Sometimes the nurses walk the gallery and you can talk to them directly, briefly, and then sometimes if you don't, if that don't do nothing, you can file a sick card slip, a sick card request.

Q. Is that a particular form that you have to

Page 17

fill out or just write it on a piece of paper or both?

A. You can just write it on a piece of paper.

Q. Okay, is there also a form?

A. Possibly, I don't never recall them ever walking around passing out sick call forms.

Q. Okay.

A. I know I would was just start it on regular paper.

Q. Okay. And once you put your -- you handwrite your request on a piece of paper, what do you do with it to get it to a nurse?

A. Put in a bar to be collected with the institutional mail.

Q. Where do you put it?

A. Put your mail in the bars and at night the officer collect all the mail, the institutional mail.

Q. So you set, you set the mail in the bars of your cell and correctional officer comes around and just collects it?

A. Yes.

Q. Do you know what the CO does with it after he or she collects it?

5 (Pages 14 - 17)

Page 18

A.  I believe it pulls it to wherever it's going to.

Q.  Do you know who reviews it, who reviews your request?

A.  You say what?

Q.  Once the CO collects it from the individuals in custody and gives it to whomever, do you know who reviews the sick call requests submitted by the individuals in custody?

A.  I'm not sure.

Q.  Do you know who decides whether you see a nurse or a doctor or a nurse practitioner?

A.  Say it again?

Q.  Do you know who decides who you see, whether they decide you see a nurse or a doctor or a nurse practitioner, do you know who makes that decision about who you see?

A.  Some medical personnel.

Q.  You just don't know who specifically?

A.  Possibly, possibly the Healthcare Unit, the Healthcare Unit Administrator or the Medical Director or probably the nurse who receive the sick call, probably one of them.

Q.  Are you just guessing?

Page 19

A.  Yeah.

Q.  Okay.

A.  Pretty much.

Q.  Do you know who makes the decision about when you're seeing, meaning what day you're seen?

A.  I'm pretty sure they got rules and regulations that govern how long you should be evaluated on a sick call.

Q.  As far as the actual decision, despite those rules and regulations, do you know who makes the decision about what day an individual in custody is seen for a sick call?

A.  No.

Q.  When you see a nurse -- strike that.

How do you go about seeing a doctor, specifically, or a nurse practitioner specifically, do you know how that works?

A.  I guess you could request to see a doctor and sometimes sick calls could lead to you being referred to seeing a doctor.

Q.  Do you know who makes the decision once you have seen a nurse sick call who makes the decision whether you're going to be seen by a doctor or nurse practitioner?

Page 20

A.  Possibly the nurse, the reviewing nurse on the sick call.

Q.  Do you know who decides what doctor or what nurse practitioner you're seen by?

A.  No.

Q.  For outside referrals to be seen by outside personnel, the jail or prison, do you know what the process is for that?

A.  Say it again?

Q.  Do you know what the process is for an individual in custody to be seen by a medical provider like a doctor outside of the prison?

A.  Do I know the procedure?

Q.  Procedure, process, how it happens, how it works?

A.  I guess you get seen by a sick call and the nurse reviewing you could possibly refer you, depending on the circumstances.  And just once they refer you, the Healthcare Unit Administrator or the Unit Medical Director gets the request getting referred to them, and eventually the warden probably will see it as well to approve the request.

Q.  Sounds like you're guessing again, is that right, you're guessing about the procedure?

Page 21

A.  Yeah, I don't have, I don't really have the rules and regulations, but again, the rules and regulations governs these proceedings and how they are to take place.  I don't have any documents in front of me right now to look over to confirm the actual procedure.

Q.  And that's fine.  A lot of my questions I'm just trying to find what you know and what you don't know and so if you don't know an answer, that's perfectly acceptable to just say I don't know.

Do you know who's responsible for scheduling appointments at outside providers?

A.  Yeah, I don't have the document, I don't have the procedure in front of me right now to give you a definitive answer to that, but again, the rules and regulations governs who is responsible for doing that.

Q.  Do you know how a date for a particular outside employment gets set, who picks the date you get seen?

A.  Who picks the date that you are seen?

Q.  Yeah, do you know who picks the date that you are seen by an outside provider?

6 (Pages 18 - 21)

Page 22

A.  Again, I have to look at the rules and regulations.

Q.  We're here today to talk to you about an injury that you suffered to your, is it your right hand?

A.  Say it again?

Q.  We're here to talk to you today about an injury that you suffered, I believe it was to your right hand, is that right?

A.  Yes.

Q.  Do you remember when you injured yourself?

A.  Yes.

Q.  What date?

A.  8/16/21.

Q.  How did you injure yourself?

A.  In a fight in self-defense with another inmate.

Q.  Where did this fight happen?

A.  In the West House.

Q.  Was that your housing unit?

A.  Yes.

Q.  What was, or what is the inmate's name who you had the fight with?

A.  I'm not sure.

Page 23

Q.  Where were you at at West House at the time of the fight?

A.  I can't even remember exactly what gallery I was, but I was in the Cell House.

Q.  Were you in your cell or was it, was --

A.  Outside of my cell.

Q.  Briefly what were the circumstances of the fight?

A.  You know, just a physical altercation got, you know, exchange of words, you know, go into an altercation.

Q.  Do you know how you injured your hand in the fight, what specifically happened that caused you to injure your hand?

A.  In the process of us fighting, just exchanging closed fists in the process of fighting.

Q.  How did the fight end, did you guys just separate yourselves and move on, did the correctional officer separate you, can you describe how it ended?

A.  Kind of separated ourselves.

Q.  Was security aware of the fight, if you know?

A.  You say what?

Page 24

Q.  Did the correctional officers ever become aware of the fight?

A.  After the fact, yes.

Q.  How did they become aware of it after the fact?

A.  I guess seeing, seeing the injury of the guy I was fighting with.

Q.  Was there any discipline for either yourself or the other individual for fighting?

A.  Yes.  I was issued a disciplinary ticket. First I was issued an investigation ticket, so I set in investigation for 30 days, and then after that 30-day period was up, they issued me a ticket, fighting ticket.

Q.  What was your consequence for the fighting ticket?

A.  Somewhere around 30 days in segregation and other restrictions, disciplinary restrictions.

Q.  So, would that, would your 30 days in segregation have begun sometime after the 30-day investigation and after you were issued the ticket?

A.  Yeah, once they -- after I did it, I was doing the 30-days investigation time, and when that was up, I was issued a ticket, and when I heard the

Page 25

ticket, I think they gave me about 30-days in seg so a few days after that, I was released from seg because I had been in seg already a little over 30-days.

Q.  Are you in seg during the investigation period?

A.  Say that again?

Q.  Were you in segregation during the investigation period?

A.  Yes.

Q.  So to kind of make sure that I understand, they put you in segregation during an investigation period, and then after they completed their investigation, they determined that a ticket for fighting was warranted and your punishment was 30 days in seg, but by that point you had already done or nearly done 30 days in seg, so you were released from segregation just a couple of days after you got your ticket?

A.  Yes.

Q.  So, when did you first -- so you get into a fight, you guys separate, you go about your business, he goes about his business.

When did you first realize there was

7 (Pages 22 - 25)

Page 26

an issue with your hand?

A. After I got back to the cell, I got to the cell, I was in the seg.

Q. What did you notice about your hand?

A. It was painful and it was swole. I think due to the adrenaline of the fight, I didn't notice it at that time, but once I was able to get back to my cell and I calmed down, I started to feel the pain, I noticed the swelling.

Q. Where was the swelling, if you can be more specific?

A. My right hand.

Q. Can you be more specific as to which finger?

A. Probably like around -- my whole hand was swollen, the whole hand was swollen.

Q. How would you describe the pain you were experiencing?

A. It felt like it was broke. I was in very severe pain, felt as if it was broke.

Q. Had you had any, prior to the fight and injuring your hand, had you had any problem with your right hand or your forearm, you know, as far as pain or numbness or tingling in your fingers, in

Page 27

your arm, things like that?

A. No.

Q. What did you do after you noticed this issue with your hand, what did you do next as far as trying to get medical care?

A. I seen a sick call, a nurse on a walk through and she gave, she came to bring my psyche medication and in the process I told her that, I told her about my hand and showed it to her, I showed her the swelling and everything and told her that I needed some medical attention and she told me to put in a sick call.

Q. And did you put in a sick call request?

A. Yes.

Q. And did you see a nurse in sick call for your hand?

A. Yes.

Q. Was that on August 17th?

A. Yes.

Q. What did the nurse do for you on August 17th?

A. Say it again?

Q. Sure. What did the nurse do for you on August 17 when you saw the nurse?

Page 28

A. She reviewed, she reviewed my hand, listened to my complaints of the pain and I think she gave me some pain pills and an ice pack.

Q. Did she talk to you about keeping your hand elevated to control the swelling?

A. She possibly did.

Q. Did she say, did she say -- strike that.

What was your understanding about what would happen next for you regarding your hand, we know she gave you some pain medication and ice pack and might have talked to you about elevating your hand, what did you understand from the nurse about what would happen next?

A. I think she said something about having putting me in for a follow-up sick call, possibly with a new nurse practitioner.

Q. So the nurse that you would possibly see, a nurse practitioner, but you don't know how they choose which nurse practitioner that you are going to see, do you?

A. I can't hear you.

Q. The nurse told you that you're possibly going to see a nurse practitioner, is that right?

A. Yes.

Page 29

Q. Do you know how the nurse goes about determining which nurse practitioner you're going to see?

A. No.

Q. You did see a nurse practitioner, correct?

A. Yes.

Q. Was that on August 20th?

A. Yes.

Q. Do you know the name of the nurse practitioner you saw?

A. Jillian Crane.

Q. Had you seen Jillian Crane before this?

A. I'm not sure, I probably have, I'm not sure.

Q. If Jillian Crane walked into the room today, would you recognize her?

A. I believe so, yes.

Q. Can you give me a brief description of what Julian Crane looks like?

A. White female, I think around the time she had like some brownish, brownish blondish color hair somewhat like that.

Q. How tall?

A. Not that tall, probably like five

8 (Pages 26 - 29)

Page 30

something.

Q. And how about approximate age, is she a younger person, older person, if you know?

A. Probably like mid age.

Q. Middle age?

A. Yeah.

Q. Do you recall this particular encounter with Jillian Crane on August 20th?

A. Yes.

Q. Tell me about it, what did you say to her and what did she say to you?

A. I told her, I showed her my hand and told her, I showed her my hand and let her know about the pain that I was experiencing and let her know that my hand was broken, showed her that it was swelling and the purple discoloration around my hand and my palm basically around my hand and my palm, and she said that she had another person, she said she don't know if it was broken at the time, but she said she needed to conduct an X-ray to find out, and at the time she had another inmate who was scheduled for an X-ray, and she said due to the severity of, the looks of my hand, how swollen it was, and all that, she was going to put me in for an X-ray that same

Page 31

day as well replacing him. She end up giving me an X-ray that same day.

Q. So she told you she didn't know if it was broken?

A. Yeah, on the sick call, she said she wasn't sure, she would have to conduct an X-ray to find out.

Q. Did she give you pain medication?

A. Yeah, she gave me some pain medication.

Q. I meant to ask you, and sorry to jump back on you here, but going back to the nurse sick call, the nurse you saw before you saw Jillian Crane, the nurse you saw on August 17th, that nurse wrote in your medical record that you fell off the bed.

Do you recall telling the nurse on August 17 that you fell off the bed?

A. Yes, I do.

Q. Why did you tell her that?

A. I told the nurse that because I felt that, I feared that if I would have told her that I injured it in a fight, she would probably be biased towards me and you know, deny me, deny me medical treatment for my hand.

Q. Were you concerned about the nurse

Page 32

notifying correctional staff that you had been in a fight?

A. No, I wasn't concerned about that.

Q. Why not?

A. I just wasn't. I was more concerned about trying to get some treatment for my hand.

Q. So you acknowledge that you told the nurse something that wasn't true?

A. Huh?

Q. You admit that you told the nurse something that wasn't true?

A. I can't hear you.

Q. Sure. On August 17th, when you told the nurse that you fell off your bed and that's how you injured your hand, you admit that that was not true?

A. Yes.

Q. When did you -- did you have an X-ray, when you saw the nurse practitioner, did you have an X-ray that same day?

A. On August 20th? August 20th, yeah, I had an X-ray.

Q. It was that same day?

A. Yeah.

Q. Did they, did you get the results or were

Page 33

you told the results of the X-ray after you had it or did you find out later?

A. Nah, it was -- she told me the same day, she told me that, after her and Alisa Dearmond reviewed the X-ray film Alisa Dearmond accompanied Jillian Crane at the X-ray, at my first X-ray film. They both seen my hand, I showed it to them, they was there together and they both reviewed the X-ray films after they took it, and then they came back and said that they didn't see any signs of fracture, no fracture being shown or nothing of that nature.

Q. Is there a room, like an X-ray room in the Healthcare Unit?

A. Say it again?

Q. Is there a particular room in the Healthcare Unit where you get an X-ray?

A. I believe so.

Q. So, was, it's your testimony that Jillian Crane and Alisa Dearmond were together when your hand was X-rayed?

A. Yes.

Q. And were you in the same room with them?

A. Yes.

Q. And your testimony is that you saw them

9 (Pages 30 - 33)

Page 34

review together, review the X-ray results?

A. Yeah, I seen them both looking over them.

Q. Okay. What were they looking at, did they print something off or were they looking at something on a screen somewhere, can you describe that for me?

A. I'm not sure exactly what, I'm not sure exactly.

Q. And then they -- which one told you the results or what their conclusion was about the X-ray?

A. Jillian Crane.

Q. And she said to you that she did not see any signs of fracture?

A. Yeah.

Q. Did she say anything else to you about the X-ray?

A. Yes, she was just basically saying that she find it odd or something that it showed no signs of fractures despite how swollen my hand was, she thought that to be odd, and they kind of laughed and joked about it.

Q. What was the, what was your understanding about the joke, what was the joke about it, can you

Page 35

explain what you mean by that?

A. The fact that my hand can be as swollen as it was and they're not being any fracture.

Q. Did you have any reason to doubt that Jillian Crane and nurse Dearmond thought that you did not have a fracture?

A. Yes.

Q. Why do you doubt that that was their thought?

A. Because the pain I was feeling, the swelling, the purple discoloration, it felt like it was broke, you know, it just felt, it felt like it was broke, the pain that I was in, I felt like it was broken, so, the fact that they said that it wasn't broken, just wasn't making sense.

Q. As far as their belief, do you have any reason to doubt that that was their belief?

A. Again -- say it again?

Q. Sure, I'm sorry, I understand that you don't understand how it could not be broken giving the symptoms that you're experiencing.

My question is, do you have any reason to doubt that that's actually what Jillian Crane and Dearmond believed that the X-ray showed

Page 36

that it was not fractured?

A. I'm not, I'm not really sure, I just know that that's what they said, and I just felt like it was broken, so, I kind of did have some doubt about it, just for the simple fact that it felt broke.

Q. It's fair to say you don't know what they were thinking at the time, is that fair?

A. Yeah, I'm not sure.

Q. When did they -- so what was, what was your understanding of what was going to happen next after you had this X-ray and you talked to Jillian Crane and she tells you she doesn't think it's fractured, did they tell you what was going to happen next?

A. She said something about, I guess, sending it to be reviewed by a doctor or something, reviewed, somebody else, a doctor review the X-ray films and that, you know, they get back at me with it, I guess whatever they find it was.

Q. Did they identify who the doctor was that was going to review it?

A. No, they never said who.

Q. Okay.

A. Who the specific doctor was, no.

Page 37

Q. Did they tell you that they were going to do another X-ray later?

A. Yes, they said they was going to schedule me for another X-ray probably about within another week or so.

Q. Did they tell you why they were going to schedule you for another X-ray within a week?

A. I guess to check again, I'm not really sure what their reason was, probably just to double check.

Q. Do you agree with their, with Jillian Crane's decision to give you pain medication for your hands, do you think that was the right thing to do?

A. Say it again?

Q. Sure. Do you agree with Jillian Crane's position to give you pain medication?

A. To give me medication?

Q. Yes.

A. Yes, at the time I believe I requested some to try to help cope with the pain.

Q. Do you agree with Jillian Crane's decision to order an X-ray of your hand to see if it was fractured?

10 (Pages 34 - 37)

Page 38

A. Yes.

Q. Do you agree with the -- I don't know who decided this, but do you agree with the decision to have you have a second X-ray to double check?

A. What do you mean agree as far as what?

Q. Well, either you agree with that medical decision or do you think that was the wrong medical decision to have another X-ray to double check?

A. I'm not really sure, I feel like, at the looks of my hand, after the first X-ray, I feel like by me telling her it felt as if it was broken and the pain that I was experiencing and the swelling that was visible and the purple discoloration that was shown, I feel like for them X-rays to come back negative for any fracture, I felt as if she probably should have sent me to a hand specialist to do an expert, to do an evaluation, you know, probably a little more qualified to assess my hand and see what's going on, the fact that, that X-ray contradicted, you know, the symptoms that I was experiencing.

Q. Okay.

A. Especially after seeing the nature of my hand.

Page 39

Q. Okay.

A. So I don't agree with the course of action that she took to schedule another X-ray versus just sending me out to see a hand specialist, who more qualified to assess and evaluate my hand.

Q. Okay, understood.

Did you, would you agree with them having a doctor review your X-ray for a second opinion?

A. As far as what?

Q. Just, so she told you, you told me that they told you that they were going to send your X-ray to a doctor to look at, right?

A. Yes.

Q. Do you agree with that decision to have a doctor look at your X-ray?

A. Yeah, I felt as if that was necessary, I felt as if that was probably necessary at the time.

Q. And you understand that -- or do you understand that Jillian Crane and Alisa Dearmond are nurse practitioners?

A. You're telling me they are?

Q. I'm asking you if you knew that?

A. At the time?

Page 40

Q. Yes, sir.

A. At the time I don't think I was really sure, I think they said, I think I knew Jillian Crane was probably a nurse practitioner based on the sick calls sending me to see a nurse practitioner, but I don't think that I knew Alisa Dearmond at the time was a nurse practitioner at the time, I thought she was a nurse.

Q. I'll tell you that they are both nurse practitioners. What's your understanding of what a nurse practitioner is versus what a doctor is, do you have an understanding about that?

A. I just felt like, I just felt like a doctor -- I mean, I can just differentiate, you know, it's two different forms of medical personnel.

Q. Do you know anything more than that that they're just two different types of medical providers?

A. I'm pretty sure different medical providers have different skill sets.

Q. Do you know if there was anything that the nurse practitioners could -- strike that.

Do you know if there's anything that a doctor can do for you at Menard that a nurse

Page 41

practitioner could not do for you?

A. I felt like the doctor, the hand specialist, I feel like he was more qualified to assess hand injuries.

Q. No, I understand that, I'm not talking about a hand specialist, I'm talking about, I'll just use the word, generally, a regular doctor, a non-specialist, a doctor working at the prison, for instance, do you know if there's anything that a nurse practitioner at the prison can do for you -- strike that.

Do you know if there's anything a doctor can do for you that a nurse practitioner could not?

A. I'm pretty sure, yeah, I'm pretty sure they got, they got different qualifications to make them do certain things that the other is not qualified to do, yes.

Q. Is there anything specific that you can think of?

A. Probably I would think a physician is more qualified to assess and diagnose a hand injury since that's the area of expertise that they specialize in over a nurse.

11 (Pages 38 - 41)

Page 42

Q. Is there a difference in your mind between a nurse and a nurse practitioner?

A. Probably due to their training they may have different skill sets that differentiate them, one maybe able to do more things than the other one due to their skill set and qualifications that they have.

Q. As far as like, put aside the assessment and their qualifications to assess you there, anything that a doctor can do for you at the prison as far as prescribing you pain medication or X-rays or sending you out, is there anything that a doctor can do that you think a nurse practitioner can do at the prison?

A. Probably so, possibly so.

Q. Is there anything specific?

A. I'm not sure, I'm not sure at this time but I'm pretty sure if I was to go look them up or research them, they might have different qualifications due to their different levels of skill set.

Q. Okay.

A. That the law would probably, would probably govern.

Page 43

Q. Is there anything specific, anything specific that you can think of right now that a doctor can do that a nurse practitioner cannot do at the prison?

A. I would say a hand specialist is probably more qualified to diagnose and assess.

Q. And I'm not talking about a hand specialist, I'm not talking about like an orthopedist that has been board certified to treat hands, I'm talking like a regular doctor, a family doctor like you see at the prison.

Is there anything that the doctor at the prison can do for you that a nurse practitioner cannot? Is there anything specific that you can think of?

A. I'm not sure.

Q. Okay.

A. There's definitely a difference.

Q. Did you have a second X-ray?

A. Yes.

Q. Who was present for that, do you remember who was present for the second X-ray?

A. The same two people that was present at the first one. Jillian Crane and Alisa Dearmond.

Page 44

Q. And was it the same sort of experience where you were in a room with them and they took the X-ray and then they reviewed it and told you the results?

A. Yeah.

Q. Okay, what -- who told you the results of the second X-ray, Alisa Dearmond or Jillian Crane?

A. I want to say Jillian Crane and Alisa Dearmond, I'm not really sure, but she never said anything contradicting what Jillian Crane told me the findings were when she was right there with her, what the findings were.

Q. What did Jillian Crane tell you the results of the second X-ray were?

A. No sign of any fracture.

Q. And again you don't know specifically what Jillian Crane or Alisa Dearmond were thinking when they reviewed your X-rays, right?

A. No.

Q. You can only go by what they told you?

A. Exactly.

Q. So now you got a second X-ray and this one is also showing no sign of fracture, what did nurse practitioner Crane or nurse practitioner Dearmond

Page 45

tell you was going to happen next for you?

A. They had said probably gone send the X-ray film to get reviewed again by a doctor.

Q. Anything else they told you?

A. They gave me some more pain pills. And at that time at the second X-ray, the swelling had went down, you know, so, you know, they said that probably would have helped, you know, with the X-ray.

Q. Okay. They told you that with less swelling, they might be able to see more on the X-ray?

A. Yes.

Q. But, still, they weren't able to see anything on the X-ray?

A. Yeah, they didn't notice any fracture.

Q. Did they ever talk to you about what -- you said that they were going to send your X-ray to a doctor to review. Did they ever talk to you about what the doctor might have reviewed on those X-rays?

A. They, I think, they did say that the doctor didn't find no fractures either.

Q. Was that for the first X-ray or the second or both, which X-ray are you referring to?

Veritext Legal Solutions

www.veritext.com                                                888-391-3376

Page 46

A.  Well, for every single one, that's why they kept rescheduling it.

Q.  Okay.  So for each X-ray, Crane or Dearmond was telling you that they had a doctor review it and the doctor said there was no fracture either?

A.  Yep.

Q.  And you don't know which -- do you know what doctor was reviewing these X-rays?

A.  No, not at the time, at the time, at the time I didn't, but, I know who viewed it now.

Q.  Do you know what those doctors qualifications are?

A.  I mean, there are different types of doctors, different type of doctors have different type of qualifications.

Q.  I understand, I'm asking you do you know what the doctors who reviewed your films were, what their qualifications are specifically?

A.  I guess to review X-ray films, I guess.

Q.  Beyond that, do you know anything more?

A.  Say it again?

Q.  Do you know anything more about the doctor's qualifications other than that they review

Page 47

X-ray films?

A.  A general doctor or a specific doctor?

Q.  The two specific doctors who reviewed your X-rays, do you know their qualifications specifically?

A.  I guess to review X-ray films.

Q.  Do you believe it's correct for Dearmond and Crane to rely on the judgment of those doctors who reviewed the films?

A.  To a certain extent.

Q.  What do you mean by that?

A.  I feel like based off their personal observation of my hands and my continued complaints of pain and suffering and me telling them I feel like my hand is broke, that if the doctor reviewed the X-ray, after them seeing the swelling and purple discoloration, and me tell them that I feel my hand is broke, and the doctor reviewed the X-ray and he said that it came back negative for any fractures, based off of their personal observation, I feel like they probably should have put me in to see a hand specialist, who was probably more qualified to assess my injury.

Q.  So you disagree with their medical

Page 48

judgment to not send you out to a hand specialist, yes?

A.  Yes, I do disagree with their medical judgment based on my circumstances at the time.

Q.  Did you have a third X-ray?

A.  Yes.

Q.  Who did that one?

A.  Say it again?

Q.  Sorry, for the third X-ray on September 14th, 2021?

A.  Yes.

Q.  Who did that X-ray or who was present for that X-ray?

A.  Alisa Dearmond and another nurse, but I'm not sure of the other nurse's name.

Q.  It wasn't Jillian Crane?

A.  No.

Q.  Were you told the results of that X-ray?

A.  They said it came back negative for any fracture.

Q.  Who said that?

A.  Alisa Dearmond.

Q.  And again, you don't know who specifically, what Alisa Dearmond was thinking when

Page 49

she reviewed your X-ray film, correct?

A.  No, I'm not sure.

Q.  What was, what did Alisa or somebody else tell you was going to happen next after you had this third X-ray?

A.  That they were going to send it to get reviewed by a doctor, the third X-ray film.

Q.  Were you ever spoken to about what that doctor thought that third film showed?

A.  Nah, nope.

Q.  So I have that there was a bit of a jump in time, you had your third X-ray on September 4th and then I have you being seen at nurse sick call on November 6th, 2021.

Do you recall being seen at nurse sick call in early November of 2021?

A.  Say it again?

Q.  So you had the third X-ray in September, September 14th, and then I showed that you were seen at nurse sick call in November.

Do you recall being seen at nurse sick call in November?

A.  Yes.

Q.  How did you, how did you come to be seen

13 (Pages 46 - 49)

Veritext Legal Solutions

www.veritext.com                                                           888-391-3376

Page 50

at nurse sick call in November?  What did you do to be seen?

A.  Well, around, I filed multiple grievances complaining about my injury, pain I was still experiencing, and I also filed multiple sick calls seeking to get some type of pain medication to help me kind of cope with the pain that I was experiencing, and I think that's what led to me getting called to sick call again.

Q.  So you told me that the swelling had gone down, is that right, overtime some swelling had gone down?

A.  Yes.

Q.  Did it go away?

A.  Eventually it did.

Q.  How long did the swelling last?

A.  The swelling lasted for awhile, but I know by the time I had my second X-ray compared to how bad it was, the first X-ray, it had went down and it had went down, it went down a lot compared to how it was at first, it was still slight swelling, still see it, but it wasn't nothing compared to what it was at that time.

Q.  Okay, that's helpful.

Page 51

How about between the second X-ray that was on August 31 and the third X-ray that was on September 14th, so about 14 days, two weeks, the swelling improved even more between the second and the third X-ray?

A.  Yes.

Q.  By that third X-ray in September, was there any swelling?

A.  Possibly not, possibly not if it was, it probably wasn't enough to be identifiable.

Q.  Did your pain get better overtime as well?

A.  Somewhat, somewhat.

Q.  Can you describe that, what you mean by somewhat?

A.  The pain that I was experiencing by the first X-ray and the second X-ray, it wasn't the same type of pain, same type of level of pain that I was experiencing.

Q.  The -- let's rate your pain with like what nurses will ask you, rate your pain between one and ten with zero being no pain whatsoever and ten being the most excruciating pain imaginable.

What was your pain when you first saw the nurse and nurse sick call after your fight, what

Page 52

pain level were you at between zero and ten?

A.  From when I first saw the nurse to when?

Q.  Just when you first saw the nurse, let's start there, at that level.

What was the pain when you first saw the nurse just days after you were in your fight?

A.  I'm not sure, it was pretty high, pretty high on the pain scale.  Probably like an eight, maybe, an eight, between an eight and a ten.

Q.  And then, when you had your second X-ray, what was your pain at on August 31st, 2021, when you got your second X-ray?

A.  Still pretty high.

Q.  And what does that mean?

A.  High, high numbers, plus the ten still in pretty much severe pain.

Q.  How about when you had the third X-ray on September 14th of 2021?

A.  I was still in severe pain.

Q.  Can you rate it?

A.  You say what?

Q.  Can you rate it on a zero to ten scale for me?

A.  Pretty high, still pretty high.

Page 53

Q.  Can you assign a number to it?

A.  I would say pretty high, pretty high, probably between like an above mid.

Q.  So, six or seven?

A.  Probably like around, probably like around anywhere between like a seven and a ten, still.

Q.  Did the pain medication help you that you were taking?

A.  Somewhat, it kind of help, kind of numb the pain a little bit but it was not, it was still reoccurring pain.  Once the medication wear off, the pain is still there, so, it wasn't necessarily fixing the problem, kind of just helping me cope a little better with the pain that I was experiencing.

Q.  Did you subsequently see a different nurse practitioner named Michael Moldenhauer?

A.  Say that again?

Q.  Did you at some point see a different nurse practitioner named Michael Moldenhauer?

A.  Yes.

Q.  Was that on December 1, 2021?

A.  Yeah, believe so.

Q.  Do you recall that interaction?

A.  It was another routine sick call visit.

14 (Pages 50 - 53)

Page 54

Q. What did he do for you?

A. Gave me some pain pills.

Q. What else?

A. I believe, I believe he said he was going to put me in to see a doctor or something.

Q. Do you know if he did that?

A. Do I know if he did it?

Q. Right.

A. I mean, eventually I did go see a doctor a few months later so I'm pretty sure it probably did.

Q. And you saw, you saw a physician assistant named Phillip Erthall, E-R-T-H-A-L-L, is that right?

A. I'm not sure when?

Q. If that's what the medical records say, do you have any reason to doubt that, that's who you saw?

A. Probably not, I probably did, I probably did see him on a sick call possibly.

Q. Did they, I think you saw this provider was on February 8th, does that sound right?

A. When?

Q. February 8th?

A. Did I see who?

Q. This doctor, this provider at the

Page 55

orthopedic clinic, Phillip Erthall, do you recall seeing him on February 8th?

A. I believe so, I seen a few people.

Q. Do you know why that date was picked February 8th, 2022, do you know why that date was picked for your visit?

A. You breaking up, I can't hear you.

Q. Sorry, do you know you were seen on February 8th and not sooner?

A. No, I'm not really sure.

Q. Do you know if there was any availability for you to be seen sooner?

A. I'm not sure.

Q. Do you know who picked that date?

A. Huh?

Q. Do you know who picked that date as the date of your visit?

A. I'm not sure. I'm not sure off the top.

MR. HILL: We have been going a little bit over an hour, is everybody good or we need to take a break.

(Short break after which the following proceedings were had.)

Page 56

BY MR. HILL:

Q. All right, Mr. Allen, we're going to go back on the record to continue the examination, are you ready to continue?

A. Yes.

Q. I'm going to share my screen and try to show you a document.

All right Mr. Allen, if I did that correctly, you should be seeing a document on that screen for the Orthopedic Institute of Southern Illinois, do you see this?

A. Yes.

Q. And for the record, we're looking at Bates stamp Keith Allen 586 to 588 and looking specifically at page 588.

Is that your signature here Mr. Allen?

A. Yeah, it looks like it, it looks like it.

Q. Is this -- there's various questions that are in this document and with answers.

Do you recall filling this out?

A. I don't know, go down one. I don't remember filling, I don't remember filling that stuff out.

Page 57

Q. How about the family history where it says, "grandmother, having various conditions."

Do you recall filling that out?

A. I don't recall filling out any of this stuff, the doctors probably wrote that stuff, I didn't write it.

Q. The chief complaint it says, "When did symptoms begin? Date of onset 9/16/21."

Do you see that?

A. Yes.

Q. Is this your handwriting?

A. No, it's not, I didn't write any of that.

Q. Do you know why the date of symptoms beginning or date of onset as September 16th, 2021?

A. Probably misinterpreted what I said because I injured my hand on the eight, 8/16/21 so they probably just misinterpreted what I said probably just put the wrong date.

Q. There's one other document that I want to show you, we're looking at Bates 59 -- Keith Allen 594 to 596, on page 596 at the bottom, is that your signature?

A. It looks like it.

15 (Pages 54 - 57)

Page 58

Q.  Do you recall filling out this form?

A.  Filling out, what do you mean filling out, all that stuff on the form?

Q.  Putting the answer on these questions, do you recall doing that?

A.  Nah.

Q.  Under a, "Chief Complaint" here and "History of Present Illness," is this your handwriting?

A.  No, that's not my handwriting, I didn't write that, that's not my handwriting.

Q.  Again it says, "When did symptoms begin, date of onset, 9-21."

Do you see that?

A.  Yes.

Q.  You didn't write that?

A.  No, I didn't.

Q.  Again same questions earlier, do you know why that is the date that's indicated here?

A.  I think it probably is just a clerical error.  I think they probably, whoever was evaluating me or asking me these questions probably just misinterpreted what I said and put nine instead of eight.  They got the year right, they got the

Page 59

date right, they just got the wrong month.

Q.  That was my next question, they got the right hand, right?

A.  You said right hand?

Q.  Yes, that was the right body part?

A.  Yes.

Q.  And you believe that your right hand was broken, right?

A.  Yes.

Q.  So they got that right, they wrote, "broke," here, right?

A.  Yes.

Q.  And it happened at prison, right?

A.  Where?

Q.  It happened at prison?

A.  Yes.

Q.  So they got that right.

And then how did it happen and somebody wrote, "fight," they got that right as well, right?

A.  Exactly.

Q.  And so the only thing that's wrong is the date, it says nine and you said it should say August or eight, correct?

Page 60

A.  Say it again?

Q.  They wrote the date as it happening in September of 2021, but it should have been August of 2021 or eight of 2021?

A.  Yes.  Correct.

Q.  So tell me about this encounter that you had when you got sent out to see a specialist out in the community, outside of prison on February 8th, 2022, tell me about that encounter with this specialist, what happened?

A.  I was given an X-ray and I talked to, I think it was a nurse or somebody, I think it was two males and a female that I seen, I don't really know exactly what their titles were specifically, but, I had an X-ray took and I talked to the hand specialist.

Q.  So there's two males and a female there?

A.  I seen two different males and I seen a female.

Q.  And do you remember any of the names of any of the folks, whether one of the two males or the females, do you remember any names?

A.  Glen Babich, that was the orthopedic hand specialist, that was the one I did the majority of

Page 61

the talking with.

Q.  So they took an X-ray, what did they tell you about the X-ray?

A.  He said that I did have an old fracture, he say my hand was broke and it healed improperly over a nerve, and he said that the pain I'm experiencing is from part of the pain that's from where the hand broke at, where the bone broke at, he said the protective coating over the bone had been damaged.  He said a bone marrow inside of the bone has been damaged as well, that part of the bone, due to it breaking, that I had bone on bone rubbing against each other.  He said that's one of the forms that was damaged and part of the pain that I was experiencing.

And he said that it had, it ended up, you know, healing improperly, the bone, after it broke it healed improperly and it was rubbing bone on bone without the protective coating.

And he said also it healed kind of over a nerve as well.  That's got me with carpal tunnel syndrome, some type of nerve damage, that was another form of the pain that I was experiencing, that's pretty much what he was saying.

16 (Pages 58 - 61)

Page 62

Q.  Do you know where the carpal, where that nerve is for the carpal tunnel syndrome, where that's located?

A.  I'm not exactly sure, I'm not exactly sure, but I know, I believe he said since I'm right hand.

Q.  Did, other than X-ray, did you have a MRI or any other kind of film?

A.  I'm not sure, I'm not sure if I had a MRI, but, I know they conducted an X-ray.

Q.  Did either one of the people that you saw, did they prescribe you any kind of treatment?

A.  Say it again?

Q.  Sure.  Was either one of the males or the nurse, did they prescribe you any treatment, did they give you any orders for medication or other treatment?

A.  Yeah, they did prescribe some medication.

Q.  Do you know what the medication was?

A.  I can't remember exactly what it was.

Q.  Okay.

A.  It wasn't ibuprofen.

Q.  It was not ibuprofen?

A.  It wasn't ibuprofen, some other type of

Page 63

medication.

Q.  Did they talk to you about surgery?

A.  Yes.

Q.  What did they say about surgery?

A.  He said that basically due to the fracture, the nature of it and by it kind of healing incorrectly on its own, due to the lapse of time, that in order to correct the bone surgery, they would have had to, I would have had to have surgery where they probably would have had to rebreak the bone, put a pin inside of it so it can kind of heal correctly and that it may have probably would have been multiple surgeries just to even do that and they said that but it did appear that, you know, it has since healed though, incorrectly.

They were really focused on mobility and they said that since they felt like I had good mobility they, he probably at that particular moment he wouldn't advise the bone corrective surgery.

Q.  What else do you recall about what you were told on this visit on February 8th about your injury and what would happen for you next?

A.  He said basically like some of the other pain I was experiencing, some of the symptoms of the

Page 64

other pain, like the numbness, the sharp pains, the stabbing pains and all that stuff in my hand, saying, that was some form that was due to the result of the nerve damage that occurred as a result of the fracture and that he will prescribe me the pain medication to kind of help me cope with that pain and that I may need carpal tunnel surgery in order to relieve me of that pain.

Q.  Did they give you any kind of splinting or casting or anything for your hand?

A.  He didn't give me any of that stuff, the day of the visit, but, nah, he didn't give me any of that stuff.

Q.  So he took an X-ray and gave you pain medication?

A.  Say it again?

Q.  They took an X-ray and they gave you pain medication, did they do anything else for you other than taking the X-ray and giving you pain medication?

A.  Other than diagnose my injury and explaining to me everything that was going on, pretty much, that was pretty much for the most part.

Q.  So you said they did not recommend surgery

Page 65

for you, correct?

A.  Say it again?

Q.  They did not recommend surgery?

A.  He said at that particular point as far as the bone corrective surgery, he said at that particular point, due to my mobility, he wouldn't recommend it at that particular point, but he said depending on the nature of the pain that I was experiencing, we could have a follow-up to consider that as an option.

Q.  Did you go back to the prison that same day?

A.  Say it again?

Q.  Did you go back to the prison that same day after seeing this specialist?

A.  Yes.

Q.  Did you subsequently go out to a different provider, maybe a female provider named Dr. Tiffany Ward for some testing?

A.  Say it again?

Q.  Sure.  After this visit with the hand specialist, did you go out and see a different specialist, a Dr. Tiffany Ward for some testing?

A.  Yes.

17 (Pages 62 - 65)

Page 66

Q. Was that on June 17, 2022?

A. Yes.

Q. And do you know who picked that date, why June 17, 2022 was picked as the date you were sent out?

A. Not right off the bat.

Q. Do you know who scheduled that date?

A. Not right off the bat.

Q. Do you know --

A. I don't have any documents in front of me.

Q. Do you know if you could have been seen sooner by Dr. Ward for this testing?

A. Say it again?

Q. Do you know if you could have been seen sooner by Dr. Ward for this testing?

A. Do I know if I could have been seen sooner?

Q. Right.

A. I believe I probably could have.

Q. Do you know what Dr. Ward's availability was, if she had any openings?

A. Say it again?

Q. Do you know what Dr. Ward's availability was between, in June or May or April, do you know

Page 67

when her availability was, if she could have seen you sooner?

A. No.

Q. What did, what did Dr. Ward do for you on June 17th, 2022?

A. She conducted some type of, some type of study or something, some type of nerve stuff, checking my nerves or something.

Q. Did she, after she did this test or these tests, did she tell you what the result was?

A. Yes.

Q. What did she tell you?

A. She said that I got carpal tunnel, some type of nerve damage in my hand. She said I had arthritis as well and she was basically telling me what I got is some type of nerve damage.

Q. Did she tell you what it was caused by?

A. Say it again?

Q. Did she tell you what the nerve damage was caused by?

A. I don't recall exactly what she said, what it was caused by, she did say I had some.

Q. And then did you go see another specialist, in September, on September 27th, 2022

Page 68

about your hand?

A. Yeah, I believe so, I think I believe that's when I went back to the orthopedic hand specialist again for a follow-up.

Q. Was that with a different person than the people you saw during that first visit or was it one or more of the same people?

A. I'm not sure, but I do recall seeing Glen Babich again, the orthopedic hand specialist, I seen the first time, seeing him again. They may have gave me another X-ray, I'm not sure, but I remember seeing him and talking to him again.

Q. Does the name, David Mason, ring a bell to you at all?

A. Yeah, he probably -- I don't know, he probably could have been somebody else I seen that day.

Q. Your medical records show you saw David Mason on September 27, 2022 at the Orthopedic Institute, and that he diagnosed you as having carpel, right carpal tunnel syndrome.

Do you recall that?

A. Probably so, I'm not sure, probably so.

Q. Did he recommend that you wear a brace, do

Page 69

you recall somebody recommending that you wear a brace?

A. Yes.

Q. So that's what I'm talking about, the person that recommended that you wear a brace.

A. If I'm not mistaken, I believe that was Glen Babich that recommended me with the brace.

Q. Tell me about that visit, where the visit, where the provider recommended that you wear a brace, tell me about what you recall about that visit?

A. I guess these was like forms of alternative forms of treatment to kind of try out before the consideration of the need for surgery, it's like some other alternative forms of treatment that they wanted me to try out to see if they could help a little bit before they just consider, consider any surgery.

Q. Were you agreeable, did you agree to try out these other treatment before trying surgery?

A. Yes.

Q. Do you know who picked the date September 27, 2022, for you to have this follow-up with the orthopedic group, do you know who picked

18 (Pages 66 - 69)

Page 70

that date?

A. Say it again?

Q. So you saw this doctor or this provider on September 27th, 2022 at the orthopedic group, do you know who picked that date, why that date was chosen?

A. I'm not sure right off the top.

Q. Do you know if the person you saw, if they could have seen you any sooner?

A. Say it again?

Q. For the person you saw at the orthopedic group, do you know what their availability was, if they had any availability to see you sooner than they did?

A. I'm not sure.

Q. So after, after this September 27, 2022 visit, where the provider recommended a brace, and try some other treatments, you went back to the prison, correct?

A. What day you say?

Q. September 27th, you went back to the prison after that visit?

A. Yes.

Q. And did they, did they get you a brace?

Page 71

A. Say it again?

Q. Were you given a brace?

A. When?

Q. At any point and time were you given a brace after you got back from the prison?

A. Yeah, yeah, eventually, eventually I was.

Q. Were you given, did you have two different braces at one point or just the one brace the whole time?

A. The first brace I was given was soft wrist brace, it was a white brace, kind of like the equivalent, you know, it didn't have any real wrist support, it was kind of like the equivalent of kind of like having a stocking or something over your hand or something. Like a wristband, like a wristband or something, but it had, had no, had no wrist support, like basically like a wristband almost.

Q. Did it cover your hand and your wrist?

A. Yes, it went over, it went over my hand, over my wrist, up to my forearm and near my forearm a little bit.

Q. Okay. And did it velcro together or velcro on?

Page 72

A. No, it didn't velcro on at all.

Q. How did you put it on?

A. Like a slip on wrist, like a slip on hand brace, but it felt like a wristband or something.

Q. And then you got, at some point you got a different brace?

A. Yes.

Q. Tell me about the different brace that you got later?

A. The brace I got after that one was, it was a black brace and it had the elastic straps on it, it had more wrist support, and I was able to, like, adjust the tightness of it. It had several straps on it where I could, were wrapped around my wrist, gave me more wrist support, and I could adjust the tightness of the wrist support which straps the velcro straps.

Q. And you got that at some point after you had had this first one?

A. Yes.

Q. Did you have to turn the first one back in?

A. No.

Q. So you're able to keep it?

Page 73

A. Yes.

Q. Do you know what type of brace the provider at the orthopedic clinic wanted you to have?

A. It wasn't the first brace they gave me.

Q. Why do you say that?

A. It wasn't a soft wrist brace.

Q. Why do you think that?

A. Because he specifically told me that when I went back on the visit with the white soft wrist brace on, and I asked him, I say, is this the wrist brace you ordered me? He said, no that's not. I said, this wrist brace ain't got no wrist support. And he said, that's not the one he ordered for me to have in the first place.

Q. Do you know who ordered the soft white brace for you?

A. I'm not exactly sure.

Q. Do you know why you got the soft white brace as opposed to the black one initially?

A. I'm not sure.

Q. Did you have some physical therapy at the prison?

A. Yes.

19 (Pages 70 - 73)

Page 74

Q. How many visits did you have in physical therapy?

A. I'm not sure of the exact amount. But I know I had a couple of.

Q. All right, what was, did that help you or not?

A. After I had surgery it helped.

Q. I'm talking to before, trying other things before surgery, part of that was physical therapy, right?

A. No, the physical therapy, it didn't, it didn't really help, it really didn't do much for the pain that I was experiencing.

Q. Did they give you a home exercise program to do as well as in addition to the physical therapy you were doing with the physical therapist?

A. Yes, some type of like hand exercises.

Q. Did you do that?

A. Huh?

Q. Did you do that?

A. Yes.

Q. Okay. I show that in November, on November 15th, you went back to see the hand specialist at the orthopedic clinic.

Page 75

Do you recall doing that?

A. You say November 15th?

Q. Yes, sir?

A. I am not sure of the exact date right off the top, but I do remember going back shortly before surgery, I'm not sure of the exact date.

Q. This would have been maybe when you talked to the provider about not having the right brace?

A. I'm not, I don't know the exact date, I don't have the documentation, but I don't know the exact date.

Q. Tell me -- regardless of the day, tell me about when you went back before the surgery, what did you talk to the provider about when you went back before the surgery?

A. When I went back, I told them like, the alternative forms of treatment that they were prescribing me, it wasn't really doing nothing. It wasn't really doing nothing, relieve me of the pain that I was experiencing, and that I wanted to just consider having the surgery just to relieve me of the pain because that stuff wasn't helping.

Q. And did the person you were seeing, the provider, did they agree that you should have

Page 76

surgery?

A. Yeah, he said that he was going to put me in to have the surgery.

Q. Your medical records show that that visit was on November 15th, so let's just assume that that's the correct date.

Do you know if, do you know what the provider's availability was during that time, whether he or she could have seen you sooner?

A. I'm not sure.

Q. And you don't know why that date was picked versus other dates, is that fair?

A. I don't even, I'm not even for certain if I even went out to the clinic that particular day that you're referring to.

Q. I show that you had -- well, do you know what date you had surgery?

A. Yeah, March 3rd, 2023.

Q. Tell me about that, that experience of surgery on March 3, walk me through what happened?

A. The day I had the surgery?

Q. Yes, sir.

A. I had, they took some, I think, I think they shaved the hair off my arms or something and

Page 77

they was doing some little tests to examine me and stuff like that running little tests on me, the nurses and something. Ran tests on me, examining me and kind of getting me ready to have surgery.

Q. And then they gave you some sort of anesthesia and then you were put to sleep, correct?

A. Yes.

Q. And then you woke up, woke up sometime later in the recovery room?

A. Yes.

Q. And then did you leave the surgery center that same day?

A. I believe so, yeah.

Q. And you went, you went back to, you went back to Menard, correct?

A. Yes.

Q. And then once at Menard, did they keep you in the infirmary for a period of time to monitor you after your surgery?

A. Yes.

Q. Do you know who picked your surgery date of March 3, 2023?

A. I'm not sure, I'm not sure who actually did the surgery.

20 (Pages 74 - 77)

Page 78

Q. Do you know, do you know if the surgeon could have done it any sooner, if the surgeon had availability to do it any sooner than he did?

A. I'm not sure, but I know, when I went back, when I went back, after my 9/27/22 ortho visit, I did go back to the clinic to the orthopedic clinic again, it could have been possibly have been in December, I'm not sure if that's the exact date, but I did go back, and I was supposed to have been going back to surgery the time I went back right before surgery and, they said that I was supposed to be going back to have surgery, that visit, the visit I had right before surgery, supposed to have surgery that visit, but, for some reason it was, it was scheduled as a follow-up appointment or something instead of it being the surgery, so they wasn't prepared to give me surgery on that particular day.

Q. Okay.

A. And then the next time I went to the clinic after that, I actually did have the surgery.

Q. And do you know who was responsible for scheduling it for a follow-up visit as opposed to a surgical visit?

A. I'm not sure, I'm not sure if it was the

Page 79

Menard staff or the orthopedic hand staff or was it both, I'm not really sure.

Q. Okay. As far as that March surgery date, March 3, 2023, you don't know if that surgery could have been performed by the surgeon any sooner than it was before?

A. I'm not sure.

Q. After you had your surgery, were you in the infirmary for a few days?

A. Yes.

Q. And then did you do some physical therapy at the prison?

A. Yes.

Q. Had you gone back to see that, to see the orthopedic group, did you go back on August 3, 2023 to go back there and follow-up?

A. I went, I did go back August 3rd to the orthopedic hand specialist, but, I had another visit prior, like before that visit, I had another visit at the orthopedic hand specialist where they took my stitches out.

Q. Okay. I see that now.

So was that March 2023 sound right?

A. Yeah.

Page 80

Q. And what else did they do besides taking your stitches out?

A. She gave me some vaseline and she kind of like took the stitches out and told me to use the vaseline to kind of massage the area where the scar was at, where they cut my hand over to do the surgery, so that, don't get it wet and just gave me a bunch of things to do to try to treat it so it don't get infected or reinjure it or because my hand wasn't fully healed, yet, it was still kind of an open wound, fresh wound at the time.

Q. Do you know -- so then you follow-up a second time after your surgery in August, does that sound right?

A. Say it again?

Q. You had a second follow-up after surgery with them in August?

A. Yeah.

Q. Okay. Do you know if you could have been seen any sooner than that date if they had availability, if the clinic had availability to see you sooner?

A. I'm not sure, but I know the orthopedic hand specialist, he said that he had scheduled me

Page 81

for a six-week follow-up, post surgery follow-up and he said he scheduled it for six weeks and I didn't see him again until about five months later on August 3rd of 2023.

And he told me that when I went to that August 3rd, 2023 visit, he told me that he had scheduled me for, I believe a post operation followup six weeks out. I don't know if it was six weeks from surgery or six weeks from getting the stitches removed, but I didn't see him again until about five months, five months later after I got the stitches removed.

Q. Do you know why you weren't seen six weeks later?

A. I'm not really sure.

Q. After you saw, after you saw the provider on August 3 for your second follow-up, what was supposed to be a six-week follow-up, did they schedule you for anymore followups?

A. I'm not sure, but I don't know if I, I don't even know if I ever went back after that follow-up, I don't even know if I, I don't remember going back to the orthopedic hand specialist after 8/3/2023.

21 (Pages 78 - 81)

Page 82

Q. You don't recall any other outside visits with any doctors for your right hand after August 3, 2023?

A. No, I don't recall.

Q. I'm going to show you my screen again, sir?

All right, sir, showing you what has been marked as Keith Allen 49, it's down here at the bottom, do you see that?

A. Yes.

Q. And is this your name, Keith Allen, and your signature on this document?

A. Yes.

Q. And it's dated September 5, 2023, do you see that?

A. Yes.

Q. This is a, "Medical Services Refusal," do you see this?

A. Yes.

Q. Do you recall signing this document, refusing medical services?

A. Yes.

Q. Why did you, what was your understanding about what you were refusing and why you were

Page 83

refusing it?

A. At the time I had a medical, at the time I had a medical hold on me because of my hand injury or whatever the case maybe, and I was trying, I was about ready to put in for a transfer and they was telling me that I can't get transferred because I got a medical hold on me, and they said in order to take the medical hold off, I have to, I have to basically sign that medical services refusal form letting them, saying that I'm all right, and I don't feel like I need anymore treatment, and, and that was basically, that was the way to give me the power to, you know, not have to continue holding so they can take the medical hold off, without the medical hold I wouldn't be able to transfer, I got to sign that form saying that I don't really need to go back and forth so they can take the medical hold off.

Q. I just have a few more specific questions about my clients and then I'll pass you to one of the other attorneys.

Other than the nurses or the nurse practitioners or the other healthcare providers at the prison, have you had any conversations with any employees of Wexford?

Page 84

A. As far as what?

Q. About anything, and I don't want, I'm not interested like the nurse, the conversations that you had with nurses at the prison, I'm not interested in conversations that you had with Dearmond or Crane or Moldenhauer or any of the other doctors or nurses at the prison, I'm talking about other people that you might have spoken with that were employed by Wexford, have you ever had any conversations with other people employed by Wexford other than those folks?

A. Other than the defendants on my case?

Q. The defendants and the other healthcare staff at the prison?

A. So, you're asking me did I have any conversations with, outside of the people that was the defendants on my case?

Q. Yes.

A. Other people at the prison?

Q. Other medical people at the prison, yes.

A. Other medical people?

Q. Right.

A. Outside of the people, my outside visits like the orthopedic hand specialist?

Page 85

Q. I'm not talking about those because those people aren't Wexford employees, I'm talking about people you believe were Wexford employees that we haven't sort of put aside, anyone else that you talked to that you believe were Wexford employees?

A. I'm not sure, I'm not sure.

Q. Have you ever reviewed any Wexford policies, manuals, guidelines, protocols, practices, anything like that?

A. Yes, I have.

Q. Okay. What you have reviewed?

A. Huh?

Q. What have you reviewed?

A. The Wexford, the Wexford Health Sources Provider Handbook from 2012.

Q. Okay.

A. I think I attached that as an exhibit to the complaint.

Q. Anything else?

A. Anything else as far as what?

Q. Any -- let's agree that that's a Wexford document, you understand that to be a Wexford document, correct?

A. Yes.

22 (Pages 82 - 85)

Veritext Legal Solutions

www.veritext.com                888-391-3376

Page 86

Q. Anything else like that you believe is a Wexford document that you have reviewed?

A. I'm not sure, I reviewed the IDOC and Wexford contract. I reviewed that document and that got, like between Wexford and IDOC, the contract terms and agreement as well. I believe it was from 2011, right before that Wexford Provider Handbook that got published.

Q. So now we have identified two things, the provider handbook from 2012, and the contract that you believe was from 2011, which Wexford was a party to.

Is there anything else, any other Wexford documents that you have reviewed?

A. I don't recall.

Q. You mentioned in your complaint that there wasn't a full-time doctor at Menard, do you recall that?

A. Yes.

Q. Why do you think there wasn't a full-time doctor at Menard?

A. Because I never seen one.

Q. Do you know what Wexford was doing, if anything, about getting, trying to get a full-time

Page 87

doctor at Menard?

A. Do I know if -- say it again?

Q. Do you know what Wexford was doing if they were doing anything at all doing, to try to get a full-time doctor at Menard?

A. I'm not sure.

Q. You said in your complaint, and I'm paraphrasing, that there was some false information in your medical records.

Do you recall saying something like that?

A. Yes.

Q. Okay. What specifically was false in your medical records?

A. The diagnosis, the diagnosis of my X-ray reviews.

Q. Anything else?

A. Some medical records, some medical records, like I seen some nursing sick call records where they didn't identify the swelling, I mean didn't identify the purple discoloration and then the sick call after that, they did identify, which was like three days later.

Also Jillian Crane, specifically, one

Page 88

of her laboratory reports, it was Menard Correctional laboratory report X-ray film of my 8/20/21 X-ray film that she conducted, that she reviewed that had her findings on there where she stated that my X-ray film reviewed was normal and stable and she signed her name on there and crossed out the abbreviation of medical doctor and put nurse practitioner and that was her review finding of my 8/201/21 X-ray film review, and her findings stated, normal and stable.

And I have, come to find out that that document, it's like, I don't know, but that's another form of falsely, false information being provided on a medical document by Jillian Crane.

Q. What part was false?

A. Her findings where she signed on there stating that the X-ray film reviews of my 8/20/21 X-ray films came back normal and stable, that was, that was false.

Q. Anything else that you can think of, specifically, in your medical records, that's false?

A. I'm not sure, I'm not sure right off the top. I don't have any of my documents in front of me.

Page 89

Q. In your complaint you allege that Wexford directed staff that when conditions are pre-existing or chronic, to simply monitor and observe them instead of providing treatment.

What evidence do you have of that?

A. Outside of the Wexford Handbook and my personal experiences of the treatment that I was provided, dealing with their staff, those are the main things.

Q. You alleged that Wexford was directing staff to maintain doubt or suspicion of inmates' complaints and missed diagnose their injuries to avoid having to offer treatment?

What evidence do you have of that?

A. Say it again?

Q. Sure. In your complaint you allege that Wexford directed staff to maintain doubt or suspicion of inmates' complaints and to missed diagnose their injuries to avoid having to offer treatment.

My question is, what evidence do you have of that?

A. Part of the evidence that I have to support that is that Wexford Provider Handbook and

23 (Pages 86 - 89)

Page 90

also my personal experience dealing with the employees seems to confirm that, as well as even reading the IDOC Contract Agreement that they signed with IDOC prior to producing that Wexford Provider Handbook from 2012.

Q. You allege in your complaint that Wexford gives staff full discretion to disregard inmates' needs if it's convenient for medical and correctional staff.

What evidence do you have that that's occurring?

A. Say that again?

Q. In your complaint you allege that Wexford gives staff full discretion to disregard inmates' needs if it is convenient for medical and correctional staff.

What evidence do you have to support that allegation?

A. That Wexford Provider Handbook mentioned that in there as well as my personal experience from encountering their employees and like how they handled me and what they did in my situation in my case confirms that.

Even with Angela Crain, you know,

Page 91

diagnosing the X-ray film that I'm telling you about where she said that X-ray film reviews came back normal and stable, when that was clearly not true, but based off of her assessment of that, that prevented me from, you know, being able to get timely care from the orthopedic hand specialist.

Q. Okay.

A. If she would have properly diagnosed that, I probably would have had to get faster care and probably had the surgery where my hand would never healed improperly at all, probably could have caught it right after I broke it and had the surgery to repair it.

Q. Aside from the provider handbook, which you've look at, and the contract which you've looked at, have you seen any written communications from Wexford to any of its medical staff?

A. Say that again?

Q. Aside from the provider handbook, which you looked at, and the contract, have you seen any written communication between Wexford and the staff at Menard?

A. Yes.

Q. What have you seen, written

Page 92

communications?

A. There are correspondences of the X-ray film reviews.

Q. I'm not talking about your medical records, I'm talking about like a memo or an email or some other written communication outside of your medical records, where Wexford was communicating with its medical staff?

A. Where Wexford was communicating with who?

Q. With the medical staff at the prison?

A. With their own employees?

Q. Yes.

A. Or just off any medical staff at Menard?

Q. I would only be interested in their employees but where Wexford would be communicating with its employees, telling them what to do, what not to do, have you seen any written communications like that?

A. No, I'm not really sure, I don't have any, I don't have my documents in front of me right now.

Q. Okay.

A. And then I haven't got all my discovery requests to verify that, whether it exist or not exist.

Page 93

Q. Do you believe that generic drugs are less effective than brand medication?

A. Yes, I do.

Q. Why do you think that?

A. Because of the affects.

Q. Any other reason, other than your own experience?

A. Pretty much, pretty much.

Q. Do you have any evidence or what evidence do you have that Wexford encourages staff to provide ineffective courses of treatment?

A. Basically that Wexford Provider Handbook for one, and also it was confirmed through the ineffective course of treatment that their employees prescribed me when I injured my hand.

Q. What evidence do you have that Wexford instructs medical staff to give less attention to propose corrective treatment that may only give some relief and give more weight to proposals if it will make -- not quite sure where you're getting at here, let me try again.

Well, what evidence do you have that Wexford told medical staff that they do not have an obligation to provide treatment simply because an

24 (Pages 90 - 93)

Page 94

inmate requested it?

A. They said that specifically in that Wexford Handbook.

Q. What evidence do you have that Wexford prolonged and delayed access to care to save money?

A. Another thing I want to add with that last question, as far as the evidence I have to support the fact that they -- say, the last question again?

Q. The one before, it was telling staff that they don't have an obligation to provide treatment simply because an inmate request it?

A. The Wexford Handbook stated that but it also was confirmed and the fact that I requested to see an outside, I requested a second opinion from an outside clinic or hospital or medical staff, I requested a second opinion, X-ray film, you know, after the X-ray film findings came back negative and I also, once I requested those things, those things were denied.

Q. Okay.

A. I didn't get those in a timely fashion.

Q. Understood.

A. That's what led to the worsening of my injury and the prolonging of my pain.

Page 95

Q. What evidence do you have that Wexford prolongs and delays access to care to save money?

A. Say that again?

Q. What evidence do you have that Wexford prolongs and delays access to care to save money?

A. My experience with Wexford employees, exactly what they did to me.

Q. Anything else?

A. Also, it's things in that Wexford Handbook that point out to that as being instructive as well.

Q. Okay.

A. That's exactly what happened to me, I requested second opinions, I requested second opinion X-rays and it was, it was delayed so long that my injury for a broken hand had healed incorrectly on its own.

MR. HILL: All right, tell you what, I'm going to let one of the other attorneys ask you questions while I review my notes to see if I have anything else, but I don't want to waste my time or colleagues' time so I'll go ahead and pass the witness and let someone else ask you questions.

Thank you for your time this morning, I may have a few after I look at my notes?

Page 96

THE WITNESS: All right.

MR. HILL: Thank you.

EXAMINATION

BY

MS. RHOADES:

Q. Mr. Allen, my name is Margaret Rhoades I represent one of the radiologists, Dr. Yousuf.

A. I can't hear you.

Q. I'm so sorry, can you hear me now?

A. Yes.

Q. Okay. I'll just try to keep my voice up sorry about that.

So my name is Margaret Rhoades, I represent Dr. Yousuf, one of the radiologists who looked at your X-rays.

My first question to you is, have you ever spoken to Dr. Yousuf?

A. Which, what radiologist did you say you represent?

Q. Dr. Yousuf.

A. Okay, okay, now what was your question again?

Q. Have you ever spoken to him?

A. Not in person, no.

Page 97

Q. Okay. Have you spoken to him in any other capacity?

A. No.

Q. Okay. Do you have any knowledge about his involvement in your care related to your hand?

A. Say that again?

Q. Sure. So, in terms of how Dr. Yousuf was involved in the care that you received related to your right hand after your injury, do you know the extent of his involvement?

A. I can't, I can't really make out what you're saying, could you say that one more time, I can barely make out what you're saying.

Q. It might be my, mic. Let me try to rephrase it and keep my voice up.

Do you have any knowledge about how Dr. Yousuf was involved in the care and treatment of that right hand?

A. Do I have any knowledge of how he was involved in my care and treatment of the right hand?

Q. Yes.

A. Yeah, from my understanding he reviewed X-ray films and he made findings.

Q. Did he ever give you any sort of physical

25 (Pages 94 - 97)

Page 98

examination?

A. No.

Q. Do you know what information, if any, he had about what your complaints were related to that left hand or that right hand?

A. I'm assuming the X-ray film that was sent to him for him to review.

Q. So you were already asked quite a bit about the care you received at the Orthopedic Institute, were you ever told where that old fracture was located on your hand?

A. I believe, if I can recall correctly, it was in the right hand towards the base of the right hand.

Q. When you say, base, are you talking about the base of the fingers or closer to the wrist?

A. I would say like on the right-hand side of my right hand.

Q. So towards?

A. Maybe somewhere around there, like on the right-hand side of my right hand between like my, between like my wrist and my fingers somewhere in between there.

Q. Okay. So somewhere between the base of

Page 99

your pinky finger and your wrist, that's what you were told?

A. Yes, on my right hand on the right side of my right hand.

Q. Mr. Allen, had you ever injured that hand before?

A. No, I never broken my right hand before.

Q. Let me narrow that just a little bit, when I say, injured, I mean in terms of the, in terms of your life, have you ever suffered any injury to that hand, could it have been just some bruising, could have smacked it into a door, just any sort of injury?

A. I sustained a pinky injury probably like sometime after I broke the hand.

Q. Okay. Do you remember how long after you broke the hand did you sustain --

A. Probably like a couple of years after I broke it, couple of years after I broke it, I sustained a pinky injury.

Q. Would it have been at some point after 2022?

A. Probably so, I believe so, yes.

Q. Okay.

Page 100

A. It was after 2022.

Q. You talked a little bit about your carpal tunnel diagnosis and then procedure, has any medical provider, so did the doctor, who diagnosed you and did the surgery, did he ever tell you that he believed the fracture caused your carpal tunnel syndrome?

A. I think, I think he probably did say it was the carpal tunnel was a result of the fracture.

Q. Okay. You remember him telling you that?

A. I think, yeah, I think he did say something of that nature that that carpal tunnel was as a result of the fracture, I think he did, if I'm not mistaken, I think he did say something like that.

Q. And I understand --

THE WITNESS: Excuse me one second, I really got to use the bathroom, right, and when y'all had the first break, I tried to get the CO to let me use the restroom, and he said he couldn't do it at the time until they resume movement, and I really have to use the restroom.

I'm going to see if he's able to do it real quick, I'll be right back.

Page 101

BY MS. RHOADES:

Q. Okay. Mr. Allen, I have one last question?

A. Okay, go ahead.

Q. We talked about the fact that you have been told by your doctor that at this stage you would need to undergo a procedure where they would have to rebreak the bone in order to have it healed correctly going forward, but, did that doctor ever tell you if you would have had surgery at the time of the injury or shortly thereafter you would have had a different outcome, it would have been better?

A. I'm not sure, I'm not sure?

MS. RHOADES: Okay, those are all my questions, go ahead and use the bathroom.

(Short break after which the following proceedings were had.)

EXAMINATION

BY

MR. STILLMAN:

Q. Okay, Mr. Allen, my name is Zachary Stillman, I'm counsel for Dr. Nicholas Florence, have you ever heard of Dr. Florence Mr. Allen?

A. Yeah, what you say, I can't hear you?

26 (Pages 98 - 101)

Page 102

Q. Are you able to hear me now?

A. Yeah.

Q. My name is Zachary Stillman, I'm counsel for Dr. Nicholas Florence in this case, have you ever heard of Dr. Florence?

Did you not hear me just then?

A. I can't, I can't really hear what you're saying, what did you say?

Q. Mr. Allen, can you hear me now?

A. Yeah, it's better.

Q. Okay. As I said, my name is Zachary Stillman, I'm counsel for Dr. Nicholas Florence in this case, have you heard of Dr. Florence?

A. Yes.

Q. And how do you know Dr. Florence name?

A. He reviewed my 8/20/21 X-ray film reviews that were sent to him by Menard medical staff.

Q. And the 8/21 X-rays that would have been your first or your second X-ray, do you remember?

A. Nicholas Florence reviewed the first one, the first X-ray film.

Q. So I'm asking, after your injury you went and got X-rays the first time you went to nursing and that was --

Page 103

A. I can't really, I can't hear you, what you say?

Q. What I'm asking you is that you went and got X-rays the day after your injury initially, correct?

A. No, I didn't.

Q. When you saw the nurse on 8/20 --

A. You said, did I have an X-ray the day after I injured, I sustained my injury, is that what you're asking me?

Q. Yes.

A. No, I did not have an X-ray the day after I sustained my injury. I sustained my injury on 8/16/21, I had my first X-ray on 8/20/21.

Q. Okay. On the day after your injury on 8/17, you did see a nurse though, correct?

A. Yeah, I did see a nurse on 8/17/2021 in sick call.

Q. And it wasn't until the August 20th visit with Crane and --

A. And Alisa Dearmond.

Q. Yes, that you received an X-ray that day, correct?

A. On 8/20/2021, yes.

Page 104

Q. And was there another X-ray on 8/20/21?

A. Yes, I had two more X-rays after that.

Q. Just to confirm, you've never attended any kind of radiology training, right?

A. You say what?

Q. You've never done any kind of radiology training?

A. No.

Q. Do you know what radiology is?

A. I'm not sure.

Q. Have you ever been trained to read X-rays?

A. No.

Q. Have you ever taken a course on interpreting hand radiographs or X-rays?

A. No.

Q. Have you ever diagnosed any fractures from any X-ray imaging on another person?

A. No.

Q. Do you have any knowledge of the criteria that radiologist would use to determine whether a fracture is determined in an X-ray imaging study?

A. No.

Q. Do you know the differences between an acute fracture and an old fracture on radiographic

Page 105

imaging?

A. No.

Q. So it's your belief in this case that -- strike that.

You mentioned before that it was an August 21st X-ray that was interpreted by Dr. Florence, are you sure it wasn't an August 20th X-ray?

A. I said, I said it was August 20th X-ray, I never said I had an X-ray on August 2021, August 21st, 2021.

Q. I just wanted to clarify.

So your belief --

A. I had an X-ray on 8/20/21, I had an X-ray conducted on 8/31/2021 and I had another one September 14th, 2021.

Q. Okay, understood.

So your belief that in your case that the August 20th, 2021 X-ray, which Dr. Florence interpreted, showed a fracture just as your personal belief, right?

A. Say that again?

Q. It's your belief in this case, you're alleging that the X-ray from August 20th, 2021,

27 (Pages 102 - 105)

Page 106

that was interpreted, as you said by Dr. Florence, it did indeed show you had a fracture you claim, right?

A. Say that last part again, you're breaking up, the last part.

Q. You believe that the X-ray from August 20th, 2021 showed that you had a fracture, correct?

A. Yes.

Q. And where does that belief come from?

A. The fact that my hand was broken on that day.

Q. Who told you that your hand was broken on that day?

A. My hand at the date, at the time that he took that X-ray, I was under the impression that my hand was broke, my hand was broken, it felt broken and I believed that the X-ray films that was conducted on 8/20/2021 reflected a fracture despite Nicholas Florence's X-ray film review stating that it didn't show any fractures.

Q. But you just said before that you don't have any formal training in interpreting X-ray studies, correct?

A. Yeah, but common sense, any common sense

Page 107

is common sense, though.

Q. Is it your belief that most of medicine is common sense?

A. Say it again?

Q. Is it your belief that most of the practice of medicine is common sense?

A. No, it's definitely not common sense but if I broke my hand on 8/16/2021 and I had an X-ray 8/20/2021, I'm pretty sure that the X-ray film review would have showed that I had a fracture and not that, as Nicholas Florence state, that I didn't have a fracture.

Q. Has any physician told you for certain that you broke your hand during the August 16th fight?

A. No.

Q. That's your belief, correct?

A. Yes.

Q. And no physician has ever -- strike that.
Do you know if any physician has ever reviewed that film that Dr. Florence reviewed from the X-ray films from August 20th?

A. Say it again?

Q. Do you know if any other physician has

Page 108

ever interpreted the X-rays from August 20th?

A. I'm not sure.

Q. To the best of your knowledge, has any physician ever told you that there was a fracture clearly visible on the August 20th X-rays?

A. No, I'm not sure, ain't nobody ever told me that yet, but I'm looking to figure that out.

Q. And has any doctor ever told you that Dr. Florence misread any of your X-rays from August 20th?

A. Nobody has ever told me that, no.

Q. And no one has ever told you that Dr. Florence intentionally misrepresented any of the findings from that August 20th, X-ray, correct?

A. No.

Q. Do you believe that Dr. Florence intentionally misrepresented any of the findings of that X-ray?

A. Yes, I do.

Q. Do you understand the specifics of Dr. Florence's employment and position at the time?

A. At the time that he reviewed the X-ray film?

Q. Yes.

Page 109

A. I didn't know exactly who he worked for at that particular time, but, the X-ray film review said something about One Radiology, as if he was employed by One Radiology.

Q. And do you think that -- strike that.
Is that One Radiology or Warren Radiology that you said?

A. The document I believe it said One Radiology, as if that was the name of a company that he was representing or something.

Q. Okay.
Would you have any reason to believe that any outside company interpreting X-rays or Menard as an institution would have a reason to misrepresent any of the findings on an interpreted X-ray?

A. Say that again?

Q. Do you know of any reason why any outside company interpreting X-rays for the nurses at Menard would be intentionally misinterpreting the results of an X-ray?

A. Do I, do I know of them intentionally misinterpreting them, is that what you said?

Q. Do you know of any reason why they would?

28 (Pages 106 - 109)

Page 110

A. Nah, I don't know, I don't know why. The only thing that I can think of is that maybe if they was -- I look at it like this, this how I look at it.

Nicholas Florence miss diagnosed my 8/20/21 X-ray films, and he got those X-ray films from a Wexford employee, Jillian Crane ordered that review of that X-ray film, she is an employee for Wexford, and due to Wexford's Handbook, they have a lot of unconstitutional policies, one of them in particular states that no diagnosis equals no treatment, they specifically stated there in their Wexford Provider Handbook from 2012, and by her being an employee there, I believe that that was the motivating cause of her not only her missed diagnosing my X-ray film with her reviews stating that my X-ray film views of 8/20, same one Nicholas Florence reviewed, stating that the results were normal and stable.

And when she conducted my X-ray film in person, she mentioned the word, she mentioned the word, "remarkable," saying that the X-ray films was remarkable that it didn't have no fractures despite the severe swelling that my hand, that I had, she

Page 111

used that term, and then Nicholas Florence's X-ray finding review, he used the same term in his findings stating that the impressions of my right hand, X-ray film that he reviewed was unremarkable.

So, I don't think it's a coincidence that they're both throwing around that term that my X-ray film reviews were unremarkable, I don't think that's a coincidence at all.

And if an outside doctor could take one X-ray film six months after I conducted an X-ray with him, six months after I sustained my injury and he identified a fracture, I'm pretty sure that Nicholas Florence X-ray, film that he conducted approximately four days after I sustained my injury, his findings would not have showed that my X-ray film was unremarkable and that it showed no fracture, I find that highly unlikely.

But at this particular time his X-ray films have not been reviewed by an expert to determine whether he actually missed diagnosed my 8/20 X-ray film from another expert.

Q. Have you reviewed many X-ray interpretation studies?

A. Have I received any of them that was

Page 112

ordered?

Q. No, have you reviewed many studies of your X-rays and interpretations from other doctors, other X-rays?

A. Say that again?

Q. How many times have you gotten X-rays, Mr. Allen, in your life?

A. In my life?

Q. Yes.

A. I'm not sure.

Q. Before August 20th, had you gotten a X-ray before?

A. On my hand?

Q. Anywhere.

A. I'm not sure, I'm not sure.

Q. You don't remember ever having another X-ray done on any part of your body, even like the dentist?

A. Not on my hand.

Q. But I'm not asking you about your hand, I'm asking any, actually any part of your body?

A. I probably have. I probably have.

Q. And have you reviewed the interpretations of those X-rays by other physicians, radiologists?

Page 113

A. Have I reviewed them, no.

Q. So you wouldn't know a term like, "remarkable or unremarkable" was a standard used by radiologists or physicians for any film studies, right?

A. Say that again?

Q. Would you have any knowledge of whether or not the term, remarkable, that you referenced before, was like a common occurrence in these types of interpretations?

A. I'm not sure.

Q. If I told you that it was, would you still think it was a remarkable coincidence that they both used that term in their descriptions of the X-rays?

A. Say that again?

Q. Never mind, strike it.

So you never met Dr. Florence in person much like Dr. Yousuf, right?

A. No, I never met Dr. Yousuf in person.

Q. Same with Dr. Yousef, you never met Dr. Florence in person, right?

A. No, I haven't.

Q. And you've never spoken to him on the phone and in person.

29 (Pages 110 - 113)

Page 114

A.  Not that I recall, no.

Q.  And you've never -- have you ever written directly to him?

A.  Written what?

Q.  Have you ever communicated with him in any way?

A.  Not that I recall.

Q.  And he never did an actual examination of your hand, right?

A.  Not in person, no.

Q.  Didn't do the actual X-ray, correct?

A.  Say it again?

Q.  He didn't do the actual X-ray study that you interpreted, he wasn't there taking the images, right?

A.  From my understanding he just reviewed the X-ray film that was sent to him by Menard nursing staff, Jillian Crane.

Q.  So my question is, Dr. Florence did not personally take the X-ray, correct?

A.  No.

Q.  And you have no evidence that Dr. Florence would have ever been aware of your continued complaint after August 20th, 2021, right?

Page 115

A.  Say it again?

Q.  You have no evidence that Dr. Florence was aware or had any reason to be aware of any continued pain complaints with your hand injury after August 20th, 2021, correct?

A.  Say that one more time, I can't really hear the last part that you said.

Q.  Okay.  Do you have any evidence that Dr. Florence was aware of your continued pain complaints in your hand injury after August 20th, 2021?

A.  I'm not sure.

Q.  Have you seen the X-ray that Dr. Florence interpreted?

A.  Yes, I did, the ones, I seen the ones you sent me.

Q.  And on your review of those X-rays, were you able to identify any fractures?

A.  Say it again?

Q.  When you looked at those X-rays, did you see any fractures?

A.  I'm not sure, but, I did notice some things about the X-ray that did seem kind of questionable.

Q.  And what would that be?

Page 116

A.  Just when I reviewed the X-ray films from 8/20/2021, I did notice like some, some indentions or some things that didn't look, didn't look normal on the X-ray film review of the one conducted on my right hand.

Q.  Now, when you say, indentions, you mean like from the scan or like something, finding on your body or something that the X-ray wasn't done right?

A.  Nah, it was just like when I looked at the X-ray film reviews, like when they showed the bone structure and stuff like that, I did notice on the X-ray that on the right-hand side of my X-ray film between like my pinky finger and my wrist on the right side toward like the base side of my hand, I did notice, did look like something was unusual in the bone structure of the X-ray film as if it was impacted or something like that.

Q.  And have you reviewed any other hand X-rays generally?

A.  No, I haven't.

Q.  So would you have any knowledge of what a normal bone structure would look like an uninjured bone structure?

Page 117

A.  I think I have a general idea, but I'm not an expert in examining X-ray films.

Q.  So any, any belief you have that the bone structure on the right side of your right hand looked impacted is just your, your personal conjecture?

A.  Yeah.

Q.  And you don't have any reason to dispute, I know -- well, strike that.

I know you dispute the actual findings of the X-ray interpretation by Dr. Florence, but you don't have any reason to dispute that his interpretation did indicate that there were no fractures, right?

A.  Say it again?

Q.  I know that you dispute Dr. Florence's actual findings that there were no fractures, right?

A.  Yes.

Q.  But do you have any reason to believe that Dr. Florence's interpretation did not note that there were any fractures or there were not any fractures, sorry?

A.  Can you say that again?

Q.  Sir, you're not disputing with what Dr.

30 (Pages 114 - 117)

Veritext Legal Solutions

www.veritext.com                                                          888-391-3376

Page 118

Florence X-rays said, X-ray interpretations said, right? You're disputing the contents of the case?

A. Yes, I am disputing what Nicholas Florence X-ray film said, he stated that no fractures were shown and I believe that it probably did reflect a fracture.

Q. So you answered my question right there, what I was asking is, you're not disputing that Dr. Florence's report said there were no fractures, you're just disputing the veracity of whether that was true or not, right?

A. Exactly.

Q. And doctor, Dr. Babitch, is it Babitch or Babitch?

A. Orthopedic hand specialist, right?

Q. Yes.

A. Okay.

Q. You know who I'm referring to when I say Dr. Babitch?

A. Yes.

Q. So he, he identified you used some language from earlier that you had an old fracture in your hand, correct?

A. Yes.

Page 119

Q. He didn't identify any present fractures at the time, correct?

A. No.

Q. And he didn't give you any, you know, specific timing or dating of when that fracture would have been from, correct?

A. No.

Q. He didn't tell you that, oh, this is an old fracture, it's probably from August 2021, right?

A. He didn't specifically say that, no.

Q. And it would have been at the February 8th, 2022 appointment that he said that you might have had an old fracture in your hand, correct?

A. Say it again?

Q. Would it be fair -- would you have any reason to dispute that it was at the February 8th, 2022 appointment with Dr. Babitch that he stated that it could have been an old fracture?

A. He stated that there was an old fracture on that date.

Q. Did Dr. Babitch ever tell you that if you had had your injury identified sooner and had surgery sooner, it would have changed your outcome?

Page 120

A. He didn't necessarily say that, no.

Q. Did any physician ever tell you that?

A. I don't recall ever asking that, no.

Q. Do you know of any written medical records that you have that state that any earlier intervention would have prevented any of the later issues with your hand?

A. Say that again?

Q. Do you have any written medical record that you can point to that show that any physician ever said, earlier intervention or identification of your injuries would have prevented later issues?

A. Say that one more time?

Q. Do you have any written medical records that you can point to that show any physician stating that earlier identification or intervention of any hand issues would have prevented the later injuries or treatment required?

A. Well, the orthopedic hand specialist did say that I did have the old fracture and about time I came and seen him at the visit six months later from the date I sustained the injury on 8/16/2021 and my visit occurred with him on February 8th, 2022, that was a six-month period

Page 121

had lapsed from the day I sustained the injury and he said that I had an old fracture and that it had since healed improperly due to the lapse of time.

So, I'm assuming if Nicholas Florence would have properly diagnosed my hand injury on 8/20/2021, and would have stated that it was fractured, I could have got sent to the hand specialist probably that day and I could have probably had the corrective surgery to repair the broken bone to the point where it never would have healed improperly because it would have got a hold to it at that time.

Q. And what drives your belief that it would have been that very day that you would have been sent to the hand specialist?

A. Well, according to Menard's Administrative Directives and Wexford policies, they say that emergency care should be available 24 hours a day, so, within 24 hours, according to their own medical policies, had that would have occurred, I should have been able to possibly been seen for an outside doctor hand specialist, if nothing else, at least for examination.

Q. So part of your allegations in this case

31 (Pages 118 - 121)

Page 122

are that there were records falsified, we kind of discussed that earlier, right?

A. Say that again?

Q. Part of what we, you discussed earlier with Mr. Hill, is that some of your allegations are that your records were falsified, right?

A. One more time?

Q. Okay. So part of your allegations in this case are that there were falsified records in some way, right?

A. Yes.

Q. And in what way do you allege that Dr. Florence falsified his records?

A. Well, the fact that his X-ray film findings of my 8/20/2021, the findings that he took, he said that it didn't consist of any fractures and also, some of his findings were contradicted by, by Yousuf's X-ray film findings that were conducted after Nicholas Florence X-ray films.

Q. What is your definition of falsification in this instance, what does that mean?

A. Knowingly presenting false information on a medical document.

Q. If Dr. Florence truly believed that he did

Page 123

not identify any fracture on his review, would that still be considered falsification in your eyes?

A. Say that again?

Q. If Dr. Florence's interpretation was his true belief that there was no fracture, would that still constitute falsification of these records in your definition?

A. If that was his true belief?

Q. Yes.

A. No, probably not, probably not. If that was his true belief, probably not, but Yousuf's X-ray film findings contradicted other aspects of Nicholas Florence's X-ray film finding outside the fact that he found no fracture.

Even if Nicholas Florence actually believed that the X-ray film findings showed no fractures, he still had other findings in his 8/20/21 X-ray film review finding that he did that was contradicted by Yousuf's X-ray review findings.

Q. So what findings were those that were contradicted?

A. What you say?

Q. What findings were those that you say were contradicted by Dr. Yousuf later on?

Page 124

A. I don't know, I don't have my documents in front of me right now to give you exactly what his findings was saying.

Q. I have them, I can put them on the screen.

A. Do you have Florence's with you and Yousuf's?

(Exhibit 1, having been marked, for identification.)

BY MR. HILL:

Q. Are you able to see this Mr. Allen, are you able to see what I just put up on the screen?

A. Yeah, I see it.

MR. STILLMAN: I will mark this as Exhibit 1, I guess? Keith, you didn't mark any exhibits that you put up, right?

MR. HILL: I did not.

BY MR. STILLMAN:

Q. So I will call this Exhibit 1 and this is, do you recognize this document Mr. Allen?

A. Yes.

Q. This is the interpretation of your X-rays from August 20th, right?

A. Yes.

Q. And this is Dr. Florence's interpretation,

Page 125

correct?

A. Yes.

Q. Dated August 26th, 2021, says right there?

A. That's what the document say.

Q. And it shows that there was three views of the right hand from 8/20/21 that he interpreted, right?

A. Yes.

Q. And, "History" was, "status post fall, findings is noted as dependent edema."

Right?

A. Yes.

Q. And then under, "Findings" he says, "No evidence of acute fracture or malalignment, normal joint spaces and mineralization is preserved. The soft tissues are unremarkable."

Correct, is that what it said?

A. Yes, that's what it says.

Q. And the impression here is, "unremarkable radiographs of the right hand."

Correct?

A. Yes, exactly.

Q. And going to the second page of this, this

32 (Pages 122 - 125)

Page 126

would be -- the document is dated September 2nd, 2021, correct?

A. Yes.

Q. And it's Dr. Yousuf's signature down at the bottom, right?

A. Yes.

Q. So this would be Dr. Yousuf's interpretation of the 8/31/21 X-rays, correct?

A. I can't hear what you said, 8/31/21 right?

Q. Yes, this is Dr. Yousuf's interpretation of the August 31st, 2021 X-rays, right?

A. Yes.

Q. And in the history it choose, pain, right?

A. Yes.

Q. And his findings note that, "Three views of the right hand are submitted, the joint spaces are intact, no fracture destructive or erosive abnormality. The soft tissues are unremarkable. If symptoms persist or progress, a follow-up study maybe considered."

Did I read that properly?

A. Yes.

Q. Can you tell me what exactly is contradicting what Dr. Florence found just, you

Page 127

know, a week earlier?

A. That's not the only X-ray film of Yousuf, it's one more X-ray film for Yousuf, the third one, the last one.

Q. So we're on the last one now date, September 16th, 2021, interpreting the X-rays from September 14th, 2021, correct?

A. Yes.

Q. Here he says, "mild degenerative changes are seen, but no acute bony fracture or dislocation is noted on this initial study."

"There is mild soft tissue swelling of the thenar and hypothenar eminences. If symptoms persist or progress, a follow-up study may be considered."

Did I read that correctly?

A. Yes.

Q. So you're saying it's different from Florence's 8/26/21 interpretation?

A. One inconsistency, Nicholas Florence stated that the soft tissues are unremarkable. Yousuf's X-ray film from the last one that he took, it said that he noticed mild soft tissue swelling, those are two contradictions.

Page 128

Q. Okay.

A. As well as when I went to the orthopedic hand specialist, the orthopedic X-ray specialist's findings, he showed the diagnosis of, of a basically like a, basically malalignment damage.

His study is saying that it was no evidence of acute fracture for malalignment, but, the orthopedic hand specialist noticed that it was malalignment in the bone structure.

Q. The orthopedic hand specialist was several months after this, right?

A. Huh?

Q. You went to see the orthopedic hand specialist several months after these X-rays were interpreted, right?

A. Yes.

Q. Do you have any knowledge of whether the body can change overtime?

A. Whether what?

Q. The body can change overtime whether injuries can develop overtime?

A. I mean, I'm not sure, and at the end of the day, it would take an expert to review those same expert films, those X-ray films to comment,

Page 129

give us some insight into what was actually shown and whether there was a missed diagnose or not --

Q. Okay. Yeah, we don't have all day so I'm going to cut you off a little bit because there is someone else that needs to ask questions.

That's my question, you are not an expert and you have no knowledge of that, right?

A. Exactly.

Q. So, you've indicated that you believe the initial X-ray interpretation by Dr. Florence and the final one by Dr. Yousuf are contradictory, but Dr. Yousuf also interpreted the middle one from August 31st and also remarked that the soft tissues were unremarkable, right?

A. Exactly.

Q. So if two separate radiologists just a few days apart remark that the soft tissues were unremarkable, do you think that the later finding contradicts them or that there was some development in the condition of your hand?

A. Say that again?

Q. If two separate physicians, radiologists within a couple of days of each other had findings that the soft tissues were unremarkable and that

33 (Pages 126 - 129)

Page 130

there were no fractures in your hand, and then one of those doctors, you know, two weeks later found that there was some mild findings in soft tissue, is that contradictory or could that possibly be a development in reinjuring your hand?

A. What I find is contradictory is, the fact that all three of those X-ray films, within a 30-day period of me sustaining my injury, all found no fractures, yet, when I went to the outside hand specialist, he took one X-ray film six months later and identified an old fracture.

Q. He actually said --

A. On top of the fact that, on top of the fact that Jillian Crane conducted an X-ray of the 8/20/21 X-ray film and her findings were normal and stable, when I know for a fact that to be a lie and she intentionally lied on that report. Because I have other documentations of the same X-ray film finding that she reviewed and signed off saying it was unremarkable and stable, that was used in other inmates X-ray film findings for their shoulders and their back, which is the same exact document, and it shows that it was a pre-drafted document showing that they intentionally miss diagnosed the X-ray

Page 131

films. So.

Q. So it's your testimony that the use of the phrase, "unremarkable," shows that these are pre-drafted interpretations?

A. Say that again?

Q. Are you alleging that the fact that these doctors commented that the findings were unremarkable and used that language means that these were pre-drafted and that they're all false?

A. I'm not sure, but, I know one thing, at the time Nicholas Florence took that X-ray, I had symptoms of severe swelling, purple discoloration, pain and other symptoms and a fractured hand and there's nothing unremarkable or remarkable about a fractured hand, there's nothing normal, there's nothing stable about swelling. There's nothing normal, it's nothing stable about purple discoloration. There's nothing unremarkable about, there's nothing good about swelling.

Q. And you just said when Dr. Florence took your X-ray, and you earlier acknowledged that Dr. Florence did not take the X-ray, you just meant that when Dr. Florence interpreted your X-ray, correct?

A. Say that again?

Page 132

Q. You just said in your answer before that Dr. Florence took your X-ray. You understand that Dr. Florence didn't actually personally take the X-ray, correct?

A. I never said that Dr. Florence took my X-ray.

Q. You said it a moment ago.

A. Jillian Crane took the X-ray and she forwarded it to him to be reviewed, he just reviewed the X-ray. He never came to Menard and took an X-ray of my hand in person, I never said that, you're misinterpreting what I said, he just reviewed the 8/20/21 X-ray film, that's it.

Q. Just a couple more questions and we'll hopefully be done with this shortly.

When you went to Dr. Babitch and he said that there was an old fracture, it had been healed, though at that point, correct, it might have healed incorrectly, but it was healed he said, right?

A. Say that again?

Q. Is that what might have, you know, he said it healed somewhat incorrectly, it had healed, right?

Page 133

A. I can't make out what you're saying.

Q. Dr. Babitch told you that the injury had healed, there was a fracture that had healed, right?

A. Yes.

Q. And that was --

A. He said it healed improperly, he said it healed improperly, the old fracture had healed improperly.

Q. Even though if it healed improperly, that would apply that the body healed the fracture, right?

A. Say that again?

Q. Even though it improperly healed, it would imply that your body healed the fracture, right?

A. I guess so.

Q. And that was just a couple of months after the injury that you allege when it would have happened, right?

A. Say it again?

Q. And that was just a couple of months that was, that was six months after the injury when you claim happened, right?

A. Yes.

Q. So in six months time, if the fracture had

34 (Pages 130 - 133)

Page 134

indeed occurred during the fight in August of 2021, the body had healed the fracture, right?

A. Yes, to a certain extent.

Q. So, if over six months the body had healed a fracture like that --

A. That's what he said, he said it healed, even though it healed improperly, it healed, yes, in a six-month period.

Q. Okay, so let me finish my question and then you can answer.

So if over six months the body is able to heal entirely a fracture in just one month, don't you think it's possible that if there were an injury it could develop such that a doctor looking at it, you know, three, four weeks later, would see a different indication than the initial doctors did?

A. That may, that may, it could possibly be possible.

Q. Okay.

A. Possibly.

Q. Do you know that --

A. I highly doubt that it would heal within three days of me actually breaking it, I would doubt it would have been healed within that three-day

Page 135

period when my hand was swollen and purple discoloration, I doubt that it was healed when Nicholas Florence took his X-ray on 8/20/21.

Q. Do you know if the discoloration of your hand is visible on an X-ray?

A. You say what?

Q. Would the discoloration of your hand be visible on an X-ray to the best of your knowledge?

A. No, I don't think so.

Q. So you know, you know that you're asserting a claim also for intentional infliction of emotional distress against Dr. Florence in this case?

A. I would like to say one thing to add with that last question.

Q. Yeah.

A. Yeah, the purple discoloration, I don't think that probably would be shown on an X-ray film, but on the X-ray film that Nicholas Florence took, you can see, you can identify the swelling.

When I looked at them X-ray films that Nicholas Florence took on 8/20/21 I was able to identify the swelling through the X-ray thing, so I know if I was able to identify, I'm pretty sure he

Page 136

was able to identify them despite his findings to the contrary.

Q. Okay. So returning again to my last question.

Do you know that you're asserting a claim for intentional infliction of emotional distress against Dr. Florence in this case?

A. Say that again?

Q. Do you know that you are asserting a claim for intentional infliction of emotional distress against Dr. Florence in this case?

A. Yes.

Q. What specific conduct by Dr. Florence are you claiming was extreme and outrageous?

A. Say it again?

Q. What specific conduct by Dr. Florence are you claiming was extreme outrageous that inflicted emotional distress on you?

A. The intentional missed diagnosis of my 8/20/21 X-ray film reviews that he conducted within a four-day period after I broke my hand. Despite being able to see the actual swelling on the X-ray film that he reviewed.

Q. All right I understand, so we're going to

Page 137

move on.

A. There was no swelling.

Q. So you have no evidence that Dr. Florence intended to cause you any emotional distress there, right?

A. Yes, I do have evidence that he caused emotional distress.

Q. That's not what I asked you. You have no evidence that Dr. Florence intended to cause you any emotional distress, correct?

A. I could tell based off of his actions and inactions.

Q. So, your testimony is that you can tell, based off his action and inaction, that he intended to cause you emotional distress?

A. It's obvious from his conduct.

Q. You haven't had any experts or other physicians review any of the materials in this case, right?

A. Say it again?

Q. You have not had any other experts, outside experts or other physicians than your treating physicians review any of the materials from this case or your medical records, right?

35 (Pages 134 - 137)

Page 138

A.  No.

Q.  You have not retained a radiologist to look at the X-rays that Dr. Florence reviewed, right?

A.  Not at the moment.

Q.  So you have no expert opinions to contradict Dr. Florence's impressions?

A.  Not at the moment, I'm still in the process of discovery.

MR. STILLMAN:  All right, I think I'm good for now, sorry I took so long, guys.

EXAMINATION

BY

MR. NELSON:

Q.  Mr. Allen my name is Todd Nelson and I represent Kelly Pierce, Anthony Wills and Angela Crain.

Let's start with Kelly -- first of all can you hear me okay?

A.  Yes.

Q.  Let's start with Kelly Pierce, who is Kelly Pierce?

A.  She was the grievance officer at one point and time, I'm not sure.  They still are, but at the

Page 139

time it was the grievance officer.

Q.  Have you ever met Kelly Pierce?

A.  Not in person.

Q.  So, okay -- okay.

And Anthony Wills, who is he?

A.  He was the Warden at the time.

Q.  And have you ever met Anthony Wills?

A.  I meet him before in person during prison tours and stuff like that, I met him in person before.

Q.  What did he look like back in 2021, 2022?

A.  Huh?

Q.  What did Anthony Wills look like back in 2021?

A.  If I'm not mistaken a black male.

Q.  Approximate height?

A.  I'm not sure, but, he was a black male, bald headed.

Q.  Approximate age?

A.  I'm not sure, I know he was older, he might be in, I don't know, he probably was in his mid 40s, 50s, maybe, I'm not sure.

Q.  And Angela Crain, who was she in 2021?

A.  The Healthcare Unit Administrator and

Page 140

possibly also the Unit Medical Director as well.

Q.  And have you ever met Angela Crain?

A.  Angela Crain, I'm not sure, I'm not sure.

Q.  All right let's talk a little bit about the grievance procedure at Menard back in 2021 when an individual in custody wanted to file a grievance, how did that process work?

A.  Well, got to get a grievance form, fill out the grievance form and you filed it with either the warden, if it's an emergency or to the counselor.

Q.  When you filled out this form and submitted it, where, where did you put the form?

A.  Which form?

Q.  The grievance form.

A.  Where did I put it, which one, I filed multiple grievances?

Q.  Anytime you would file a grievance, where would you put that grievance?

A.  It depends, sometimes I, sometime I drop it in a specific box, they got like a warden box, counselor box, you can drop the grievance in a specific box or you can just put it in the bars and it will be collected at night with the mail, and it

Page 141

will get to wherever you directed it to.

Q.  Did it depend on the nature of the grievance where you put that grievance?

A.  Yes.

Q.  So, if it was an emergency grievance, was that the type of grievance that you would put in the Warden's box?

A.  Yeah, either put in the Warden's box or address it to the Warden so it get sent to the Warden's office.

Q.  And any grievance that you did not mark as an emergency that is a grievance that you would just put in the bars?

A.  Or you can put it in the counselor box.

Q.  Counselor box?

A.  Put in the bars or the counselor box, either or.

Q.  So let's talk about an emergency grievance, when you put that in the Warden's box, what would happen to the grievance after that?

A.  I'm not, I'm pretty sure it would get, it will get forwarded to the Warden.

Q.  And then what would happen after that?

A.  The Warden would receive it and review it

36 (Pages 138 - 141)

Page 142

and after he reviewed it, he will respond, whether it's an emergency or not, he'll respond to your grievance.

Q. And how would you know what his response was?

A. Sometimes they will send you a receipt saying giving you confirmation that the Warden received it, and whatever his findings, the day he received it, they would give you a notice and they received it on this day and sometimes they may even respond with a notice saying that they received the end, whatever his particular findings were, and then sometimes he will just respond to the grievance on the grievance and send you your grievance back or if they forward it to the grievance officer, they'll send you a notice saying that the Warden received it, he deemed it an emergency and he forwarded it to the grievance officer, but you'll get some type of response back whether a notice or your grievance back or something.

Q. So sometimes the Warden or the Warden's office would send the grievance directly back to you, and other times he would send it to the grievance office?

Page 143

A. Yeah, but they definitely, when you file it, you gone get a response, you gone get a response back normally.

Q. I understand that, I guess I'm just wondering, is it your testimony that, that there wasn't one way in which the Warden would respond to your grievance?

A. What you mean?

Q. I'm sorry, that's a really bad question.

My question is, is it your testimony that sometimes the Warden would send a grievance directly to you and other times the Warden would send a grievance back to the grievance office?

A. In my particular instance when I filed my emergency grievance, dated 10/15/2021, I filed it with the Warden, and I got a notice back, I got a notice back saying that he received it, and that he deemed it an emergency, yeah, that was the notice I got, and that's what let me know that he received it and that he reviewed it.

Q. And we'll get to the particular grievances in a minute, I'm just trying to understand the overall grievance procedure right now.

So after you would get the notice or

Page 144

the grievance back from the Warden's office, what happens with the grievance after that?

A. I guess it depends on a response, you know, in my particular circumstance I sent the emergency grievance to the Warden, he reviewed it, he deemed it an emergency and he expedited my grievance. I guess, refer the processing to be reviewed, I guess by the grievance officer, I guess to investigate the things in the grievance.

Q. Okay. Let's do this, let's go ahead and talk about that grievance that you submitted that was dated October 15th, 2021, is that correct?

A. Yes.

Q. So that particular grievance, do you remember what you complained about in that grievance?

A. In so many words basically making them aware that I sustained a hand injury in an altercation of self-defense and the pain that I was feeling, the swelling, the treatment I was receiving by the medical staff, in fact, that it felt like it broke, so basically just let him know that I had three X-rays, and they all came back negative for fractures, and I requested a second opinion. I

Page 145

requested a second opinion, an X-ray from an outside medical personnel, outside nurse to have a second opinion, and, and letting him know that I was receiving inadequate treatment. And he just basically making him aware of my situation.

Q. And you had indicated on that grievance form that that was an emergency grievance, correct?

A. Yes.

Q. And do you know, do you remember how you submitted that grievance, did you put that in the Warden's box?

A. Yes, yes.

Q. So you did not submit that grievance to the grievance officer.

A. Nah, I put that grievance in the Warden's box.

Q. And did the Warden review that grievance?

A. Yes.

Q. Do you remember the date that he reviewed that grievance?

A. Nah, I'm not sure of the date, but I remember getting the notice back that he received it, reviewed it and he deemed it an emergency and expedited it for further review.

37 (Pages 142 - 145)

Page 146

Q.  Do you have any reason to dispute that he received it on October 20th and deemed it an emergency on October 20th?

A.  Yeah, I'm not sure of the specific date, but I do know he did receive it and responded to it and he deemed it an emergency.

Q.  So you're not, you're not sure of the specific date, but, do you have a reason to dispute that it was that day, October 20th?

A.  I don't know, I don't know what date it was, I don't know what date he got it, all I know is he received it and he responded to it and deemed the situation an emergency and forwarded it for expedited review.

Q.  And then when he forwarded it for expedited review, did that grievance come back to you or did that go to the grievance office?

A.  No, the grievance did not come back to me, whoever he forwarded it to, that's where it went to, so I think he forwarded it to the grievance officer.

Q.  And do you know what the grievance officer did with that grievance?

A.  They reviewed it.

Q.  Do you know when they reviewed it?

Page 147

A.  I don't know the specific date, but, they reviewed it and they end up making a ruling on it.

Q.  And we'll get to that, but did the Grievance Office do anything to investigate that grievance?

A.  Yeah, they said they, based on the grievance officer report, they said they reviewed it and they identified some of the things that I put in the grievance in his report as far as the symptoms and things of that nature, and he also acknowledged the relief that I was seeking and the second opinion, the MRI, probably some pain pills and stuff like that and, I think he also contacted the Healthcare Unit Administrator to review it.  I guess he probably talked with them as well to go over it --

Q.  And do you know --

A.  -- the investigation.

Q.  I'm sorry for interrupting.

Do you know who the grievance officer was for that particular grievance?

A.  Kelly Pierce.

Q.  And do you know when Kelly Pierce forwarded that grievance, do you know who responded

Page 148

from the Healthcare Unit?

A.  I'm not sure, I'm not sure.  But I know in his, in the grievance officer's report, I think he mentioned something about investigating with the Healthcare Unit Administrator or some type of medical staff.

Q.  Do you remember what the Healthcare Unit Administrator had responded?

A.  I don't remember exactly what they responded for that particular grievance, no.

Q.  So there was the October 15th grievance and then were there other grievances in which you complained about the treatment in your hand?

A.  Yeah, it was another one dated 11/3/2021 and that was also an emergency grievance.

Q.  And any other grievances?

A.  Another one dated 2/15/2022, that was after I came back from the visit with the orthopedic hand specialist.

Q.  And as I understand it, you are, you are faulting all three of my clients for the way that they responded or for delayed responding to those grievances, is that correct?

A.  Yes.

Page 149

Q.  And so there are three grievances, are there any other grievances that you fault them?

A.  Yeah, I filed other grievances as well leading up to actually having surgery.

Q.  So what other grievances are those?

A.  I think I filed one requesting to have the corrective surgery, and that one got denied.  I think that was the 2/15 of '22 grievance, requesting the corrective surgery to repair the improperly healed bone, and then I filed another one requesting carpal tunnel surgery.

I filed another one requesting to get the hand splint, the correct hand splint, and I filed a couple of other grievances, even filed a grievance requesting surgery, the carpal tunnel surgery as well.

Q.  You just said that.  So, the grievance that you're referring to where you requested carpal tunnel surgery, what was the date of that grievance?

A.  I'm not sure, I don't have my documents on me right now.

Q.  And the hand splint grievance, what was the date of that grievance?

A.  I think it was somewhere in 2022, I ain't

38 (Pages 146 - 149)

Page 150

got my documents, I don't know the exact date, but it was somewhere in 2022.

Q.   And any other grievances that you fault my clients for their responses to?

A.   I think I filed another grievance when I injured my hand due to wearing soft brace without any wrist support, filed another grievance on that.

Q.   And when was that filed?

A.   Somewhere in 2022.

Q.   Any other grievances?

A.   From the time, from the time that I sustained the injury until the time that I had surgery, I filed multiple grievances pertaining to my medical treatment for my right hand.

Q.   Okay.  Well, we talked about six grievances, were there any others?

A.   I'm not sure, I don't have, I don't have, I don't have my documentation on me right now, I'm not sure.

Q.   So you can't remember the content or the complaints in any other grievances that you're faulting my clients for?

A.   Pretty much grievance that we just mentioned was pertaining to majority, pertaining to

Page 151

my treatment, the inadequate treatment request for surgery or requesting for certain forms of treatment that was prescribed that I wasn't receiving and, you know, continued pain and suffering that I was enduring, lack of getting medical attention, lack of getting pain medication, and stuff like that.

Q.   Let's talk about sick call slips, are those submitted to medical personnel?

A.   You can submit them to medical personnel, sometimes they be walked to pass out medication and when they do that, you can give it to them or you can just write your request or sick call request on a regular sheet of paper and put it in the bars and when they collect mail at the end of the night, they will put it to whoever it's addressed to.

Q.   And who reviews sick call slips?

A.   I'm guessing the medical staff, the nurses, maybe some type of nurse, I know the nurses review them, and I'm pretty sure the Healthcare Unit Administrator and possibly the Unit Medical Director reviews them at some point as well.

Q.   Well, you're just guessing that, right, do you know for certain that those individuals reviewed them?

Page 152

A.   I believe so.

Q.   And what makes you believe that the Healthcare Unit Administrator reviews sick call slips?

A.   I mean, because they the one that govern medical care, if I'm sending a sick call slip pertaining to my medical treatment, I'm pretty sure that some type of medical staff or the medical unit would be the ones handling those types of requests versus somebody that's not medical personnel.

Q.   Do you know what the responsibilities of the Healthcare Unit Administrator are?

A.   Say it again?

Q.   What are the health, what are the responsibilities of the Healthcare Unit Administrator?

A.   Of the Healthcare Unit Administrator, I'm not pretty sure of everything, I don't have any documentation, but, they do have administrator, directors and the Wexford policies and even state law that governs the practices and the duties and responsibilities, even the 504 Administrative Code and Department Rules have a section on medical and they outline the duties and responsibilities of

Page 153

specific medical staff.

Q.   Did you ever send any kite or letters to Angela Crain directly?

A.   Yes.

Q.   And when did you send her a kite or a letter?

A.   I know I sent her some in 2022 after I came back from the hand specialist.  One of them in particular was pertaining to the pain I was experiencing and the lack of being prescribed, the lack of receiving the pain medication when I came back from the hand specialist, probably like a couple month period that I was trying to get some pain medication to help cope with the pain, and I wrote her a letter, I, making her aware of that and trying to get some pain medication.

Q.   And Mr. Allen, maybe I mentioned it, you said that you sent that to Angela Crain in 2022?

A.   Yes.

Q.   Do you remember what month you sent that to her?

A.   I think I sent her, if I recall correctly, I believe I sent her at least like two, two kites, two medical kites, and informed her of the medical

Veritext Legal Solutions

www.veritext.com                                                    888-391-3376

Page 154

issues and things that I was seeking or whatever.

One of them in May, I believe, if I'm not mistaken, probably May 31st was one of them, if I'm not mistaken, like I say, I don't have my documents in front of me, but I think one in May, and I believe another one, somewhere after I came from the orthopedic hand specialist on 2/8/2022.

Q. So one in May and then when did you send the other one?

A. I'm not, I probably, I think I probably, I know within the time that I came from the orthopedic hand specialist on 2/8/22, to May 31st, I sent her two medical kites, I'm not sure of the exact date, it could have been another one in May.

Q. Okay. So between February and May of 2022, you sent two kites to Angela Crain?

A. Yeah, and I filed on multiple sick call requests as well.

Q. And how many kites or letters did you send to Anthony Wills, if any?

A. To who?

Q. Anthony Wills.

A. I don't know the exact amount, but I do recall writing him a kite as well between the

Page 155

timeframe of 8/2 -- I mean 2/8 when I came back from the orthopedic hand specialist on 2/8/22, and May I sent him a kite as well between that timeframe.

Q. Okay. And did you send any kites or letters to Kelly Pierce?

A. To who?

Q. Kelly Pierce?

A. No, I don't recall sending any requests to Kelly Pierce other than just filing grievances that Kelly Pierce reviewed.

Q. Okay. So the two kites that you sent to Angela Crain and the one that you sent to Anthony Wills, did you keep copies of those kites at all?

A. I think I might have copies of some of them, yeah.

Q. Well, we're talking about three kites, right?

A. Yeah, I think I do have a copy of all three, at least three kites that I sent them within that timeframe, yes.

Q. And would that be a photocopy or something that you hand copied?

A. The kites was basically me just writing a request on regular sheets of paper. And I probably

Page 156

made copies of them as well to attach it as an exhibit to my complaint.

Q. So I saw a handwritten copy of a kite attached as an exhibit to your complaint, did you ever make any photocopies of any kites that you sent?

A. Yeah, I mean those particular ones I had to make copies of them to attach them to my complaint as an exhibit, so I took the original, the copies, the copies that are requested, I made copies of, and attached them as exhibits to my complaint.

Q. And I just want to be clear, when you say, copies, you stuck the document on a machine and pressed the button and it made a copy?

A. No. I mean, when I write my medical request, when I wrote the medical request to the Warden and Angela Crain, I made a carbon copy in the event they lost it or didn't receive it, and I had to resend it or something. I have another copy to resend it to them and even, even, you know, the other way you make copies is taking those copies and getting copies made from the law library of those same carbon copies.

Q. So you made a carbon copy?

Page 157

A. Yes, but they request that I send it to Angela Crain and the Warden, yes.

Q. And did you make carbon copies of all three of those requests or kites?

A. Yes.

Q. And when you say, carbon copy, what do you mean?

A. Just when I write the request, when I wrote the request to send to them, I wrote an additional copy by hand, that's what I refer to as a carbon copy, same exact letter that I wrote her, I made an additional handwritten copy of it, that's what I referred to as a carbon copy.

Q. Okay.

A. And I ended up getting a copy of the carbon copy made at the law library to attach a copy of that letter as an exhibit to my complaint.

Q. And how do you know if Anthony Wills or Angela Crain received any of those kites?

A. Well, shortly after, I think she did receive a sick call shortly after I sent them those kites, probably like within a, within like a, I know I sent them, I sent one to Angela Crain on 5/31, if I'm not mistaken I probably sent another one to the

40 (Pages 154 - 157)

Page 158

warden and Angela Crain on 5/18/2022, and I sent one to Angela Crain on 5/31/2022, if I'm not mistaken, and then I remember going to sick call sometime in June, early to mid June, so I'm assuming they got it, and when I got called, the sick call sometime shortly after I sent the notice request.

Q. And then let's talk a little bit about the alleged infliction of, intentional infliction of emotional distress claim, tell me a little bit about what you, what you experienced as far as emotional distress?

A. Just basically from the whole deal, everything that I experienced, from the moment that I sustained my injury on 8/16/2021, all the way up until I had surgery on 3/3/2023, all the missed diagnoses of the injury, knowingly being prescribed inadequate medical treatment and a form of pain pills that's not correcting the root cause of the issue, but it's just basically like a form to help cope with the pain but it's not resolving the issue, you know what I'm saying, so now I have to be reoccurring, just the pain and suffering, the unnecessary prolonged pain and suffering as a result of being prescribed known and ineffective course of

Page 159

treatment.

And then when I actually did go to the outside doctor to get diagnosed where he diagnosed me with an old fracture, which was confirmation and proof that I did have a fracture, I was missed diagnosed and that delay and promptly referring me out to get evaluation by a hand specialist, caused me unnecessary pain and suffering, and it also worsened my injury to the point where I finally got out there, the hand had healed incorrectly and I wasn't even able to get the corrective surgery to repair the bone damage that I sustained, you know, and if they would have sent me out promptly, as they should have, I could have been saved some of that pain and suffering, I probably wouldn't have to go through all that.

Q. And so when you're referring to pain and suffering in this context, you're not talking about your hand, you're talking about mentally or emotionally?

A. I'm talking about everything that I was forced to endure and I was subjected to as a result of being prescribed improper medical treatment.

Q. Did you --

Page 160

A. Even like they got IDOC policies that states that when you are seen for the same complaint three times within a 30-day period, which I was you're supposed to be seen by an outside specialist a physician, a medical doctor for evalve, and I was not afforded that.

Had they would have complied with their own IDOC Administrative Directives, I probably would have been able to have, I probably would have been able to get evalve much sooner than six months after sustaining my injury, that would have saved me a lot of pain and suffering, now I actually could have had the surgery repairing the bone before it was improperly healed on its own within that six-month period.

Q. Mr. Allen, did you receive any mental health counseling?

A. Yes, I did.

Q. And when did that start?

A. Sometime in 2022 after I came from the orthopedic hand specialist on 2/8/2022.

Q. When did the counseling in 2022 start?

A. I don't know the exact date, like I say, I don't have any documentations or anything in front

Page 161

of me at the moment to give you the exact date, but I know in 2022 I did, I did reach out to mental health, but, pain and suffering, the emotional distress that I was experiencing as a result of the malicious conduct that I was subjected to.

Q. And how long were you in counseling?

A. Say it again?

Q. When did your counseling end?

A. I'm not sure, but I know I was, I was prescribed some antidepressants by the psychiatrist and I'm still getting that medication till today.

They prescribed me with Cymbalta and some sleeping pills, and I'm still on the Cymbalta today.

Q. When did you start taking the Cymbalta?

A. Once they prescribed it to me, like I said, I don't have any documents on me, I know in 2022 I was prescribed the Cymbalta sometime in 2022 and from the moment they prescribed it, I have been taking it and been taking it every since, I'm still taking them.

Q. And you didn't receive counseling because you were having a difficult time with other inmates in the facility?

41 (Pages 158 - 161)

Page 162

A.  I had -- before I even received, before I even received mental health treatment for the depression and emotional distress, I was receiving from my hand injury and inadequate treatment and everything surrounding my hand injury, I was already getting, I was already on mental health caseload, I was already diagnosed with bipolar disorder or something else, but I specifically was prescribed Cymbalta for the depression that I was experiencing, surrounding the inadequate treatment and everything surrounding my hand injury and malicious conduct and things that I was being subjected to in my attempts to seek adequate medical care for a fractured hand and carpal tunnel and arthritis.

Q.  And specifically what was the conduct of Wills, Crain and Pierce, that caused your emotional distress?

A.  The fact that I reached out to the Warden, the Healthcare Unit Administrator, and even the grievance officer in an attempt to get properly adequate medical treatment for a severe hand injury that was later identified as fractured that healed improperly, and, you know, the Warden being the person who runs the facility and Angela Crain being

Page 163

the Healthcare Unit Administrator that oversees the nursing, due to her being negligent and failing to do her job, it caused me to be denied adequate medical treatment in a timely fashion that led to all type of damages and unnecessary pain and suffering, all type of irreparable damages and all of that could have been, some of that pain could have been alleviated had she would had did her job when I reached out to her and the Warden and Kelly Pierce, with highly detailed written experiences explaining my situation and multiple portions of inadequate treatment I was being prescribed and yet they still didn't remedy the situation, they still didn't provide me with adequate medical care to the point where Kelly Pierce denied my grievance as moot, and I was requesting, in my first two grievances, a second opinion X-ray from the outside nurse, a MRI to try to see if I had any nerve damage, all of which I have.  I was trying to get a second opinion to see if my hand was actually broken and, and, I filed, when I reached out to them, it took me, still, approximately four months to get sent out for an evalve because they denied my grievances.

Page 164

Had they properly investigated, properly took my condition as serious, based on what I told them, I could have got seen by an orthopedic hand specialist sooner, and he probably could have, you know, saved me some pain and suffering, probably could have gave me the surgery before the bone healed improperly on its own to correct it.

Now, I'm dealing with irreparable damage, permanent disfiguration because the bone healed improperly.  That diminished the strength in my hand, all type of stuff.

Q.  Mr. Allen, is there anything else that Wills, Crain and Pierce did to cause you severe emotional distress?

A.  Just the maliciousness of their conduct, the maliciousness of their conduct, turned a blind eye to my serious medical needs and intentionally disregarding them, ignoring them and failing to do their job to ensure that I was provided adequate medical treatment which the Eighth Amendment of the United States Constitution guarantees.

They took an oath of office, it took -- it's several administrative directives, that's -- clearly guideline their duties and responsibilities

Page 165

that they failed to uphold, that they failed to negligent.

Had they would have admitted that they were going to disregard all state law and all federal law and fail to do duties and adhere to the policies that govern their positions, had they would have put that on their job application that they were not going to adhere to that, they would have never got hired, he would have never became the Warden if he told on his application that he wasn't going to follow no state laws regarding inmates' medical treatment.  Same with Angela Crain.

MR. NELSON:  Mr. Allen, I'm going to stop you there, we're well beyond the question that I asked, so I'm just going to stop you there.

I actually don't have any other questions, so I'm going, I'm going to turn this over, I guess turn it back to Mr. Hill in case he has any other questions.  Thank you.

MR. HILL:  I don't have anything further.  Anyone else have any follow-up?

MS. RHOADES:  I have none.

MR. STILLMAN:  I have none.

MR. HILL:  All right then, I think that

42 (Pages 162 - 165)

Page 166

will conclude your deposition Mr. Allen.

I'll tell you about your ability to review the transcript, I'm not your attorney, I can't give you advice, I can just tell you about what you can do to review.

You have the opportunity, if you wish, to review the transcript, to make sure that the court reporter has correctly recorded down what the parties have talked about today.

You can't change your answers or change the questions, but if there was a misspelling, such like that, like an error in the transcript, you can note it on an errata sheet, it's up to you whether you want to do that or whether you want to waive.

THE WITNESS:  Yeah, I would like to review.

MR. HILL:  Okay.

THE WITNESS:  And can I also receive a copy of it as well?

MR. HILL:  You have to pay for a copy of the transcript.

THE WITNESS:  Okay, all right, well, if I have to pay for it, could you let me know how many

Page 167

pages it consist of and how much it will cost for me to obtain a copy of it?

MR. HILL:  That is something that the court reporter has to do, that's something that she does -- do you want to waive or -- what do you want to do as far as waiving, reviewing the transcript and waiving.

THE WITNESS:  I would like to review.

MR. HILL:  Okay, we will we go off the record and get some details to you, okay.

THE WITNESS:  Okay.

COURT REPORTER:  Is anyone ordering?

MR. HILL:  I would like a copy please.

MR. STILLMAN:  I would also like a copy.

MS. RHOADES:  I would also like a copy please.

MR. NELSON:  I would as well.

(Which were all the proceedings had in the above-entitled cause.)

Page 168

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

I, Pamela C. Taylor, CSR/RPR of the State of Illinois, do hereby certify that I reported in machine shorthand the proceedings had at the deposition in the above-entitled cause, and that this transcript is a true and accurate transcription of my machine shorthand notes so taken to the best of my ability.

*Pamela C. Taylor*
CSR #084-001184

Dated this 19th day
of March, 2026

Page 169

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

March 19, 2026

Keith Allen #M21830

Case Name: Allen, Keith #M21830 v. Wexford Health Sources, Inc., et al.

Veritext Reference Number: 7851743  Deposition Date:  3/5/2026

Dear Sir/Madam:

Enclosed you will find a transcript of your deposition.

As the reading and signing have not been expressly waived, please review the transcript and note any changes or corrections on the errata sheet included, indicating the page, line number, change and reason for the change. Sign at the bottom of the sheet in the presence of a notary and forward the errata sheet back to us at the address shown above or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

43 (Pages 166 - 169)

Page 170

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7851743
CASE NAME: Allen, Keith #M21830 v. Wexford Health Sources, Inc., et al.
DATE OF DEPOSITION: 3/5/2026
WITNESS' NAME: Keith Allen
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have made no changes to the testimony as transcribed by the court reporter.

_____    _____
Date          Keith Allen
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public
_____
Commission Expiration Date

Page 171

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7851743
CASE NAME: Allen, Keith #M21830 v. Wexford Health Sources, Inc., et al.
DATE OF DEPOSITION: 3/5/2026
WITNESS' NAME: Keith Allen
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.
_____    _____
Date          Keith Allen

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20____.

_____
Notary Public
_____
Commission Expiration Date

Page 172

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7851743
PAGE/LINE(S) /       CHANGE       /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Date          Keith Allen
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

44 (Pages 170 - 172)

**[084-001184 - 309]**                                                    Page 1

**0**

**084-001184**
1:15 168:14

**1**

**1**  3:12 53:21
124:7,14,18
**10/15/2021**
143:15
**101**  3:8
**105**  2:11
**11/3/2021**
148:14
**1100**  169:1
**115**  2:16
**11:00**  1:10
**124**  3:12
**13177**  168:13
**138**  3:9
**14**  51:3
**14th**  48:10
49:19 51:3
52:18 105:16
127:7
**15th**  74:23 75:2
76:5 144:12
148:11
**16th**  57:14
107:14 127:6
**17**  27:24 31:16
66:1,4
**17th**  27:18,21
31:13 32:13
67:5

**1820**  169:2
**19**  169:4
**19th**  168:17

**2**

**2/15**  149:8
**2/15/2022**
148:17
**2/8**  155:1
**2/8/2022**  154:7
160:21
**2/8/22**  154:12
155:2
**20**  170:16
171:22 172:22
**2006**  8:8
**2009**  9:8 11:16
11:18
**2011**  11:1,21
13:21 86:7,11
**2012**  85:15
86:10 90:5
110:13
**2013**  12:18
13:21
**2014**  13:22,22
**2016**  13:23,24
**2017**  13:24
14:1,1,7,8
16:11,12
**2021**  48:10
49:14,16 52:11
52:18 53:21
57:15 60:3,4,4

105:10,11,16
105:19,24
106:7 114:24
115:5,10 119:9
125:3 126:2,11
127:6,7 134:1
139:11,14,23
140:5 144:12
**2022**  55:5 60:9
66:1,4 67:5,24
68:19 69:23
70:4,16 99:22
100:1 119:12
119:18 120:24
139:11 149:24
150:2,9 153:7
153:18 154:16
160:20,22
161:2,18,18
**2023**  14:18
15:8 76:18
77:22 79:4,15
79:23 81:4,6
82:3,14
**2025**  14:18
15:8
**2026**  1:10
168:18 169:4
**20th**  29:7 30:8
32:20,20
103:19 105:7,9
105:19,24
106:7 107:22
108:1,5,10,14

112:11 114:24
115:5,10
124:22 146:2,3
146:9
**216-523-1313**
169:3
**21st**  105:6,11
**22**  149:8
**223-2221**  2:22
**23**  1:5
**24**  121:18,19
**26th**  125:3
**27**  68:19 69:23
70:16
**27th**  67:24 70:4
70:21
**2nd**  126:1

**3**

**3**  76:20 77:22
79:4,15 81:17
82:2
**3/3/2023**
158:15
**3/5/2026**  169:7
170:3 171:3
**30**  24:12,13,17
24:19,20,23
25:1,4,15,17
130:7 160:3
**300**  2:6
**303**  2:6
**309**  2:17

**[31 - actual]**

**31** 51:2
**312** 2:7
**31st** 52:11 126:11 129:13 154:3,12
**3775** 1:5
**3rd** 76:18 79:17 81:4,6

**4**

**4** 3:6
**400** 2:16
**40s** 139:22
**44114** 169:2
**49** 82:8
**4th** 49:12

**5**

**5** 1:10 82:14
**5/18/2022** 158:1
**5/31** 157:23
**5/31/2022** 158:2
**504** 152:22
**50s** 139:22
**586** 56:14
**588** 56:14,15
**59** 57:21
**594** 57:22
**596** 57:22,22

**6**

**6/4/88** 4:14

**60606** 2:6
**6127** 4:17
**617** 2:22
**61701** 2:16
**618** 2:12
**62025** 2:11
**62301** 2:22
**628** 2:21
**656-4646** 2:12
**6th** 49:14

**7**

**781-6650** 2:7
**7851743** 169:7 170:2 171:2 172:2

**8**

**8/16/2021** 107:8 120:23 158:14
**8/16/21** 22:14 57:17 103:14
**8/17** 103:16
**8/17/2021** 103:17
**8/2** 155:1
**8/20** 103:7 110:17 111:21
**8/20/2021** 103:24 106:18 107:9 116:2 121:6 122:15
**8/20/21** 88:3,18 102:16 103:14

104:1 105:14 110:6 123:18 125:7 130:15 132:13 135:3 135:22 136:20
**8/201/21** 88:9
**8/21** 102:18
**8/26/21** 127:19
**8/3/2023** 81:24
**8/31/2021** 105:15
**8/31/21** 126:8,9
**828-5281** 2:17
**8th** 54:20,22 55:2,5,9 60:8 63:21 119:12 119:17 120:24

**9**

**9-21** 58:13
**9/16/21** 57:8
**9/27/22** 78:5
**96** 3:7

**a**

**a.m.** 1:10
**aag** 2:21
**abbreviation** 88:7
**ability** 166:2 168:10
**able** 7:11,24 15:14 26:7 42:5 45:11,14 72:12,24 83:15

91:5 100:23 102:1 115:17 121:21 124:10 124:11 134:12 135:22,24 136:1,22 159:11 160:9 160:10
**abnormality** 126:18
**above** 53:3 167:19 168:7 169:16
**acceptable** 21:10
**access** 94:5 95:2,5
**accompanied** 33:5
**accordance** 170:5 171:5
**accurate** 168:8
**acknowledge** 32:7 170:11 171:16
**acknowledged** 131:21 147:10
**act** 170:14 171:20
**action** 39:2 137:14
**actions** 137:11
**actual** 19:9 21:6 114:8,11

114:13 117:10 117:17 136:22

**actually** 35:23 77:23 78:20 111:20 112:21 123:15 129:1 130:12 132:3 134:23 149:4 159:2 160:12 163:20 165:16

**acute** 104:24 125:15 127:10 128:7

**add** 94:6 135:14

**addition** 74:15

**additional** 157:10,12

**address** 141:9 169:16

**addressed** 151:15

**adequate** 162:13,21 163:3,14 164:19

**adhere** 165:5,8

**adjust** 72:13,15

**administrative** 121:16 152:22 160:8 164:23

**administrator** 18:21 20:19 139:24 147:14

148:5,8 151:20 152:3,12,16,17 152:19 162:19 163:1

**admit** 32:10,15

**admitted** 165:3

**adrenaline** 26:6

**advice** 166:4

**advise** 63:19

**affects** 93:5

**affixed** 170:15 171:21

**afforded** 160:6

**age** 30:2,4,5 139:19

**ago** 132:7

**agree** 37:11,16 37:22 38:2,3,5 38:6 39:2,7,15 69:19 75:24 85:21

**agreeable** 69:19

**agreement** 86:6 90:3

**ahead** 7:18 8:2 95:21 101:4,15 144:10

**ain't** 73:13 108:6 149:24

**al** 1:6 169:6 170:3 171:3

**alisa** 33:4,5,19 39:20 40:6 43:24 44:7,8 44:17 48:14,22 48:24 49:3 103:21

**allegation** 90:18

**allegations** 121:24 122:5,8

**allege** 5:8 89:1 89:16 90:6,13 122:12 133:17

**alleged** 89:10 158:8

**alleging** 105:24 131:6

**allen** 1:3,9 2:3 4:1,7,12 56:2,8 56:14,17 57:21 82:8,11 96:6 99:5 101:2,21 101:23 102:9 112:7 124:10 124:19 138:15 153:17 160:16 164:12 165:13 166:1 169:5,6 170:3,4,9 171:3,4,13 172:20

**alleviated** 163:8

**allow** 6:6,8

**altercation** 23:9,11 144:19

**alternative** 69:13,15 75:17

**amendment** 164:20

**amount** 12:5 74:3 154:23

**anesthesia** 77:6

**angela** 90:24 138:16 139:23 140:2,3 153:3 153:18 154:16 155:12 156:17 157:2,19,23 158:1,2 162:24 165:12

**answer** 6:7,8 7:18,19 21:9 21:16 58:4 132:1 134:10

**answered** 118:7

**answers** 56:20 166:10

**anthony** 138:16 139:5,7,13 154:20,22 155:12 157:18

**antidepressants** 161:10

**anymore** 81:19 83:11

**[anytime - back]** Page 4

anytime 140:18
apart 129:17
appear 63:14
  170:11 171:15
appearances
  2:1
appeared 2:8
  2:13,18,23
appended
  171:11,18
application
  165:7,10
apply 133:10
appointment
  78:15 119:12
  119:18
appointments
  21:13
approve 20:22
approximate
  30:2 139:16,19
approximately
  111:14 163:22
april 66:24
area 8:9 41:23
  80:5
arm 27:1
arms 76:24
arthritis 67:15
  162:14
aside 9:23 42:8
  85:4 91:14,19
asked 73:11
  98:8 137:8

165:15
asking 4:8 6:4
  6:5 39:23
  46:17 58:22
  84:15 102:22
  103:3,10
  112:20,21
  118:8 120:3
aspects 123:12
asserting
  135:11 136:5,9
assess 38:18
  39:5 41:4,22
  42:9 43:6
  47:23
assessment
  42:8 91:4
assign 53:1
assignment
  170:2 171:2
  172:2
assistant 54:11
assume 7:4
  76:5
assuming 98:6
  121:4 158:4
attach 156:1,8
  157:16
attached 85:17
  156:4,11 171:7
attempt 162:20
attempts
  162:12

attended 104:3
attention 27:11
  93:17 151:5
attorney 2:20
  166:3
attorneys 6:5
  83:20 95:18
august 27:18
  27:21,24 29:7
  30:8 31:13,16
  32:13,20,20
  51:2 52:11
  59:23 60:3
  79:15,17 80:13
  80:17 81:4,6
  81:17 82:2
  103:19 105:6,7
  105:9,10,11,19
  105:24 106:6
  107:14,22
  108:1,5,10,14
  112:11 114:24
  115:4,10 119:9
  124:22 125:3
  126:11 129:13
  134:1
authorize
  171:11
availability
  55:11 66:20,23
  67:1 70:12,13
  76:8 78:3
  80:21,21

available
  121:18
ave 169:1
avoid 6:10 7:8
  89:13,19
aware 23:22
  24:2,4 114:23
  115:3,3,9
  144:18 145:5
  153:15
awhile 50:17

**b**

babich 60:23
  68:9 69:7
babitch 118:13
  118:13,14,19
  119:18,22
  132:16 133:2
back 13:17,23
  13:24 26:2,7
  31:10,11 33:9
  36:18 38:14
  47:19 48:19
  56:3 65:11,14
  68:3 70:18,21
  71:5 72:21
  73:10 74:23
  75:5,13,15,16
  77:14,15 78:5
  78:5,6,9,10,10
  78:12 79:14,15
  79:16,17 81:21
  81:23 83:16

**[back - brand]** Page 5

88:18 91:2 94:17 100:24 130:22 139:11 139:13 140:5 142:14,19,20 142:22 143:3 143:13,16,17 144:1,23 145:22 146:16 146:18 148:18 153:8,12 155:1 165:18 169:16

**bad** 50:19 143:9

**bald** 139:18

**bar** 17:13

**barely** 97:13

**barger** 2:15

**bars** 17:16,19 140:23 141:13 141:16 151:13

**base** 98:13,15 98:16,24 116:15

**based** 40:4 47:12,20 48:4 91:4 137:11,14 147:6 164:2

**basically** 16:7 30:17 34:18 63:5,23 67:15 71:17 83:9,12 93:12 128:4,5 144:17,22

145:5 155:23 158:12,19

**bat** 66:6,8

**bates** 56:13 57:21

**bathroom** 100:18 101:15

**bed** 31:14,16 32:14

**beginning** 57:14

**begun** 24:20

**behalf** 2:8,13 2:18,23

**belief** 35:16,17 105:3,13,18,21 105:23 106:9 107:2,5,17 117:3 121:13 123:5,8,11

**believe** 10:15 18:1 22:8 29:17 33:17 37:20 47:7 53:22 54:4,4 55:3 59:7 62:5 66:19 68:2,2 69:6 77:13 81:7 85:3,5 86:1,6,11 93:1 98:12 99:23 106:6 108:16 109:8,12 110:14 117:19

118:5 129:9 152:1,2 153:23 154:2,6

**believed** 35:24 100:6 106:17 122:24 123:16

**bell** 68:13

**best** 108:3 135:8 168:9

**better** 51:11 53:14 101:12 102:10

**beyond** 46:21 165:14

**biased** 31:21

**bipolar** 162:7

**birth** 4:13

**bit** 49:11 53:10 55:19 69:17 71:22 98:8 99:8 100:2 129:4 140:4 158:7,9

**black** 72:11 73:20 139:15 139:17

**blind** 164:16

**blondish** 29:21

**bloomington** 2:16

**board** 43:9

**body** 59:5 112:17,21 116:8 128:18

128:20 133:10 133:14 134:2,4 134:11

**bone** 61:8,9,10 61:10,11,12,12 61:17,18,19 63:8,11,19 65:5 101:8 116:11,17,23 116:24 117:3 121:10 128:9 149:10 159:12 160:13 164:6,9

**bony** 127:10

**books** 15:21

**bottom** 57:22 82:9 126:5 169:14

**box** 140:21,21 140:22,23 141:7,8,14,15 141:16,19 145:11,16

**brace** 68:24 69:2,5,7,10 70:17,24 71:2 71:5,8,10,11,11 72:4,6,8,10,11 73:2,5,7,11,12 73:13,17,20 75:8 150:6

**braces** 71:8

**brand** 93:2

**[break - check]**                                                                 Page 6

**break** 7:15,16 55:21,22 100:19 101:16
**breaking** 55:7 61:12 106:4 134:23
**brief** 29:18
**briefly** 5:24 16:21 23:7
**bring** 27:7
**broke** 26:19,20 35:12,13 36:5 47:15,18 59:11 61:5,8,8,18 91:12 99:15,17 99:19,19 106:16 107:8 107:14 136:21 144:22
**broken** 30:15 30:19 31:4 35:14,15,20 36:4 38:11 59:8 95:15 99:7 106:10,12 106:16,16 121:10 163:20
**brownish** 29:21 29:21
**bruising** 99:11
**bunch** 80:8
**business** 25:23 25:23

**button** 156:14

**c**

**c** 1:14 168:4
**ca** 169:24
**call** 9:3 17:6 18:8,23 19:8 19:12,22 20:2 20:16 27:6,12 27:13,15 28:15 31:5,11 49:13 49:16,20,22 50:1,9 51:24 53:24 54:18 87:19,22 103:18 124:18 151:7,12,16 152:3,6 154:17 157:21 158:3,5
**called** 1:12 14:14 50:9 158:5
**calling** 16:1
**calls** 19:19 40:5 50:5
**calmed** 26:8
**capacity** 97:2
**captured** 13:8
**carbon** 156:17 156:23,24 157:3,6,11,13 157:16
**card** 16:23,23

**care** 16:6,14 27:5 91:6,9 94:5 95:2,5 97:5,8,17,20 98:9 121:18 152:6 162:13 163:14
**carpal** 61:21 62:1,2 64:7 67:13 68:21 100:2,6,9,12 149:11,15,18 162:14
**carpel** 68:21
**case** 4:23 5:1,2 5:3,8,9,10,16 83:4 84:12,17 90:23 102:4,13 105:3,18,23 118:2 121:24 122:9 135:13 136:7,11 137:18,24 165:18 169:6 170:3 171:3
**caseload** 162:6
**casting** 64:10
**caught** 91:11
**cause** 110:15 137:4,9,15 158:18 164:13 167:20 168:7
**caused** 23:13 67:17,20,22

100:6 137:6 159:8 162:16 163:3
**cavo** 2:5
**cell** 16:16 17:20 23:4,5,6 26:2,3 26:8
**center** 12:2,10 12:16,22 77:11
**central** 5:13,15
**certain** 41:17 47:10 76:13 107:13 134:3 151:2,23
**certificate** 9:1,3 9:5 171:11
**certification** 9:6,24 170:1 171:1
**certified** 43:9
**certify** 168:5
**change** 128:18 128:20 166:10 166:11 169:13 169:14 171:8 172:3
**changed** 119:24
**changes** 127:9 169:12 170:7 171:7,9
**charged** 11:7
**check** 37:8,10 38:4,8

**[checking - confirm]**

**checking** 67:8
**chicago** 2:6
  8:17 10:2
**chief** 57:7 58:7
**choose** 28:19
  126:13
**chosen** 70:6
**chronic** 89:3
**circumstance**
  144:4
**circumstances**
  20:18 23:7
  48:4
**civil** 1:13 170:5
  171:5
**claim** 106:2
  133:22 135:11
  136:6,9 158:9
**claiming**
  136:14,17
**clarification**
  10:22
**clarify** 105:12
**classified** 12:24
**clear** 7:12,14
  156:12
**clearly** 91:3
  108:5 164:24
**clerical** 58:20
**cleveland** 169:2
**clients** 83:19
  148:21 150:4
  150:22

**clinic** 55:1 73:3
  74:24 76:14
  78:6,7,20
  80:21 94:15
**closed** 23:16
**closer** 98:16
**coating** 61:9,19
**code** 152:22
**coincidence**
  111:5,8 113:13
**colleagues**
  95:21
**collect** 17:17
  151:14
**collected** 17:13
  140:24
**collects** 17:21
  17:24 18:6
**college** 8:14,16
**color** 29:21
**come** 38:14
  49:24 88:11
  106:9 146:16
  146:18
**comes** 16:5
  17:20
**comment**
  128:24
**commented**
  131:7
**commission**
  170:19 171:25
  172:25

**commissioned**
  1:16
**common**
  106:24,24
  107:1,3,6,7
  113:9
**communicated**
  114:5
**communicating**
  92:7,9,15
**communication**
  91:21 92:6
**communicati...**
  91:16 92:1,17
**community**
  8:14,16 60:8
**company** 9:22
  109:9,13,19
**compared**
  50:18,20,22
**complained**
  144:15 148:13
**complaining**
  50:4
**complaint** 57:7
  58:7 85:18
  86:16 87:7
  89:1,16 90:6
  90:13 114:24
  156:2,4,9,11
  157:17 160:2
**complaints**
  28:2 47:13
  89:12,18 98:4

  115:4,9 150:21
**completed**
  25:13
**complied** 160:7
**computer** 8:17
  10:1
**concerned**
  31:24 32:3,5
**conclude** 166:1
**conclusion**
  34:10
**condition** 5:10
  5:11 129:20
  164:2
**conditions** 57:2
  89:2
**conduct** 30:20
  31:6 136:13,16
  137:16 161:5
  162:11,15
  164:15,16
**conducted**
  62:10 67:6
  88:3 105:15
  106:18 110:20
  111:10,13
  116:4 122:18
  130:14 136:20
**conference**
  1:17
**confinement**
  5:10,11
**confirm** 21:5
  90:2 104:3

**[confirmation - couple]** Page 8

**confirmation**
142:7 159:5
**confirmed**
93:13 94:13
**confirms** 90:23
**conjecture**
117:6
**consequence**
24:15
**consider** 65:9
69:17,18 75:21
**consideration**
69:14
**considered**
123:2 126:20
127:15
**consist** 122:16
167:1
**constitute**
123:6
**constitution**
164:21
**contacted**
147:13
**content** 150:20
**contents** 118:2
**context** 159:18
**continue** 56:3,4
83:13
**continued**
47:13 114:23
115:3,9 151:4
**continuously**
11:17 13:15

14:21
**contract** 86:4,5
86:10 90:3
91:15,20
**contradict**
138:7
**contradicted**
38:20 122:17
123:12,19,21
123:24
**contradicting**
44:10 126:24
**contradictions**
127:24
**contradictory**
129:11 130:4,6
**contradicts**
129:19
**contrary** 136:2
**control** 28:5
**convenient**
90:8,15
**conversations**
83:23 84:3,5
84:10,16
**convicted** 10:8
10:21,23 11:6
**cope** 37:21 50:7
53:13 64:6
153:14 158:20
**copied** 155:22
**copies** 155:13
155:14 156:1,8
156:10,10,10

156:13,21,21
156:22,23
157:3
**copy** 155:18
156:3,14,17,19
156:24 157:6
157:10,11,12
157:13,15,16
157:16 166:20
166:21 167:2
167:13,14,15
**correct** 29:5
47:7 49:1
59:24 60:5
63:8 65:1
70:19 76:6
77:6,15 85:23
103:5,16,23
106:7,23
107:17 108:14
114:11,20
115:5 118:23
119:2,6,14
125:1,18,22
126:2,8 127:7
131:23 132:4
132:18 137:10
144:12 145:7
148:23 149:13
164:7
**correcting**
158:18
**correction** 5:19

**correctional**
12:10,15 17:20
23:19 24:1
32:1 88:2 90:9
90:16
**corrections**
5:22 169:12
171:17
**corrective**
63:19 65:5
93:18 121:9
149:7,9 159:12
**correctly** 56:9
63:12 98:12
101:9 127:16
153:22 166:8
**corresponden...**
92:2
**cost** 167:1
**counsel** 101:22
102:3,12
**counseling**
160:17,22
161:6,8,22
**counselor**
140:11,22
141:14,15,16
**county** 11:2,3,9
11:12 170:10
171:15
**couple** 25:18
74:4 99:18,19
129:23 132:14
133:16,20

**[couple - decide]** Page 9

149:14 153:13
**course** 39:2
93:14 104:13
158:24
**courses** 93:11
**court** 1:1 4:19
5:12 6:11,22
166:8 167:4,12
168:1 170:7
**cover** 71:19
**crain** 90:24
138:17 139:23
140:2,3 153:3
153:18 154:16
155:12 156:17
157:2,19,23
158:1,2 162:16
162:24 164:13
165:12
**crane** 29:11,12
29:15,19 30:8
31:12 33:6,19
34:12 35:5,24
36:12 39:20
40:4 43:24
44:7,8,10,13,17
44:24 46:3
47:8 48:16
84:6 87:24
88:14 103:20
110:7 114:18
130:14 132:8
**crane's** 37:12
37:16,22

**criteria** 104:19
**crossed** 88:6
**csr** 1:14 168:4
168:14
**current** 9:11
14:2
**custody** 12:23
16:6,12,13
18:7,9 19:11
20:11 140:6
**cut** 80:6 129:4
**cv** 1:5
**cymbalta**
161:12,13,15
161:18 162:9

**d**

**d** 3:1
**damage** 61:22
64:4 67:14,16
67:19 128:5
159:12 163:19
164:9
**damaged** 61:10
61:11,14
**damages** 163:5
163:6
**date** 4:13 5:5
21:19,20,22,23
22:13 55:4,5
55:14,16,17
57:8,13,14,19
58:13,19 59:1
59:23 60:2

66:3,4,7 69:22
70:1,5,5 75:4,6
75:9,11 76:6
76:11,17 77:21
78:8 79:3
80:20 106:14
119:21 120:22
127:5 145:19
145:21 146:4,8
146:10,11
147:1 149:19
149:23 150:1
154:13 160:23
161:1 169:7
170:3,9,19
171:3,13,25
172:20,25
**dated** 82:14
125:3 126:1
143:15 144:12
148:14,17
168:17
**dates** 76:12
**dating** 119:5
**david** 68:13,18
**day** 14:2 15:9
19:5,11 24:13
24:20 31:1,2
32:19,22 33:3
64:12 65:12,15
68:17 70:20
75:12 76:14,21
77:12 78:17
103:4,8,12,15

103:22 106:11
106:13 121:1,8
121:14,18
128:23 129:3
130:7 134:24
136:21 142:8
142:10 146:9
160:3 168:17
170:16 171:22
172:22
**days** 15:12,13
24:12,17,19,23
25:1,2,4,16,17
25:18 51:3
52:6 79:9
87:23 111:14
129:17,23
134:23 169:18
**deal** 158:12
**dealing** 89:8
90:1 164:8
**dear** 169:8
**dearmond** 33:4
33:5,19 35:5
35:24 39:20
40:6 43:24
44:7,9,17,24
46:4 47:7
48:14,22,24
84:6 103:21
**december**
53:21 78:8
**decide** 18:15

**decided** 38:3

**decides** 18:11 18:14 20:3

**decision** 18:17 19:4,9,11,21,23 37:12,22 38:3 38:7,8 39:15

**deed** 170:14 171:20

**deemed** 142:17 143:18 144:6 145:23 146:2,6 146:12 169:19

**defendant** 2:8 2:18

**defendants** 1:7 1:12 2:13,23 5:18 84:12,13 84:17

**defense** 22:16 144:19

**definitely** 43:18 107:7 143:1

**definition** 122:20 123:7

**definitive** 21:16

**degenerative** 127:9

**degree** 8:24 9:3 10:15

**delay** 159:6

**delayed** 94:5 95:14 148:22

**delays** 95:2,5

**denied** 94:19 149:7 163:3,15 163:23

**dentist** 112:18

**deny** 31:22,22

**department** 5:19,22 152:23 169:22

**depend** 141:2

**dependent** 125:11

**depending** 20:18 65:8

**depends** 140:20 144:3

**deposed** 4:2

**deposition** 1:9 4:18,22 5:24 166:1 168:7 169:7,9 170:1 170:3 171:1,3

**depression** 162:3,9

**describe** 23:19 26:17 34:5 51:13

**description** 29:18

**descriptions** 113:14

**despite** 19:9 34:20 106:18 110:23 136:1

136:21

**destructive** 126:17

**detail** 16:2

**detailed** 163:10

**details** 167:10

**detained** 11:11 11:17

**determine** 104:20 111:20

**determined** 25:14 104:21

**determining** 29:2

**develop** 128:21 134:14

**development** 129:19 130:5

**diagnose** 41:22 43:6 64:21 89:12,19 129:2

**diagnosed** 68:20 91:8 100:4 104:16 110:5 111:20 121:5 130:24 159:3,4,6 162:7

**diagnoses** 158:16

**diagnosing** 91:1 110:16

**diagnosis** 87:15 87:15 100:3

110:11 128:4 136:19

**difference** 42:1 43:18

**differences** 104:23

**different** 9:15 16:4 40:15,17 40:19,20 41:16 42:4,19,20 46:14,15,15 53:15,18 60:18 65:17,22 68:5 71:7 72:6,8 101:12 127:18 134:16

**differentiate** 40:14 42:4

**difficult** 6:11 161:23

**digits** 4:16

**diminished** 164:10

**diploma** 9:24

**directed** 89:2 89:17 141:1

**directing** 89:10

**directives** 121:17 160:8 164:23

**directly** 16:21 114:3 142:22 143:12 153:3

**[director - dr]** Page 11

**director** 18:22 20:20 140:1 151:20
**directors** 152:20
**disagree** 47:24 48:3
**disciplinary** 24:10,18
**discipline** 24:8
**discoloration** 30:16 35:11 38:13 47:17 87:21 131:12 131:18 135:2,4 135:7,17
**discovery** 92:22 138:9
**discretion** 90:7 90:14
**discussed** 122:2 122:4
**disfiguration** 164:9
**dislocation** 127:10
**disorder** 162:7
**dispute** 117:8 117:10,13,16 119:17 146:1,8
**disputing** 117:24 118:2,3 118:8,10

**disregard** 90:7 90:14 165:4
**disregarding** 164:18
**distinguish** 12:21,24
**distress** 135:12 136:7,10,18 137:4,7,10,15 158:9,11 161:4 162:3,17 164:14
**district** 1:1,1 5:13,13,15 168:1,1
**doctor** 18:12,15 19:15,18,20,23 20:3,12 36:16 36:17,20,24 39:8,13,16 40:11,14,24 41:2,7,8,13 42:10,12 43:3 43:10,11,12 45:3,19,20,22 46:4,5,9 47:2,2 47:15,18 49:7 49:9 54:5,9,24 70:3 86:17,21 87:1,5 88:7 100:4 101:6,9 108:8 111:9 118:13 121:22 134:14 159:3

160:5
**doctor's** 46:24
**doctors** 46:12 46:15,15,18 47:3,8 57:5 82:2 84:7 112:3 130:2 131:7 134:16
**document** 21:14 56:7,9 56:20 57:20 82:12,20 85:22 85:23 86:2,4 88:12,14 109:8 122:23 124:19 125:5 126:1 130:22,23 156:13
**documentation** 75:10 150:18 152:19
**documentatio...** 130:18 160:24
**documents** 21:4 66:10 86:14 88:23 92:20 124:1 149:20 150:1 154:5 161:17
**doing** 21:18 24:23 58:5 74:16 75:1,18 75:19 77:1 86:23 87:3,4,4

**door** 99:12
**double** 37:9 38:4,8
**doubt** 35:4,8,17 35:23 36:4 54:15 89:11,17 134:22,23 135:2
**dr** 2:8,18 65:18 65:23 66:12,15 66:20,23 67:4 96:7,14,17,20 97:7,17 101:22 101:23 102:4,5 102:12,13,15 105:6,19 106:1 107:21 108:8 108:12,16,20 113:17,18,19 113:20,20 114:19,22 115:2,8,12 117:12,16,20 117:24 118:8 118:13,19 119:18,22 122:12,24 123:4,24 124:24 126:4,7 126:10,24 129:10,11,11 131:20,21,23 132:2,3,5,16 133:2 135:12

**[dr - eventually]**  Page 12

136:7,11,13,16
137:3,9 138:3
138:7
**drafted** 130:23
131:4,9
**drives** 121:13
**drop** 140:20,22
**drugs** 93:1
**due** 26:6 30:22
42:3,6,20
61:11 63:5,7
64:3 65:6
110:9 121:3
150:6 163:2
**duly** 4:2
**dupage** 11:3,9
11:11
**duties** 15:14
152:21,24
164:24 165:5
**dwd** 1:5

**e**

**e** 3:1 54:12
**earlier** 58:18
118:22 120:5
120:11,16
122:2,4 127:1
131:21
**early** 49:16
158:4
**earn** 9:7
**edema** 125:11

**education** 8:11
10:3
**edwardsville**
2:11
**effective** 93:2
**eight** 8:14,19
8:22 13:20
15:11 52:8,9,9
57:17 58:24
59:24 60:4
**eighth** 164:20
**either** 24:8 38:6
45:22 46:6
62:11,14 140:9
141:8,17
**elastic** 72:11
**elevated** 28:5
**elevating** 28:11
**else's** 5:2
**email** 92:5
169:16
**emergency**
121:18 140:10
141:5,12,18
142:2,17
143:15,18
144:5,6 145:7
145:23 146:3,6
146:13 148:15
**eminences**
127:13
**emotional**
135:12 136:6
136:10,18

137:4,7,10,15
158:9,10 161:3
162:3,16
164:14
**emotionally**
159:20
**employed** 5:20
84:9,10 109:4
**employee** 110:7
110:8,14
**employees** 2:13
2:23 5:19,19
5:22 83:24
85:2,3,5 90:2
90:21 92:11,15
92:16 93:14
95:6
**employment**
21:20 108:21
**enclosed** 169:9
**encounter** 30:7
60:6,9
**encountering**
90:21
**encourages**
93:10
**ended** 23:20
61:16 157:15
**endure** 159:22
**enduring** 151:5
**ensure** 164:19
**enter** 11:20
**entered** 171:9

**entire** 6:6,8
170:5 171:5
**entirely** 134:12
**entitled** 167:19
168:7
**equals** 110:11
**equivalent**
71:12,13
**erosive** 126:17
**errata** 166:13
169:12,15,18
171:7,10,18
172:1
**error** 58:21
166:12
**erthall** 54:12
55:1
**especially**
38:23
**et** 1:6 169:6
170:3 171:3
**evaluate** 39:5
**evaluated** 19:8
**evaluating**
58:22
**evaluation**
38:17 159:7
**evalve** 160:5,10
163:23
**event** 156:18
**eventually**
20:21 50:15
54:9 71:6,6

**everybody** 55:20
**evidence** 89:5 89:14,21,23 90:10,17 93:9 93:9,16,22 94:4,7 95:1,4 114:22 115:2,8 125:15 128:7 137:3,6,9
**exact** 5:5 11:13 12:5 74:3 75:4 75:6,9,11 78:8 130:22 150:1 154:13,23 157:11 160:23 161:1
**exactly** 23:3 34:7,8 44:21 59:21 60:14 62:4,4,20 67:21 73:18 95:7,12 109:1 118:12 124:2 125:23 126:23 129:8,15 148:9
**examination** 4:4 56:3 96:3 98:1 101:18 114:8 121:23 138:12
**examine** 77:1
**examining** 77:3 117:2

**exchange** 23:10
**exchanging** 23:16
**excruciating** 51:22
**excuse** 100:17
**executed** 171:10
**execution** 170:14 171:19
**exercise** 74:14
**exercises** 74:17
**exhibit** 3:12 85:17 124:7,13 124:18 156:2,4 156:9 157:17
**exhibits** 3:10 124:14 156:11
**exist** 92:23,24
**existing** 89:2
**expedited** 144:6 145:24 146:14,16
**experience** 44:1 76:19 90:1,20 93:7 95:6
**experienced** 158:10,13
**experiences** 89:7 163:10
**experiencing** 26:18 30:14 35:21 38:12,21 50:5,8 51:15

51:18 53:14 61:7,15,23 63:24 65:9 74:13 75:20 153:10 161:4 162:9
**expert** 38:17 111:19,21 117:2 128:23 128:24 129:7 138:6
**expertise** 41:23
**experts** 137:17 137:21,22
**expiration** 170:19 171:25 172:25
**explain** 16:2 35:1
**explaining** 64:22 163:11
**expressly** 169:10
**extent** 47:10 97:10 134:3
**extreme** 136:14 136:17
**eye** 164:17
**eyes** 123:2

**f**

**facilities** 16:5,8
**facility** 12:8 161:24 162:24

**fact** 24:3,5 35:2 35:14 36:5 38:19 94:8,13 101:5 106:10 122:14 123:14 130:6,13,14,16 131:6 144:21 162:18
**factory** 9:19
**fail** 165:5
**failed** 15:24 165:1,1
**failing** 163:2 164:18
**fair** 7:6 15:5 36:6,7 76:12 119:16
**fall** 125:10
**false** 87:8,13 88:13,15,19,21 122:22 131:9
**falsely** 88:13
**falsification** 122:20 123:2,6
**falsified** 122:1 122:6,9,13
**family** 43:10 57:1
**far** 16:15 19:9 26:23 27:4 35:16 38:5 39:10 42:8,11 65:4 79:3 84:1 85:20 94:7

**[far - fingers]** Page 14

147:9 158:10 167:6

**fashion** 94:21 163:4

**faster** 91:9

**fault** 149:2 150:3

**faulting** 148:21 150:22

**feared** 31:20

**february** 54:20 54:22 55:2,5,9 60:8 63:21 119:12,17 120:24 154:15

**federal** 1:13 165:5

**feel** 26:8 38:9 38:10,14 41:3 47:12,14,17,20 83:11

**feeling** 35:10 144:20

**fell** 31:14,16 32:14

**felonies** 10:17 10:24

**felony** 10:8,14

**felt** 26:19,20 31:19 35:11,12 35:12,13 36:3 36:5 38:11,15 39:17,18 40:13 40:13 41:2

63:17 72:4 106:16 144:21

**female** 29:20 60:13,17,19 65:18

**females** 60:22

**fight** 22:16,18 22:23 23:2,8 23:13,17,22 24:2 25:22 26:6,21 31:21 32:2 51:24 52:6 59:19 107:15 134:1

**fighting** 23:15 23:16 24:7,9 24:14,15 25:15

**figure** 108:7

**file** 5:12 16:23 140:6,18 143:1

**filed** 50:3,5 140:9,16 143:14,15 149:3,6,10,12 149:14,14 150:5,7,8,13 154:17 163:21

**filing** 155:9

**fill** 17:1 140:8

**filled** 140:12

**filling** 56:21,23 56:23 57:3,4 58:1,2,2

**film** 33:5,6 45:3 49:1,7,9 62:8 88:2,3,5,9,17 91:1,2 92:3 94:16,17 98:6 102:16,21 106:19 107:9 107:21 108:23 109:2 110:8,16 110:17,20 111:4,7,10,13 111:16,21 113:4 114:17 116:4,11,13,17 118:4 122:14 122:18 123:12 123:13,16,18 127:2,3,22 130:10,15,18 130:21 132:13 135:18,19 136:20,23

**films** 33:9 36:18 46:18,20 47:1,6,9 88:18 97:23 106:17 107:22 110:6,6 110:22 111:19 116:1 117:2 122:19 128:24 128:24 130:7 131:1 135:21

**final** 129:11

**finally** 159:10

**find** 21:8 30:20 31:7 33:2 34:19 36:19 45:22 88:11 111:17 130:6 169:9

**finding** 88:8 111:2 116:7 123:13,18 129:18 130:19

**findings** 44:11 44:12 88:4,9 88:16 94:17 97:23 108:14 108:17 109:15 111:3,15 117:11,17 122:15,15,17 122:18 123:12 123:16,17,19 123:20,23 124:3 125:11 125:14 126:15 128:4 129:23 130:3,15,21 131:7 136:1 142:8,12

**fine** 21:7

**finger** 26:14 99:1 116:14

**fingers** 26:24 98:16,22

Veritext Legal Solutions

**finish**  134:9
**first**  4:2 10:15
  11:11,20,24
  14:16,20 15:11
  24:11 25:21,24
  33:6 38:10
  43:24 45:23
  50:19,21 51:16
  51:23 52:2,3,5
  68:6,10 71:10
  72:19,21 73:5
  73:15 96:16
  100:19 102:19
  102:20,21,23
  103:14 138:18
  163:16
**fists**  23:16
**five**  5:6 29:24
  81:3,11,11
**fixing**  53:13
**florence**  2:8
  101:22,23
  102:4,5,12,13
  102:15,20
  105:7,19 106:1
  107:11,21
  108:9,13,16
  110:5,18
  111:13 113:17
  113:21 114:19
  114:22 115:2,9
  115:12 117:12
  118:1,3 121:4
  122:13,19,24

123:15 126:24
  127:20 129:10
  131:11,20,22
  131:23 132:2,3
  132:5 135:3,12
  135:19,22
  136:7,11,13,16
  137:3,9 138:3
**florence's**
  106:19 108:21
  111:1 117:16
  117:20 118:9
  123:4,13 124:5
  124:24 127:19
  138:7
**focused**  63:16
**folks**  5:21
  60:21 84:11
**follow**  28:15
  65:9 68:4
  69:23 78:15,22
  79:16 80:12,16
  81:1,1,17,18,22
  126:19 127:14
  165:11,21
**following**  55:23
  101:17
**follows**  4:3
**followup**  81:8
**followups**
  81:19
**forced**  159:22
**forearm**  26:23
  71:21,21

**foregoing**
  170:13 171:18
**form**  16:24
  17:4 58:1,3
  61:23 64:3
  83:9,16 88:13
  140:8,9,12,13
  140:14,15
  145:7 158:17
  158:19
**formal**  106:22
**forms**  17:6
  40:15 61:13
  69:12,13,15
  75:17 151:2
**forth**  83:17
**forward**  101:9
  142:15 169:15
**forwarded**
  132:9 141:22
  142:17 146:13
  146:15,19,20
  147:24
**found**  123:14
  126:24 130:2,8
**four**  4:16
  111:14 134:15
  136:21 163:22
**fracture**  33:10
  33:11 34:14
  35:3,6 38:15
  44:15,23 45:16
  46:5 48:20
  61:4 63:6 64:5

98:11 100:6,9
  100:13 104:21
  104:24,24
  105:20 106:2,7
  106:18 107:10
  107:12 108:4
  111:12,17
  118:6,22 119:5
  119:9,13,19,20
  120:20 121:2
  123:1,5,14
  125:15 126:17
  127:10 128:7
  130:11 132:17
  133:3,7,10,14
  133:24 134:2,5
  134:12 159:4,5
**fractured**  36:1
  36:13 37:24
  121:7 131:13
  131:15 162:13
  162:22
**fractures**  34:20
  45:22 47:19
  104:16 106:20
  110:23 115:17
  115:20 117:14
  117:17,21,22
  118:4,9 119:1
  122:16 123:17
  130:1,9 144:24
**free**  170:14
  171:20

**[fresh - guarantees]**

**fresh** 80:11
**front** 21:5,15
  66:10 88:23
  92:20 124:2
  154:5 160:24
**full** 86:17,20,24
  87:5 90:7,14
**fully** 80:10
**further** 145:24
  165:20

**g**

**g** 2:5
**gallery** 14:11
  14:12,17,21,22
  15:3,7,19
  16:20 23:3
**general** 2:20
  47:2 117:1
**generally** 5:7
  41:7 116:20
**generic** 93:1
**getting** 12:23
  20:20 50:9
  77:4 81:9
  86:24 93:20
  145:22 151:5,6
  156:22 157:15
  161:11 162:6
**give** 5:7 6:2
  10:12 21:15
  29:18 31:8
  37:12,17,18
  62:16 64:9,11

64:12 74:14
78:17 83:12
93:17,18,19
97:24 119:4
124:2 129:1
142:9 151:11
161:1 166:4
**given** 4:18 5:24
  60:11 71:2,4,7
  71:10
**gives** 18:7 90:7
  90:14
**giving** 31:1
  35:20 64:19
  142:7
**glen** 60:23 68:8
  69:7
**go** 5:24 7:18
  8:2 11:24 12:6
  12:17,23 19:15
  23:10 25:22
  42:18 44:20
  50:14 54:9
  56:2,22 65:11
  65:14,17,22
  67:23 78:6,9
  79:15,16,17
  83:16 95:21
  101:4,15
  144:10 146:17
  147:15 159:2
  159:16 167:9
**goes** 25:23 29:1

**going** 6:2 7:4
  18:2 19:23
  28:19,23 29:2
  30:24 31:11
  36:10,13,21
  37:1,3,6 38:19
  39:12 45:1,18
  49:4,6 54:4
  55:19 56:2,6
  64:22 75:5
  76:2 78:10,12
  81:23 82:5
  95:18 100:23
  101:9 125:24
  129:4 136:24
  158:3 165:4,8
  165:11,13,15
  165:17,17
**good** 4:7 10:22
  55:20 63:17
  131:19 138:10
**gotten** 112:6,11
**govern** 19:7
  42:24 152:5
  165:6
**governs** 21:3
  21:17 152:21
**graduate** 8:5,7
**grandmother**
  57:2
**grievance**
  138:23 139:1
  140:5,6,8,9,15
  140:18,19,22

141:3,3,5,6,11
141:12,19,20
142:3,13,14,14
142:15,18,19
142:22,24
143:7,11,13,13
143:15,23
144:1,2,5,7,8,9
144:11,14,16
145:6,7,10,13
145:14,15,17
145:20 146:16
146:17,18,20
146:21,22
147:4,5,7,9,20
147:21,24
148:3,10,11,15
149:8,15,17,19
149:22,23
150:5,7,23
162:20 163:15
**grievances** 50:3
  140:17 143:21
  148:12,16,23
  149:1,2,3,5,14
  150:3,10,13,16
  150:21 155:9
  163:17,24
**ground** 6:1
**group** 69:24
  70:4,12 79:15
**grow** 8:3
**guarantees**
  164:21

**[guess - healed]**

**guess** 15:22 19:18 20:16 24:6 36:15,19 37:8 46:20,20 47:6 69:12 124:14 133:15 143:4 144:3,7 144:8,8 147:14 165:18
**guessing** 18:24 20:23,24 151:17,22
**guideline** 164:24
**guidelines** 85:8
**guy** 24:7
**guys** 23:17 25:22 138:11

**h**

**h** 54:12
**hair** 29:21 76:24
**hand** 22:5,9 23:12,14 26:1 26:4,12,15,16 26:22,23 27:4 27:9,16 28:1,5 28:9,12 30:12 30:13,15,16,17 30:23 31:23 32:6,15 33:7 33:20 34:20 35:2 37:23

38:10,16,18,24 39:4,5 41:2,4,6 41:22 43:5,7 47:15,17,21 48:1 57:17 59:3,4,7 60:15 60:23 61:5,8 62:6 64:2,10 65:21 67:14 68:1,3,9 71:15 71:19,20 72:3 74:17,23 79:1 79:18,20 80:6 80:9,24 81:23 82:2 83:3 84:24 91:6,10 93:15 95:15 97:5,9,18,20 98:5,5,11,13,14 98:17,18,21,21 99:3,4,5,7,11 99:15,17 104:14 106:10 106:12,14,16 106:16 107:8 107:14 110:24 111:4 112:13 112:19,20 114:9 115:4,10 116:5,13,15,19 117:4 118:15 118:23 119:13 120:7,17,19 121:5,7,15,22

125:7,21 126:16 128:3,8 128:10,13 129:20 130:1,5 130:9 131:13 131:15 132:11 135:1,5,7 136:21 144:18 148:13,19 149:13,13,22 150:6,14 153:8 153:12 154:7 154:12 155:2 155:22 157:10 159:7,10,19 160:21 162:4,5 162:11,13,21 163:20 164:4 164:11
**handbook** 85:15 86:7,10 89:6,24 90:5 90:19 91:14,19 93:12 94:3,12 95:9 110:9,13
**handled** 90:22
**handling** 152:9
**hands** 37:13 43:10 47:13
**handwrite** 17:11
**handwriting** 57:11 58:9,10 58:11

**handwritten** 156:3 157:12
**happen** 22:18 28:9,13 36:10 36:14 45:1 49:4 59:18 63:22 141:20 141:23
**happened** 15:23 16:2 23:13 59:13,15 60:10 76:20 95:12 133:18 133:22
**happening** 16:17 60:2
**happens** 20:14 144:2
**he'll** 142:2
**head** 6:16,17
**headed** 139:18
**heal** 63:11 134:12,22
**healed** 61:5,18 61:20 63:15 80:10 91:11 95:15 101:8 121:3,11 132:18,19,19 132:23,23 133:3,3,6,7,7,9 133:10,13,14 134:2,4,6,7,7 134:24 135:2

149:10 159:11 160:14 162:22 164:7,10

**healing** 61:17 63:6

**health** 1:6 85:14 152:14 160:17 161:3 162:2,6 169:6 170:3 171:3

**healthcare** 18:20,21 20:19 33:13,16 83:22 84:13 139:24 147:14 148:1,5 148:7 151:19 152:3,12,15,17 162:19 163:1

**hear** 6:22,23 7:1 28:21 32:12 55:7 96:8,9 101:24 102:1,6,7,9 103:1 115:7 126:9 138:19

**heard** 7:5 24:24 101:23 102:5 102:13

**height** 139:16

**held** 11:7,9 14:6 15:15

**help** 37:21 50:6 53:7,9 64:6 69:17 74:5,12

153:14 158:19

**helped** 45:8 74:7

**helpful** 6:2 14:3 50:24

**helping** 53:13 75:22

**heyl** 2:10

**heylroyster.c...** 2:12

**high** 8:5,7,11 9:23 52:7,8,13 52:15,15,24,24 53:2,2

**highly** 111:17 134:22 163:10

**hill** 2:10 3:4,6 4:6,8 55:19 56:1 95:17 96:2 122:5 124:9,16 165:18,20,24 166:18,21 167:3,9,13

**hired** 15:20 165:9

**history** 57:1 58:8 125:10 126:13

**hold** 83:3,7,8 83:14,15,17 121:11

**holding** 83:13

**home** 10:15 74:14

**hopefully** 7:24 132:15

**hospital** 94:15

**hour** 55:20

**hours** 15:9,11 121:18,19

**house** 22:19 23:1,4

**housing** 22:20

**huh** 4:24 7:8 32:9 55:15 74:19 85:12 128:12 139:12

**hypothenar** 127:13

---

**i**

---

**ibuprofen** 62:22,23,24

**ice** 28:3,10

**idea** 117:1

**identifiable** 51:10

**identification** 4:15 120:11,16 124:8

**identified** 86:9 111:12 118:21 119:23 130:11 147:8 162:22

**identify** 36:20 87:20,21,22

115:17 119:1 123:1 135:20 135:23,24 136:1

**idoc** 2:23 11:20 16:5 86:3,5 90:3,4 160:1,8

**ignoring** 164:18

**illinois** 1:1,16 2:6,11,16,20,22 5:14 8:18 11:4 12:14 56:11 168:1,5

**illness** 58:8

**images** 114:14

**imaginable** 51:22

**imaging** 104:17 104:21 105:1

**impacted** 116:18 117:5

**imply** 133:14

**impression** 106:15 125:20

**impressions** 111:3 138:7

**improper** 159:23

**improperly** 61:5,17,18 91:11 121:3,11 133:6,7,8,9,13 134:7 149:9

**[improperly - interpretation]**

160:14 162:23 164:7,10

**improved** 51:4

**inaction** 137:14

**inactions** 137:12

**inadequate** 145:4 151:1 158:17 162:4 162:10 163:12

**incarcerated** 11:18 12:14 13:1

**incarceration** 9:11

**included** 169:13

**inconsistency** 127:20

**incorporated** 171:12

**incorrectly** 63:7,15 95:16 132:19,23 159:11

**indentions** 116:2,6

**indicate** 117:13

**indicated** 58:19 129:9 145:6

**indicating** 169:13

**indication** 134:16

**individual** 16:5 16:12,13 19:11 20:11 24:9 140:6

**individuals** 12:23 18:7,9 151:23

**ineffective** 93:11,14 158:24

**infected** 80:9

**infirmary** 77:18 79:9

**inflection** 7:10

**inflicted** 136:17

**infliction** 135:11 136:6 136:10 158:8,8

**information** 87:8 88:13 98:3 122:22

**informed** 153:24

**initial** 127:11 129:10 134:16

**initially** 73:20 103:4

**injure** 22:15 23:14

**injured** 22:11 23:12 31:21 32:15 57:17 93:15 99:5,9 103:9 150:6

**injuries** 41:4 89:12,19 120:12,18 128:21

**injuring** 26:22

**injury** 22:4,8 24:6 41:22 47:23 50:4 63:22 64:21 83:3 94:24 95:15 97:9 99:10,13,14,20 101:11 102:22 103:4,9,13,13 103:15 111:11 111:14 115:4 115:10 119:23 120:22 121:1,5 130:8 133:2,17 133:21 134:14 144:18 150:12 158:14,16 159:9 160:11 162:4,5,11,21

**inmate** 22:17 30:21 94:1,11

**inmate's** 22:22

**inmates** 89:11 89:18 90:7,14 130:21 161:23 165:11

**inside** 61:10 63:11

**insight** 129:1

**instance** 41:9 122:21 143:14

**institute** 8:17 10:1 56:10 68:20 98:10

**institution** 109:14

**institutional** 17:14,17

**instructive** 95:10

**instructs** 93:17

**intact** 126:17

**intended** 137:4 137:9,14

**intentional** 135:11 136:6 136:10,19 158:8

**intentionally** 108:13,17 109:20,22 130:17,24 164:17

**interaction** 53:23

**interested** 84:3 84:5 92:14

**interpretation** 111:23 117:11 117:13,20 123:4 124:21 124:24 126:8

**[interpretation - know]**

126:10 127:19 129:10

**interpretations** 112:3,23 113:10 118:1 131:4

**interpreted** 105:6,20 106:1 108:1 109:15 114:14 115:13 125:7 128:15 129:12 131:23

**interpreting** 104:14 106:22 109:13,19 127:6

**interrupting** 147:19

**intervention** 120:6,11,16

**invasion** 10:16

**investigate** 144:9 147:4

**investigated** 164:1

**investigating** 148:4

**investigation** 24:11,12,21,23 25:5,9,12,14 147:18

**involved** 97:8 97:17,20

**involvement** 97:5,10

**ipad** 7:21

**irreparable** 163:6 164:8

**issue** 26:1 27:4 158:19,20

**issued** 24:10,11 24:13,21,24

**issues** 120:7,12 120:17 154:1

**j**

**j.c.** 9:20

**jail** 11:7,9,12 20:7

**jefferson** 2:16

**jillian** 29:11,12 29:15 30:8 31:12 33:6,18 34:12 35:5,23 36:11 37:11,16 37:22 39:20 40:3 43:24 44:7,8,10,13,17 48:16 87:24 88:14 110:7 114:18 130:14 132:8

**job** 14:4,7 15:14,16 16:1 163:3,8 164:19 165:7

**jobs** 9:15,16,17 9:19 14:6,10

**joint** 125:16 126:16

**joke** 34:24,24

**joked** 34:22

**journal** 9:19,22

**judgment** 47:8 48:1,4

**julian** 29:19

**jump** 31:10 49:11

**june** 66:1,4,24 67:5 158:4,4

**k**

**keep** 6:15,21 72:24 77:17 96:11 97:15 155:13

**keeping** 28:4

**keith** 1:3,9 2:3 2:10 3:4 4:1,7 4:12 56:14 57:21 82:8,11 124:14 169:5,6 170:3,4,9 171:3,4,13 172:20

**kelly** 138:16,18 138:21,22 139:2 147:22 147:23 155:5,7 155:9,10 163:9

163:15

**kept** 46:2

**khill** 2:12

**kind** 15:22 23:21 25:11 34:21 36:4 50:7 53:9,9,13 61:20 62:8,12 63:6,11 64:6,9 69:13 71:11,13 71:13 77:4 80:3,5,10 104:4,6 115:22 122:1

**kite** 153:2,5 154:24 155:3 156:3

**kites** 153:23,24 154:13,16,19 155:4,11,13,16 155:19,23 156:5 157:4,19 157:22

**knew** 39:23 40:3,6

**know** 7:16 9:17 11:13,22 14:24 15:18,21,24 17:8,23 18:3,8 18:11,14,16,19 19:4,10,17,21 20:3,7,10,13 21:8,9,9,11,12 21:19,23 23:9

**[know - little]**

23:10,10,12,23 26:23 28:10,18 29:1,9 30:3,13 30:14,19 31:3 31:22 35:12 36:2,6,18 38:2 38:17,20 40:15 40:16,21,23 41:9,12 44:16 45:7,7,8 46:8,8 46:11,12,17,21 46:23 47:4 48:23 50:17 54:6,7 55:4,5,8 55:11,14,16 56:22 57:13 58:18 60:13 61:17 62:1,5 62:10,19 63:14 66:3,7,9,11,14 66:16,20,23,24 68:15 69:22,24 70:5,8,12 71:12 73:2,16 73:19 74:4 75:9,10 76:7,7 76:11,16 77:21 78:1,1,4,21 79:4 80:12,19 80:23 81:8,13 81:20,21,22 83:13 86:23 87:2,3 88:12 90:24 91:5

94:16 97:9 98:3 102:15 104:9,23 107:20,24 109:1,18,22,24 110:1,1 113:2 117:9,10,16 118:18 119:4 120:4 124:1 127:1 130:2,16 131:10 132:22 134:15,21 135:4,10,10,24 136:5,9 139:20 139:21 142:4 143:19 144:4 144:22 145:3,9 146:5,10,10,11 146:11,21,24 147:1,17,20,23 147:24 148:2 150:1 151:4,18 151:23 152:11 153:7 154:11 154:23 156:20 157:18,22 158:21 159:13 160:23 161:2,9 161:17 162:23 164:5 166:24

**knowingly** 122:22 158:16

**knowledge** 97:4,16,19

104:19 108:3 113:7 116:22 128:17 129:7 135:8

**known** 158:24

**kwame** 2:20

**l**

**l** 54:12,12

**laboratory** 88:1,2

**lack** 151:5,5 153:10,11

**language** 118:22 131:8

**lapse** 63:7 121:3

**lapsed** 121:1

**laptop** 7:20,22 7:24

**lasted** 50:17

**laughed** 34:21

**law** 42:23 152:21 156:22 157:16 165:4,5

**laws** 165:11

**lawsuit** 5:11

**lbbscom** 2:17

**lead** 19:19

**leading** 149:4

**leave** 77:11

**led** 50:8 94:23 163:4

**left** 13:17,21,21 13:22,24 98:5

**legal** 169:1 172:1

**letter** 153:6,15 157:11,17 169:19

**letters** 153:2 154:19 155:5

**letting** 83:10 145:3

**level** 51:17 52:1 52:4

**levels** 42:20

**library** 156:22 157:16

**license** 1:14

**lie** 130:16

**lied** 130:17

**life** 99:10 112:7 112:8

**line** 169:13 171:7 172:3

**listed** 171:7,17

**listened** 28:2

**listing** 171:7

**litchfield** 2:5

**litchfieldcav...** 2:7

**little** 16:2 25:3 38:18 53:10,14 55:19 69:17 71:22 77:1,2 99:8 100:2

**[little - medical]**

129:4 140:4 158:7,9

**living** 9:14

**livingston** 2:15

**llp** 2:5

**located** 62:3 98:11

**long** 12:4,19 13:12,12 14:23 14:24 15:2,4 19:7 50:16 95:14 99:16 138:11 161:6

**look** 21:5 22:1 39:13,16 42:18 91:15 95:24 110:3,3 116:3 116:3,16,23 138:3 139:11 139:13

**looked** 91:15 91:20 96:15 115:19 116:10 117:5 135:21

**looking** 7:20 34:2,3,4 56:13 56:14 57:21 108:7 134:14

**looks** 29:19 30:23 38:10 56:18,18 57:24

**lost** 156:18

**lot** 21:7 50:20 110:10 160:12

**m**

**m21830** 1:3 2:3 169:5,6 170:3 171:3

**machine** 156:13 168:6,9

**madam** 169:8

**made** 97:23 156:1,10,14,17 156:22,24 157:12,16 170:7

**madison** 2:6

**mail** 17:14,16 17:17,18,19 140:24 151:14

**main** 2:21 89:9

**maintain** 89:11 89:17

**majority** 60:24 150:24

**make** 6:18 13:8 25:11 41:16 93:20 97:11,13 133:1 156:5,8 156:21 157:3 166:7

**makes** 6:11 18:16 19:4,10 19:21,22 152:2

**making** 35:15 144:17 145:5 147:2 153:15

**malalignment** 125:15 128:5,7 128:9

**male** 139:15,17

**males** 60:13,17 60:18,21 62:14

**malicious** 161:5 162:11

**maliciousness** 164:15,16

**manuals** 85:8

**march** 1:10 76:18,20 77:22 79:3,4,23 168:18 169:4

**margaret** 2:15 96:6,13

**mark** 124:13 124:14 141:11

**marked** 82:8 124:7

**marrow** 61:10

**mason** 68:13,19

**massage** 80:5

**materials** 137:18,23

**mcdonald's** 9:19

**mean** 13:14 35:1 38:5 40:14 46:14 47:11 51:13 52:14 54:9 58:2 87:20

99:9 116:6 122:21 128:22 143:8 152:5 155:1 156:7,15 157:7

**meaning** 19:5

**means** 131:8

**meant** 7:11 31:10 131:22

**medical** 10:6 16:6,14 18:18 18:21 20:11,20 27:5,11 31:14 31:22 38:6,7 40:15,17,19 47:24 48:3 54:14 68:18 76:4 82:17,21 83:2,3,7,8,9,14 83:14,17 84:20 84:21 87:9,14 87:18,18 88:7 88:14,21 90:8 90:15 91:17 92:4,7,8,10,13 93:17,23 94:15 100:3 102:17 120:4,9,14 121:19 122:23 137:24 140:1 144:21 145:2 148:6 150:14 151:5,8,9,17,20 152:6,7,8,8,10

152:23 153:1
153:24,24
154:13 156:15
156:16 158:17
159:23 160:5
162:13,21
163:4,14
164:17,20
165:12
**medication**
27:8 28:10
31:8,9 37:12
37:17,18 42:11
50:6 53:7,11
62:16,18,19
63:1 64:6,15
64:18,20 93:2
151:6,10
153:11,14,16
161:11
**medicine** 107:2
107:6
**meet** 139:8
**memo** 92:5
**menard** 12:10
12:13 13:10,13
13:15,16,18,19
13:20 14:1,1,4
14:6,7,17
16:11,12,19
40:24 77:15,17
79:1 86:17,21
87:1,5 88:1
91:22 92:13

102:17 109:14
109:19 114:17
132:10 140:5
**menard's**
121:16
**mental** 160:16
161:2 162:2,6
**mentally**
159:19
**mentioned**
86:16 90:19
105:5 110:21
110:21 148:4
150:24 153:17
**merely** 11:7
**met** 113:17,19
113:20 139:2,7
139:9 140:2
**mic** 97:14
**michael** 53:16
53:19
**mid** 30:4 53:3
139:22 158:4
**middle** 30:5
129:12
**midwest**
169:17 172:1
**mild** 127:9,12
127:23 130:3
**milwaukee** 8:4
8:9
**mind** 12:21
42:1 113:16

**mineralization**
125:16
**minute** 143:22
**misinterpreted**
57:16,18 58:23
**misinterpreting**
109:20,23
132:12
**misread** 108:9
**misrepresent**
109:15
**misrepresented**
108:13,17
**missed** 89:12
89:18 110:15
111:20 129:2
136:19 158:15
159:6
**misspelling**
166:12
**mistaken** 69:6
100:14 139:15
154:3,4 157:24
158:2
**mobility** 63:16
63:18 65:6
**moldenhauer**
53:16,19 84:6
**moment** 63:18
132:7 138:5,8
158:13 161:1
161:19
**money** 94:5
95:2,5

**monitor** 77:18
89:3
**month** 8:14,19
8:22 11:15,22
13:20 59:1
120:24 134:8
134:12 153:13
153:20 160:15
**months** 15:4,5
15:9,15 54:10
81:3,11,11
111:10,11
120:21 128:11
128:14 130:10
133:16,20,21
133:24 134:4
134:11 160:10
163:22
**moot** 163:16
**morning** 4:7,9
95:23
**motivating**
110:15
**move** 6:3 23:18
137:1
**movement**
100:21
**mrhoades** 2:17
**mri** 62:7,9
147:12 163:18
**multiple** 50:3,5
63:13 140:17
150:13 154:17
163:11

**[murder - nurse]**

**murder** 10:15

**n**

**n** 3:1
**nah** 13:20 14:23 33:3 49:10 58:6 64:12 110:1 116:10 145:15 145:21
**name** 4:7,10 22:22 29:9 48:15 68:13 82:11 88:6 96:6,13 101:21 102:3,11,15 109:9 138:15 169:6 170:3,4 170:15 171:3,4 171:21
**named** 53:16 53:19 54:12 65:18
**names** 60:20,22
**narrow** 99:8
**nature** 5:8 33:11 38:23 63:6 65:8 100:12 141:2 147:10
**near** 71:21
**nearly** 25:17
**necessarily** 53:12 120:1

**necessary** 39:17,18
**need** 7:15 55:20 64:7 69:14 83:11,16 101:7
**needed** 27:11 30:20
**needs** 90:8,15 129:5 164:17
**negative** 38:15 47:19 48:19 94:17 144:23
**negligent** 163:2 165:2
**nelson** 2:21 3:9 138:14,15 165:13 167:17
**nerve** 61:6,21 61:22 62:2 64:4 67:7,14 67:16,19 163:18
**nerves** 67:8
**never** 17:5 36:22 44:9 86:22 91:10 99:7 104:3,6 105:10 113:16 113:17,19,20 113:23 114:2,8 121:10 132:5 132:10,11 165:9,9

**new** 28:16
**newspaper** 9:22
**nicholas** 101:22 102:4,12,20 106:19 107:11 110:5,17 111:1 111:13 118:3 121:4 122:19 123:13,15 127:20 131:11 135:3,19,22
**night** 17:16 140:24 151:14
**nine** 58:23 59:23
**nod** 6:16,16
**non** 41:8
**nope** 49:10
**normal** 88:5,10 88:18 91:3 110:19 116:3 116:23 125:15 130:15 131:15 131:17
**normally** 143:3
**northern** 12:2 12:22
**notary** 1:15 169:15,24 170:10,18 171:15,23 172:23

**note** 117:20 126:15 166:13 169:11
**noted** 125:11 127:11
**notes** 95:19,24 168:9
**notice** 26:4,6 45:16 115:21 116:2,12,16 142:9,11,16,19 143:16,17,18 143:24 145:22 158:6
**noticed** 26:9 27:3 127:23 128:8
**notifying** 32:1
**november** 49:14,16,20,22 50:1 74:22,23 75:2 76:5
**nrc** 12:13 13:3 13:4,6,9
**numb** 53:9
**number** 4:16 16:4 53:1 169:7,13
**numbers** 52:15 171:7
**numbness** 26:24 64:1
**nurse** 16:18,19 17:12 18:12,12

18:15,16,22
19:14,16,22,24
20:1,1,4,17
27:6,15,20,23
27:24 28:12,16
28:17,18,19,22
28:23 29:1,2,5
29:9 31:11,12
31:13,13,15,19
31:24 32:7,10
32:14,18 35:5
39:21 40:4,5,7
40:8,9,11,22,24
41:10,13,24
42:2,2,13 43:3
43:13 44:23,24
48:14 49:13,15
49:20,21 50:1
51:24,24 52:2
52:3,6 53:15
53:19 60:12
62:15 83:21
84:3 88:7
103:7,16,17
145:2 151:18
163:18
**nurse's** 48:15
**nurses** 16:20
51:20 77:3
83:21 84:4,7
109:19 151:18
151:18
**nursing** 87:19
102:23 114:17

163:2

**o**

**oath** 164:22
**obligation**
93:24 94:10
**observation**
47:13,20
**observe** 89:3
**obtain** 8:24
167:2
**obvious** 137:16
**occur** 10:17
**occurred** 64:4
120:23 121:20
134:1
**occurrence**
113:9
**occurring**
90:11
**october** 144:12
146:2,3,9
148:11
**odd** 34:19,21
**offer** 89:13,19
**office** 141:10
142:22,24
143:13 144:1
146:17 147:4
164:22
**officer** 17:17,20
23:19 138:23
139:1 142:15
142:18 144:8

145:14 146:20
146:21 147:7
147:20 162:20
**officer's** 148:3
**officers** 24:1
**official** 170:15
171:21
**officially** 15:1,2
15:20
**oh** 119:8
**ohio** 169:2
**okay** 4:23 13:4
17:4,7,10 19:2
34:3 36:23
38:22 39:1,6
42:22 43:17
44:6 45:10
46:3 50:24
62:21 71:23
74:22 78:18
79:3,22 80:19
85:11,16 87:13
91:7 92:21
94:20 95:11
96:11,21,21
97:1,4 98:24
99:16,24
100:10 101:2,4
101:14,21
102:11 103:15
105:17 109:11
115:8 118:17
122:8 128:1
129:3 134:9,19

136:3 138:19
139:4,4 144:10
150:15 154:15
155:4,11
157:14 166:18
166:23 167:9
167:10,11
**old** 61:4 98:10
104:24 118:22
119:9,13,19,20
120:20 121:2
130:11 132:17
133:7 159:4
**older** 30:3
139:20
**once** 13:18
17:10 18:6
19:21 20:18
24:22 26:7
53:11 77:17
94:18 161:16
**ones** 115:14,14
152:9 156:7
**onset** 57:8,14
58:13
**open** 80:11
**openings** 66:21
**operation** 81:7
**opinion** 39:9
94:14,16 95:14
144:24 145:1,3
147:12 163:17
163:20

**[opinions - pass]**

**opinions** 95:13 138:6

**opportunity** 166:6

**opposed** 73:20 78:22

**option** 65:10

**order** 37:23 63:8 64:8 83:7 101:8

**ordered** 73:12 73:14,16 110:7 112:1

**ordering** 167:12

**orders** 62:16

**original** 156:9

**ortho** 78:5

**orthopedic** 55:1 56:10 60:23 68:3,9 68:19 69:24 70:4,11 73:3 74:24 78:6 79:1,15,18,20 80:23 81:23 84:24 91:6 98:9 118:15 120:19 128:2,3 128:8,10,13 148:18 154:7 154:11 155:2 160:21 164:3

**orthopedist** 43:9

**outcome** 101:12 119:24

**outline** 152:24

**outrageous** 136:14,17

**outside** 20:6,7 20:12 21:13,20 21:24 23:6 60:8 82:1 84:16,23,23 89:6 92:6 94:14,15 109:13,18 111:9 121:21 123:13 130:9 137:22 145:1,2 159:3 160:4 163:17

**overall** 143:23

**oversees** 163:1

**overtime** 50:11 51:11 128:18 128:20,21

**own** 4:23 5:1,3 63:7 92:11 93:6 95:16 121:19 160:8 160:14 164:7

**p**

**pack** 28:3,11

**page** 56:15 57:22 125:24 169:13 171:7 172:3

**pages** 167:1

**pain** 26:9,17,20 26:24 28:2,3 28:10 30:14 31:8,9 35:10 35:13 37:12,17 37:21 38:12 42:11 45:5 47:14 50:4,6,7 51:11,15,17,17 51:19,20,21,22 51:23 52:1,5,8 52:11,16,19 53:7,10,11,12 53:14 54:2 61:6,7,14,23 63:24 64:1,6,7 64:8,14,17,19 65:8 74:13 75:19,22 94:24 115:4,9 126:13 131:13 144:19 147:12 151:4,6 153:9,11,14,14 153:16 158:17 158:20,22,23 159:8,15,17 160:12 161:3 163:5,7 164:5

**painful** 26:5

**pains** 64:1,2

**palm** 30:17,17

**pamela** 1:14 168:4

**paper** 17:1,3,9 17:11 151:13 155:24

**paraphrasing** 87:8

**part** 59:5 61:7 61:11,14 64:23 74:9 88:15 89:23 106:4,5 112:17,21 115:7 121:24 122:4,8 171:9

**particular** 16:24 21:19 30:7 33:15 63:18 65:4,6,7 76:14 78:17 109:2 110:11 111:18 142:12 143:14,21 144:4,14 147:21 148:10 153:9 156:7

**parties** 166:9

**party** 86:11

**pass** 14:13 83:19 95:21 151:10

**[passing - post]**

Page 27

passing 17:6
pay 166:21,24
pending 7:17
penny 9:20
people 5:20
  43:23 55:3
  62:11 68:6,7
  84:8,10,16,19
  84:20,21,23
  85:2,3
perfectly 21:10
perform 15:14
performed 79:5
period 13:16
  15:9,22,24
  24:13 25:6,9
  25:13 77:18
  120:24 130:8
  134:8 135:1
  136:21 153:13
  160:3,15
permanent
  164:9
persist 126:19
  127:14
person 30:3,3
  30:18 68:5
  69:5 70:8,11
  75:23 96:24
  104:17 110:21
  113:18,19,21
  113:24 114:10
  132:11 139:3,8
  139:9 162:24

personal 47:12
  47:20 89:7
  90:1,20 105:20
  117:5
personally
  114:20 132:3
  170:11 171:15
personnel
  18:18 20:7
  40:15 145:2
  151:8,9 152:10
pertaining
  150:13,24,24
  152:7 153:9
phillip 54:12
  55:1
phone 113:24
  169:3
photocopies
  156:5
photocopy
  155:21
phrase 131:3
physical 23:9
  73:22 74:1,9
  74:11,15,16
  79:11 97:24
physician
  41:21 54:11
  107:13,19,20
  107:24 108:4
  120:2,10,15
  160:5

physicians
  112:24 113:4
  129:22 137:18
  137:22,23
picked 55:4,6
  55:14,16 66:3
  66:4 69:22,24
  70:5 76:12
  77:21
picks 21:20,22
  21:23
piece 17:1,3,11
pierce 138:16
  138:21,22
  139:2 147:22
  147:23 155:5,7
  155:9,10
  162:16 163:10
  163:15 164:13
pills 28:3 45:5
  54:2 147:12
  158:18 161:13
pin 63:11
pinky 99:1,14
  99:20 116:14
place 21:4
  73:15
plainatiff 1:4
please 4:10 6:6
  6:24 167:13,16
  169:11
plus 52:15
pod 11:13

point 25:16
  53:18 65:4,6,7
  71:4,8 72:5,18
  95:10 99:21
  120:10,15
  121:10 132:18
  138:23 151:21
  159:10 163:15
policies 85:8
  110:10 121:17
  121:20 152:20
  160:1 165:6
pontiac 5:11
  12:15,17,19
  13:9,21,21,23
  13:24
portions
  163:11
position 37:17
  108:21
positions 165:6
possible 134:13
  134:18
possibly 15:6
  17:5 18:20,20
  20:1,17 28:6
  28:15,17,22
  42:15 51:9,9
  54:18 78:7
  121:21 130:4
  134:17,20
  140:1 151:20
post 81:1,7
  125:10

**[power - progress]**

**power**  83:12
**practice**  107:6
**practices**  85:8
    152:21
**practitioner**
    18:12,16 19:16
    19:24 20:4
    28:16,18,19,23
    29:2,5,10
    32:18 40:4,5,7
    40:11 41:1,10
    41:13 42:2,13
    43:3,13 44:24
    44:24 53:16,19
    88:8
**practitioners**
    39:21 40:10,22
    83:22
**pre**  89:2 130:23
    131:4,9
**prepared**  78:17
**prescribe**  62:12
    62:15,18 64:5
**prescribed**
    93:15 151:3
    153:10 158:16
    158:24 159:23
    161:10,12,16
    161:18,19
    162:8 163:12
**prescribing**
    42:11 75:18
**presence**
    169:15

**present**  43:21
    43:22,23 48:12
    58:8 119:1
**presenting**
    122:22
**preserved**
    125:16
**pressed**  156:14
**pretty**  19:3,6
    40:19 41:15,15
    42:18 52:7,7
    52:13,16,24,24
    53:2,2 54:10
    61:24 64:23,23
    93:8,8 107:9
    111:12 135:24
    141:21 150:23
    151:19 152:7
    152:18
**prevented**  91:5
    120:6,12,17
**print**  34:4
**prior**  9:11
    26:21 79:19
    90:4
**prison**  13:1,2,5
    20:7,12 41:8
    41:10 42:10,14
    43:4,11,13
    59:13,15 60:8
    65:11,14 70:19
    70:22 71:5
    73:23 79:12
    83:23 84:4,7

    84:14,19,20
    92:10 139:8
**prisons**  12:14
**pro**  2:3
**probably**  14:18
    15:4,21 18:22
    18:23 20:21
    26:15 29:13,24
    30:4 31:21
    37:4,9 38:15
    38:17 39:18
    40:4 41:21
    42:3,15,23,24
    43:5 45:2,8
    47:21,22 51:10
    52:8 53:3,5,5
    54:10,17,17,17
    57:5,16,18,19
    58:20,21,22
    63:10,12,18
    66:19 68:15,16
    68:23,23 91:9
    91:10,11 99:14
    99:18,23 100:8
    112:22,22
    118:5 119:9
    121:8,9 123:10
    123:10,11
    135:18 139:21
    147:12,15
    153:12 154:3
    154:10,10
    155:24 157:22
    157:24 159:15

    160:8,9 164:4
    164:5
**problem**  26:22
    53:13
**procedure**  1:14
    16:7,13 20:13
    20:14,24 21:6
    21:15 100:3
    101:7 140:5
    143:23 170:5
    171:5
**proceeding**
    4:19
**proceedings**
    21:3 55:23
    101:17 167:18
    168:6
**process**  20:8,10
    20:14 23:15,16
    27:8 138:9
    140:7
**processing**
    144:7
**producing**  90:4
**production**
    169:17,22
**professional**
    9:5,24
**program**  8:15
    8:20,22 9:1
    13:20 74:14
**progress**
    126:19 127:14

**[prolonged - ray]**

**prolonged** 94:5 158:23
**prolonging** 94:24
**prolongs** 95:2,5
**promptly** 159:6 159:14
**proof** 159:5
**properly** 6:19 91:8 121:5 126:21 162:20 164:1,2
**proposals** 93:19
**propose** 93:18
**protective** 61:9 61:19
**protocols** 85:8
**provide** 93:10 93:24 94:10 163:14
**provided** 88:14 89:8 164:19
**provider** 20:12 21:24 54:19,24 65:18,18 69:9 70:3,17 73:3 75:8,14,24 81:16 85:15 86:7,10 89:24 90:4,19 91:14 91:19 93:12 100:4 110:13

**provider's** 76:8
**providers** 21:13 40:18,20 83:22
**providing** 89:4
**psyche** 27:7
**psychiatrist** 161:10
**public** 1:15 170:10,18 171:15,23 172:23
**published** 86:8
**pulls** 18:1
**punishment** 25:15
**purple** 30:16 35:11 38:13 47:16 87:21 131:12,17 135:1,17
**purposes** 4:15
**pursuant** 1:13
**put** 17:10,13,15 17:16 25:12 27:12,13 30:24 42:8 47:21 54:5 57:19 58:23 63:11 72:2 76:2 77:6 83:5 85:4 88:7 124:4,11,15 140:13,16,19 140:23 141:3,6

141:8,13,14,16 141:19 145:10 145:15 147:8 151:13,15 165:7
**putting** 28:15 58:4

**q**

**qualifications** 41:16 42:6,9 42:20 46:13,16 46:19,24 47:4
**qualified** 1:15 38:18 39:5 41:3,18,22 43:6 47:22
**quarter** 14:14
**question** 6:7,9 6:23,24 7:2,4 7:17,18 35:22 59:2 89:21 94:7,8 96:16 96:21 101:3 114:19 118:7 129:6 134:9 135:15 136:4 143:9,10 165:14
**questionable** 115:23
**questions** 4:8 6:4,6 21:7 56:19 58:4,18

58:22 83:18 95:19,22 101:15 129:5 132:14 165:17 165:19 166:11
**quick** 100:24
**quincy** 2:22
**quite** 93:20 98:8

**r**

**r** 54:12
**radiographic** 104:24
**radiographs** 104:14 125:21
**radiologist** 96:18 104:20 138:2
**radiologists** 96:7,14 112:24 113:4 129:16 129:22
**radiology** 104:4,6,9 109:3,4,6,7,9
**ran** 77:3
**range** 10:12
**raoul** 2:20
**rate** 51:19,20 52:20,22
**ray** 30:20,22,24 31:2,6 32:17 32:19,21 33:1

33:5,6,6,8,12
33:16 34:1,11
34:17 35:24
36:11,17 37:2
37:4,7,23 38:4
38:8,10,19
39:3,8,13,16
43:19,22 44:3
44:7,14,22
45:2,6,9,12,15
45:18,23,24
46:3,20 47:1,6
47:16,18 48:5
48:9,12,13,18
49:1,5,7,12,18
50:18,19 51:1
51:2,5,7,16,16
52:10,12,17
60:11,15 61:2
61:3 62:7,10
64:14,17,19
68:11 87:15
88:2,3,5,9,17
88:18 91:1,2
92:2 94:16,17
97:23 98:6
102:16,19,21
103:8,12,14,22
104:1,17,21
105:6,8,9,10,14
105:14,19,24
106:6,15,17,19
106:22 107:8,9
107:22 108:14

108:18,22
109:2,16,21
110:6,6,8,16,17
110:20,22
111:1,4,7,10,10
111:13,15,18
111:21,22
112:12,17
114:11,13,17
114:20 115:12
115:22 116:1,4
116:8,11,13,13
116:17 117:2
117:11 118:1,4
122:14,18,19
123:12,13,16
123:18,19
127:2,3,22
128:3,24
129:10 130:7
130:10,14,15
130:18,21,24
131:11,21,22
131:23 132:2,4
132:6,8,10,11
132:13 135:3,5
135:8,18,19,21
135:23 136:20
136:22 145:1
163:17
**rayed** 33:20
**rays** 38:14
42:11 44:18
45:20 46:9

47:4 95:14
96:15 102:18
102:23 103:4
104:2,11,14
108:1,5,9
109:13,19
112:3,4,6,24
113:14 115:16
115:19 116:20
118:1 124:21
126:8,11 127:6
128:14 138:3
144:23
**reach** 161:2
**reached** 162:18
163:9,21
**read** 104:11
126:21 127:16
170:5,6,12
171:5,6,17
**reading** 90:3
169:10,19
**ready** 56:4 77:4
83:5
**real** 71:12
100:24
**realize** 25:24
**really** 14:23,24
21:1 36:2 37:8
38:9 40:2 44:9
55:10 60:13
63:16 74:12,12
75:18,19 79:2
81:15 83:16

92:19 97:11
100:18,22
102:7 103:1
115:6 143:9
**reason** 35:4,17
35:23 37:9
54:15 78:14
93:6 109:12,14
109:18,24
115:3 117:8,12
117:19 119:17
146:1,8 169:14
171:8 172:3
**rebreak** 63:10
101:8
**recall** 17:5 30:7
31:15 49:15,21
53:23 55:1
56:21 57:3,4
58:1,5 63:20
67:21 68:8,22
69:1,10 75:1
82:1,4,20
86:15,17 87:10
98:12 114:1,7
120:3 153:22
154:24 155:8
**receipt** 142:6
169:18
**receive** 18:22
141:24 146:5
156:18 157:21
160:16 161:22
166:19

**[received - request]** Page 31

**received** 97:8 98:9 103:22 111:24 142:8,9 142:10,11,16 143:17,19 145:22 146:2 146:12 157:19 162:1,2

**receiving** 144:20 145:4 151:3 153:11 162:3

**reception** 12:2 12:22

**recognize** 29:16 124:19

**recommend** 64:24 65:3,7 68:24

**recommended** 69:5,7,9 70:17

**recommending** 69:1

**record** 4:11 31:14 56:3,13 120:9 167:10 171:9

**recorded** 166:8

**records** 54:14 68:18 76:4 87:9,14,18,19 87:19 88:21 92:5,7 120:4 120:14 122:1,6

122:9,13 123:6 137:24

**recovery** 77:9

**refer** 20:17,19 144:7 157:10

**reference** 169:7 170:2 171:2

**referenced** 113:8 170:11 171:15

**referrals** 20:6

**referred** 19:20 20:21 157:13

**referring** 45:24 76:15 118:18 149:18 159:7 159:17

**reflect** 118:5

**reflected** 6:19 106:18

**refusal** 82:17 83:9

**refusing** 82:21 82:24 83:1

**regarding** 28:9 165:11

**regardless** 75:12

**regular** 17:9 41:7 43:10 151:13 155:24

**regulations** 19:7,10 21:2,3 21:17 22:2

**reinjure** 80:9

**reinjuring** 130:5

**related** 97:5,8 98:4

**released** 25:2 25:17

**relief** 93:19 147:11

**relieve** 64:8 75:19,21

**rely** 47:8

**remark** 129:17

**remarkable** 110:22,23 113:3,8,13 131:14

**remarked** 129:13

**remedy** 163:13

**remember** 22:11 23:3 43:21 56:23,23 60:20,22 62:20 68:11 75:5 81:22 99:16 100:10 102:19 112:16 144:15 145:9,19,22 148:7,9 150:20 153:20 158:3

**remind** 6:1

**removed** 81:10 81:12

**reinjure** 80:9

**reoccurring** 53:11 158:22

**repair** 91:13 121:9 149:9 159:12

**repairing** 160:13

**repeat** 7:1,3

**rephrase** 7:1,4 97:15

**replacing** 31:1

**report** 88:2 118:9 130:17 147:7,9 148:3

**reported** 168:5

**reporter** 6:12 6:22 166:8 167:4,12 170:7

**reports** 88:1

**represent** 96:7 96:14,19 138:16

**representing** 109:10

**request** 16:6,14 16:23 17:11 18:4 19:18 20:20,22 27:13 94:11 151:1,12 151:12 155:24 156:16,16 157:1,8,9 158:6 171:9,11

**[requested - right]**

**requested**
37:20 94:1,13
94:14,16,18
95:13,13
144:24 145:1
149:18 156:10
**requesting**
149:6,8,10,12
149:15 151:2
163:16
**requests** 18:8
92:23 152:9
154:18 155:8
157:4
**required**
120:18 169:24
**requirement**
7:16
**rescheduling**
46:2
**research** 42:19
**resend** 156:19
156:20
**resolved** 5:17
**resolving**
158:20
**respond** 142:1
142:2,11,13
143:6
**responded**
146:5,12
147:24 148:8
148:10,22

**responding**
148:22
**response** 6:19
142:4,19 143:2
143:2 144:3
**responses** 6:15
150:4
**responsibilities**
152:11,15,22
152:24 164:24
**responsible**
21:12,17 78:21
**restrictions**
24:18,18
**restroom**
100:20,22
**result** 64:4,4
67:10 100:9,13
158:23 159:22
161:4
**results** 32:24
33:1 34:1,10
44:4,6,14
48:18 109:20
110:18
**resume** 100:21
**retained** 138:2
**returned**
169:18
**returning**
136:3
**review** 34:1,1
36:17,21 39:8
45:19 46:5,20

46:24 47:6
88:8,9 95:19
98:7 106:19
107:10 109:2
110:8 111:2
115:16 116:4
123:1,18,19
128:23 137:18
137:23 141:24
145:17,24
146:14,16
147:14 151:19
166:3,5,7,17
167:8 169:11
170:1 171:1
**reviewed** 28:1
28:1 33:5,8
36:16,17 44:3
44:18 45:3,20
46:18 47:3,9
47:15,18 49:1
49:7 85:7,11
85:13 86:2,3,4
86:14 88:4,5
97:22 102:16
102:20 107:21
107:21 108:22
110:18 111:4
111:19,22
112:2,23 113:1
114:16 116:1
116:19 130:19
132:9,9,12
136:23 138:3

142:1 143:20
144:5,8 145:19
145:23 146:23
146:24 147:2,7
151:23 155:10
**reviewing** 20:1
20:17 46:9
167:6
**reviews** 18:3,3
18:8 87:16
88:17 91:2
92:3 102:16
110:16 111:7
116:11 136:20
151:16,21
152:3
**rhoades** 2:15
3:7 96:5,6,13
101:1,14
165:22 167:15
**right** 5:23
20:24 21:5,15
22:4,9,9 26:12
26:23 28:23
37:13 39:13
43:2 44:11,18
50:11 54:8,12
54:20 56:2,8
58:24 59:1,3,3
59:4,5,7,8,10
59:11,13,17,19
59:20 62:5
66:6,8,18
68:21 70:7

**[right - see]** Page 33

| | | | |
|---|---|---|---|
| 74:5,10 75:4,8 | 150:14,18 | 54:11,16,19 | 82:5 124:4,11 |
| 78:10,13 79:23 | 151:22 155:17 | 62:11 68:6,18 | **se** 2:3 |
| 80:14 82:2,7 | 165:24 166:23 | 70:3,8,11 | **seal** 170:15 |
| 83:10 84:22 | **ring** 68:13 | 81:16,16 103:7 | 171:21 |
| 86:7 88:22 | **room** 29:15 | 156:3 | **second** 38:4 |
| 91:12 92:20 | 33:12,12,15,22 | **saying** 7:8 | 39:8 43:19,22 |
| 95:17 96:1 | 44:2 77:9 | 34:18 61:24 | 44:7,14,22 |
| 97:9,18,20 | **root** 158:18 | 64:3 83:10,16 | 45:6,23 50:18 |
| 98:5,13,13,17 | **routine** 53:24 | 87:10 97:12,13 | 51:1,4,16 |
| 98:18,21,21 | **royster** 2:10 | 102:8 110:22 | 52:10,12 80:13 |
| 99:3,3,4,7 | **rpr** 1:14 168:4 | 124:3 127:18 | 80:16 81:17 |
| 100:18,24 | **rubbing** 61:12 | 128:6 130:19 | 94:14,16 95:13 |
| 104:4 105:21 | 61:18 | 133:1 142:7,11 | 95:13 100:17 |
| 106:3 111:3 | **rude** 6:18 | 142:16 143:17 | 102:19 125:24 |
| 113:5,18,21 | **rules** 1:13 6:1 | 158:21 | 144:24 145:1,2 |
| 114:9,15,24 | 19:6,10 21:2,2 | **says** 57:2,7 | 147:11 163:17 |
| 116:5,9,13,15 | 21:17 22:1 | 58:12 59:23 | 163:20 |
| 117:4,4,14,17 | 152:23 170:5 | 125:3,14,19 | **section** 152:23 |
| 118:2,7,11,15 | 171:5 | 127:9 | **security** 4:16 |
| 119:9 122:2,6 | **ruling** 147:2 | **scale** 52:8,22 | 23:22 |
| 122:10 124:2 | **running** 77:2 | **scan** 116:7 | **see** 7:24 8:1 |
| 124:15,22 | **runs** 162:24 | **scar** 80:5 | 16:18,18 18:11 |
| 125:3,7,8,12,21 | | **schedule** 37:3,7 | 18:14,15,17 |
| 126:5,9,11,13 | **s** | 39:3 81:19 | 19:14,18 20:22 |
| 126:16 128:11 | **s** 171:8,8 172:3 | **scheduled** | 27:15 28:17,20 |
| 128:15 129:7 | **save** 94:5 95:2 | 30:21 66:7 | 28:23 29:3,5 |
| 129:14 132:20 | 95:5 | 78:15 80:24 | 33:10 34:13 |
| 132:24 133:3 | **saved** 159:15 | 81:2,7 | 37:23 38:18 |
| 133:11,14,18 | 160:11 164:5 | **scheduling** | 39:4 40:5 |
| 133:22 134:2 | **saw** 27:24 | 21:13 78:22 | 43:11 45:11,14 |
| 136:24 137:5 | 29:10 31:12,12 | **school** 8:5,7,11 | 47:21 50:22 |
| 137:19,24 | 31:13 32:18 | 9:23 | 53:15,18 54:5 |
| 138:4,10 140:4 | 33:24 51:23 | **screen** 7:23 | 54:9,18,23 |
| 143:23 149:21 | 52:2,3,5 54:11 | 34:5 56:6,10 | 56:11 57:9 |

**[see - show]** Page 34

58:14 60:7 65:22 67:23 69:16 70:13 74:23 79:14,14 79:22 80:21 81:3,10 82:9 82:15,18 94:14 95:19 100:23 103:16,17 115:20 124:10 124:11,12 128:13 134:15 135:20 136:22 163:18,20

**seeing** 19:5,15 19:20 24:6,6 38:23 47:16 55:2 56:9 65:15 68:8,10 68:12 75:23

**seek** 162:13

**seeking** 50:6 147:11 154:1

**seem** 115:22

**seems** 90:2

**seen** 19:5,12,22 19:23 20:4,6 20:11,16 21:21 21:22,24 27:6 29:12 33:7 34:2 49:13,15 49:20,21,24 50:2 55:3,8,12 60:13,18,18

66:11,14,16 67:1 68:9,16 70:9 76:9 80:20 81:13 86:22 87:19 91:16,20,24 92:17 115:12 115:14 120:21 121:21 127:10 160:2,4 164:3

**seg** 25:1,2,3,5 25:16,17 26:3

**segregation** 24:17,20 25:8 25:12,18

**self** 22:16 144:19

**send** 39:12 45:2 45:18 48:1 49:6 142:6,14 142:16,22,23 143:11,13 153:2,5 154:8 154:19 155:4 157:1,9

**sending** 36:15 39:4 40:5 42:12 152:6 155:8

**sense** 5:7 35:15 106:24,24 107:1,3,6,7

**sent** 38:16 60:7 66:4 98:6

102:17 114:17 115:15 121:7 121:15 141:9 144:4 153:7,18 153:20,22,23 154:12,16 155:3,11,12,19 156:6 157:21 157:23,23,24 158:1,6 159:13 163:23

**sentinel** 9:20,22

**separate** 13:2 23:18,19 25:22 129:16,22

**separated** 23:21

**september** 48:9 49:12,18,19 51:3,7 52:18 57:14 60:3 67:24,24 68:19 69:23 70:4,16 70:21 82:14 105:16 126:1 127:6,7

**serious** 164:2 164:17

**services** 82:17 82:21 83:9

**set** 17:19,19 21:20 24:11 42:6,21

**sets** 40:20 42:4

**seven** 15:13 53:4,6

**several** 9:15,15 72:13 128:10 128:14 164:23

**severe** 26:20 52:16,19 110:24 131:12 162:21 164:13

**severity** 30:22

**shake** 6:16,17

**share** 56:6

**sharp** 64:1

**shaved** 76:24

**sheet** 151:13 166:13 169:12 169:14,15 171:7,10,18 172:1

**sheets** 155:24

**shift** 15:11

**short** 55:22 101:16

**shorthand** 168:6,9

**shortly** 75:5 101:11 132:15 157:20,21 158:6

**shoulders** 130:21

**show** 7:23 56:7 57:21 68:18

74:22 76:4,16
82:5 106:2,20
120:10,15
**showed** 27:9,10
30:12,13,15
33:7 34:19
35:24 49:9,19
105:20 106:7
107:10 111:15
111:16 116:11
123:16 128:4
**showing** 44:23
82:7 130:23
**shown** 33:11
38:14 118:5
129:1 135:18
169:16
**shows** 125:6
130:23 131:3
**sick** 16:23,23
17:6 18:8,22
19:8,12,19,22
20:2,16 27:6
27:12,13,15
28:15 31:5,11
40:5 49:13,16
49:20,22 50:1
50:5,9 51:24
53:24 54:18
87:19,22
103:18 151:7
151:12,16
152:3,6 154:17
157:21 158:3,5

**side** 13:4,5
98:17,21 99:3
116:13,15,15
117:4
**sign** 44:15,23
83:9,15 169:14
**signature** 56:16
57:23 82:12
126:4 168:13
**signed** 88:6,16
90:3 130:19
170:13 171:18
**signing** 82:20
169:10,19
**signs** 33:10
34:14,19
**simple** 36:5
**simply** 89:3
93:24 94:11
**sincerely**
169:20
**single** 46:1
**sir** 40:1 75:3
76:22 82:6,7
117:24 169:8
**situation** 90:22
145:5 146:13
163:11,13
**six** 15:4,5,9,15
53:4 81:1,2,8,8
81:9,13,18
111:10,11
120:21,24
130:10 133:21

133:24 134:4,8
134:11 150:15
160:10,15
**skill** 40:20 42:4
42:6,21
**sleep** 77:6
**sleeping** 161:13
**slight** 50:21
**slip** 16:23 72:3
72:3 152:6
**slips** 151:7,16
152:4
**smacked** 99:12
**social** 4:16
**soft** 71:10 73:7
73:10,16,19
125:17 126:18
127:12,21,23
129:13,17,24
130:3 150:6
**solutions** 169:1
172:1
**somebody**
36:17 49:3
59:19 60:12
68:16 69:1
152:10
**someplace** 5:14
13:17
**somewhat** 13:3
16:9 29:22
51:12,12,14
53:9 132:23

**sooner** 55:9,12
66:12,15,17
67:2 70:9,13
76:9 78:2,3
79:5 80:20,22
119:23,24
160:10 164:4
**sorry** 31:10
35:19 48:9
55:8 96:9,12
117:22 138:11
143:9 147:19
**sort** 13:5 44:1
77:5 85:4
97:24 99:12
**sound** 54:20
79:23 80:14
**sounds** 20:23
**sources** 1:6
85:14 169:6
170:3 171:3
**southern** 1:1
5:13 56:10
168:1
**spaces** 125:16
126:16
**specialist** 38:16
39:4 41:3,6,8
43:5,8 47:22
48:1 60:7,10
60:16,24 65:15
65:22,23 67:24
68:4,9 74:24
79:18,20 80:24

**[specialist - stuff]**

81:23 84:24 91:6 118:15 120:19 121:8 121:15,22 128:3,8,10,14 130:10 148:19 153:8,12 154:7 154:12 155:2 159:8 160:4,21 164:4

**specialist's** 128:3

**specialize** 41:23

**specific** 26:11 26:13 36:24 41:19 42:16 43:1,2,14 47:2 47:3 83:18 119:5 136:13 136:16 140:21 140:23 146:4,8 147:1 153:1

**specifically** 11:15 16:11 18:19 19:16,16 23:13 44:16 46:19 47:5 48:24 56:15 60:14 73:9 87:13,24 88:21 94:2 110:12 119:10 162:8 162:15

**specifics** 108:20

**spell** 9:21

**splint** 149:13 149:13,22

**splinting** 64:9

**spoken** 49:8 84:8 96:17,23 97:1 113:23

**stabbing** 64:2

**stable** 88:6,10 88:18 91:3 110:19 130:16 130:20 131:16 131:17

**staff** 32:1 79:1 79:1 84:14 89:2,8,11,17 90:7,9,14,16 91:17,21 92:8 92:10,13 93:10 93:17,23 94:9 94:15 102:17 114:18 144:21 148:6 151:17 152:8 153:1

**stage** 101:6

**stamp** 56:14

**standard** 113:3

**start** 6:7,9 14:16 16:16 17:8 52:4 138:18,21 160:19,22

161:15

**started** 8:2 14:20 26:8

**state** 1:16 4:10 5:18 107:11 120:5 152:20 165:4,11 168:4 170:10 171:15

**stated** 88:5,9 94:12 110:12 118:4 119:18 119:20 121:6 127:21

**statement** 170:13,14 171:19,19

**states** 1:1 110:11 160:2 164:21 168:1

**stateville** 11:24 12:4,6,9,13,15 12:22 13:1,2,5 13:9,10,22,23

**stating** 88:17 106:19 110:16 110:18 111:3 120:16

**status** 5:16 125:10

**stillman** 2:5,7 3:8 101:20,22 102:3,12 124:13,17 138:10 165:23

167:14

**stitches** 79:21 80:2,4 81:10 81:12

**stocking** 71:14

**stop** 165:13,15

**stopped** 15:18 16:1

**straps** 72:11,13 72:16,17

**street** 2:6,11,16 2:21

**strength** 164:10

**strike** 19:14 28:7 40:22 41:11 105:4 107:19 109:5 113:16 117:9

**structure** 116:12,17,23 116:24 117:4 128:9

**stuck** 156:13

**studies** 106:23 111:23 112:2 113:4

**study** 67:7 104:21 114:13 126:19 127:11 127:14 128:6

**stuff** 14:13 56:24 57:5,5 58:3 64:2,11

**[stuff - swelling]** Page 37

64:13 67:7
75:22 77:2
116:12 139:9
147:12 151:6
164:11
**subjected**
159:22 161:5
162:12
**submit** 145:13
151:9
**submitted** 18:9
126:16 140:13
144:11 145:10
151:8
**subscribed**
170:10 171:14
172:21
**subsequently**
53:15 65:17
**suffered** 22:4,8
99:10
**suffering** 47:14
151:4 158:22
158:23 159:9
159:15,18
160:12 161:3
163:6 164:5
**suite** 169:2
**superior** 169:1
**support** 71:13
71:17 72:12,15
72:16 73:13
89:24 90:17
94:7 150:7

**supposed** 78:9
78:11,13 81:18
160:4
**sure** 5:5 6:18
10:11 11:23
12:5 13:8,15
16:3 18:10
19:6 22:24
25:11 27:23
29:13,14 31:6
32:13 34:7,7
35:19 36:2,8
37:9,16 38:9
40:3,19 41:15
41:15 42:17,17
42:18 43:16
44:9 48:15
49:2 52:7
54:10,13 55:10
55:13,18,18
62:4,5,9,9,14
65:21 68:8,11
68:23 70:7,15
73:18,21 74:3
75:4,6 76:10
77:23,23 78:4
78:8,24,24
79:2,7 80:23
81:15,20 85:6
85:6 86:3 87:6
88:22,22 89:16
92:19 93:20
97:7 101:13,13
104:10 105:7

107:9 108:2,6
111:12 112:10
112:15,15
113:11 115:11
115:21 128:22
131:10 135:24
138:24 139:17
139:20,22
140:3,3 141:21
145:21 146:4,7
148:2,2 149:20
150:17,19
151:19 152:7
152:18 154:13
161:9 166:7
**surgeon** 78:1,2
79:5
**surgeries** 63:13
**surgery** 63:2,4
63:8,9,19 64:7
64:24 65:3,5
69:14,18,20
74:7,9 75:6,13
75:15,21 76:1
76:3,17,20,21
77:4,11,19,21
77:24 78:10,11
78:12,13,13,16
78:17,20 79:3
79:4,8 80:7,13
80:16 81:1,9
91:10,12 100:5
101:10 119:24
121:9 149:4,7

149:9,11,15,16
149:19 150:13
151:2 158:15
159:12 160:13
164:6
**surgical** 78:23
**surrounding**
162:5,10,11
**suspicion** 89:11
89:18
**sustain** 99:17
**sustained** 99:14
99:20 103:9,13
103:13 111:11
111:14 120:22
121:1 144:18
150:12 158:14
159:13
**sustaining**
130:8 160:11
**swelling** 26:9
26:10 27:10
28:5 30:15
35:11 38:12
45:6,11 47:16
50:10,11,16,17
50:21 51:4,8
87:20 110:24
127:12,23
131:12,16,19
135:20,23
136:22 137:2
144:20

swole   26:5
swollen   26:16
   26:16 30:23
   34:20 35:2
   135:1
sworn   4:2
   170:10,13
   171:14,18
   172:21
symptoms
   35:21 38:20
   57:8,13 58:12
   63:24 126:19
   127:13 131:12
   131:13 147:9
syndrome
   61:22 62:2
   68:21 100:7
systems   8:17
   10:1

t

t   54:12
take   7:15,16
   21:4 55:20
   83:8,14,17
   111:9 114:20
   128:23 131:22
   132:3
taken   1:16
   104:13 168:9
talk   16:10,10
   16:21 22:3,7
   28:4 45:17,19

63:2 75:14
140:4 141:18
144:11 151:7
158:7
talked   28:11
   36:11 60:11,15
   75:7 85:5
   100:2 101:5
   147:15 150:15
   166:9
talking   6:10,13
   41:5,6 43:7,8
   43:10 61:1
   68:12 69:4
   74:8 84:7 85:1
   85:2 92:4,5
   98:15 155:16
   159:18,19,21
tall   29:23,24
taylor   1:14
   168:4
tell   30:10 31:18
   36:13 37:1,6
   40:9 44:13
   45:1 47:17
   49:4 60:6,9
   61:2 67:10,12
   67:17,19 69:8
   69:10 72:8
   75:12,12 76:19
   95:17 100:5
   101:10 119:8
   119:22 120:2
   126:23 137:11

137:13 158:9
166:2,4
telling   31:15
   38:11 39:22
   46:4 47:14
   67:15 83:6
   91:1 92:16
   94:9 100:10
tells   36:12
ten   51:21,21
   52:1,9,15,22
   53:6
term   111:1,2,6
   113:2,8,14
terms   86:6 97:7
   99:9,9
test   67:9
testified   4:2,19
testimony
   33:18,24 131:2
   137:13 143:5
   143:10 170:6,7
   171:6,9,12
testing   65:19
   65:23 66:12,15
tests   67:10 77:1
   77:2,3
thank   14:3
   95:23 96:2
   165:19
thenar   127:13
therapist   74:16
therapy   73:22
   74:2,9,11,15

79:11
thing   37:13
   59:22 94:6
   110:2 131:10
   135:14,23
things   6:3 7:23
   27:1 41:17
   42:5 74:8 80:8
   86:9 89:9
   94:18,18 95:9
   115:22 116:3
   144:9 147:8,10
   154:1 162:12
think   15:20
   25:1 26:5 28:2
   28:14 29:20
   36:12 37:13
   38:7 40:2,3,3,6
   41:20,21 42:13
   43:2,15 45:21
   50:8 54:19
   58:20,21 60:12
   60:12 68:2
   73:8 76:23,23
   85:17 86:20
   88:20 93:4
   100:8,8,11,11
   100:13,14
   109:5 110:2
   111:5,7 113:13
   117:1 129:18
   134:13 135:9
   135:18 138:10
   146:20 147:13

**[think - transcript]**

148:3 149:6,8 149:24 150:5 153:22 154:5 154:10 155:14 155:18 157:20 165:24

**thinking** 36:7 44:17 48:24

**third** 48:5,9 49:5,7,9,12,18 51:2,5,7 52:17 127:3

**thirty** 169:18

**thought** 34:21 35:5,9 40:7 49:9

**three** 87:23 125:6 126:15 130:7 134:15 134:23,24 144:23 148:21 149:1 155:16 155:19,19 157:4 160:3

**throwing** 111:6

**ticket** 24:10,11 24:13,14,16,21 24:24 25:1,14 25:19

**tiffany** 65:18 65:23

**tightness** 72:13 72:16

**till** 161:11

**time** 10:18 12:5 13:16 15:1,9 23:2 24:23 26:7 29:20 30:19,21 36:7 37:20 39:18,24 40:2,7,7 42:17 45:6 46:10,10 46:11 48:4 49:12 50:18,23 63:7 68:10 71:4,9 76:8 77:18 78:10,19 80:11,13 83:2 83:2 86:17,20 86:24 87:5 95:20,21,23 97:12 100:21 101:10 102:23 106:14 108:21 108:22 109:2 111:18 115:6 119:2 120:13 120:20 121:3 121:12 122:7 131:11 133:24 138:24 139:1,6 150:11,11,12 154:11 161:23

**timeframe** 155:1,3,20

**timely** 91:6 94:21 163:4

**times** 112:6 142:23 143:12 160:3

**timing** 119:5

**tingling** 26:24

**tips** 6:3

**tissue** 127:12 127:23 130:3

**tissues** 125:17 126:18 127:21 129:14,17,24

**titles** 60:14

**today** 6:2 12:11 22:3,7 29:16 161:11,14 166:9

**todd** 2:21 138:15

**together** 33:8 33:19 34:1 71:23

**told** 27:8,9,10 27:11 28:22 30:12,12 31:3 31:19,20 32:7 32:10,13 33:1 33:3,4 34:9 39:11,11,12 44:3,6,10,20 45:4,10 48:18 50:10 63:21 73:9 75:16 80:4 81:5,6 93:23 98:10

99:2 101:6 106:12 107:13 108:4,6,8,11,12 113:12 133:2 164:3 165:10

**took** 33:9 39:3 44:2 60:15 61:2 64:14,17 76:23 79:20 80:4 106:15 122:15 127:22 130:10 131:11 131:20 132:2,5 132:8,10 135:3 135:19,22 138:11 156:9 163:22 164:2 164:22,22

**top** 55:18 70:7 75:5 88:23 130:13,13

**tours** 139:9

**toward** 116:15

**towards** 31:22 98:13,19

**trained** 104:11

**training** 10:4,6 42:3 104:4,7 106:22

**transcribed** 170:7

**transcript** 6:20 7:12,14 166:3 166:7,13,22

**[transcript - unremarkable]**

167:6 168:8 169:9,11 170:5 170:12 171:5 171:11,17

**transcription** 168:8

**transfer** 83:5 83:15

**transferred** 83:6

**transpire** 6:2

**trays** 14:13

**treat** 43:9 80:8

**treating** 137:23

**treatment** 31:23 32:6 62:12,15,17 69:13,15,20 75:17 83:11 89:4,7,13,20 93:11,14,18,24 94:10 97:17,20 110:12 120:18 144:20 145:4 148:13 150:14 151:1,1,2 152:7 158:17 159:1,23 162:2 162:4,10,21 163:4,12 164:20 165:12

**treatments** 70:18

**trial** 15:22

**tried** 100:19

**true** 32:8,11,15 91:3 118:11 123:5,8,11 168:8

**truly** 122:24

**try** 7:8 37:21 56:6 69:13,16 69:19 70:18 80:8 87:4 93:21 96:11 97:14 163:18

**trying** 6:18 21:8 27:5 32:6 69:20 74:8 83:4 86:24 143:22 153:13 153:16 163:19

**tryout** 15:24

**tunnel** 61:22 62:2 64:7 67:13 68:21 100:3,6,9,12 149:11,15,19 162:14

**turn** 72:21 165:17,18

**turned** 164:16

**two** 10:17 12:13 40:15,17 43:23 47:3 51:3 60:12,17 60:18,21 71:7

86:9 104:2 127:24 129:16 129:22 130:2 153:23,23,24 154:13,16 155:11 163:16

**type** 9:17 46:15 46:16 50:6 51:17,17 61:22 62:24 67:6,6,7 67:14,16 73:2 74:17 141:6 142:18 148:5 151:18 152:8 163:5,6 164:11

**types** 40:17 46:14 113:9 152:9

**u**

**um** 7:9,9

**un** 7:8,8,8,9,9

**unconstitutio...** 110:10

**under** 58:7 106:15 125:14

**undergo** 101:7

**understand** 6:22,24 7:2,11 25:11 28:12 35:19,20 39:19 39:20 41:5 46:17 85:22 100:16 108:20

132:2 136:24 143:4,22 148:20

**understanding** 28:8 34:23 36:10 40:10,12 82:23 97:22 114:16

**understood** 7:5 39:6 94:22 105:17

**uninjured** 116:23

**unit** 18:20,21 20:19,20 22:20 33:13,16 139:24 140:1 147:14 148:1,5 148:7 151:19 151:20 152:3,8 152:12,15,17 162:19 163:1

**united** 1:1 164:21 168:1

**unnecessary** 158:23 159:8 163:5

**unremarkable** 111:4,7,16 113:3 125:17 125:20 126:18 127:21 129:14 129:18,24 130:20 131:3,8

131:14,18
**unusual** 116:16
**uphold** 165:1
**use** 41:7 80:4
  100:18,20,22
  101:15 104:20
  131:2
**used** 111:1,2
  113:3,14
  118:21 130:20
  131:8

**v**

**v** 1:5 169:6
  170:3 171:3
**vandalia** 2:11
**various** 56:19
  57:2
**vaseline** 80:3,5
**velcro** 71:23,24
  72:1,17
**veracity** 118:10
**verbal** 6:15
**verify** 92:23
**veritext** 169:1,7
  172:1
**veritext.com.**
  169:17
**versus** 39:3
  40:11 76:12
  152:10
**viewed** 46:11
**views** 110:17
  125:6 126:15

**visible** 38:13
  108:5 135:5,8
**visit** 53:24 55:6
  55:17 63:21
  64:12 65:21
  68:6 69:8,8,11
  70:17,22 73:10
  76:4 78:6,12
  78:12,14,22,23
  79:18,19,19
  81:6 103:20
  120:21,23
  148:18
**visits** 74:1 82:1
  84:23
**voice** 6:21
  96:11 97:15

**w**

**w** 2:6,11,16
**waive** 166:15
  167:5
**waived** 169:11
  169:19
**waiving** 167:6
  167:7
**walk** 16:20
  27:6 76:20
**walked** 29:15
  151:10
**walking** 17:6
**want** 6:10,18
  7:1,18 16:17
  44:8 57:20

84:2 94:6
  95:20 156:12
  166:14,15
  167:5,5
**wanted** 69:16
  73:3 75:20
  105:12 140:6
**wanting** 16:6
**ward** 65:19,23
  66:12,15 67:4
**ward's** 66:20
  66:23
**warden** 20:21
  139:6 140:10
  140:21 141:9
  141:22,24
  142:7,16,21
  143:6,11,12,16
  144:5 145:17
  156:17 157:2
  158:1 162:18
  162:23 163:9
  165:10
**warden's** 141:7
  141:8,10,19
  142:21 144:1
  145:11,15
**warehouse**
  9:20
**warranted**
  25:15
**warren** 109:6
**waste** 95:20

**way** 6:21 83:12
  114:6 122:10
  122:12 143:6
  148:21 156:21
  158:14
**wear** 53:11
  68:24 69:1,5,9
**wearing** 150:6
**week** 15:12,13
  37:5,7 81:1,18
  127:1
**weeks** 51:3
  81:2,8,9,9,13
  130:2 134:15
**weight** 93:19
**went** 12:8
  13:17,21,22,23
  45:6 50:19,20
  50:20 68:3
  70:18,21 71:20
  71:20 73:10
  74:23 75:13,14
  75:16 76:14
  77:14,14,14
  78:4,5,10,19
  79:17 81:5,21
  102:22,23
  103:3 128:2,13
  130:9 132:16
  146:19
**west** 22:19 23:1
**wet** 80:7
**wexford** 1:6
  2:13 83:24

**[wexford - x]**

84:9,10 85:2,3 85:5,7,14,14,21 85:22 86:2,4,5 86:7,11,14,23 87:3 89:1,6,10 89:17,24 90:4 90:6,13,19 91:17,21 92:7 92:9,15 93:10 93:12,16,23 94:3,4,12 95:1 95:4,6,9 110:7 110:9,13 121:17 152:20 169:6 170:3 171:3

**wexford's** 110:9

**whatsoever** 51:21

**white** 29:20 71:11 73:10,16 73:19

**wills** 138:16 139:5,7,13 154:20,22 155:13 157:18 162:16 164:13

**wisconsin** 8:4

**wish** 166:7

**witness** 1:12 3:3 95:22 96:1 100:17 166:16 166:19,23

167:8,11 170:1 170:4,11 171:1 171:4,15

**woke** 77:8,8

**wondering** 143:5

**word** 41:7 110:21,22

**words** 7:13 23:10 144:17

**work** 9:9,12 14:23 15:2 140:7

**worked** 9:15 14:21 109:1

**worker** 14:11 14:12,17,21,22 15:3,7,19

**working** 14:16 14:20 15:7,10 15:12,18 41:8

**works** 8:1 19:17 20:15

**worsened** 159:9

**worsening** 94:23

**wound** 80:11 80:11

**wrapped** 72:14

**wrist** 71:10,12 71:17,19,21 72:3,12,14,15 72:16 73:7,10

73:11,13,13 98:16,22 99:1 116:14 150:7

**wristband** 71:15,16,17 72:4

**write** 17:1,3 57:6,12 58:11 58:16 151:12 156:15 157:8

**writing** 154:24 155:23

**written** 91:16 91:21,24 92:6 92:17 114:2,4 120:4,9,14 163:10

**wrong** 38:7 57:19 59:1,22

**wrote** 31:13 57:5 59:10,19 60:2 153:15 156:16 157:9,9 157:11

---

**x**

**x** 3:1 30:20,22 30:24 31:2,6 32:17,19,21 33:1,5,6,6,8,12 33:16,20 34:1 34:11,17 35:24 36:11,17 37:2 37:4,7,23 38:4

38:8,10,14,19 39:3,8,13,16 42:11 43:19,22 44:3,7,14,18,22 45:2,6,9,12,15 45:18,20,23,24 46:3,9,20 47:1 47:4,6,16,18 48:5,9,12,13,18 49:1,5,7,12,18 50:18,19 51:1 51:2,5,7,16,16 52:10,12,17 60:11,15 61:2 61:3 62:7,10 64:14,17,19 68:11 87:15 88:2,3,5,9,17 88:18 91:1,2 92:2 94:16,17 95:14 96:15 97:23 98:6 102:16,18,19 102:21,23 103:4,8,12,14 103:22 104:1,2 104:11,14,17 104:21 105:6,8 105:9,10,14,14 105:19,24 106:6,15,17,19 106:22 107:8,9 107:22 108:1,5 108:9,14,18,22

**[x - zoom]**

Page 43

109:2,13,16,19
109:21 110:6,6
110:8,16,17,20
110:22 111:1,4
111:7,10,10,13
111:15,18,21
111:22 112:3,4
112:6,12,17,24
113:14 114:11
114:13,17,20
115:12,16,19
115:22 116:1,4
116:8,11,13,13
116:17,20
117:2,11 118:1
118:1,4 122:14
122:18,19
123:12,13,16
123:18,19
124:21 126:8
126:11 127:2,3
127:6,22 128:3
128:14,24
129:10 130:7
130:10,14,15
130:18,21,24
131:11,21,22
131:23 132:2,4
132:6,8,10,11
132:13 135:3,5
135:8,18,19,21
135:23 136:20
136:22 138:3
144:23 145:1

163:17

**y**

**y'all**   100:19
**yeah**   14:5 19:1
  21:1,14,23
  24:22 30:6
  31:5,9 32:20
  32:23 34:2,15
  36:8 39:17
  41:15 44:5
  45:16 53:22
  56:18 62:18
  68:2,15 71:6,6
  76:2,18 77:13
  79:24 80:18
  97:22 100:11
  101:24 102:2
  102:10 103:17
  106:24 117:7
  124:12 129:3
  135:16,17
  141:8 143:1,18
  146:4 147:6
  148:14 149:3
  154:17 155:15
  155:18 156:7
  166:16
**year**   8:14 10:20
  10:21,23 11:14
  11:15 12:20
  13:23 58:24
**years**   5:6 99:18
  99:19

**yep**   46:7
**younger**   30:3
**yousef**   113:20
**yousuf**   2:18
  96:7,14,17,20
  97:7,17 113:18
  113:19 123:24
  127:2,3 129:11
  129:12
**yousuf's**   122:18
  123:11,19
  124:6 126:4,7
  126:10 127:22

**z**

**zachary**   2:5
  101:21 102:3
  102:11
**zero**   51:21 52:1
  52:22
**zoom**   1:17

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.